STATE OF FLORIDA

CASE NOS. 6:08-bk-4327-KSJ

                                           6:08-bk-

4328-KSJ

                                           6:08-bk-

4681-KSJ
COUNTY OF ORANGE

### AFFIDAVIT

I, Jodi Jaiman, being duly sworn state the following:

1.    I was the President of the following companies for the following time periods:

| Company | Time Period |
| --- | --- |
| Mirabilis Ventures, Inc. | March 14, 2007 to May 23, 2008 |
| AEM, Inc. | April 23, 2008 to May 23, 2008 |
| Nexia Strategy Corporation | October 11, 2007 to May 23, 2008 |
| Tenshi Leasing, Inc. | August 24, 2005 to May 23, 2008 |
| Titanium Technologies, Inc. | February 26, 2007 to April 13, 2007 |

2.    I know the information contained in the following paragraphs through conversations with Frank L. Amodeo (Amodeo); Shane Williams (Williams); Jay Stollenwerk (Stollenwerk); Scott Shuker, Esq. (Shuker) and Elizabeth Green, Esq. (Green), who are partners with the law firm of Lantham, Shuker, et al.; and/or Aaron Bates, Esq. (Bates) and Matthew Mokwa, Esq. (Mokwa).  Bates and Mokwa were previously in-house counsel at Mirabilis Ventures, Inc. (Mirabilis) and are partners in the firm of Bates and Mokwa.  Once they formed their firm, almost all of Bates and Mokwa's work consisted of representing Mirabilis at the behest of Amodeo.

3.    Although affidavits and documents may have stated otherwise, as



GOVERNMENT EXHIBIT

A

a result of my observations and interaction with Amodeo and others, Amodeo
was the person who controlled the above-referenced companies, as well as Hoth
Holdings, Inc. and others.

4.      I was instructed by Amodeo to hire Green to handle bankruptcy
matters relating to, among other entities, Mirabilis entities.  Upon my resignation,
Cuthill hired Green to handle Mirabilis, AEM, Inc., and Hoth Holdings, Inc.
bankruptcy filings.

5.      One of my responsibilities was to gather documents so that
Amodeo and his defense attorneys could provide documents to the United
States pursuant to grand jury subpoenas which were executed in late 2006.

6.      Another one of my responsibilities as president of the above-
referenced companies was to liquidate assets of the companies so that the funds
could be paid to the Internal Revenue Service (IRS) to pay back the IRS for
payroll tax monies (trust fund taxes) for which Amodeo, other individuals, AEM,
and Professional Benefits Solutions were responsible but which were not
remitted to the IRS.  Amodeo knew that he was the target of a federal grand jury
investigation and he thought that if he paid the trust fund taxes to the IRS, a
sentencing judge would be lenient with him.

7.      I was further responsible for paying as many creditors as possible.
It was my understanding that almost all of the creditors had been paid prior to
the institution of the bankruptcy proceedings.  Other than creditors who had
claims which were disputed by Amodeo, I know of no creditors who were not
paid as of the time the bankruptcies were filed, other than Amodeo who asserted
that he was a secured creditor.

8.    At the time that the bankruptcy petitions were filed, lawsuits which Mirabilis had instituted against other companies and individuals comprised almost all of the assets of the companies.

9.    When seizure warrants were served on law firms which handled legal matters for the above-referenced companies, there was a concern by Amodeo about how to save the litigation cases to make sure the IRS received the funds referenced above for his benefit in the potential criminal case.

10.    It is my understanding through Bates and Amodeo that Green proposed the bankruptcy proceedings to Bates.  Green believed that filing bankruptcy was the best way to save the litigation.  Bates spoke with Amodeo, and Amodeo then advised me to speak with Bates concerning the bankruptcy. Bates advised me that Green suggested placing Mirabilis into bankruptcy to save the litigation.

11.    I was present at a meeting with Bates, Mokwa, Williams, Stollenwerk, Green and Shuker at Green and Shuker's office in which Shuker and Green discussed how to handle the bankruptcy.  They talked about their experience in what they referred to as the "Church Street case."  Williams, Stollenwerk and I would resign as officers and directors where appropriate. Williams and Stollenwerk were to appoint Michael E. Moecker (Moecker) as a member of the board of directors.  Moecker would then appoint R. W. (Bill) Cuthill, Jr. (Cuthill) as president of Mirabilis.  They wanted to talk with the office of the United States Trustee, as they believed that they had found a loophole arising from the Church Street and Lexington hotel bankruptices which would allow them to proceed without a trustee.  Approximately one month later, Green

was concerned that the United States would seize attorney fees, but they decided that they could use the money received from the settlement of two cases with RKT Constructors, Inc. to fund the bankruptcies.

12.    I have spoken with Green about paying back the trust funds to the IRS for Amodeo's benefit in the grand jury investigation.  It was clear that any funds recovered were to go to the IRS, no matter the source of the funds, for Amodeo's benefit in the grand jury investigation.

13.    To my knowledge, at the time the bankruptcies were filed, there were no remaining employees of Mirabilis, AEM, or Hoth Holdings.  Hoth Holding contained only one asset, i.e., a piece of property in Virginia.

Further your Affiant sayeth not.

_Jodi Jaiman_
Jodi Jaiman

Sworn to and subscribed
before me this _16th_ day
of September, 2008

_Barbara R. Harris_

Notary Public State of Florida
Barbara R Harris
My Commission DD688427
Expires 07/07/2011