*Filed*

RECEIVED

AUG - 5 2009

CLERK, U.S. BANKRUPTCY
ORLANDO, FL

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA

In re                                                          Case No 6:08-BE-04327-KSJ

   Mirabilis Ventures, Inc.

_____/

### Statement of Facts
### and
### Comments on Disclosure Statement

Comes Now Frank L. Amodeo and files this Amodeo's comments on the disclosure statement and statement of facts.

The attached Statement of Facts is a true and accurate recollection of Frank L. Amodeo.

Respectfully Submitted

Frank L. Amodeo
2875 S. Orange Ave.
Ste. 500 PMB1810
Orlando, FL. 32806

*Title*

RECEIVED
AUG - 5 2009
CLERK, U.S. BANKRUPTCY
ORLANDO, FL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT
OF FLORIDA

Frank L. Amodeo
    Plaintiff

v.

    Defendant
_____/

### COMMENTS ON DISCLOSURE STATEMENT

Comes now Frank L. Amodeo and files the attached Statement of Facts which is incorporated into and made part of this Comment.

The facts surrounding the instant case and related proceedings are best known by Amodeo as a result of personal experience and thorough review of the documentary and recorder evidence over a two year period since most of the relevant events occurred.

An accurate and true accounting of the facts are contained in the statement. A vote on any plan or other matter without taking these facts into account would be a decision made with less than all material information.

Especially in light of the misleading interpretation of facts promulgated by United States Attorneys office, (inexplicably so, since the USAO's "client" is the beneficiary of the bankruptcy proceedings and other collection efforts).

Also certain entities with interests adverse to the estate are also promulgating untruthful versions of the events which could lead to materially different disclosures or votes.

Wherefore Amodeo respectfully requests the Court include the Statement of Facts in the disclosure statement or at least require the discloser statement to reference the docketing of the State and such other and further relief as the Court deems fair and equitable.

Frank L. Amodeo #48883-019
Federal Correctional Complex
Coleman low-Unit B-3
P.O. Box 1031
Coleman, Florida 33521
or
2875 South Orange Ave.
Suite 500 PMB 1810
Orlando, Florida 32806

## STATEMENT OF FACTS

### Introduction

This case addresses an extremely complicated series of acts and transactions occurring over a three year period from 2004-2006. A full understanding involves facts which cover a much broader timeframe, involving Frank Amodeo's personal and business history before 2004, as well as events occurring after the initiation of the government's investigation in late 2006. Including the fact there was a concerted plan to withhold payroll tax collections from the IRS and instead use the funds for other purposes, including, but not limited to, the payment of operating expenses, rehabilitating the business and expanding into new business areas.

Frank Amodeo suffers from a mental illness: Bipolar Axis I disorder with psychotic features. His illness is fundamental this explaining this mystery. Why would a well educated and highly intelligent man willfully allow millions of dollars in corporate payroll taxes to go unpaid, in the midst of an ongoing audit by the IRS. As will be shown, the answer essentially involves a combination of three factors: (i) Amodeo's own character flaws, for which he is justly accountable; (ii) the effects of Amodeo's mental illness, and (iii) the encouragement of a number of other persons, including attorneys, accountants and business executives, who found it in their own interests to encourage Amodeo or stand idly by so that they could reap the financial benefits of his actions.

### Amodeo's childhood and education (1960 -1987)

Frank Louis Amodeo ("Amodeo") was born in 1960 in Detroit, Michigan, the first of four children to his parents, Frank Phillip Amodeo and Margaret Amodeo. In 1966, the family moved to Orlando, Florida. Amodeo attended high school at Oak Ridge,

2

where he was an extremely industrious student, serving variously as student council president, commentator on a local radio show and a local Sunday morning television program, *Pro and Con*, student advisor to the Orange County School Board, and a student member of the PTSA Board of Directors.

After graduating from Oak Ridge High School in 1978, Amodeo accepted a scholarship to attend the University of Central Florida, majoring in Political Science. In 1983, during his senior year at UCF, Amodeo underwent what he now believes was his first major bipolar episode. At first, he thought he was sick and simply stayed in bed for several weeks. When he finally came out of the depression, he transitioned into an extremely energized phase, which, as will be discussed in greater detail below, was to be followed by a succession of manic phases throughout his life. A formal diagnosis of this condition would not occur for many years, but it is important to note that Amodeo's doctors now believe that another factor probably exacerbated the manic phases during this early period of Amodeo's life. Amodeo has had an almost lifelong dependence on caffeine. As a child, he drank as much as a dozen sodas a day, gradually transitioning to iced tea in his adult life (drinking as much as two to three gallons a day). His psychiatrists now believe that his caffeine dependence substantially aggravated his bipolar condition.

It was during this same energized period in his senior year in college that Amodeo met his first wife, who was then attending Georgia Tech. Within the space of a few months, they were married and Amodeo enrolled at Emory Law School. In order to support himself and his wife and pay their tuition, Amodeo began working the graveyard shift at a 24-hour delicatessen in downtown Atlanta. After he began to miss morning

3

classes, he was forced by the Dean of the Law School to quit his job at the delicatessen and instead took a part-time job as a pizza deliveryman on weekend nights. Meanwhile, his marriage was collapsing. The couple eventually separated after only four months.

Amodeo confronted the collapse of his marriage and the difficulties in juggling school and work in characteristic fashion: he took on more responsibilities. In the second semester of his first year in law school, he enrolled in night-time classes in a graduate business program at Georgia State University, shortly thereafter changing over to an extremely demanding pre-doctoral program in finance. Only a year later, in the midst of full-time attendance at Emory Law School, night-time classes in the finance doctoral program at Georgia State University, and weekend work as a pizza deliveryman, Amodeo applied to join the CIA. He changed his mind in the middle of the testing process, after concluding that he would be unhappy in a bureaucratic environment. The episode is nonetheless noteworthy because it marks the beginning of a long-term fascination by Amodeo with agency and its clandestine activities, a fascination which later in his life would have material consequences.

### Amodeo's legal career in Atlanta (1988-1993)

After rejecting the idea of pursuing a career in the CIA, Amodeo planned to finish his doctoral studies and teach finance. However, in 1987 his father was diagnosed with throat cancer. Having finished law school, Amodeo decided to begin practicing law so that he could financially assist his parents. He passed the Georgia bar examination in 1988, taking the first job offered to him, a position with one of the Atlanta offices of Hyatt Legal Services, which provided legal services to low and middle income families and small businesses.

4

At the time that Amodeo started employment with Hyatt Legal Services, the firm had six offices in the Atlanta region.   The offices had accumulated problems in bankruptcy court due primarily to Hyatt's high attorney turnover, the relatively modest fees that had been charged, and the fact that individual cases would often drag on for years.  Hyatt's solution to their dilemma was to turn over to Amodeo all of the several hundred accumulated Atlanta area bankruptcy cases, plus all of the new bankruptcy cases.  Again, in characteristic fashion, Amodeo took on far more than he or anyone could have been reasonably expected to handle. Almost immediately, he became the third largest bankruptcy filer in the Atlanta area.

Amodeo's personal life followed the same frenetic arc as his professional life. During the summer of 1988, Amodeo met his future wife, Claire Holland, another attorney with the firm.  They began dating and were married by the end of the year.  Ms. Holland was just coming out of a troubled marriage.  She had a four year old son at the time, Gentry, who suffered from Down's Syndrome.  At the same time that Amodeo was taking on a breathtakingly difficult role at Hyatt, he had thus immersed himself in a new marriage with the added emotional commitments of a special needs child.

Ms. Holland, who is now separated from Amodeo, will testify at sentencing about the history of their relationship.  Almost from the beginning of their relationship, she became aware of certain essential oddities about the man.  Amodeo held a seemingly messianic belief that he would someday he would be called upon to resolve an international crisis.  He claimed to be the head of a mysterious entity, the Aurelius Foundation, and carried business cards naming him as the Director (Ms. Holland later discovered that the foundation was a complete fiction).  He propagated the rumor around

5

the Hyatt offices that his family was extremely wealthy and lived in a "compound" in Orlando. There was also a more paranoid undertone to his delusions. For example, on one occasion Amodeo appeared convinced that he was being followed by a helicopter hovering outside Ms. Holland's apartment.

Although Ms. Holland was seriously concerned about Amodeo's behavior, she eventually reached the conclusion that there was a pharmacological basis for it. Amodeo suffers from asthma, a condition for which he had been prescribed a prescription drug, Isoclor, while at Emory Law School. Isoclor is known to cause excitation and irritability. By combining excessive amounts of caffeine and Isoclor, Amodeo was traveling down a path that almost certainly exaggerated and catalyzed his manic episodes. At the time, Ms. Holland was not aware of Amodeo's bipolar condition, nor was she aware of the role that caffeine might be playing in Amodeo's behavior. However, she was aware of the powerful stimulant effect of Isoclor, and she drew the conclusion that Amodeo's behavior was attributable to the drug. She expressed her concerns to Amodeo and demanded that he stop taking the drug. Amodeo complied with her wishes, and thereafter stopped discussing his grandiose delusions with her.

Unbeknownst to Ms. Holland, Amodeo simply switched to the over-the counter drug, Sudafed, taking as many as 16 pills a days (four every four hours, twice the maximum recommended dosage). It is now known that Sudafed not only can cause insomnia, but can also trigger manic episodes in bipolar individuals, an adverse reaction for which the manufacturer now provides a specific written warning. Consequently, by switching from Isoclors to Sudafed, Amodeo simply substituted one catalyst for another.

6

Many years later, in 2000, Amodeo confessed to Ms. Holland that he had never given up his grandiose beliefs, he had simply stopped talking with her about them.

Ms. Holland became pregnant in 1990. Mia Amodeo, the couple's only child together, was born on September 20, 1990. Ms. Holland subsequently left Hyatt to care for Mia and Gentry.    Shortly thereafter, in 1991, Hyatt severed its employment relationship with Amodeo. This parting of the ways was in part a prophylactic measure by Hyatt, as it helped to insulate the firm from the mounting problems of an unmanageable and insufficiently remunerative bankruptcy caseload.    However, Hyatt continued to supply Amodeo with bankruptcy cases, simply taking a referral fee and eliminating direct responsibility for the firm.    In order to handle the ever-increasing case load, Amodeo entered into a partnership with two other attorneys, Stan Durden and Rich Thompson.    With the mass of bankruptcy cases and a growing complex litigation caseload, the staff of the new firm, Amodeo, Durden & Thompson grew relatively quickly to approximately 14 attorneys.

Within a relatively short period of time, the business collapsed, in part because of the thin profit margin for small bankruptcy cases and in part because of sheer mismanagement by Amodeo and his partners.    As had already been evident at various junctures in his life, the sheer intensity of Amodeo's activity could not substitute for sober planning and sound decisions. Bar complaints began to accumulate about the lack of activity in bankruptcy cases, and in other cases the lack of internal controls at the firm produced more complaints.[1]    Eventually, Amodeo's firm formally dissolved.    This further

_____

[1]    For example, a grievance was filed for the firm's disbursement of $30,000 in trust funds as fees after Amodeo's partner, Stan Durden, who handled all of the bank accounts

7

exacerbated the problems with the Georgia bar, because the insolvency trustee failed to pay the commercial storage fees for the firm's records and the records were discarded.

### Amodeo's move to Orlando and first incarceration (1994-2001)

Out of money and lacking any records with which to even attempt to mount a coherent response to the various complaints, Amodeo voluntarily agreed to a suspension of his law license in 1993. However, this did not end the matter, as several of the bar complaints resulted in criminal inquiries. For years, these inquiries never passed beyond the filing of an initial complaint. Amodeo attempted to start a new career as a financial consultant, focusing, somewhat ironically, on failed business workouts. Notwithstanding his own business failure, Amodeo was actually well qualified for his sort of work as a result of his years in bankruptcy court. During this period, Amodeo moved his family to Orlando to be close to his parents and rented a small two bedroom home. He reconnected with an old high school friend, Ken Mueller, who was a practicing CPA, and would ultimately consult on a number of cases involving Mueller's clients who were attempting to work out tax debts with the IRS. However, his financial situation at this point was at an all time low. He filed for bankruptcy in 1995 listing only $500 in assets.

Just after Amodeo moved with his family to Florida in 1994, Ms. Holland came to her first tentative conclusion that he might be suffering from bipolar disorder. After discussing the situation with Ms. Holland, Amodeo agreed to go to the Princeton Behavioral Center in Orlando, where he underwent a one hour intake interview, which resulted in a recommendation of in-patient treatment. Amodeo did not have the money to seek the recommended treatment at that time.

---

for the firm, was unable to produce the fee contract or an adequate record of his hours spent on the case.

8

Undeterred, Ms. Holland convinced Amodeo to seek a Social Security Disability ("SSDI") evaluation, which occurred in 1995. Ms. Holland was subsequently informed by Amodeo that the disability had not been granted, and she assumed that this was on medical grounds. However, years later, during Amodeo's first incarceration (discussed below), Ms. Holland contacted the doctor who conducted the 1995 SSDI examination, Dr. Cyndey Yerushalmi, and was shocked to discover that Dr. Yerushalmi considered Amodeo the most manic patient she had ever evaluated. Dr. Yerushalmi never followed through on the disability process, not because Amodeo was unimpaired, but because he had failed the financial test.

Amodeo had claimed he did not need the money because he had many financial deals forthcoming. This pronouncement came at a time when the family of four was bankrupt, living in a small two bedroom apartment, driving ten year old automobiles, and living without medical insurance. Notwithstanding the failure to obtain assistance from Social Security, Ms. Holland was able to convince Amodeo to seek treatment from a local mental health therapist, Dr. Phillip Tell, who saw Amodeo intermittently up to 1998.

Beginning in 1997, Amodeo began working with building contractors, acting as a sort of middleman connecting the contractors with potential clients and collecting a percentage of the profits from the contract as a finder's fee. However, these efforts toward rehabilitating himself financially were short lived. In 1998, he was informed by the Postal Inspector that he was under investigation for mail fraud, relating back to his work in 1993 for a Chapter 11 client, Lad Santiago. Santiago's mother, Louise Housten, had deposited approximately $50,000 to the firm's trust account. In March 11, 1993

9

letter to Ms. Housten, indicating that the money would be used to pay Mr. Santiago's

creditors and only used in conjunction with the confirmed bankruptcy plan. According to

Ms. Housten, she was promised by Amodeo that the $50,000 would be fully refunded if

the bankruptcy was not successful in protecting Santiago's real estate assets. Instead, Mr.

Santiago had the firm invest the funds in a Puerto Rico public relations company for

which Amodeo was doing legal work. When the Puerto Rican company itself went

bankrupt and the firm could not return the funds, Ms. Housten filed a complaint with the

Bar and took steps which eventually led to the Postal Inspector investigation.

In March of 1998, Amodeo pled guilty to a one-count mail fraud information in

U.S. District Court in Atlanta before the Honorable G. Ernest Tidwell. During the

sentencing phase, the United States Probation Office inquired into Amodeo's mental

health and recommended that a psychological evaluation be performed. Amodeo

subsequently had a full psychiatric examination conducted by Stephen O' Hagan, M.D.

(in or about September 1998) while being represented by the Federal Defenders Program.

These results have never been provided to Mr. Amodeo or the BOP despite repeated

attempts to obtain the results.

On October 30, 1998, Judge Tidwell sentenced Amodeo to 24 months

imprisonment and a 3 year period of supervised release, ordered him to pay $50,000 in

restitution, and recommended him for the boot camp program at Lewisburg FPC in

Pennsylvania. No mental health treatment component was included in the sentence.

However, while in prison, he was taken off of Sudafed and his caffeine intake was

severely restricted. Amodeo successfully participated in the boot camp program at

10

Lewisburg FPC, where he served 6 months and 11 days before being released to an Orlando halfway house.

### Amodeo's supervised release violation and second incarceration

Almost immediately after arriving again at the halfway house, Amodeo lapsed into a familiar manic pattern, fueled by a resumption of his excessive intake of caffeine and Sudafed. He began spending all of his available hours working with accountant Mueller and with building contractors. He was so successful in these endeavors that he actually began hiring other residents of the halfway house to work for him. However, his mania once again brought its own punishment, because he eventually was found in violation of halfway house rules (he was found to be working at an unapproved job site). The halfway house component of his sentence was revoked, and in January 2000 he was remanded to the Pensacola FPC for service of a sentence of a nine month sentence.

At the prison camp, Amodeo was seen by a BOP psychiatrist, Dr. Janet Lewis. Although not able to complete a full evaluation of Amodeo, Dr. Lewis diagnosed him as suffering from Cyclothymia, a chronic bipolar disorder consisting of short periods of mild depression and short periods of hypomania (lasting a few days to a few weeks), separated by short periods of normal mood. Dr. Lewis further opined that the Cyclothymia was being exacerbated by Amodeo's constant consumption of Sudafed and caffeine. The Sudafed was discontinued and Amodeo's caffeine intake was substantially curtailed. He has also placed on a disciplined regimen including running several miles a day, every day of the week, as part of the treatment. During this period, Amodeo experienced a marked diminution of his manic phases, both in frequency and duration.

11

Amodeo was released from prison camp in September 2000 and began serving three years of supervised release under the supervision of Probation Officer Scott Fanelli. By 2001, Mr. Amodeo was in a position to privately pay for his treatment and began treating with Dr. Joseph Trimm at the New Leaf Center, a Winter Park outpatient mental health facility. Amodeo eventually ended treatment with Dr. Trimm for financial reasons. Probation Officer Fanelli subsequently explained to Amodeo that if he agreed to modify his supervised release order to require psychological counseling, the government would have to pay for the treatment. Amodeo agreed, and as a result of this modification, he was treated by mental health specialist Diane Shuker through the conclusion of his supervised release, which terminated in September 2003.

After his release from supervised release, Amodeo again was without any ongoing mental health counseling. However, from this point forward he took the initiative to avoid all pseudophed drugs. He also met and became friends with Dr. Robert Pollack ("Dr. Pollack"), a local psychiatrist retired from active practice who had started a second career building internet technology companies and consulting in that field.[2] Although

---

[2]     Dr. Pollack received his B.S. from Yale University, and his M.D. from the Downstate Medical Center, Kings County Hospital in Brooklyn, New York. His psychiatric and chief residencies were spent at University of Florida's Shands Teaching Hospital. He subsequently settled into professional practice in Orlando, where he co-founded Florida Psychiatric Associates. He devoted a substantial part of his practice to forensic consultation in criminal cases. In addition to his medical background, Dr. Pollack has extensive business consulting/management experience, having assisted companies with mergers and acquisitions, organizational development, trend analysis and task force guidance. To that end, he co-founded Professional Quality Analysts and The Rondo Group. He has been honored with the Quality Excellence Award from the Central Florida Health Care Coalition. At present, Dr. Pollack is serving as the Executive Vice President of Strategic Planning for PaySourceUSA, a national PEO that was founded in Dayton Ohio and has now opened a regional office in Orlando.

12

Amodeo did not undergo any sort of formal treatment by Dr. Pollack, Dr. Pollack was familiar with Amodeo's personal and psychiatric history and acted as his physician for the purpose of prescribing Albuterol (a bronchodilator) for Amodeo's asthma and referring him to other specialists for treatment.

## Amodeo's association with Matrix Network, Inc.

Meanwhile, Amodeo had resumed his career as a financial consultant, focusing once again on failed business workouts and liquidations, including businesses with outstanding IRS debts. In this capacity, he began collaborating as an independent consultant with Matrix Network Inc., an Orlando consulting firm in which Dr. Pollack was a principal. By late summer of 2003, Matrix Network, Inc. was struggling and on the verge of filing for bankruptcy. In an effort to restructure and expand its business operations, the company recruited Bob Curry[3], Dan Myers[4], Jason Carlson[5] and Tom Broadhead,[6] who at the time were working together in another consulting company. As part of the reorganization, the company was renamed Matrix Network Orlando, LLC ("Matrix"), and commenced operations in a suite on the 14th floor of the Wachovia building in downtown Orlando. Mr. Broadhead eventually left the company to become

---

[3]     Bob Curry holds a B.A. in Business Administration Accounting from Waynesburg College and a Masters Degree in Taxation from Widener University. He has more than 20 years experience in senior financial management positions in both public and private companies.
[4]     Myers holds a B.S. in Economics from the University of Central Florida and is a licensed C.P.A.
[5]     Carlson holds a B.A. from Carlton College and an M.B.A. from Duke University.
[6]     Broadhead holds an M.B.A. from Duke University and a J.D. from the College of William and Mary.

13

assistant general counsel at CitiGroup, and his wife, Edie Curry (Bob Curry's sister),[7] took his place.

Notwithstanding the reorganization, Matrix continued to struggle financially. Meanwhile, Amodeo, in collaboration with Dr. Pollack, was trying to develop a new product for professional employee organizations (PEOs), a type of company that specializes in leasing employees to businesses. The responsibilities of PEOs include, among other duties, the reporting and paying over of the payroll wages and payroll taxes of the worksite employees. Amodeo's objective was to create a PEO model that would include an internally coordinated insurance benefits/manage care program. Working with two local businessmen, Denny Kurir and Jerry Cox, Amodeo and Dr. Pollack set up a company, Quantum Delta Enterprises ("Quantum Delta"), to market the new program to existing PEOs.

## The Sunshine Companies Plan

In the summer of 2004, while attempting to market the new PEO program, Amodeo was introduced to John Burcham, the Chairman of Presidion Solutions, Inc. ("PSI"). PSI was a Michigan-based holding company for several PEOs that provided comprehensive and integrated resource management services, including payroll services, to small and medium sized companies. Prior to July of 2005, PSI was a wholly owned

---

[7]    Edie Curry holds a B.S. in Accounting from Frostburg State University, an MBA from Golden Gate University, and J.D. from the University of Akron School of Law. A former Director of Accounting for Nestle Frozen Food, she is the President of the Brookmeade Group, LLC, a Virginia consulting firm. In that capacity, she has provided both financial and legal guidance to mid-sized and large corporations. Curry regularly lectures on corporate governance and fraud detection. She is a featured guest speaker at this year's "Sarbanes-Oxley Strategic Symposium" in Orlando, Florida on March 23rd and 24th, 2009. She will be speaking on the topic of "Is Your Anti-Fraud Strategy Strong Enough to be SOX-compliant?"

14

subsidiary of Presidion Corporation, a publicly traded company, which was later de-listed. Although Burcham was not immediately interested in the new PEO concept being marketed by Amodeo, he was interested in enlisting Amodeo's assistance in bailing out his struggling company.

In July of 2004, Burcham visited Amodeo in Florida; he was followed by Craig Vanderburg, the President of PSI, who visited Amodeo in August. They explained to Amodeo that Ken Hendricks, the former owner of another PEO, Paradyme, Inc. (Paradyme"), had sold Paradyme to PSI for stock in PSI and a $2 million promissory note. Burcham and Vanderburg further explained that PSI was financially burdened not only by the debt to Hendricks, but also by approximately $5 million in unpaid payroll taxes that had been accrued by certain companies under its control, and by continuing difficulties in maintains a sufficient asset reserve to keep its worker's compensation insurance policy in force with its insurance company, FCIC.

PSI had previously acquired seven PEOs, which made up PSI's "PEO book of business" (i.e. the contracts PSI had with its PEO clients). In or about May 2001, PSI acquired Sunshine Staff Leasing, Sunshine Companies I, II, III, and IV (collectively referred to as the Sunshine Companies). Post-acquisition, these entities did business as Presidion Solutions I, II, II, IV, and V, respectively. After PSI acquired Paradyme from Hendricks, in or about January 2002, Paradyme subsequently did business as Presidion Solutions VI. PSI then acquired certain PEO customer contracts from BST, Inc. in or about June 2002.

The clients of the PEOs entered into contracts, or service agreements, with PSI or its subsidiaries. According to the contracts signed by the clients when PSI or its

15

subsidiaries started providing services to the clients, PSI became the co-employer of its clients' employees and assumed the liabilities and responsibilities for reporting and paying over to the Internal Revenue Service the payroll wages and the payroll taxes of the worksite employees. At the end of a client's payroll cycle, a client would e-mail, fax or mail the number of hours worked by the worksite employee(s) to PSI. After receiving the information, PSI computed the amount of FICA, Medicare (HITS), Withholding Taxes, Worker's Compensation Insurance, and 401K contributions to be added to the clients' bill, along with PSI's administrative fee. PSI would then e-mail, fax or mail this information back to the clients, who would either direct debit, mail or wire the funds to PSI.

At the time that Burcham and Vanderburg commenced negotiations with Amodeo, PSI's publicly traded parent corporation, Presidion Corporation, was preparing for an annual audit. Burcham and Vanderburg were interested in retiring Hendrick's note and buying out his stock interest, but at the time they were more acutely concerned about the millions of dollars in unpaid payroll taxes that had previously been accrued by the Sunshine Companies. As stated above, Amodeo was initially told that the accrued tax liabilities totaled approximately $5 million. In an attempt to have Presidion Corporation appear more profitable as a publicly traded company, PSI wanted the Sunshine Companies' payroll tax liabilities removed from Presidion Corporation's financial statements.

As their negotiations continued, the level of potential future involvement between the Matrix personnel and Presidion escalated. On September 7, 2004, Amodeo, acting on behalf of Trafalgar, entered into a "commitment letter" agreement with Presidion

16

Corporation. Under the terms of the letter, Trafalgar would provide a broad array of services, including assistance in reactivating Presidion's insurance contract with FCIC (possibly by substituting assets to establish a sufficient reserve and to free up cash for other purposes), the provision of "guarantees" to restructure other debts (including restructuring or retiring the Hendricks debt). The commitment letter also contemplated consulting assistance on tax strategy for an unspecified contingency fee. As a further inducement for Trafalgar to provide these services, Presidion Corporation offered to sell Trafalgar 25% of its own common stock for the aggregate price of $100,000. [8]

The vague outline of a plan of action was thus beginning to emerge. Amodeo and his colleagues were interested in the long-term growth potential of Presidion Corporation, notwithstanding its problems, and were eager to obtain an equity interest in the company.[9] Prior to entering into a contract with Presidion, Amodeo took the initiative to

---

[8]     The reason that Amodeo had used Trafalgar, as opposed to Matrix, as a vehicle for entering into this initial commitment with Presidion Corporation, was that Trafalgar, Bob Currie's old consulting company, was in possession of certain precious metals which the parties hoped could be used as substitute collateral with FCIC to rehabilitate Presidion's worker's compensation insurance contract and to free up the cash then on deposit with FCIC for other uses. The precious metals were actually purported to be unrefined alluvial deposits, maintained in steel cases at a warehouse, which Trafalgar had acquired the contractual rights to from one of its former clients, Glen Thompson. Under the terms of the agreement with Mr. Thompson, he remained entitled to royalties on the use of the alluvial deposits, and ultimately was paid over $2 million by Amodeo and his associates. Much later, it would be learned that the assay value of alluvial deposits was completely misrepresented, and Mr. Thompson was referred by the principals of Trafalgar, and others, for investigation by the FBI.

[9]     One of the principals of Matrix, Jason Carlson, came from a family that was prominent in the printing business, and Amodeo and his associates reasonably believed that the Presidion business could be increased by as much as 10% simply by obtaining the Carlson family's businesses as PEO clients. Because of the family's connections (Carlson's father was the former President of the American Printers Association), Amodeo optimistically speculated that they could add thousands of more employees over time. Amodeo and his associates thought that they could benefit from this expansion in two ways: first, through stock participation in Presidion; and second,

17

disclose his criminal record, which as a general matter he did with all of the persons with whom he did business. He also brought in Matrix personnel to help him with the project, enlisting John Murphy's assistance in assisting PSI to find sources of capital to help them buy out Hendricks, and Bob Curry to conduct a profit improvement analysis for PSI. Jason Carlson, Jack Duvall and Edie Curry, who had succeeded her husband, Tom Broadhead, as a principal at Matrix, were tasked to do due diligence on PSI. At that time, Amodeo's expectation was that he and Matrix would receive a fee for their services, and in addition would acquire a 25% equity interest in Presidion, but would not actually take over the Sunshine Companies.

The original commitment letter had left unspecified the exact amount of the payment to which AQMI would be entitled for assisting Presidion in resolving its problems with the IRS. Resolving that issue, on October 18, 2004, Vanderburg, on behalf of PSI, signed a "Consultant Agreement" with Amodeo, acting on behalf of AQMI Strategy Corporation ("AQMI"), a corporation which Amodeo created for this purpose. The Consultant Agreement called for AQMI to provide tax advice to PSI for a non-refundable fee in the amount of $150,000.00 and an additional fee of 25% of any tax savings of the company's current payroll tax liability. After payment of the initial $150,000, the Consultant Agreement provided that, commencing in January of 2004, PSI

_____

through commission on bringing in the new PEO clients. Toward the latter end, on October 15, 2004, Carlson, acting as President of Quantum Delta, entered into an "Outside Marketing Representative Agreement" with Presidion entitling Quantum Delta to a 25% fee on the value of the business it brought to the company.

would either pay $75,000 per month to AQMI or accrue this amount on its financial statements pending completion of services under the Consultant Agreement.[10]

During the course of the due diligence investigation, the Matrix personnel discovered that the Sunshine Companies' accrued tax liabilities were actually much larger than had originally been disclosed to Amodeo, amounting to approximately $13 million (including interest, penalties and taxes) by October of 2004. In addition, Vanderburg disclosed to Amodeo that Presidion Corporation and its related entities were being investigated by an organized crime task force in Michigan for racketeering activities. Jim Baiers, the general counsel for Presidion Corporation, later informed Amodeo that he had been told by the Special Agent in charge of the investigation that the delinquency of the payroll taxes was not a focus of the investigation, and that it was being treated as a civil matter. Amodeo also learned that the Burcham, Vanderburg and Baiers had previously worked at Simplified Employment Services ("SES"), another PEO, which had been implicated in an alleged check kiting scheme that was also under investigation by the government.[11]

Amodeo initially concluded that there were too many problems with Presidion Corporation to become further involved with the company. However, he became

---

[10]   Edie Curry, on behalf of her personal consulting firm, Brookmeade Group, L.L.C., executed her own Consultant Agreement with PSI on or about November 1, 2004, under which she was tasked with restructuring non-tax debt with specified Presidion creditors in return for a $25,000 flat fee plus 50% of the amount of any principal reduction.

[11]   The criminal investigation of Presidion Corporation was closed in February of 2005, and Baiers subsequently provided Amodeo with a copy of a letter dated February 4, 2005 from IRS Special Agent Gary Patterson confirming the termination of the case. The U.S. Attorney's Office in Michigan continued to investigate Burcham with respect to the activities of another unrelated corporation. Following the indictments of a number of business associates, Burcham was indicted in 2007.

19

convinced, based in part from the input of attorneys and accountants who were advising him, that he could achieve the objectives sought by Presidion Corporation by purchasing the Sunshine Companies himself.[12]  Amodeo's plan (the "Sunshine Companies Plan") was to have Wellington Capital Group, Inc. ("Wellington"), a Nevada corporation wholly owned by him, purchase the Sunshine Companies from PSI and thereby relieve Presidion Corporation's consolidated financial statements of the Sunshine Companies' accumulated payroll tax liabilities. Prior to the sale of the Sunshine Companies stock to Wellington, the Sunshine Companies would sell all of their client service agreements, subscriber agreements, accounts and notes receivable, bank accounts, and other assets to PSI's subsidiary, Paradyme.  After the sale of the Sunshine Companies stock to Wellington, and after the winding down of the companies, including negotiations with the IRS and the conclusion of several pending courts cases in which the companies were involved, the companies would be administratively dissolved.

As set forth above, the viability of this entire plan depended on its success in achieving the ultimate objective of freeing Presidion Corporations' balance sheet of the Sunshine Companies' liabilities.  Presidion Corporation was not dependent on Amodeo alone to confirm the viability of the plan.  The company was receiving legal advice during this period of time from both from its general counsel, Jim Baiers, and from the prestigious New York tax law firm, Kostelanetz & Fink.[13]    Vanderburg was also receiving legal advice from the corporate law firm of Kirkpatrick & Lockhart regarding

---

[12]    It is noteworthy that Amodeo made this fateful decision just a little more than one year removed from the termination of his supervised release, with a felony conviction on his record and little in the way of personal equity.
[13]    On November 30, 2004, Amodeo participated in a conference call regarding the tax ramifications of the proposed deal with Vanderburg and Kostelanetz & Fink senior partner Robert Fink.

20

the securities law implications of the sale. Presidion Corporation, a publicly traded entity, was also under audit at the time, and Vanderburg made the auditors aware on an ongoing basis of the details of the plan.

Amodeo did not have any serious reservations about the legal viability of the essential premise of the plan; i.e., that the sale of a subsidiary encumbered by historical payroll tax obligations would eliminate the liability from the parent corporation's consolidated balance sheet. However, it was not until several months after the completion of the sale of the Sunshine Companies that this position would be confirmed in a legal memorandum completed at Amodeo's request by Elena Wildermuth, an associate with the Fort Lauderdale law firm of Berman, Kean & Riguera. While Wildermuth's memorandum was supportive of the viability of the central objective of the transaction, i.e., ridding the Presidion balance sheet of the Sunshine Companies' liabilities, it also recognized that any individuals who had played a role in the original diversion of the payroll taxes by the Sunshine Companies, would remain liable for the taxes under the "100 percent penalty" imposed by IRC § 6672, which imposes liability on individual officers and employees to the extent that they are determined to be "responsible persons" for the collection and payment of the payroll taxes.[14]

### The Wildermuth Memorandum -- Payroll Tax Withholding and Payment Rules

---

[14]     The Wildermuth memorandum actually was preceded by another memorandum authored by Lawrence Haber. Haber, a corporate attorney formerly employed by Disney World, prepared a memorandum for Amodeo in February of 2005 on the application of I.R.C. Section 6672 to "responsible parties" that could  be found liable for the 100% penalty. Haber's memorandum was found to be unsatisfactory a variety of reasons, in particular its failure to sufficiently address whether a corporation could be considered to be a responsible party subject to the 100% penalty. As a result, Berman delegated the task to his associate, Wildermuth.

21

The Wildermuth memorandum was written with a specific objective in mind – to explain whether, after the proposed sale, the Presidion Corporation would still remain liable under IRC § 6672 for the historical unpaid payroll taxes of the Sunshine Companies. However, the memorandum also provides a relatively broad overview of the statutes and court decisions dealing with the collection and payment of payroll taxes. It is consistent with and reflective of the general understanding of the law that Amodeo had in late 2004 and early 2005 regarding the payroll tax withholding rules. As set forth in the memorandum, the Internal Revenue Code requires the payment of a variety of taxes by corporate employers with regard to the earnings of the employees, including the following:

     (i)    the employees' federal income taxes that have been withheld from the employees' paychecks in accordance with the W-4s filed by the employees (IRC §§ 3401 and 3402) ;

     (ii)    the employees' share of Social Security taxes imposed at a flat rate of 6.2% of the wages up to a statutory ceiling (currently \$106,900 in annual wages) and Medicare taxes imposed at a flat rate of 1.45% (IRC § 3101), which together make up the Federal Insurance Contributions Act ("FICA") taxes;

     (ii)    the employer's share of the FICA taxes, equal to the employees' share (IRC § 3111); and

     (iv)    the employer's Federal Unemployment Act ("FUTA") taxes imposed at a flat rate of 6.2% (IRC § 3301) up to a statutory ceiling (currently \$7,000 in wages), but subject to a credit of 5.4% if state unemployment ("SUTA")

22

taxes have also been paid, resulting in an effective federal rate of 0.8%, or $56 per employee per year (in Florida, the SUTA rate for new employers is 2.7% up to a $7,000 statutory ceiling, with the rate adjusted over time based on the claims history of the employer).

As stated above, the employees' income taxes and FICA taxes must be deducted and withheld from the employees' paychecks, and are collectively referred to as "trust fund taxes" to reflect the fact that the employer is essentially acting as an intermediary for the IRS in collecting and paying over these taxes that are being assessed, not against the employer, but against the employees. Employers are required to report the withheld income taxes and the employer and employee portions of FICA taxes on a quarterly basis on Form 941 unless the employer has an annual liability of less than $1,000 for FICA and withheld income taxes. In the latter case, only an annual filing using Form 944 is required. The FUTA taxes are reported annually on Form 940. In Florida, the SUTA taxes are reported and paid quarterly on Form UCT-6.

The Wildermuth memorandum describes the variety of statutory tools at the IRS' disposal to civilly enforce compliance with the payroll tax withholding and payment rules:

(i)     The IRS may assess civil penalties against the employer under IRS § 6656 (which imposes penalties of up to 10% of the tax if the payment is delinquent for more than 15 days);

(ii)    The IRS may create a lien upon the property of the employer under IRC § 6321 and subsequently levy, distrain and sell the property in satisfaction of the debt;

23

(iii)    The IRS may provide written notice of the failure to the employer

pursuant to IRC § 7512, triggering a requirement that the payroll taxes be

segregated into a separate bank account and maintained there until

payment is made to the IRS; and

(iv)    The IRS may assess a penalty amounting to 100% of the tax against

individual officers and employees of the employer to the extent that such

persons were personally responsible for collection and payment of trust

fund taxes and willfully failed to fulfill this responsibility.

The Wildermuth memorandum is primarily devoted to establishing that § 6672
does not apply to corporations, such as Presidion Corporation, because a corporation is
not a "person" as defined in the statute.  Consequently, the memorandum devotes little
attention to the rules regarding an individual's potential liability under the statute.  A
more comprehensive analysis of these rules can be found in another legal memorandum
that was circulating in the same time period – late 2004 and early 2005 – that was
prepared for the Presidion Corporation by Kevin Flynn, an attorney at Kostelanetz &
Fink (the "Flynn memorandum").[15]

As stated in the Flynn memorandum, IRC § 6672 provides that any person
required to collect, truthfully account for, and pay over any Title 26 tax who willfully
attempts in any manner to evade or defeat the payment of the tax shall be subjected to a
penalty amounting to 100% of the tax (where there are multiple responsible persons, they
are jointly and severally liable for the 100% penalty).  This means that separate and apart

---

[15]    Although Amodeo does not have any recollection of ever seeing this
memorandum, its content is generally reflective of what he was gleaning from
conversations with James Baiers, the general counsel of Presidion Corporation, and with
Kostelanetz & Fink attorneys.

24

from corporate liability for the unpaid taxes, individual officers and employees of a corporation may find themselves personally liable for the unpaid trust fund taxes. Attorney Flynn goes on to succinctly summarize the law on this issue, a discussion that is worth summarizing at length both for explanation of the law and for the lights its casts on the mindset of the parties during this period:

> A person cannot be held liable for the penalty in Section 6672 unless (i) he is a "responsible person" for collecting and paying the employer's taxes to the IRS, and (ii) he willfully fails to do so. See *Fiataruolo v. United States*, 8 F.3d 930, 938 (2d Cir. 1993); *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed. Cir. 1984). The key question under the first prong of the Section 6672 test is whether "the individual has significant control over the enterprise's finances." *Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir. 1990), *cert. denied,* 112 S. Ct. 2967 (1992) (emphasis added). See also *Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991) (to be liable responsible person must have significant authority in decision making areas involving employment taxes). In this regard, the penalty "is not meant to ensnare those who have merely technical authority or titular designation." *Fiataruolo v. United States*, 8 F.3d 930, 939 (2d Cir. 1993). The requirement of significant control is met by a person who has "ultimate authority over the expenditure of funds" for the corporation. *Godfrey v. United States*, 748 F.2d at 1575, quoting from *White v. United States*, 372 F.2d 513, 517 (Ct. Cl. 1967).

Like the Wildermuth memorandum, the Flynn memorandum concludes that the Presidion Corporation will not be liable under § 6672 for the Sunshine Companies' unpaid payroll taxes, albeit based on a different rationale, i.e., that the Presidion Corporation, even if it could be construed as a "person" within the ambit of the statute, did not have the necessary responsibility for or control over the payroll tax obligations of the Sunshine Companies to trigger liability under § 6672.

25

Two important facts can be distilled from the flurry of memo writing in late 2004 and early 2005. First, the parties believed that the central objective of the Sunshine Companies Plan, freeing Presidion Corporation of the Sunshine Companies' historical payroll tax liabilities, could be achieved under existing tax rules. Second, it is clear from these memoranda (as well as from a variety of other evidence) that the parties were well aware that the extent to which individual officers or employees might become personally liable for unpaid payroll taxes under § 6672 depended upon whether the company for which they worked had a corporate responsibility for the payment of payroll taxes, and if so, whether their degree of involvement in the actual collection and payment of the payroll taxes was sufficient to qualify them as a "responsible person" under the applicable case law.[16] Much of the subsequent history of this case can be understood as the attempt by certain companies and individuals to avoid the 100% penalty under § 6672 while at the same time retaining effective control over the disposition of the unpaid payroll taxes.

**The December 2004 sale of the Sunshine Companies**

As set forth above, under the Consulting Agreement executed in October 2004, AQMI was not entitled to receive any additional payments from PSI until January of 2005, when the obligation to pay $75,000 per month under the contract would commence. Even then, PSI had the option to simply accrue this amount on its financial statements pending completion of services under the Consultant Agreement and

---

[16]     For example, former IRS-CID Chief Marerro sent Amodeo an e-mail on February 25, 2005 enclosing an internet link to a section of the IRS Manual regarding the liability of third parties for unpaid employment taxes. Characteristically, Amodeo never bothered to read it. However, Amodeo's staff attorney and accountant reviewed the e-mail and opined no exposure existed for AQMI's personnel.

26

determination of the exact amount to which AQMI was entitled, 25% of the aggregate payroll tax liability relief provided to PSI and, as amended, 50% of all other savings which ultimately resulted in a $6.15 million dollar fee resulting from reduction in exorbitant insurance costs. However, in the interval since the execution of the Consulting Agreement, the entire dynamics of the deal had changed – Amodeo and Wellington were now proposing to take over the Sunshine Companies' rather than simply providing consulting services. In this situation, neither Amodeo nor his associates at Matrix would agree to enter into a deal with Vanderburg that provided them with no immediate source of compensation, not only for the work that they had already performed, but even more important, for the burdens they were assuming in acquiring the Sunshine Companies. Edie Curry, in particular, was adamant that AQMI would have to get the 25% fee up front in order for the transaction to make any sense.

Amodeo consequently demanded that prior to the purchase of the companies, Presidion make an advance payment to AQMI of the 25% fee. Amodeo intended to use these funds in part as the source of capital for the acquisition of the stock of the Sunshine Companies, the purchase price of which had been set at $500,000. For Vanderburg and PSI, the value of the transaction had nothing to do with the $500,000 purchase price, since the source of funds for the $500,000 was actually PSI itself. For PSI, and more specifically for its corporate officers such as Vanderburg and Burcham, the real value of the transaction was that it moved the Sunshine Companies' tax liabilities off of Presidion Corporation's balance sheet. On December 8, 2004, the parties executed a Securities Purchase Agreement memorializing the terms of the proposed transaction.

27

In a series of payments commencing on December 10, 2004 and continuing through December 31, 2004, PSI began transferring all of its excess cash to AQMI after the payment of ongoing operating expenses, eventually transferring a total of $8,905,201.26.    Prior to the first such payment, Vanderburg, acting on behalf of the Sunshine Companies, granted Amodeo a limited power of attorney authorizing him to act on behalf of the Sunshine Companies in "any matter relating to receipt, escrowing, and payments to the appropriate parties of any and all tax monies."    On December 8, 2004, Baiers sent the power of attorney to Amodeo along with a set of written instructions, to be signed in acknowledgement by Amodeo, indicating that all of the Sunshine Companies' future payroll tax deposits were to be deposited into a specified AQMI bank account, which was then to issue and deliver daily certified checks, made payable to the IRS, to the accounting firm of Rachlin Cohen & Holtz LLP ("Rachlin LLP"), where the checks would be held until such time as Amodeo directed that the checks be provided to him for delivery to the IRS. The instructions go on to state that if the power of attorney is revoked or if the Sunshine Companies sale is not consummated, Amodeo will immediately cause the checks to be returned to Vanderburg.

Amodeo interpreted Baiers' e-mail and attachments as an obvious attempt by Vanderburg and Baiers to have their cake and eat it too: Vanderburg and Baiers wanted to pay AQMI to extricate Presidion from the Sunshine Companies' morass, but still leave themselves with an avenue through which to claim that the payments made to AQMI should have been applied to reduce the Sunshine Companies' accumulated payroll tax liabilities, thereby shifting liability for the 100% penalty from Vanderburg and Baiers to Amodeo and other responsible persons at AQMI.    Amodeo refused to execute the

28

proposed instructions and acknowledgement, and fired off a responsive e-mail to
Vanderburg and Baiers threatening to terminate the entire deal. In effect, Amodeo was
telling Vanderburg that he could either use his excess cash to pay off a portion of the
existing payroll tax debt, or use the cash to complete the deal with AQMI, but not both.

Vanderburg quickly capitulated, calling Amodeo personally and assuring him that
they would continue to make the payments, asking only that Amodeo keep the entire
issue confidential until the completion of the deal. Vanderburg took no subsequent action
to reiterate his previous position or back out of the deal prior to its completion.[17]  Most

---

[17]    In a December 10th e-mail to Vanderburg, Baiers alludes to Amodeo's email and
suggests that they should "call and settle him down." Baiers concludes with "I like this
e-mail for the file." After the sale was completed, Vanderburg and other officers at
Presidion continued to take the position in internal memoranda, and in emails to Amodeo
and other AQMI personnel, that part or all of the $8.9 million should have been applied
to the payroll tax liability. See, e.g., January, 26, 2005 Presidion internal memorandum
from Presidion CFO Sue Schumacher to Vanderburg containing a schedule purporting to
show the entire $8.9 million in payments to AQMI being applicable to the payment of the
Sunshine Companies' payroll tax liability; March 10, 2005 e-mail from Vanderburg to
Amodeo asking for "confirmation" of the payroll tax deposits in December 2004; March
17, 2005 Baiers e-mail to Amodeo and others indicating that in December 2004 AQMI
"directed the tax payments for the Sunshine entities under the Limited Power of
Attorney;" March 25, 2005 e-mail from Chris O'Connor at Presidion to Dan Myers
"reminding" him that Presidion "ran up the [tax] liability by $9 million at the direction of
Frank via a limited power of attorney." On February 11, 2005, Vanderburg sent Amodeo
a "deposit confirmation request" asking Amodeo to confirm that as of December 31,
2004, AQMI had been holding the $8.9 million on deposit for PSI. Amodeo signed the
confirmation request, but included a handwritten interpolation that the amount on deposit
was "for tax controversy resolution," on the basis that the payments were actually being
made under the Consulting Agreement, but that the payments were contingent until the
end of the year when the contracts were actually signed on December 31st. All of this
was followed by a flurry of e-mails in late March 2005 to the effect that the $8.9 million
in payments should be treated as part of the consideration exchanged in the sale of the
Sunshine Companies, in effect buttressing Amodeo's position that the $8.9 million had
been paid pursuant to the Consulting Agreement and not as a transfer of monies to be
held in trust for payment to the IRS. The payments were ultimately booked by Presidion
Corporation and its auditor in precisely this manner. It is also noteworthy that in the
aforementioned Flynn memorandum completed in early 2005, the details of the
December 31, 2004 sale are recited, but no mention is made of any issue regarding

29

tellingly, as the payments continued to be made on a daily basis between December 10th and December 31st, Vanderburg never took any action to enforce compliance with the written instructions he had sent Amodeo on December 8th requiring daily checks to be delivered to Rachlin LLP, or to suspend payments pending proof that Amodeo was following the procedure dictated by the instructions. The acknowledgement to the written instructions was never signed by Amodeo and the instructions were never complied with by him, and PSI transferred the $8.9 million to AQMI free and clear, from Amodeo's position, of any obligation to use the funds to pay off the Sunshine Companies' historical tax obligations. In return, AQMI agreed to the Sunshine Companies' assumption of PSI's obligations under the Consulting Agreement, effectively removing this liability from Presidion Corporation's corporate balance sheet.[18]

On December 21, 2004, Amodeo, other Matrix personnel and outside advisors met to finalize the strategy at the Miami office of Rachlin LLP, one of the largest independent accounting and advisory services firm in the Southeastern United States.[19] In attendance were the following persons, all of whom were assembled at Amodeo's request: Laurie Holtz (a Rachlin LLP Senior Advisor reputed to be one of the nation's

---

AQMI's responsibility for any taxes collected during the month of December – a curious omission if Vanderburg in fact believed that this had been the arrangement with AQMI.

[18]    The power of attorney remained in effect. Amodeo needed the power of attorney so that, if the deal fell through in the last weeks of December, he could pay over the $8.9 million directly to the IRS and not be left in a position where the funds would have to be returned to and thereafter potentially dissipated by Vanderburg and others at PSI, leaving Amodeo potentially vulnerable to allegations by the IRS of transferee liability.

[19]    According to their website at www.Rachlin.com, the company is ranked among the top 100 National Accounting Firms by Accounting Today, and has more than 200 employees and 26 partners. In 2006, Rachlin LLP was considered the fastest-growing audit firm in the nation, according to the Bowman Accounting Report.

30

foremost forensic accountants);[20] Richard Berman (a Fort Lauderdale commercial litigation attorney was not in attendance but fully briefed on the meeting);[21] Hans Beyer (a Tampa bankruptcy attorney);[22] Edie Curry (the Matrix employee tasked with vetting UCC and Bankruptcy Code Article 9 issues); and Ken Levine (a Tallahassee attorney specializing in state regulatory matters).[23] James Baiers, the General Counsel of Presidion, was also in attendance. Jose Marrero (a Rachlin LLP partner and former CID Chief of the Miami field Office of the IRS) was not in attendance at the meeting, but was

---

[20]     Holtz is reportedly "one of the nation's pioneers in the area of investigative accounting, "known for his keen ability to track financial footprints and to present valid, accurate evidence of the nature and logistics of fraud."[20] Amodeo had known Holtz for approximately two years, had worked with him on previous matters, and at the very outset of their working relationship had disclosed his criminal record. See Holtz profile at http://www.rachlin.com/firmprofile/holtz.htm.

[21]     Berman is partner in the Fort Lauderdale law firm of Berman, Kean & Riguera, He had worked with both Amodeo and Holtz in the past. According to his firm's website, Mr. Berman has been a practicing attorney for more than 30 years. Prior to forming Berman, Kean & Riguera, P.A., he was a senior partner in a large prestigious Florida firm, where he served on the Management Committee and as chairman of the Risk Management and Ethics Committees. Mr. Berman specializes in trial practice in State and Federal Court as well as in various arbitration proceedings. He is also a Florida Supreme Court Certified Mediator and Broward County Certified Arbitrator. See Berman profile at http://www.bermankean.com.

[22]     Beyer was retained by Amodeo to advise him on bankruptcy and conveyance issues in connection with the Sunshine Companies Plan. Mr. Beyer is currently partner in the Tampa law firm of partner at Saxon, Gilmore, Carraway, Gibbons, Lash & Wilcox, P.A. At the time of the meeting, he was an attorney with the Tampa office of Buchanan, Ingersol & Rooney, P.C., a large corporate law firm with office throughout the United States. According to the Saxon, Gilmore website, Mr. Beyer concentrates his practice in the areas of bankruptcy and creditors' rights with an emphasis on fraudulent conveyances as well as international and domestic asset recovery, and in the areas of estate planning and probate. Mr. Beyer is a 1988 graduate of the University of Michigan with a B.A. in Economics, with high honors. He earned his J. D. degree in 1991 from the University of Michigan Law School.   See   Beyer   profile   at http://www.saxongilmore.com/lawyers/hanscbeyer.htm.

[23]     Levine is currently a Partner in the Tallahassee law firm, The Levine Law Group. He previously was an attorney in the law firm of Tew Cardenas, LLP. He holds a B.S. in Management and a J.D. from Tulane University, and is a former Senior Counsel at the Chief of Staff Office of the Florida Department of Insurance. See Levine profile at www.lawyers.com

31

briefed on the meeting by Holtz, and subsequently participated in negotiations with the IRS.[24]

At the meeting, all aspects of Amodeo's Sunshine Companies Plan were discussed, without any suggestion from any of the panel of assembled experts that the Plan violated any state or federal laws.    Given Presidion's legal problems in Detroit, Amodeo specifically authorized Berman to contact the United States Attorney's Office for the Southern District of Florida,[25] Marrero to contact the Criminal Investigation Division of the Internal Revenue Service, and Levine to contact the State of Florida, to discuss the details of the Sunshine Companies Plan – including the divestiture of the Sunshine Companies and deconsolidation from Presidion Corporation – with the objective of prospectively clearing the Sunshine Companies plan with the federal government and state authorities.[26]

---

[24]    During the time frame of the indictment, Marrero was a partner in Rachlin LLP's Advisory Services division. According to information previously contained on Rachlin LLP's website, he is a 28 year veteran of the IRS, where he served in many roles, including revenue agent, special agent, group manager, regional analyst, division chief/special agent in charge and deputy director in the Criminal Investigation Division. Mr. Marrero directed the national policies and programs of Criminal Investigation employees in the Office of Strategy. As the special agent in charge of the Miami field office, he was responsible for all criminal investigation resources in the southern district of Florida, Puerto Rico and the U.S. Virgin Islands.

[25]    Berman was tasked with contacting the U.S. Attorney's Office in part because he had represented to Amodeo that he had a special connection to the USAO, i.e., a client who was the AUSA in charge of the Organized Crime Division.

[26]    As a practical matter, it is of course difficult, if not impossible, to obtain a prospective legal opinion from either IRS-CID or a U.S. Attorney's Office. Although Amodeo repeated his requests to Berman on December 30, 2004 and January 5, 2005, and to Marrero on December 31, 2004, there is no evidence that they actually followed up with the requested action at this time. A detailed agenda setting forth Amodeo's requests with regard to government contacts discussed above is contained in a memorandum from Amodeo to Berman which was distributed to all of the participants.

32

By late December 2004, the proposed transaction had thus been run by a bevy of well-credentialed experts, none of whom communicated to Amodeo even a murmur of dissent as to the legality of the transaction or to its viability to achieve the desired result. On December 31, 2004, Wellington acquired the Sunshine Companies for the stipulated purchase price of $500,000, which was paid by Wellington from the AQMI line of credit derived from the $8.9 million fee that had previously been paid to AQMI by PSI. As discussed above, Wellington's purchase of the Sunshine Companies was not intended to include their book of business.  Prior to consummation of the sale, PSI transferred the Sunshine Companies' book of business, to Paradyme, PSI's wholly owned subsidiary, under an Assignment and Assumption Agreement, a transaction which was booked as being made in satisfaction of pre-existing inter-corporate liabilities.

Trafalgar's option to buy 25% of the common stock of Presidion Corporation, recited in the September 2004 commitment letter, was never exercised by Trafalgar. However, in December of 2004, Amodeo and his colleagues at Matrix had negotiated for the purchase of Burchem's 27% interest in the common stock of Presidion Corporation in return for an upfront payment of $600,000 (paid out of the $8.9 million in fees paid by Presidion) and monthly payments of $60,000 for three years.  This acquisition managed to kill two birds with one stone: it achieved Presidion's objective of eliminating Burchem as a shareholder, and achieved Amodeo's and his colleagues' objective of obtaining a stake in Presidion Corporation, which they placed in Mirabilis Ventures, Inc. ("Mirabilis"), a private equity fund created for this express purpose.[27] At the same time,

---

[27]     The Mirabilis stock was originally registered in the name of Yaneev Amar ("Amar"), the Matrix employee who had set the company up by acquiring and renaming a defunct Nevada corporation.  However, Amodeo considered himself to be the beneficial

33

Mirabilis negotiated for the purchase of additional shares from another Presidion shareholder, Fred Sandlin, raising Mirabilis' overall ownership of the common stock of Presidion to approximately 34%.

### Early negotiations with the IRS over the Sunshine Companies' tax liabilities

On January 6, 2005, Amodeo, Richard Berman, Jose Marrero, Daniel Myers and Hans Beyer attended a meeting at the office of the Plantation, Florida branch of the IRS Collections Division with Revenue Officer Judith Berkowitz. At the meeting, the details of the Sunshine Companies Plan were specifically discussed, including the prior non-payment of taxes by the Sunshine Companies. Revenue Agent Berkowitz was told at that time that the trust fund portion of the overall tax liability, exclusive of interest and penalties, was believed to be approximately $25 million.[28]  At the meeting, Revenue Agent Berkowitz requested that the Sunshine Companies change their corporate address to a local mailbox to ensure that the case was assigned to her.[29]

---

owner of the stock, albeit with plans to distribute shares in the near future. See January 18, 2005 memorandum from Amodeo to Berman outlining his ownership interests in various corporations.  As of January 3, 2005, the Mirabilis Board of Directors consisted of Carlson, Dr. Pollack, Curry and, as the board, they appointed Carlson as President, Dr. Pollack as Vice President, and Curry as Secretary and Treasurer.

[28]    It was subsequently determined that the total payroll tax liability as of December 31, 2004, inclusive of both the non-trust fund and the trust fund portions but excluding interests and penalties, was approximately $52,000,000, with several million more in local and state taxes outstanding.

[29]    On February 25, 2005, Jose Marrero, who had already provided a Power of Attorney to the IRS authorizing to him to represent the Sunshine Companies, formally notified the IRS that the companies' mailing addresses had been changed to a Hollywood, Florida address.

34

The ensuing months[30] were spent administratively winding down the business of the Sunshine Companies, including concluding pending litigation involving the companies. Many of these lawsuits were handled by Berman's law firm. One of the major pieces of litigation was a class action suit that had been filed on behalf of former employees of the PEOs alleging the embezzlement of approximately $5 million in funds that should have been used to pay for the employees' health care coverage. This litigation was settled in August 2005.

There were also additional contacts with Revenue Agent Berkowitz during this time period. On or about April 21, 2005, Jose Marrero met with Revenue Agent Berkowitz, at which time he was told that her calculation to date indicated total liabilities for just one of the Sunshine Company entities, Sunshine Staff Leasing, of in excess of $24 million. She provided Marrero with a list of questions, including asking why no deposits were made during the first quarter of 2005 and whether another company had taken over the business. She also wanted to know more generally what plans were being made to pay the outstanding liabilities. She gave Marrero until June 1, 2005 to obtain the requested information. According to Marrero's written recollection of the meeting, Revenue Agent Berkowitz appeared "to be very cooperative and flexible at this time." On May 11, 2005, Revenue Agent Berkowitz sent Marrero a fax updating her analysis of the outstanding tax liability for Sunshine Staff Leasing, including penalties and interest which she calculated at that time to total approximately $26 million. Via e-mail, Marrero subsequently updated Myers on the status of the case, indicating that Revenue Agent

---

[30]    In actuality, the administrative wind-down of the Sunshine Companies took approximately three (3) years, resulting in over $2 million in expenses plus fees for third-party providers and professionals. This partly explains the disparity between the actual fee and what many outsiders thought it should have been.

35

Berkowitz "has been very cooperative and understanding so far and I want to keep the relationship very positive and working in our favor." Sometime prior to the June 1st deadline, all of the information Revenue Agent Berkowitz had requested was provided to her, with the exception of certain tax returns that has had not been deconsolidated from the Presidion Corporation return and adjusted as of that time. Revenue Agent Berkowitz was informed at this time that the Sunshine Companies book of business was now being managed by a new subsidiary of Presidion Corporation, Professional Benefits Solutions, Inc. (discussed more fully below).

Meanwhile, Presidion Corporation was proceeding with its own corporate audit. In the course of the audit, Presidion's auditors discovered that the December 31st sale had not accounted for one of the Sunshine Companies' assets, a contingent obligation on the part of FCIC to repay collateral based on actual claims performance; i.e., the actual amount that would have to be paid out on workman's compensation claims in the future. Although the exact amount of the obligation could not be determined until the completion of a 7-year claim history, the value was estimated at $12.24 million. In accordance with the original December 31, 2004 Assignment and Assumption Agreement, the Sunshine Companies transferred this contingent asset to Paradyme, obtaining in return for $12.24 million promissory note from Paradyme, payable in a lump sum balloon payment after five years. As part of attempting settlement of the case with the IRS, Amodeo offered to simply transfer over this note to the IRS. Not surprisingly, Revenue Agent Berkowitz had little interest in taking possession of a promissory note of uncertain collectibility from a distressed company. She directed Amodeo to find a buyer for the note and to transfer over to her any automobiles that were titled to the companies.

36

Amodeo and his associates subsequently arranged to have Mirabilis buy the note from the Sunshine Companies. Based on the uncertain collectability of the note, they set a price of 10 % of face value ($1.24 million), payable in three installments.[31] This proposal was conveyed to Revenue Agent Berkowitz with copies of the contracts. Revenue Agent Berkowitz raised no objections to the transaction and stipulated only that payments were sent directly to her. The payments were sent to the IRS over a ninety day period during the summer of 2005.   Subsequent to the disposition of the Paradyme note, the last remaining asset of the corporations (other than a few claims against third parties that ultimately proved to be virtually worthless), the Sunshine Companies were administratively dissolved in the late summer of 2005.

The final assessment of the Sunshine Companies tax liabilities, including penalties and interest, was approximately $52 million.   In addition to making the payments referred to above in the summer of 2005, Amodeo and his associates continued to negotiate with the Revenue Agent Berkowitz over the resolution of the remaining Sunshine Companies' tax debt and to assist her in locating old unfiled tax returns. Although Revenue Agent Berkowitz has continued to pursue the former principals of the Sunshine Companies for their personal liability under the 100% penalty, she has never asserted liability for the Sunshine Companies' taxes against Presidion Corporation. The government's treatment of Sunshine Companies' tax liabilities has thus been consistent

---

[31]    The Assignment and Assumption Agreement under which the note was transferred was executed on May 31, 2005 by Amodeo on behalf of the Sunshine Companies, and Dr. Pollack, on behalf of Mirabilis.  Obviously, this did not have the appearance of an "arms length" transaction and the parties' valuation of the note is open to dispute, particularly insofar as the practical effect was to substantially discount an asset that might potentially have been used to pay tax debts. On the other hand, AMODEO had managed to obtain $1.24 million of liquid assets which the IRS, under the circumstances, was eager to accept.

37

with the analysis that underlay Amodeo's initial Sunshine Companies Plan, i.e., that the parent corporation had no continuing responsibility for the payroll tax obligations of the subsidiary companies after their sale in December of 2004.

### Distribution of fees earned under the Consulting Agreement

In addition to the original $8.9 million paid in December of 2004, PSI paid an additional $3.1 million to AQMI pursuant to the Consulting Agreement over the course of the first seven months of 2005, for a total of $13,113,000, reflecting the fact that the IRS' final determination of the Sunshine Companies' payroll tax liability was approximately $52,000,000 ($13.1 million amounting to 25% of the tax liability, as per the Consulting Agreement).

Of the approximately $13 million that was paid by PSI to AQMI pursuant to the Consulting Agreement, 40% went to Amodeo personally, for a total of $5.25 million. Amodeo used $1.5 million of these funds to purchase a home at 709 Euclid Avenue in Orlando in February of 2005. He also established a trust for his adopted son, Gentry, and funded it with $125,000 (he later contributed an additional $75,000). He spent $800,000 on a variety of charitable causes, as reflected on his tax returns. He bought cars for himself and his wife, Claire, costing a total of approximately $170,000. After setting aside money to pay taxes on his earnings, he was left with approximately $1,000,000, most of which he eventually spent in early 2006 to acquire two additional properties: a condo on DeLaney Avenue which he purchased for $550,000 in February of 2006; and a house on Lake Avenue which he purchased jointly with Mirabilis in April of 2006 for development as a business property (contributing $300,000 of his own funds). The remaining $7.85 million paid by Presidion to AQMI was expended for a variety of

38

business purposes, including the buyout of Burchem and Sandlin in December 2004, compensation for the participation of Amodeo's partners at Matrix, and the legal fees concomitant to the winding down of the Sunshine Companies' operations.

For Amodeo, the apparent (or at least temporary) success of the Sunshine Companies Plan, after years of struggle on his part, was a powerful fuel for his manic tendencies. According to his wife, Claire, Amodeo's transformation during this period was profound and frightening. In her words, he became "manic, angry when confronted, cocksure of anything and everything he believes, especially with regard to the delusion of controlling the world." In fact, Amodeo's mania, and the power and influence that fueled it, were about to increase precipitously over the course of the next year.

### The PBS Plan

On or about January 1, 2005, PSI purchased a South Florida PEO, Professional Benefits Solutions, Inc. (subsequently renamed Presidion Solutions VII, but referred to herein as "PBS"). Immediately, thereafter, PSI began reporting all Florida employees under the PBS EIN number. All non-Florida employees were reported under the Paradyme EIN number. As of April 20, 2005, PBS had no federal tax liability. Amodeo was not involved in the purchase of PBS and/or the decisions on how to process the individual employees' payroll during this period. These decisions were made by the management of Presidion.

However, as discussed above, Mirabilis held a substantial minority stake in Presidion and Amodeo consequently had a considerable interest in its future success. Although Amodeo did not expect to play a direct role in running the company, Dr. Pollack and Carlson were appointed to the Presidion Corporation Board of Directors on

39

January 1, 2005. Both Dr. Pollack and Carlson subsequently became integrally involved in strategic planning with regard to Presidion Corporation's subsequent operations.[32] Toward that end, Dr. Pollack arranged in February of 2005 for a specialist in Sarbanes-Oxley Act compliance, Frank Hailstones, to consult on Presidion Corporation's Sarbanes-Oxley compliance issues.[33]  On March 4, 2005, Mirabilis extended a $5 million letter of credit to PSI to help the still struggling company with its creditors.[34]

In May of 2005, Amodeo was again approached by Vanderburg and Byers regarding further problems with Presidion Corporation, including a severe shortage of working capital, other liabilities totaling millions of dollars,[35] and of most urgency, the potential cancellation of its worker's compensation insurance policy with FCIC.  Amodeo proposed a plan that involved consolidating and settling the Presidion liabilities into one secured claim owed to the IRS. Specifically, Amodeo intended to have Presidion convert the 11 million dollar unsecured claim owed to the IRS into a 70 million dollar secured claim owed to the IRS and use the excess operating cash to settle all other claims, which

---

[32]    See, e.g., January 10, 2005 memorandum from Baiers to Dr. Pollack regarding input solicited on purchase of PBS.

[33]    Prior to joining Mirabilis, Hailstones was the Managing Partner of Price Waterhouse Coopers Europe. Hailstones regularly lectures on corporate governance and fraud detection. He was a featured guest speaker at the 2008 "Fraud Summit" in Las Vegas, Nevada on April 13, 2008. Hailstones spoke on the following topics: "Fighting White Collar Fraud Now" and "How to Perform a Fraud Risk Assessment for the Internal Auditor."

[34]    Under the terms of the Note, $1 million could be borrowed on demand and the remaining $4 million was available upon certification that the amount to be borrowed was less than 80% or receivables less than 90 days old.  The note was secured by a $300,000 deposit with Mirabilis, a $2,300,000 deposit on account with Brentwood Capital Corporation, and PSI's business assets.

[35]    By this point in time, Presidion's remaining subsidiaries had again fallen behind in payment of the payroll taxes, owing approximately $2.1 million in delinquent payroll taxes for the second quarter of 2005.  By the end of June, it was up to $11 million.

40

approximated 50 million in secured claims and over 100 million in unsecured claims. This would be accomplished via the short-term nonpayment of payroll taxes.[36]

Amodeo's plan took another turn in July of 2005 when he was notified that the Presidion workers compensation policy with FCIC would be cancelled within days. Moreover, the insurance underwriter that they were negotiating with to take over the policy, Sunz Insurance, refused to do business with Vanderburg or Baiers. The immediate loss of workers compensation would have the following two effects: (1) it would trigger defaults under a variety of loan and security agreements and (2) it would decimate the PEO book of business; this in turn would immediately destroy the company and result in 20,000 employees losing their insurance having their payroll checks returned for insufficient funds. At this point, it was clear that the business could not continue under the Presidion mantle, as the company had lost all credibility with its lenders and was the subject of numerous damaging rumors in the industry.

In order to avoid the complete collapse of the business, Vanderburg consequently agreed to sell all of the client service agreements owned by PBS, the aforementioned PSI subsidiary processing all Florida employees, to AEM, Inc. ("AEM"), a subsidiary of Mirabilis, an idea which originated not with Amodeo, but with Edie Curry.[37] On July 28,

---

[36]    Amodeo wanted to become the controlling person of the PEO, but was dissuaded by Berman and Holtz, since such a position would require a public hearing before the Board of Employee Leasing and expose Amodeo to personal liability.

[37]    AEM was originally a shell corporation purchased by Presidion shareholder Fred Sandlin in 2004. When Sandlin purchased AEM, it had an extremely low state unemployment tax ("SUTA") rate making it a prime acquisition for a PEO. Immediately after the purchase, Sandlin had AEM licensed as an employee leasing company with the state of Florida. On or about April 29, 2005, Sandlin sold the stock of AEM to Mirabilis for $125,000. Mirabilis purchased AEM for the general purpose of developing a PEO business and making use of AEM's advantageous SUTA rate. The original idea was to

41

2005, an Assignment Agreement was executed by Vanderburg, acting on behalf of PSI, and Amar, acting on behalf of AEM, transferring the entire PBS book of business to AEM, excluding from the transfer any liabilities (including accrued tax liabilities) other than PSI's indemnity proxy and employment agreements with Vanderburg and Baiers. The purchase price for the sale was $12 million, paid out in monthly payments equaling .50% of the monthly gross payroll associated with the transferred book of business. On the same date, July 28, 2005, Presidion Corporation sold PSI, Paradyme, PBS, and other non-operating entities to Wellington for $100,000.

Notwithstanding the fact that the Assignment Agreement appears to contemplate a simultaneous transfer of the PEO book of business, the parties determined that it would be more advantageous to delay the formal transfer of the assets until the end of the 2005 year in order to avoid millions of dollars in state unemployment taxes on "SUTA restarts." The parties subsequently executed a First Amendment to the Assignment Agreement, effective September 8, 2005, indicating that the assets had not in fact been transferred from PBS to AEM and that the transfer would be delayed until December 31, 2005. As an interim measure, the parties entered into a Management Services Agreement, effective July 28, 2005, providing that AEM would manage PBS' book of business in exchange for 2% of PBS' monthly revenues.

Even after the execution of the Management Agreement, Vanderburg remained CEO of PBS and Paradyme, controlled the bank accounts for those entities, supervised personnel and contracting, and generally continued to manage the PEO business, with the important exception that he agreed that PSI would not pay any of its debts without the

---

simply develop the business independent of Presidion, but these plans were overtaken by developments in May and June of 2005.

42

prior consent of Amodeo. Amodeo's role during the second half of 2005 primarily consisted of reviewing on a daily basis the available amount of cash, determining the amount necessary to implement the rehabilitation plan, and allocating the balance to the creditors on the payables list. In a nutshell, he used the payroll tax collections to pay off secured creditors who could otherwise impair the operation of the business, obtain the necessary insurance coverage to continue the business (with the long term plan to acquire a captive insurance company, Beacon Insurance), and to grow the business to the point where AEM, its parent, Mirabilis, or Presidion Corporation (through a reverse merger) could become a viable publicly traded company. A key element of the strategy was the diversification of the company into other business areas, particularly areas where the company could enjoy synergistic advantages by using the existing PEO business to service the labor force of new, otherwise unrelated, businesses. In Amodeo's view, once all of that was accomplished, the revivified publicly traded company would be able to repay the payroll taxes.

Pursuant to the Plan, between June and December 2005 the parties used $9.5 million in payroll tax funds to fund a new insurance policy with Sunz Insurance, $18 million in payroll tax funds to pay various secured creditors (including FCIC, Sandlin and Hendricks), $8 million in payroll tax funds to pay various unsecured creditors, and an additional $250,000 a month to pay Nexia Strategy Corporation ("Nexia"), a wholly-owned subsidiary of Mirabilis engaged by Presidion to execute a profit improvement plan and/or sell the PEO business, $1.2 million toward AQMI's outstanding bill for services implementing the Sunshine Companies Plan, and $1.5 million to resolve outstanding

43

health care claims for which PSI was jointly liable with the Sunshine Companies.[38] Additional funds were used to defray operating losses from bad contracts, and to implement the second phase of the plan, i.e., the rehabilitation of the company as a business enterprise through the acquisition of new companies. During this period, PSI acquired High Tech Development, Inc., a gold refinery facility in El Paso, Texas, for approximately $1.5 million, and Mirabilis acquired Florida Industrial Electric, a commercial electrical company in Orlando, for approximately $6 million.

In order to facilitate the Plan and the aforementioned disbursements, Amodeo advised Vanderburg that he must decide whether PBS should pay payroll taxes or instead pay PSI. Vanderburg decided to make the PBS payments to the standard PSI account and then transfer a portion of those funds to a PSI account opened by Vanderburg at First Southern Bank in Fort Lauderdale (the "Reserve account").[39] Amodeo was given sole signature authority over this account. First Southern Bank in Fort Lauderdale was chosen for this purpose, at Amodeo's request, because Berman was an attorney for the bank, and

---

[38]     The $1.5 million was paid to Amodeo and then transferred to the trust account of the law firm of Gray, Robinson to be used as security for payment of the health care claims. The claims were ultimately paid by Wellington from other funds and Wellington was reimbursed out of the trust account.

[39]     At the time, Amodeo wrongly believed that payroll tax collections by Paradyme and PBS were being deposited into separate Paradyme and PBS operating accounts which were also being used to pay creditors, with the balance then being paid over to PSI. In actuality, payroll taxes collected by electronic means for both Paradigm and PBS were being collected in a single Paradigm Key Bank account, rather than separate Paradigm and PBS accounts, and subsequently being transferred en masse to a PSI account maintained by Vanderburg at Bank of America (the "Ultimate Master account"), from which payments to creditors were being made at Vanderburg's direction on behalf of both companies. These details are significant because Amodeo's intent was to have the decision as to whether to divert the tax monies to non-tax creditors made at the corporate level by Vanderburg while the monies were still within Paradigm and PBS. This was important to Amodeo because at this point he was arguably a "responsible person" for the payment of trust funds taxes by PSI, and was consequently at risk for any decisions by PSI to divert trust monies to non-tax purposes.

44

Amodeo understood that the bank had agreed not to permit Vanderburg to remove Amodeo as a signatory without simultaneous notification to Amodeo or closing of the account.[40] As the sole signatory on the Master Account, Vanderburg was consequently personally involved in the transfer of these funds. The funds were later disbursed from the Reserve account by Amodeo for the aforementioned business purposes unrelated to the payment of payroll taxes.[41] From June 10, 2005 until December 31, 2005, Amodeo and Vanderburg caused to be transferred approximately $64,600,000.00 to the Reserve account from the Ultimate Master account.

Given that the parties had delayed the effective date of the sale to December 31, 2005, they still needed a mechanism whereby the reality on the ground, i.e., Mirabilis' use of the trust fund taxes for non-tax purposes as part of the PBS Plan, could be booked as reflecting a bona fide transfer of funds from Presidion to Mirabilis that would also constitute a perfected security interest that would trump the IRS' claim to the funds. Consequently, the parties entered into a Hold Harmless Agreement whereby PSI promised to pay Mirabilis $50,000,000 by December 31, 2005 in return for Mirabilis' agreement to hold PSI harmless for any subsequent claims against the company, up to a maximum of $70,000,000. The Agreement was executed by Dr. Pollack as Vice-President of Mirabilis and Vanderburg as President of PSI, and ratified by Amodeo and the Mirabilis Board of Directors, which at the time included Edie Curry, Jason Carlson,

---

[40]    Vanderburg had complete discretion to change the account's signers or close it, all Amode was entitled to was notice.
[41]    This is corroborated by the general ledger notes for PSI for 2005, which reflect the disbursement of monies for these purposes. All of PSI and Presidion Corporation's officers had access to these records.

45

Dr. Pollack and Bruce Walko.[42]    This obligation effectively diverted to Mirabilis $50,000,000 of funds owed to the Internal Revenue Service, with the additional advantage of creating a $70,000,000 debt owed by Mirabilis that could be used in negotiating with the Internal Revenue Service for deferment of the payment of the rapidly escalating unpaid trust fund taxes.

In devising the plan to collect payroll taxes and use them for unrelated business purposes, Amodeo believed himself to be acting in accordance with a theory that was originally expounded by Edie Curry as early as November of 2004, in connection with the Sunshine Companies Plan, and which was expanded on by Curry in mid and late 2005 in connection with the PBS Plan.  According to Curry, unsecured IRS debts, including accrued liabilities for trust fund taxes, were subordinate to properly perfected security interests.  In her opinion, the favoring of other creditors over the IRS under such circumstances would expose any "responsible persons" to the I.R.C. Section 6672 100% penalty, but this was the extent of the potential liability risked by such nonpayment as long as the tax liability was truthfully reported on the applicable tax reporting forms. Amodeo had believed much the same even before hearing this opinion voiced by Curry, but her articulation of the theory added all of the fuel he needed to proceed forward with the PBS Plan.[43]

---

[42]    Bruce Walko is an M.B.A. graduate of the University of Southern California with extensive consulting, business and project management experience in start-up environments.  He joined Mirabilis in or about April of 2005, and would continue with Mirabilis in various capacities, including as a member of the Board of Directors, until December 2006.

[43]    During an October of 2005 conversation between Baiers and one of Amodeo's employees, Brian Taylor, at which Curry was present, Baiers was asked by Taylor whether Baiers failure to pay over the Sunshine Companies' tax debt to the IRS in 2004

46

Amodeo had surrounded himself with an array of legal and financial professionals, many of whom had considerable experience in anti-fraud corporate compliance.[44] Amodeo's wife, Claire Holland, will testify that Amodeo confided to her on more than one occasion that he wanted people around him like Dr. Pollack and the legal and accounting experts to provide a compass for his actions, and to help make sure that he did not, through manic impulses or simple bad judgment, repeat the mistakes of his past. However, the experts, like Curry, not only stood idly by and did nothing to prevent the tax fraud, they at many points in time actively encouraged Amodeo in his self-destructive course of action.

The persons who were integrally involved with the business operations during the second half of 2005 and on whom Amodeo relied, to varying degrees, in forming his own judgment that the risks of his course of action did not outweigh the potential benefits, included, among others, the following:

(1)    **Laurie Holtz:** As stated above, Holtz was Amodeo's personal business advisor, and his firm, Rachlin LLP, provided accounting and tax advice to Amodeo. In this capacity, he conferred regularly with Amodeo on matters relating to both the Sunshine Companies Plan and the PBS Plan. Holtz was present at the meeting in his Miami office on July 28, 2005 when it was disclosed that Presidion would be closed down if the PBS plan was not implemented immediately. He was aware that the lynchpin of the plan

---

was a criminal act. According to Baiers, Curry corrected Taylor, asserting that it was not illegal. <u>See</u> Baiers handwritten notes of October 18, 2005 meeting.

[44]    <u>See</u> **Addenda A, B,** and **C** attached hereto. These are lists of accountants, attorneys, and experts who dealt with some aspect of the case and never recognized or notified anyone of potential problems. Individuals highlighted in bold had knowledge of all facets of the case.

47

was to use payroll tax funds for other business purposes, including the payment of secured and unsecured creditors. In connection with the management of the PBS book of business, Holtz personally advised Amodeo that Amodeo should not become the President of PBS or Paradyme because of the increased risk of liability for the 100% penalty under I.R.C. Section 6672 and because any application by Amodeo for a controlling person license under Florida law would necessitate a public hearing that would be problematic given his criminal background. Holtz suggested that it would be advantageous to leave Vanderburg as the controlling person of the companies and their related bank accounts so that he would remain on the front line of exposure for any Section 6672 penalty. In October of 2005, Holtz was offered a position as a member of the Mirabilis Board of Directors and member of its audit committee. He deferred until he could complete a personal review of Amodeo's financial affairs, which was complete in January 2006. He then accepted a position as Chairman of the Board of Directors of Mirabilis, effective March 1, 2006. In a videotaped meeting on April 19, 2006, Holtz stated: I'm his [Amodeo's] doctor; he asked me to come onboard – I came onboard."

(2)    **Edie Curry:** As stated above, Curry performed the original due diligence with regard to Presidion in connection with the Sunshine Companies Plan, and had continuing due diligence responsibility in 2005, which culminated in her recommendation that Mirabilis acquire Presidion's book of business.    From January through December of 2005, she was the

48

Treasurer of Mirabilis. Curry sat on the Mirabilis Board of Directors from January 2005 until October of 2006, eventually becoming chairperson of the Audit Committee in 2006 with responsibility for the original audit of Mirabilis. She was the fourth largest shareholder of Presidion, owning 8 million shares of common stock, an interest she had acquired in part as a result of her work performed on the Sunshine Companies Plan. She also was the president of Nexia, which was a direct beneficiary of Amodeo's PBS Plan, earning $250,000 in consulting fees from PSI during the latter half of 2005. She was the head of the PBS reorganization team from June 2005 through September 2005. Finally, and most important, she was the person who most vocally articulated and reinforced Amodeo's theory that the IRS' claim to the trust fund taxes could be thwarted by the creation of perfected secured creditor positions.

(3)    **Hans Beyer:**    Han Beyer, a bankruptcy attorney, prepared draft bankruptcy schedules for Paradyme, PBS and PSI in anticipation of the possibility that these entities might have to be placed in bankruptcy if matters could not be resolved with the IRS. Later, in January of 2006, he became an Executive Vice-President and Manager for the Tampa region for Mirabilis. In anticipation of assuming that position, he conducted a review of the Presidion transactions and the PBS Plan with a view toward ascertaining whether any civil or criminal liability would arise as a result of the Plan. Following his review, he brought no such concerns to the

49

attention of Amodeo.  Between January and June of 2006, he attended several conferences with the IRS as counsel for Mirabilis.

(4)    **Richard Berman**:  Berman, a Fort Lauderdale attorney, served as the primary legal counsel for Amodeo and his businesses.  He was present at the July 28, 2005 meeting at Holtz's office in Miami when the acceleration of the PBS plan was discussed.  He was personally involved in the drafting of many of the documents that underlay the transfer of control of the PBS book of business in July 2005.  In January of 2006, he became Executive Vice-President, general counsel and Member of the Board of Directors of Mirabilis.  In his capacity as General Counsel, he was charged with reviewing all contracts and corporate governance.

(5)    **James Baiers**:  Baiers, the general counsel for Presidion Corporation and PSI, was also the general counsel for PBS and Paradyme and a statutory controlling person (along with Vanderburg) of those companies.  He remained in this role even after the sale of PBS and Paradyme to Wellington.  He was present by phone from Detroit for the July 28, 2005 meeting at Holtz's office when the acceleration of the PBS Plan was discussed, and was involved in drafting the contracts that were executed on that date.  In 2006, he continued on as Presidion Corporation's general counsel during the winding down of its affairs, but had no role in Mirabilis.  In his capacity as general counsel for Presidion, he assisted in the preparation of the PBS 941 tax returns for the first two quarters of 2006, which reflected PBS as having the liability for the taxes related to

50

the Florida PEO book of business in those quarters, as well as an affidavit, signed by Vanderburg, admitting the PBS was liable for the unpaid taxes and that Vanderburg was personally responsible for their payment under I.R.C. Section 6672.

(6) **Dr. Robert Pollack:** Dr. Pollack became an Executive Vice-President and Board Member of both Presidion and Mirabilis in January of 2005, and became Chairman of the Mirabilis PEO Steering Committee in July of 2006. Dr. Pollack was charged with managing the acquisition of PBS by Presidion at the end of 2004 and handled relations between Presidion and PBS until the State of Florida approved the acquisition in February of 2005.    He was part of the team that performed Sarbanes-Oxley compliance (internal controls) work for Presidion during the period from February through December 2005. He was the principal corporate contact for Mirabilis with the Axena Corporation, a Sarbanes-Oxley compliance consulting and software development company run by his long-time friend and colleague, Frank Hailstones.

(7) **Dan Myers:** Myer's was Amodeo's personal accountant, having worked with him on two previous unrelated workout matters that were successfully resolved with the IRS. Myers was the Controller for his companies, including AQMI and Wellington. He was the CFO for Mirabilis from its inception and controlled all of the financial disbursements out of the aforementioned Reserve Account at Southern Bank. Myers eventually became overwhelmed by his responsibilities and

51

asked to step down from his CFO position at the end of 2005. He was replaced as CFO as of January 1, 2006, by Paul Glover.

(8) **Jason Carlson:**    Carlson was President of Mirabilis until he was succeeded by Frank Hailstones in January of 2006, thereafter serving as Executive Vice President. He was responsible for communications with the Presidion Corporation auditor during the first half of 2005, particularly with regard to the Sunshine Companies Plan. During all of 2005, he was the primary liaison for Presidion and Mirabilis in their efforts to raise funds from the investment banking community. He was a Board member of Mirabilis from January 2005 to February 2007, and was a Board member of Presidion from January 2005 to December 2006.

(9) **Lawrence Haber:**    Haber, an attorney, was an executive Vice-President of Mirabilis, and staff counsel for Amodeo at AQMI since 2004. He was charged with updating the Presidion narrative for outside inquiries. In 2006, he was both President and controlling person of certain Mirabilis PEO's, including Human Resource Enterprises and the Allstaff Group. During the period from April through October 2006, he was one of two officers of Mirabilis responsible for providing customers with federal and state employment tax verification letters identifying the entity that would be withholding taxes on behalf of the client businesses. He was also the attorney who prepared the first version of the tax memorandum in 2005 that identified many of the issues under I.R.C. Section 6672 that motivated the subsequent behavior of the conspirators.

52

(10)    **Yaneev Amar**:  Amar was a former client of Amodeo's and his closest
friend in the Mirabilis organization.  Beginning in July of 2005, he
implemented the profit improvement plan as it related to cost reduction
efforts.    In 2006, he began to make the day-to-day PEO operational
decisions as the President and statutory controlling person of AEM until
he was succeeded by Michael Stanley in March 2006.  Amar acquiesced in
the PBS Plan, in part because he thought that the diverted payroll taxes
would be used only to pay existing creditors for a limited period of time as
part of a workout arrangement, and in part because Holtz, Curry and
Berman, three business people he admired and respected, were involved in
the Plan.

(11)    **Craig Vanderburg**:    As stated above, even after the execution of the
Management Agreement, Vanderburg remained CEO of PBS and
Paradyme, was a statutory controlling person for both companies along
with Baiers, controlled the bank accounts for those entities, supervised
personnel and contracting, and generally continued to manage the PEO
business, with the important exception that he agreed that PSI would not
pay any of its debts without the prior consent of Amodeo.

(12)    **Laurie Andrea**:    Andrea was the original owner of PBS before its
acquisition by PSI in late 2004.  She became a Presidion Corporation
shareholder and a Mirabilis shareholder, as well as a statutory controlling
person of AEM commencing in June of 2005.  Andrea was a Vice-
President of both corporations, specializing in employee benefits.  She was

53

aware of the problems with PBS' unpaid payroll taxes as early as January 2005, and was concerned that she might be a responsible person for the tax obligation. In February 2005, she, along with Robert Pollack, established a protocol for the regular review and audit of the payroll tax deposits. As long as that procedure was in place, Amodeo believed that Andrea was cognizant of the mounting unpaid taxes and not concerned about the potential legal consequences of the Plan.

(13)   **Frank Hailstones:** Hailstones continued the consulting work he had begun with Presidion earlier in 2005, and began in the fall of 2005 to establish internal control procedures at Mirabilis, eventually becoming President of Mirabilis in January of 2006. In December of 2005, he agreed to become a statutory controlling person of AEM, along with Yaneev Amar, Paul Glover and Laurie Andrea.

Notwithstanding their awareness of the essential details of the PBS Plan, and their integral involvement in carrying out the Plan, none of the above persons took any action to dissuade Amodeo or to otherwise prevent the implementation of the Plan in 2005. On the contrary, many of the individuals listed above directly benefited from the Plan in the form of substantial compensation and/or the repayment of existing debts.[45]

---

[45]      In addition, in the case of the principals of Presidion Corporation, they received the added and not inconsiderable benefit of minimizing potential criminal exposure. Past business associates of Vanderburg and Baiers continued to be investigated for bank and securities fraud involving various entities. PSI paid off various outstanding workers' compensation and health claims that were within the ambit of the criminal investigation, and criminal cases against Vanderburg and Baiers were never pursued by the government.

54

Comments made by various attendees at a Mirabilis conference held on April 20, 2005 provide valuable insights into Amodeo's relationship with the Mirabilis employees during this time period. The conference was videotaped and the recording will be made available for review by the Court at the sentencing. During the conference, the participants are each asked to stand and introduce themselves, and they proceed to provide a brief explanation of their background, and in some instances, an explanation or anecdote about their relationship with Amodeo. Collectively, the clear impression that is conveyed is that those in the audience who know Amodeo are generally familiar with both his strengths and his weaknesses, i.e., his energy and creativity, as well as his need for guidance and supervision. As befits the occasion, this is presented in an essentially positive light, but the overall effect is almost as if the participants are trying to convince each other than Amodeo is manageable. Berman indicates that he has worked with Amodeo on a number of projects over the years, and that he is "a client who listens," who "takes instruction and criticism." Dr. Pollack comments that "I am here to keep Frank in check." Perhaps most tellingly, Khanokar jokingly explains that "I always come away from meeting with Frank with a very giddy high that lasts for at least a couple of days."

**Communications with the IRS and tax compliance discussions in early 2006**

At the beginning of 2006, arrangements were made for a January 20th conference with Revenue Agent Berkowitz in Plantation to lay down the groundwork for a formal installment plan to resolve both the Sunshine Company trust fund tax debt (which at that time was estimated to be $26 million) and the PBS debt (at that time estimated to be $71 million). Myers checked with Vanderburg to ensure that Vanderburg had properly filed the 941 tax returns for the third and fourth quarters of 2005. Vanderburg initially

55

indicated that they had been prepared by Melanie Lavigne, the Presidion Corporation tax manager, and filed electronically. However, he was unable to produce a signed version. At the insistence of Amodeo, Vanderburg then printed and signed new copies of the tax returns that were mailed to Myers and to Revenue Agent Berkowitz in Plantation, Florida.

Also in preparation for the January 20th conference, Amodeo attended a meeting with Berman, Holtz and Curry at which they discussed the persons who should attend the IRS conference. At that meeting, Curry reaffirmed her opinion that unsecured IRS debts were subordinate to properly perfected security interests. The understanding Amodeo took away from this meeting, as from the previous discussions with Curry, was that Mirabilis and AEM could relegate the accruing IRS debt to a secondary status behind perfected security interests, especially its own. Amodeo requested that a legal memorandum be prepared by Berman which would confirm this.    The meeting participants were so confident in their position at this point that they agreed to only send the "B" team to the IRS conference – Dan Myers and Sharmilla Khanokar (a CPA with Rachlin LLP). Amodeo insisted that Hans Beyer also attend the IRS meeting as the company's bankruptcy expert,[46] since bankruptcy remained Amodeo's failsafe strategy if the IRS was ultimately not amenable to an installment plan.

The legal memorandum was not completed until after the IRS conference, which was generally uneventful. Subsequent to the January 20, 2006 meeting with Berkowitz, Myers also provided her with an additional copy of the tax returns in February of 2006. The tax returns, filed on behalf of PBS, accurately reflected the full amount of the

---

[46]    Hans Beyer reviewed all of Presidion and Mirabilis' transactions for any criminal violations, particularly RICO, and found none.

56

accrued and unpaid employment tax liabilities, a fact that is not disputed by the government. Included in the copy of the tax returns sent to Revenue Agent Berkowitz by Myers was a February 8, 2006 letter from Amodeo confirming the original tax liability of the Sunshine Companies of $52 million, and indicating that the PBS liability for 2005 was $71 million. Pursuant to a previous conversation between Myers and Revenue Agent Berkowitz, Amodeo directed the payment of approximately $600,000 to the IRS in the month of February 2005, the first of what was intended to be a series of $600,000 monthly payments to the IRS to pay off historic (non-current) tax liabilities of both the Sunshine Companies and PBS.[47]

On February 2, 2006, a final version of the requested legal memorandum was submitted to Amodeo regarding the relationship between current trust fund obligations, after acquired funds and willfulness under I.R.C. Section 6672. The memorandum described in detail the legal obligation to hold payroll tax funds for the Internal Revenue Service and specified civil and criminal penalties, including a brief reference to criminal penalties under Section 7202 for failure to follow the applicable law. In this last respect, the memorandum implicitly supported Amodeo's and Curry's shared theory that they could use trust fund taxes to pay pre-existing non-tax perfected security interests with no other risk than potential civil exposure to the 100% penalty.

The legal memorandum was personally delivered by Berman to Amodeo when they had lunch together near Berman's office at a Sonny's Barbecue in Fort Lauderdale,

---

[47]     In connection with the proposed payments, Myers called Revenue Berkowitz and asked if the IRS would accept weekly installments of $150,000 made directly from a PSI American Express "Black Card" registered to Amodeo. On February 2, 2006, Revenue Agent Berkowitz replied in writing that the IRS would accept the payments charged to the Black Card.

57

but was not touched upon by either of them in conversation. Instead, Berman raised the possibility of having a "shadow" Board of Directors for Mirabilis consisting of Holtz, Amodeo and Berman, ostensibly because Berman and Holtz both wanted to become more involved in the business. Amodeo encouraged Berman to become more involved in taking over the operations of the business, but declined to become more involved in the day-to-day running of the business himself, insisting that he was an "entrepreneur" and not an "operator". Amodeo concluded by saying he preferred to pursue his own interests, including his plan to establish a world empire making the existing nation state governments obsolete. He handed the legal memorandum back to Berman, never reading it, and directing him "to give it to the people in charge of running Mirabilis," by which he meant the Mirabilis Board of Directors.[48]

### AEM's assumption of formal ownership of PBS book of business

At the end of 2005, AEM had assumed formal ownership of PBS's book of business pursuant to the previously executed First Amendment to the Assignment Agreement. Taking over from Vanderburg on a transitional basis, Amar had begun making day-to-day operations decisions for the PEOs as President and statutory controlling person of AEM. At this time, Paul Glover was hired as CFO of Mirabilis.[49]

---

[48]    Several months later, in July of 2006, Amodeo also personally delivered a copy of the memorandum, still unread by him, to the Internal Revenue Service.

[49]    Glover graduated with a B.S. in Accounting from the University of Florida and is a CPA. He has more than 25 years of experience with a diverse range of businesses, including serving as CFO for Pan Am International Flight Academy Holdings, Inc., a holding company for a consolidated group of businesses the principally provide flight training to the commercial aviation industry. Shortly after being hired by Mirabilis, Glover approached Martin Flynn, the head of the Mirabilis HR Department, and asked him if realized that the company was primarily built on unpaid payroll taxes. Flynn responded that this was common knowledge and he referred Glover to Berman and Holtz.

58

At the end of February of 2006, Amar was replaced as CEO of AEM by Michael Stanley, a C.P.A. who was previously an Associate Treasurer at Anheuser Busch, and more recently had been the CFO of a large Central Florida staffing company, Workers Temporary Staffing, Inc. ("WTS"). With the approval of Amodeo and Vanderburg, WTS was acquired by Mirabilis contemporaneous with Stanley's accession to the position of AEM CEO. Mirabilis paid the owners of WTS, Mark Lang and Frank Falconetti, $5 million for the company out of payroll tax funds. In addition, the broker who brought WTS to Mirabilis' attention, Kevin Munroe, was paid $250,000 out of payroll tax funds.[50]

Reflecting the change of ownership, as of January 1, 2006 all funds collected from the PEOs were deposited into an AEM d/b/a Mirabilis HR bank account with Bank of America. The account was opened by Amar. He also had signature authority over the account, although the account was actually managed by Sue Schumacher, Presidion's CFO who was now in the same effective role with AEM without the title. Under Amar's supervision, Schumacher made disbursements using Amar's electronic signature to pay for day-to-day operations.

From the BOA depository account, the monies were disbursed to various other AEM accounts for the payment of payroll, operating expenses, taxes, etc. Funds used for the acquisition of new business assets would be transferred from the BOA depository

Glover subsequently informed Amodeo that he had spoken with Berman, and that Berman had directed him to ask Amodeo for a copy of the Wildermuth tax memorandum.
[50]    Mark Lang subsequently became Vice-President of Staffing Acquisitions for Mirabilis. Kevin Munroe became President of WTS, now a subsidiary of Mirabilis, and a consultant for Nexia.

59

account to an account maintained by Mirabilis at SunTrust Bank in Orlando[51] or to Berman's law firm trust account at First Southern Bank in Fort Lauderdale. Transfers were also made from AEM's operating account to PSI's account at SunTrust Bank in Orlando (the "PSI Capital Account") to pay Presidion related expenses and for the purchase of two businesses, WTS and Winpar (a real estate development project based in Nashville, Tennessee purchased for approximately $3 million), both of which provided security for Presidion within the context of the Hold Harmless Agreement.[52] Mirabilis anticipated the receipt of $40 to $50 million in profit from the eventual sale of these two businesses.

All of Presidion's Florida customers were sent letters informing them that AEM had purchased the book of business and all of AEM's subsequent actions were consistent with it being the owner of the Florida book of business. However, in April of 2006, Michael Stanley discovered that the client service agreements were in the name of Paradyme and not PBS. Consequently, the July 28, 2005 Assignment Agreement between AEM and PBS was with the wrong party.[53] As a result, AEM and Paradyme

---

[51]     Sadrianna originally held signature authority over the SunTrust account, and was later succeeded by Hailstones.

[52]     Many of the payments to PSI were actually for the use of PSI equipment and facilities with respect to which PSI had existing lease contracts with third parties. The original intention parties was to title both WTS and Winpar in PSI's name, but Sunz Insurance, for reasons already discussed, would not agree to continue to insure WTS if PSI was its owner. Wellington consequently assumed ownership of WTS, with an informal assurance from Amodeo to Vanderburg that the asset would be used as security for the Hold Harmless Agreement.

[53]     This was not the only defect with the July 28, 2005 sale. Under Florida law, Vanderburg, as controlling person of PSI, had a duty to inform the Florida Department of Business and Professional Regulation that there had been a change in ownership of a company that owned Florida PEOs. In the absence of such notice, the sale is voidable, and the original owners remain liable for all insurance and state and federal tax obligations. Vanderburg failed to ever contact the State of Florida. Vanderburg's failure

60

entered into an April 1, 2006 Transfer Agreement (the "Transfer Agreement") whereby Paradyme agreed that AEM could purchase as much of its book of business as AEM wished for an amount not to exceed 0.5% of the transferred book of business' gross wages per month, with a cap on total payments of $10,800,000, an agreement which essentially took the place of the 2005 agreement between PBS and AEM.

At the time of Stanley's revelation that the PEO contracts were with the wrong party, AEM was already several weeks in arrears on its payroll tax deposits, having effectively suspended payments in February 2006 after Stanley's accession to the CEO position of the Mirabilis PEOs. The discovery of the contract glitch was thus a convenient pretext to engage in a familiar fiction. Amodeo and Amar, on behalf of Paradyme and AEM, respectively, entered into a "Service Agreement", retroactively effective as of January 1, 2006, which purported once again to maintain that AEM was in the first quarter of 2006 just managing the book of business on behalf of Paradyme. The whole purpose of this charade was to avoid or at least diminish the possibility that the AEM management would become responsible under the 100% penalty for the unpaid taxes in the first quarter of 2006. The one person who wouldn't gain any advantage from this transaction was Amodeo, since he was the owner of the Paradyme through its parent company, Wellington.[54]

to inform Amodeo that Paradyme was the actual owner of the Florida PEO contracts, as well as his failure to ever contact the State of Florida, raises the possibility that he intended to use this loophole as a means to reacquire the PEO book of business at a later date. Such a conclusion would be buttressed by the fact that Vanderburg continued to look for a new WC insurer even after completing the sales agreement with AEM. His failure to ever attempt to capitalize this loophole may be explained by the fact that he was never able to find another insurer who would do business with him.

[54] Apparently as a result of this pretense, at a videorecorded April 18, 2006 Mirabilis Chairman's Finance Meeting attended by attended Mirabilis CFO Glover,

61

However, notwithstanding the revelation about Paradyme's ownership of the PEO

contracts and the retroactive execution of the Service Agreement, there was no getting

around the fact that letters and invoices had already been sent out to the PEO customers

stating that AEM was in control of the book of business. Mike Stanley ultimately

decided to take the position that AEM was in fact the proper reporting entity for the

payroll taxes for the first quarter of 2006.[55] AEM timely submitted a 941 return to the

IRS properly showing the tax liability for that quarter, the amount that had been paid, and

the deficiency remaining. Approximately 2/3 of the taxes had been paid, reflecting the

fact that proper collection and payment procedures had been followed for the short period

---

Mirabilis COO Simo, Mirabilis CEO Hailstones, Mirabilis Executive Vice-President
Curry, Mirabilis Chairman Holtz, and Mirabilis auditors Khanokar and Stephen Holtz,
Glover claims that the PBS/Paradyme book of business "is not really our
[Mirabilis/AEM's] book of business." Glover goes on to say that they have "drawn a
very thin line in the sand" and that Amodeo thinks they are "well insulated." Much of the
rest of the meeting is an interesting exercise in coy denial. Holtz asks Glover is there is
some way that they [Mirabilis/AEM] can get information on the tax payments from
Presidion (notwithstanding the fact that the PEO payroll and tax deposits were then being
run through AEM bank accounts, all tax deposits in 2006 had been made by AEM, and
Mike Stanley had just filed a 941 return on behalf of AEM indicating that it was
responsible for the book of business). Glover responds, "probably not," and goes on to
note that "they're negotiating the IRS resolution and the proposal is $144 million." Holtz
states that he knows about the negotiations, to which Glover replies: "then you know how
bad it is." Holtz concludes by worrying aloud that "what would be bad to me is in the
middle of doing that [negotiating with the IRS] they [the IRS] found out that they
[Presidion] were grabbing the money. . . And that everything we are doing over there,
nobody's going to know that it was theirs, because it was part of the time that we were
part of it."    Much of the rest of the meeting is devoted to a discussion of
Mirabilis/AEM's potential liability for the unpaid employment taxes, with Hailstones
reaching the conclusion that their exposure is basically limited to the first quarter of 2006
due to the fact that the letters had been sent out to clients in that quarter acknowledging
that the book of business had been moved to AEM.
[55]    Another contributing factor in this decision had to do with the applicable SUTA
rates. If the returns had been filed by Paradyme, its applicable SUTA rate would have
exceeded 5%, whereas AEM's SUTA rate was the Florida minimum of .43%. The
difference amounted to over $8 million in tax savings ($310 x 28,000 employees =
$8,680,000).

62

from January 1, 2006 up to the time of Stanley's hiring in late February 2006, with a

cessation of tax payments after that date. The unpaid taxes were used for the $5 million

acquisition of WTS, discussed above, as well as for the acquisition by Mirabilis of two

other PEOs, National Medstaff, owned by Charles Kirkpatrick,[56] and Allstaff, owned by

Jeff Riechel.[57]    The decision to purchase both Medstaff and Allstaff was made by the

Mirabilis directors with some input from Amodeo on Medstaff, but no input from

Amodeo on Allstaff. Again, the source of the funds for the acquisitions was the unpaid

payroll taxes.

Subsequent to the submission of the aforementioned AEM 941 return for the first

quarter of 2006, on April 20, 2006, Beyer, Khanokar and Myers attended a meeting at the

IRS office in Plantation Florida with Revenue Officer Berkowitz. The agenda for the

meeting was to continue discussion about a potential installment for the repayment of the

existing Sunshine Companies and PBS tax obligations (the basic plan was to pay

$600,000 a month until the end of the year, and then a $1,000,000 a month thereafter,

increasing to an amount sufficient to pay off all of the debt within 72 months).[58]   After

---

[56]    Kirkpatrick was the Chief Operating Officer of Presidion Corporation and PSI since January 2004. He was also the owner of a Georgia PEO, National Medstaff. In January 2006, Mirabilis purchased National Medstaff and Kirkpatrick became Vice-President of PEO Acquisitions for Mirabilis, leaving after only a month due to personality conflicts with Amar and other personal reasons. Over the next eight months, Kirkpatrick received $1 million in installment payments as consideration for the purchase of National Medstaff.

[57]    Mirabilis paid Reichel $1 million upfront for Allstaff, with another $1 million to be paid in monthly installments over a two years period.

[58]    On April 18, 2006, immediately subsequent to the aforementioned Mirabilis Chairman's Finance Committee Meeting, Holtz attended another meeting with Khanokar and Curry in which he references the upcoming IRS meeting, and indicates that he intends to go over the "bullet presentation" for that meeting with Curry (in a later taped discussion with his son, he indicates that made the charts that he wanted them to use at the meeting). At this point in time, Holtz was thus well aware of the magnitude of the tax

63

the meeting, Beyer and Myers reported back to Amodeo that everything was satisfactory with the IRS. Khanokar indicated that that if there were going to be any problems, they would probably hear about with the next week or two.

In late April, the IRS sent back the AEM 941 Form for the first quarter of 2006 with a letter rejecting the Form on the technical basis that AEM had insufficient employees in 2005 to warrant the filing of a Form 941, directing that a Form 944 should be filed instead. However, by this point Mike Stanley and Paul Glover had made another revelation, i.e., that PSI had a second computer system (the "Alpha 5 system") that was producing a different set of financial numbers for many of the contracts that the main system (the "Lawson system"). As a result, the Alpha 5 system was masking the fact that certain contracts were actually being priced below cost. Charles Kirkpatrick, who created and owned the Alpha 5 system and was now hostile to Mirabilis since his resignation in February of 2005, refused to allow Stanley and Glover to have access to the system.

On or about May 9, 2006, Amar, who was still acting President of AEM pending Stanley's approval by the State of Florida, sent Presidion a letter unilaterally rescinding the original July 28, 2005 Assignment Agreement on the basis of 'inaccurate statements" and "misinformation" which induced AEM to enter into the contract. The letter makes no mention of the April 1, 2006 Transfer Agreement. However, the intent was to unwind both the Assignment Agreement and the Transfer Agreement.

---

problem, having just attended a meeting in which the $144 million deficiency was referenced, and was also actively involved in supervising the preparations for the ongoing negotiations with the IRS. Holtz's meeting with Khanokar and Curry is also instructive in at least one other respect: contrary to his implicit suggestion in the Finance Committee Meeting earlier that day that he was somehow cut off from knowledge about the day-to-day flow of funds because of a lack of access to information about Presidion's operations, he acknowledges in this meeting that all of the PEO business is in fact being run through one man [Amar], the President of AEM, who had no relation to Presidion.

64

In reality, the computer system imbroglio, although very real, was also a pretext for rescinding the sale. At this point, it had become apparent to Stanley and others that AEM could not afford to both keep the taxes current on the PBS book of business and subsidize the mounting operating loss of Mirabilis. By rescinding the Transfer Agreement, the liability for the unpaid trust fund taxes could potentially be placed back on Presidion's doorstep. At this time, Presidion was no longer a viable entity and did not respond to the rescission letter.

Based on this rescission, Stanley and the Mirabilis Board of Directors decided to continue to operate the PBS book of business pursuant to the pre-existing Management Agreement executed in 2005. AEM retroactively amended the Management Agreement in order to justify the company's control over the PBS book of business through March 31, 2006. The amendment extended the term of the Management Agreement through August 1, 2006. A new 941 was consequently prepared for PBS, which reflected the same tax collection as the 941 Form originally filed for AEM, but differed from that Form in that it showed zero tax deposits with the IRS during the first quarter of 2006. AEM correspondingly did not include the PBS book of business in its 944 tax filing for the first quarter of 2006. Moreover, AEM applied the tax credit resulting from the deposits previously made on behalf of the PBS book of business to taxes accruing after April 1, 2006 as opposed to applying the tax credit to the PBS book of business for the first quarter of 2006.

In one fell swoop, AEM thus purported to foist the tax liability back onto Presidion and deprive it of credit for the tax deposits already made in the first quarter of 2006. In the second quarter of 2006, AEM continued this practice. Even though by its

65

own account it was no longer the owner of the PBS book of business, but only its manager, AEM continued to apply the currently accruing PBS trust fund tax collections to the costs of Mirabilis' operations. This was a course of conduct consistent with the PBS Plan and agreed upon by all of the Directors and Officers of Mirabilis and Presidion.[59]

### Amodeo's Capital Genesis Plan

The PBS Plan had always contemplated that Amodeo would eventually be phased out of the day-to-day operations of Mirabilis in favor of more well-credentialed and blemish-free professionals better suited to soon-to-be publicly traded entity. As reflected above by the hiring of Mike Stanley and Paul Glover, this transition was already well underway in early 2006 and took another substantial step forward with Holtz' accession to the Chairmanship of the Board of Directors in Mirabilis in March of 2006. For Amodeo, this transition to a team of more experienced managers who were expected to impose more internal controls served the additional purpose of reining in his manic tendencies.[60]  As he explained in a videotaped March 23, 2006 Mirabilis Board of Directors Meeting, "[c]atch me in the doggone hallway and I'll blow $100,000 -- this process is designed to protect me from myself."  Holtz subsequently confirmed Amodeo's disengagement from the day-to-day operations of the business, noting in an April 18, 2006 videotaped conversation with his son that Amodeo has "let go of the

---

[59]     Vanderburg may have agreed to this arrangement because one of the consequences of this was that Mirabilis would pay off Presidion's pre-existing insurance obligations, and it was the payment of these obligations that was arguably preventing Vanderburg from becoming a target of the letter of credit fraud investigation then being conducted by the U.S. Attorney's Office in Fort Lauderdale.

[60]     This plan began in October of 2005 when Mirabilis voluntarily adopted the strict requirements of the Sarbanes-Oxley Act in its corporate by-laws.

66

reins," and further stating in an April 19, 2006 Mirabilis meeting with Curry and others

that "Frank is not going to challenge the people he's putting in." Later that same day, in

another videotaped conversation, Holtz commented: "Frank is not going to get in our

way, subsequently adding "just because you put the money up, doesn't mean you can run

it."

Notwithstanding Amodeo's stepping back from the day-to-day operations of the

company, he continued to assert influence over long range planning for the company.

For example, during a March 21, 2006 Mirabilis Board of Directors meeting attended by

Amodeo, he told the Board that they had a fiduciary obligation to him as the company's

sole common stock shareholder (Amodeo had not yet and world never be eligible to

purchase the shares) and senior secured creditor, recommended various changes to the

composition of the Board of Directors that were subsequently implemented by the Board,

laid out recommended changes in operational procedures that were sometimes

implemented by the Board, and proposed future acquisition strategies.[61]

Amodeo also remained extremely active in trying to realize his ambitious plans

for expanding the company into new areas, efforts which, at least initially, were

encouraged by the Mirabilis management. During Holtz' aforementioned April 18, 2006,

---

[61]    Although Amodeo represented at the meeting that he would be making the cash
infusions that would fund such acquisitions, the funds were in fact not being supplied by
Amodeo personally, but from the trust fund taxes that were being collected by AEM.
Everyone on the Board of Directors knew or should have known that this was in fact the
case, as the flow of funds into and out of the AEM bank accounts was no secret. In fact,
as stated repeatedly above, it was commonly understood among the Board members and
was in fact an integral part of the PBS Plan that future acquisitions would be funded
directly with trust fund tax collections. Amodeo's comments at the meeting are an
incredibly illustrative example of his particular strain of mania – even though he was
essentially performing for an audience of one, himself, he could not resist grandiosely
playing the corporate benefactor.

67

videotaped conversation with his son, Holtz comments that Amodeo was looking toward "huge deals that may or may not happen." His son responds that "there's a fine line between ambitious and delusional. Holtz replies: [t]o me reaching across the table is a success. He [Amodeo] wants to reach across the world." Holtz concludes by saying that "[i]f this thing is a success we could make a [expletive] fortune. And you get a piece."

As stated above, Amodeo had suffered from delusions for years that he had a special destiny and would somehow, someday, become master of the world. The funds made available by the Sunshine Companies Plan allowed Amodeo and his wholly owned corporation, AQMI, to pursue various opportunities to fulfill that vision. Some of these ventures were completely philanthropic and laudable.[62] For example, immediately after Katrina devastated the Gulf Coast in August of 2005, Amodeo took steps to reestablish cellular and satellite communication to the region by acquiring unused cellular towers in Pennsylvania and Ohio, moving them to Louisiana, and connecting them to the MCI system. Within days of the disaster, this enabled emergency personnel to use cell phones to communicate in the field. Mirabilis employee James Vandevere was the project leader and an IT team employed by a Mirabilis subsidiary, ISI, remained in place in Louisiana for 18 months to maintain the system until regular communications were reestablished.

However, other activities were far more outreaching and grandiose in their implications. Amodeo increasingly occupied himself with laying the groundwork for his grandiose vision, which he called his "Capital Genesis Plan." The economic basis of the Capital Genesis Plan was a broad theory of business integration; in a nutshell, Amodeo envisioned combining PEO businesses into a broader family of companies that would

---

[62]     See **Addendum D** – "List of Charitable Activities" and **Addendum E** – "List of Extraordinary Events."

68

provide synergies not achievable between unrelated companies. Just as the original PEO model which Amodeo had been marketing in 2004 contemplated an integration of medical insurance/managed care with traditional PEO functions, the more ambitious model that he was germinating would integrate an even broader array of complementary businesses. Rather than simply contracting with unrelated companies for PEO services, Amodeo anticipated acquiring labor intensive businesses, such as construction companies and restaurant chains, on a large scale, that would serve as captive customers for the PEO businesses.

The economic basis of the Genesis Plan was just a means to an end. Amodeo envisioned himself heading a global conglomerate that through it integration of services would insinuate itself into almost every aspect of the individual's life. In essence, he envisioned an institution that would not only dominate the economic life of cities, towns and countries, but also essentially take the place of government in providing for the needs of the people.

As a first step toward the realization of the Capital Genesis Plan, Amodeo tasked AQMI employees to identify the key elements in every geographical area of the world necessary to implement the Plan. In Amodeo's estimation, each geographical area of the world had specific resource advantages and social needs which needed to be identified. He tasked the AQMI employees to write what he called "Master Strategic Reports" for each such geographical area, beginning with comprehensive reports for the five major continents and Eastern Europe. The reports contain information on such diverse issues as political factions, cultural factions, key companies, key NGOs, detailed commercial reports on available resources in production and planned production, as well as existing

69

relationships, if any, between Amodeo/Mirabilis affiliated persons and government officials in the specified regions. Six to twelve employees worked on this project over an 8-12 month period commencing in or around October of 2005.

At the same time, in order to effectuate the Plan, Amodeo began identifying and hiring former law enforcement and military personnel, particularly those with foreign experience. Amodeo thought that this was crucial to the success of the Plan because he needed people with real world experience of the conditions "on the ground" in the countries and regions that were being investigated. In addition, Amodeo anticipated that the same personnel would provide security for future operations in those countries and regions. Toward that end, in 2005 Amodeo hired, *inter alia*, a former senior supervisor for the FBI's organized crime task force in New York City; the then highest ranking DOJ attorney before the FISA Court; a security firm, Tactical Intelligence, that was under contract with the DEA and ATF to apprehend fugitives wanted for drug and weapons crimes; and private security contractors who had previously provided security services, through a subcontract with the security firm, Blackwater, for Ambassador Bremer in Iraq.

In April of 2006, Amodeo was introduced to Oscar Kashala, a Harvard educated oncologist from the Democratic Republic of Congo (the "DRC"), who was then living in Boston, Massachusetts. The DRC was about to have its first free election in 46 years and Dr. Kashala was one of thirty-two persons on the slate of Presidential candidates. Kashala explained to Amodeo that he wished to obtain security services from the security firm, Tactical Intelligence, to protect him and his staff while he campaigned in the DRC. Amodeo convinced Kashala that he needed his help with more than just security services, and Amodeo eventually became Kashala's chief financial backer and a senior political

70

advisor.  Kashala's political party, UREC, even went so far as to adopt the Capital Genesis Plan as one of the planks in its political platform, actually including the plan, by name, in its campaign literature in the DRC.

As a result of Amodeo's introduction to Kashala, Amodeo was also introduced to Karen Tramontano, a former senior White House staff member in the Clinton Administration, who at the time was a principal in the prominent Washington, D.C. lobbying and international consulting firm, Dutko Worldwide.  Amodeo retained Ms. Tramontano with the intention of enlisting her assistance in implementing the Capital Genesis Plan on a worldwide basis.  Dutko Worldwide arranged for AQMI personnel to meet with senior government officials throughout Eastern and Central Europe, and opened up preliminary discussions between AQMI personnel and government and corporate commercial interests in Central Asia.  In addition, Dutko Worldwide arranged for Amodeo to be nominated for a seat on the Board of Directors of the Global Fairness Initiative, which also included on its Board former President Bill Clinton, the President of the AFL-CIO, John Sweeney, the former Prime Minister of the Netherlands, Willem Kok, and other major international political and business leaders.  On May 9, 2006, Amodeo was offered a seat on the Board, but had to decline the offer because of a crisis that was then developing in the DRC.

One of Amodeo's employees was Kevin Billings, the former head of the Presidential Protection Unit of the Secret Service.  He and Amodeo's Chief of Staff at AQMI, Joe Robinson,[63] along with two security contractors from Tactical Intelligence, had been sent in early May 2006 to the DRC to do advance planning work in anticipation

---

[63]    Robinson is a retired captain with the Orlando Police Department who had served as Deputy Chief of Staff to Orlando Mayor Buddy Dyer until January 2006.

71

of Dr. Kashala's arrival later that month. While doing the advance work, they were also scouting opportunities for Amodeo's Capital Genesis Plan, and were given by the governor of one of the DRC provinces a diamond survey showing what were purported to be previously untapped resources. After nine days in the DRC, they had completed their tasks and were planning on flying back to the United States. However, while in the airplane on the tarmac at Kinshasa Airport, they were confronted by military police, who pulled them from the plane and forced them to surrender their passports and baggage. Billings was able to place a cell phone call to Amodeo, notifying him of their situation. The police sent Billings and Robinson back to their rental home and told them that they could return to the airport for their passports the next day. That night, while they were sleeping, armed police broke into the home and arrested both them and the security contingent of eight subcontractors that Tactical Intelligence had already hired to provide local security.

When AQMI personnel in Orlando did not hear from their employees in the morning, they knew that there was some sort of problem. Amodeo began trying to mine contacts in the DRC that could assist them in establishing a line of communication with the DRC government. They also commenced publicizing the situation, so the DRC government would be aware that it was no longer a secret. Eventually, Amodeo received a report from a Kinshasa Rotary Club member that that Billings, Robinson and the contractors were being held at a prison near Kinshasa. Amodeo and his staff then stepped up their efforts, contacting members of Congress, prompting them to make their own inquiries to the DRC. These efforts eventually paid off, and the DRC government allowed staff from the U.S. Embassy to meet with Billings and Robinson at the prison.

72

However, the government had no intention of immediately releasing the men, and instead paraded them in front of the local press, claiming that they had been part of a corrupt effort to manipulate the outcome of the Presidential election.

The following day, six days into Billings' and Robinson's captivity, the story began to be picked up by the international press. AQMI increased its own media campaign, conducting interviews with the AP, CNN, ABC, CBS World News, and all of the Central Florida television stations. While Amodeo also began preparing for the possibility that they might have to pay some sort of ransom to secure his employees' release, the mounting publicity about the situation eventually led to a breakthough. On the ninth day of their captivity, Billings, Robinson and the contractors were released by the DRC government with no charges against them. They were driven to the airport, paraded before the media one last time, and placed on a plane home.

Subsequent to the Congo episode and through the public relations efforts of Dutko Worldwide, Amodeo was invited to Washington D.C. to meet with officials from the Department of Interior, Department of Commerce and USAID about the application of his theories to domestic and foreign policy in the United States. While Amodeo was in Washington, he met with Dan Barks, a partner with the law firm of Spizer and Krause, who introduced him to former national Security Advisor Bud MacFarlane. MacFarlane complained that a project he had been working on in Afghanistan to provide soybeans to farmers was going to fail because of government inaction in transporting the seeds from the United States to Afghanistan.

In typical fashion, Amodeo volunteered to make sure that the seeds arrived within eight days in Afghanistan. He had already been in negotiations with some aviation

73

companies about possible acquisitions, and some of the potential acquisition companies were willing to donate planes for, or subsidize the cost of, flying the seeds to Afghanistan. The seeds subsequently arrived in Afghanistan in a timely manner. Later, Amodeo's interest in acquiring aviation companies led on one occasion to two F-16 pilots, on a routine Marines exercise, detouring to Orlando Executive Airport to deliver due diligence packages to Amodeo on companies that they knew were interested in being acquired by Amodeo.

**The June 13, 2006 meeting**

On May 1, 2006, Stanley opened up new AEM bank accounts because he was uncomfortable using an account to which Vanderburg or Schumacher had previously had any access. Now as a signatory on the bank accounts and clear a "responsible person" subject to the 100% penalty, he also made clear that payroll taxes, which had not been paid as they accrued since late February of 2006, would henceforth be paid on an ongoing basis. However, in early June, AEM was again unable to pay its ongoing payroll tax obligations.

On June 13, 2006, Myers called Amodeo and told him that he needed his assistance with the Mirabilis audit. According to Myers, Amar was raising red flags about the unpaid payroll taxes and beginning to make both external and internal auditors nervous. Amodeo agreed to attend a meeting at the Boheme Restaurant in downtown Orlando and address any issues. In attendance at the meeting were Stanley, Myers, Amar, Kevin Leonard (the Controller of Mirabilis) and Glover. The parties revisited the issue of the use of employment taxes to fund operations, reorganize businesses and capitalize acquisitions. In particular, the parties discussed how the payroll tax funds had

74

been transferred from Presidion to Mirabilis because of Mirabilis' secured creditor interest under the 2005 Hold Harmless Agreement. Glover had previously discussed many of the same issues on April 18, 2006 with Holtz, Berman, Curry and Fernando Simo (as of April 1, 2006, the COO of Mirabilis).

At the conclusion of the meeting, it was decided to uphold the decision reached by key Mirabilis executives that the payroll taxes would not be paid for the rest of the quarter, or until June 30th, that PBS would have to take responsibility[64] for the unpaid taxes, and that Mirabilis and AEM would have to get their affairs in order by July 1st so that they could pay their own bills, including AEM being able to pay payroll tax obligations on an ongoing basis. The parties all left the meeting apparently satisfied, with no other substantive change in the status of operations anticipated except that Stanley was expected to complete the approval process for his controlling person license by June 21st and that Amar would then officially resign as President of AEM.   Immediately after the meeting, Amodeo told Myers that he wanted to personally attend the next IRS meeting, and asked Myers to schedule the meeting for early July. Amodeo's plan was to use the July meeting as a forum to bring the negotiations to a head and to reach some final agreement as to the disposition of the Sunshine Companies and PBS cases.

**The Capital Genesis Plan – cont'd**

The June 13th meeting did not signal a renaissance of Amodeo's involvement in the day-to-day operations of Mirabilis.[65]   Instead, he immediately turned his attention

---

[64]      Again, shifting liability away from the pristine Mirabilis and AEM executives towards the defunct Presidion.
[65]      At this point, Amodeo was not involved in the day-to-day operations of the PEOs (i.e. AEM/PBS). Rachlin LLP, Berman, Kean & Riguera, P.A., and Foley & Lardner had all warned Amodeo that such activities were forbidden because of the responsibilities

75

back to implementing the Capital Genesis Plan on a worldwide basis. In late June, Dutko Worldwide presented AQMI to the Bush administration and the government of Latvia as a potential corporate sponsor of the NATO Bi-Annual Global Summit which was to be held in Riga, Latvia in November 2006. The Bush administration approved the proposal and offered the sponsorship to AQMI. AQMI became one of the five principal corporate sponsors of the Summit. As a result, AQMI's presence continued to expand.

In July, AQMI was invited to a Washington D.C. ceremony honoring Afghanistan President Hamid Karzai, and Mirabilis subsidiaries were invited to participate in substantive discussions with NATO, Afghanistan and United Nations representatives about resource exploitation and security issues in Afghanistan. Meanwhile, Amodeo was swept up in a myriad of activities, including being invited to sit in a private balcony seat at joint session of Congress, and meeting personally in the White House's Roosevelt Room with President Bush, the Secretary General of NATO, and the Deputy National Security Advisor.

## The acquisition of BCA

Sometime in early 2006, Vanderburg presented to Mirabilis a potential PEO target based in Pennsylvania ("BCA"). BCA was not very profitable and was carrying pre-existing debt that caused it to have a negative book value. What made BCA attractive to Stanley was that it already owned the software and hardware preferred by him as the IT engine for AEM.[66] However, Amodeo saw the potential acquisition of BCA as an opportunity to ensure that the officers and directors of Mirabilis did not expropriate the

---

attendant to a PEO and IRS controlling person law. However, each felt that Amode's limited capacity of consulting only as to which payables should be paid would not subject Amodeo to liability.

[66]    The same software was the IT platform for WTS, Stanley's former company.

76

value of the PBS/Paradyme book of business from either PBS/Paradyme or the IRS as

creditor, a matter about which he was particularly concerned as he headed toward a final

resolution of the case with the IRS. He believed that the best way to resolve matters with

the IRS, and thereby protect both himself and his colleagues from potential Section 6672

liability, was to create a substantial income stream on which the IRS could levy in the

future. Amodeo's concern was that the officers and directors of Mirabilis, who did not

believe they were going to be held responsible for the unpaid taxes, would try to

expropriate the value by paying a much smaller sum to PBS than had previously been

agreed to in the now-repudiated Transfer Agreement.

As set forth above, Amodeo's principal interest in BCA at this point was as a

conduit to facilitate settlement with the IRS. Although he remained involved in the

settlement negotiations with the IRS, he had little involvement in the day-to-day PEO

business of Mirabilis. Amodeo was not involved in the BCA acquisition or integration.

All of these matters were handled by Mirabilis acquisitions personnel. His only real

contribution to the BCA purchase was to recommend that the deal be structured as an

agreement by BCA to acquire the Paradyme/PBS contracts for a price certain and then

merge with AEM.    Amodeo believed that if the PBS/Paradyme book of business was

sold to BCA for actual market value, he could preserve the legal rights to the

PBS/Paradyme PEO contracts, make a show of good faith to the IRS, and place himself

in a better position to negotiate a favorable settlement.

## July 20th meeting with the IRS

On July 20, 2006, Amodeo attended a meeting at the IRS office in Plantation,

Florida. The second quarter 941 return for PBS was either hand delivered to Berkowitz

on or before this date or filed with the IRS by Vanderburg. The 941 return reflected $27 million in additional payroll tax liability and no payments to the IRS. In attendance at the meeting on behalf of PBS and the Sunshine Companies were Amodeo, Sharmilla Khanokar (an accountant with Rachlin LLP) and Myers. In attendance on behalf of the IRS were Revenue Agent Berkowitz, Revenue Agent Daley (who was replacing Agent Berkowitz on the case), their Group Manager, and District Counsel John Lordi. Amodeo produced a large binder containing documents, some of which had been requested by the IRS and the remainder of which Amodeo thought would be useful in the meeting. The parties discussed the fees that had been charged by Amodeo in the case (he told them he had received a total of $13 million out of $18 million due).[67] Amodeo explained that he had a plan to acquire and merge as many PEO's as possible, but already four (Hancock Group, National Medstaff, Allstaff, and BCA), onto the same IT platform as AEM.

Included in the package he provided to the IRS was a chart showing the consolidation plan whereby the PEOs would be merged together by the end of the 2006 year. He further explained that he believed that the newly merged company could then be sold for a market value of between $264 million and $480 million. Regardless of the accuracy, or inaccuracy, or Amodeo's predictions, the fact remains that he believed even at this late stage of the game that the workout could be salvaged to the satisfaction of everyone involved, including the IRS. The meeting concluded with an agreement to have

---

[67]    Although the contract was not specifically discussed at the meeting only the amounts received, Amodeo at this point had received approximately $13, million as part of the Sunshine Companies Plan and was due another $5 million for reducing the cost of the worker's compensation insurance as part of the PBS Plan. He never received the latter payment.

78

Khanokar and Myers produce additional documents and to schedule another meeting between Amodeo and District Counsel Lordi sometime in September 2006.

## Amodeo's first knowledge of problems with the payment of of 3rd quarter 2006 PBS trust fund taxes

In July of 2006, prior to his meeting with the IRS, Amodeo had issued an e-mail directive that Mirabilis-controlled PEO's should, as a matter of best practice (even though not legally required), segregate all of the withholdings from an employee check into a separate bank account that would be segregated from general operating revenues. At this point in time, Amodeo believed that Stanley had started paying currently accruing payroll taxes on a timely basis as of July 1, 2006.[68] However, in August 2006, Amodeo learned that AEM payroll tax payments were starting to lag behind their due dates. He was nevertheless assured by Stanley that this was more of a computer problem than a financial problem, and that the matter was in the process of being corrected. Around the end of September, Holtz made an inquiry to Amodeo about the payment of payroll taxes, and Amodeo subsequently checked with Stanley and was told that they were still somewhat behind, but would be caught up by September 30th. Amodeo then reminded Stanley that to be safe he needed to make sure he at least deposited $238,000 a day in order to make sure that he was depositing enough to cover the trust fund obligations.

## The Mock Deposition

Given the vast number of new employees that had joined the company since February of 2006, in August of 2006 Dr. Pollack suggested that Amodeo hold a town hall style meeting with Mirabilis employees and others (including outside representatives

---

[68]    As Stanley himself claimed to Vanderburg in correspondence in or about July of 2006.

79

from the PEO and insurance industry) to field questions about the past, present and future relationship of Presidion and Mirabilis. A second purpose of the meeting, suggested by Berman, was that this would be a good dry run for Amodeo before his next meeting with the IRS in September. The format that was eventually agreed upon was to solicit questions from the audience (and in advance from employees not in attendance) which were to be submitted in writing to Holtz and Amodeo's D.C. attorney, Dan Barks, who would then consolidate the questions and pass them on to Berman. The meeting has been referred to as the "mock deposition" because it was conducted in the format of a sworn question and answer session between Berman and Amodeo. The mock deposition was held in the AQMI Training Room on August 29, 2006 in two 2½ hour sessions with an hour recess in between the sessions. In attendance at the mock deposition were Amodeo, Berman, Pollack, Beyer, Curry, Holtz, Glover, Haber, Amar, Simo, Khanokar, Sadrianna and Stanley, as well as approximately 40 other persons who attended one or both sessions. Both sessions were professionally videotaped and transcribed by a court reporter and are available for review.

During the first session, Berman asked questions to Amodeo in a chronologically random fashion about various issues concerning the historical relationship of Presidion and Mirabilis, and asked follow up questions that flowed responsively from the Amodeo's answers. In the session, Amodeo talked explicitly about the various periods of time in which the payroll taxes had been withheld from the IRS and used for other purposes, including the reasons why it was considered necessary at each such time to do so in the interest of preserving the overall business.

80

During the recess in the mock deposition, Amodeo was advised by Curry that he needed to change the way that he presented the past events, because the way that Amodeo was testifying, it appeared that actions had been planned in a manner that would constitute a racketeering offense.[69]   Curry stated that she was concerned that it looked like the entire set of activities were planned, including moving the book of business back and forth between companies, and not that they were simply responding on an "ad hoc basis to the crisis de jour."   She also complained that Amodeo did not emphasize enough the various benefits that accrued to creditors and employees as a result of their activities.   She reminded Amodeo not to forget about Holtz' comment from July of 2006 that the government had received more tax revenues from Mirabilis' activities than had been lost in payroll taxes.[70]

In the second session of the mock deposition, Berman accordingly changed the way in which he asked his questions, making them more open-ended and allowing Amodeo to present the transactions in chronological order, emphasizing the perceived benefits of the transactions to the various stakeholders of Presidion.   After the mock

---

[69]   Months later, Sadrianna confided to Amodeo that he overheard Curry make a similar statement to Beyer during the mock deposition.
[70]   Holtz had made this statement in late June of 2006, in the presence of Amodeo, Curry and others, in the context of editing Amodeo's biography for use on the AQMI website. Holtz wanted Amodeo to do a case study summary for use on the website that would show how the nonpayment of taxes pursuant to the PBS Plan had generated more tax revenue than if the taxes were actually paid. Holtz' basis for this conclusion was the assertion that the creditors who received the tax funds were paying income tax on those receipts at a higher rate than the funds would have been taxed had they been retained and paid over by Presidion. While this assertion does not make much sense, since 100% of the payroll taxes were due the IRS, Amodeo not only clearly recollects the conversation, he acted upon it by making his own calculations about the potential tax savings (which not surprisingly failed to support Hotlz' assertion), and by publicizing the PBS Plan on AQMI's website. Since February or March of 2006, Amodeo had also been using his biography on the AQMI website to publicize the fact that he was a disbarred attorney and convicted felon with a mental health condition.

deposition concluded, Amodeo tasked Khanokar and Mark Middleton (a media specialist with Mirabilis and former local television news reporter) with preparing a seminar-style presentation of the PBS Plan to present to various potential clients and prospect groups in an attempt to gain new business. Amodeo also directed Khanokar to make her subsequent representations to the IRS consistent with the second half of the deposition, rather than the first. As soon as Amodeo had finished his discussion with Khanokar, Holtz and Berman approached Amodeo and advised him to take the videotape of the deposition and destroy it. A few minutes later, Curry and Bayer advised Amodeo not to have the court reporter make a transcription of the deposition. Amodeo ignored their advice, preserved the videotape, and ordered a transcription from the court reporter.[71]

## The 4th quarter PBS payroll taxes

On November 1, 2006, Holtz made his regular monthly visit from Miami to Mirabilis' Orlando headquarters, where he met with Amodeo, and together they made an inquiry to Debra Cole (the CFO of AEM since March of 2006) about the amount of taxes that were currently being paid over to the IRS. They discovered that the number was substantially less than the $238,000 a day Amodeo had previously insisted upon. Cole responded that since AEM had a tax credit available, there was no reason to pay more money over on its behalf. Cole informed Amodeo and Holtz that they had not been paying the taxes with respect to PBS PEOs, and had instead been applying these taxes collected in the third quarter of 2006 to meet AEM's current obligations, just as it had done in the first and second quarters of 2006. This had resulted in a large credit for AEM with regard to its own trust fund tax liabilities. Amodeo then renewed his directive to

---

[71]    Amodeo was not afraid of anything he said, believing himself to be a hero in this disaster.

82

Stanley that he had to pay $238,000 a day to defray PBS' trust fund tax obligations, regardless of who owned the PBS book of business at the moment.

Amodeo and Holtz agreed that this was a major problem that would jeopardize their position with the IRS, particularly because it appeared to be a replication of the same bad management that had landed Vanderburg and Baiers in trouble in the first place. They agreed to retain separate counsel for Mirabilis and Presidion who were familiar with the IRS in Miami, and that after Amodeo returned from the NATO summit in Riga, Latvia, they would meet with the IRS and suffer the consequences. Amodeo subsequently interviewed potential legal counsel to represent the various entities, and Holtz began to take a more aggressive role in attempting to place the Mirabilis house in order.

As an apparent result of Holtz' efforts, Stanley and Andrea approached Amodeo and informed him that they were not going to include any of the former PBS employees on the AEM tax returns, and that they would not signs any PBS tax returns because they did not want to "responsible persons" for the payment of the taxes. They asked Amodeo what he was going to do, because this would result in none of the various employees of the PEOs that were either owned or being controlled by Mirabilis being reported to the IRS or the Social Security Administration. In typical fashion, Amodeo indicated that he would personally file the third and fourth quarter 941 returns for PBS (or more properly, for AEM) if they prepared them correctly, i.e., showing the correct tax liability and the fact that no taxes had in fact been paid.

**The grand jury investigation is disclosed**

83

In the last week of November 2006, Presidion PEO customers began receiving subpoenas from the Orlando Office of the U.S. Attorney's Office for the Middle District of Florida relating to PEO tax collections during the 2004-2005 time period. The customers informed AEM of the subpoenas and asked for help in complying with the subpoenas. AEM personnel informed Dan Myers, and both Amar and Myers eventually informed Amodeo. The key personnel at Mirabilis, including those who had been present since the implementation of the Sunshine Companies Plan, then began to leave the company. Meanwhile, Stanley devised a plan to purchase AEM from Mirabilis for a nominal sum and thereby take possession of the $11 million in tax credits that AEM had accrued through the aforementioned application of trust fund tax collections from PBS/Paradyme clients. At this point in time, although Amodeo knew that the PBS/Paradyme trust fund tax collections had been misapplied in the 3rd quarter of 2006 in satisfaction of AEM's payroll tax obligation, he did not know the full extent of the diversion or the fact that it produced such a large cash credit that could potentially be converted into a refund.

Earlier in the year, Amodeo had retained undersigned counsel, Harrison Slaughter, Jr. ("Slaughter'), for the limited purpose of assisting him in an attempt to recover his bar license; then to assist with allegations against Amodeo made by the U.S. Trustee's Office; next Slaughter attended the mock deposition in late August 2006, where open discussion of the use of the payroll tax funds by Mirabilis was discussed. In September of 2006, in the wake of Amodeo's aforementioned decision to retain separate counsel for the various Mirabilis and Presidion affiliates, he enlisted Slaughter's assistance in the search for corporate counsel in South Florida. Slaughter requested that

84

Amodeo provide him with the transcript of the mock deposition to assist him in familiarizing himself with the Mirabilis operations. Approximately two (2) months thereafter (ten days after the subpoenas), Slaughter reported back to Amodeo that he had reviewed the transcript with a former IRS Criminal Investigation Division Special Agent, Paul Hawkins, and their mutual conclusion was that massive criminal tax evasion had occurred and Amodeo was implicated insofar as he developed the plan and was there from the beginning.

**Amodeo's December payment of trust fund taxes for non-tax purposes**

On or about December 15, 2006, the Directors of Mirabilis met with Amodeo and informed him that they wanted to sell all of the PEOs and discontinue any further involvement with them. Amodeo indicated that he believed he could restructure the purchase of an unrelated company, Paysource, with which Mirabilis had already been in acquisition negotiations. In essence, Amodeo proposed reversing the transaction by having Paysource buy the PEO contracts and then having the Mirabilis shareholders buy the stock of Paysource. It was believed that Paysource's note payments on its purchase of the PEOs would provide the necessary funds to allow Mirabilis to meet its ongoing obligations on a much scaled down operation that would no longer include the PEOs. It was also hoped that this would provide some insulation for Mirabilis from liability for the historical unpaid payroll taxes, simply by virtue of the fact that Mirabilis would have retired from the PEO business after learning of the government investigation.

One of the problems with this plan was that Mirabilis would have to terminate a significant portion of its workforce, and it then lacked the funds to pay the employees and their health and benefit claims. In order to make the payroll for December 15th to January

85

1st, Amodeo decided to use the funds from the PBS trust fund tax collections to pay Mirabilis' final payroll and health plan obligations, as well as the health plan obligations of all of the PEO employees. Amodeo agreed to allow the final payroll taxes to be used for the *net* payroll and healthcare claims, resulting in the payroll taxes being paid approximately a week late.

## Winding down of operations at AEM and Mirabilis

In the midst of plea negotiations[72] initiated by Mr. Slaughter, in early February 2007 Amodeo agreed to act as a confidential informant for the government and to work with the government in winding down the AEM and Mirabilis operations. Shortly thereafter, Mr. Slaughter received a phone call from IRS-CID Special Agent Richard Smith notifying him that AEM was not paying its payroll taxes for the first quarter of 2007. Amodeo subsequently discovered that Stanley was engaging in the same behavior as before, i.e., using payroll tax funds to pay operating expenses. A few weeks later, Stanley resigned from his position at AEM, leaving no one with signature authority over the AEM bank accounts. Amodeo consequently took active control of the operations of AEM and its PEO book of business until the business was sold on April 30, 2007 to Oxygen Unlimited, an unrelated company, for a total of approximately $5 million, with the government's acquiescence. Prior to the sale, and with the government's approval, he collected funds from AEM and applied them to the 2007 payroll tax deficiencies.

Meanwhile, back at Mirabilis, the entire Board of Directors resigned by mid-March 2007 in the wake of the criminal investigation. They were replaced by AQMI

---

[72]    Amodeo was unaware and not informed by Slaughter that formal plea negotiations had begun, nor was he informed of the government's view of the negotiations and view of Amodeo's total culpability for the alleged crimes.

86

personnel, Jodi Jaiman, Jay Stollenwerk and Shane Williams.    With the PEO book of
business now sold off, the question still remained how to wind up operations at Mirabilis
and liquidate it remaining assets.  Mark Burnett, a bankruptcy attorney who was acting
general counsel for Mirabilis from December 15, 2006 until his resignation in May 2007,
wanted to appoint a receiver for the company.  Amodeo thought it made more sense to
initiate a Chapter 11 bankruptcy proceeding.  AUSA Gold, who was then heading the
criminal investigation, did not want the complications of a bankruptcy, and allowed
Amodeo (in his capacity as the sole secured creditor) to simply wind up the operations of
the company and shut it down himself.

Acting with AUSA Gold's knowledge and consent, Amodeo spent the next 13
months, from May of 2007 to June of 2008, selling off corporate assets and both pursuing
claims on behalf of the company and defending against claims brought against it.  Again,
in characteristic fashion, he applied the same manic energy to attempting to recover the
payroll tax funds as he had previously applied in spending them.  An initial review of
assets in January 2007 revealed personal property consisting of equipment, machinery
and vehicles which if auctioned would have produced net proceeds of approximately
$900,000.  In addition, there were two pieces of unencumbered real property existing in
Huntsville, Alabama and El Paso, Texas.  The anticipated net proceeds at auction from
these properties were $1.1 million and $800,000, respectively.  There were other pieces
of encumbered real property, with respect to which any recovery was extremely
speculative.  Amodeo calculated the total anticipated recovery from the disposition of
assets, including the PEO book of business, at less than $5 million.  Should the

87

businesses have chosen bankruptcy or receivership in the first quarter of 2007, it is unlikely that more than $1 million could have been obtained from their sale.

Due to Mirabilis' abrupt termination, Mirabilis faced extensive litigation arising from its layoffs and cancelled insurance policies. At Amodeo's direction, Mirabilis successfully resolved all undisputed employment and insurance related claims. Specifically, Mirabilis researched over 450 healthcare claims totaling more than $450,000, and settled those claims for approximately $250,000. In addition, Amodeo reviewed $3,000,000 in other vendor claims against Mirabilis and settled them for approximately $450,000. Amodeo and Mirabilis also defended approximately 26 court cases in which Mirabilis was a named defendant, and obtained dismissal or negotiated settlement in over 20 of the cases. The claimed compensatory damages against Mirabilis (not including exemplary damages, interests, costs or fees) in the aggregate, exceeded $9,000,000. The cases were dismissed or settled for a total cost of approximately $500,000. Without these efforts, the default, secured judgments against Mirabilis would have totaled in the tens of millions and it is unlikely the government would have recovered any monies.

As part of the winding down process, Amodeo directed the sale of approximately 10 companies for over $25,000,000 in cash and notes. Many of the entities would have been worthless and/or looted by their former principals had Amodeo and Mirabilis not interceded. Amodeo used the proceeds from the sale of corporate assets to pay of $3.2 million in pre-2007 payroll tax deficiencies. He also paid $2 million in other debts, including individual health claims of employees and almost all of the undisputed creditors. He commenced a variety of lawsuits against various persons and companies

88

who had wrongfully received funds from Mirabilis that should instead have been used to pay payroll tax deficiencies.

Amodeo also directed Mirabilis to place several subsidiary entities in bankruptcy in order to protect their assets from being misappropriated by opportunistic insiders. For example, Mirabilis placed Winpar Hospitality Chattanooga, LLC ("Winpar"), in bankruptcy to avoid Atlantic American Capital Group, LLC, ("Atlantic American") from foreclosing on their mortgage and seizing Winpar's only asset, certain real property located in Chattanooga, TN. As a result of Mirabilis' efforts, the property was later sold at auction for over $7,000,000. The validity of the Atlantic American mortgage (which is held by former Mirabilis insiders) is now being litigated and may be declared invalid.

In December of 2007, Amodeo personally settled an insurance premium dispute with Sunz Insurance over the length and amount of the tail obligation for potential Worker's Compensation claims. Sunz Insurance Company claimed that it did not owe Mirabilis any portion of its workers compensation payments and provided significant evidence in support of their position. Sunz subsequently offered Mirabilis $1,000,000 to commute its policy and settle its claims. After significant negotiations, an audit, revised actuary tables, and the threat of litigation, Sunz paid Mirabilis $5,500,000 to commute its policy and settle its claims. Amodeo calculated what might still be owed by AEM for 2007 payroll tax deficiencies at $770,000, and, after speaking to Special Agent Smith, paid this amount to Paradyme to hold the funds until an exact liability determination could be made. Amodeo spent the rest of the insurance refund paying various administrative expenses and costs of liquidating the company, including settling claims and paying the attorney's fees of various firms that were attempting to recover assets on

89

the company's behalf. During this period, Amodeo was paid $10,000 a month for his services, via a regular paycheck drawn from an account that was being monitored by the government.

Throughout 2007 and early 2008, Amodeo had been collecting and organizing the massive amount of documentary evidence that might be of use to the government in pursuing both assets and culpable individuals. Toward that end, he had consolidated all of the available documents and evidence into two centralized warehouses and was in the process of entering the information into a specialized database (Summation) prior to the government seizure in April 2008. Amodeo and Mirabilis were using this information to build affirmative cases against former officers and directors, accounting firms, law firms, financial institutions, insurance companies, and other entities that took advantage of Mirabilis or colluded with principals of Mirabilis to the detriment of Mirabilis. A portion of these cases are now being pursued by the Mirabilis bankruptcy estate and other law firms.

In total, Amodeo and Mirabilis paid the IRS $19,070,157 in direct cash payments since January 2007 – with $3,385,728 being "out of ordinary" payments. Amodeo also redesignated over $7,000,000 in overpayments made by other entities toward the accumulated payroll tax deficiencies.

**Amodeo's substantial assistance to the government**

Upon receiving the initial grand jury subpoenas of over seventy (70) relevant companies in late-2006, Amodeo retrieved and preserved original evidence consisting of millions of documents, hundreds of computer hard drives, and over 20,000 hours of corporate audio and video surveillance from multiple locations around the country.

90

Additionally, Amodeo helped organize and store this evidence in two centralized warehouses in Orlando, Florida. In these warehouses, Amodeo funded and created a searchable computerized Summation database containing over two (2) million scanned documents critical to proving the government's case. Amodeo also reviewed and catalogued over 8,000 hours of the aforementioned audio-video surveillance and continues to do so today. Amodeo provided indexed reports and logs of this evidence to the United States.

On or about February 15, 2007, Amodeo entered into a confidential informant agreement with the United States which provided that he would cooperate in the investigation of other individuals involved in the conspiracy. At the request of the United States, Amodeo participated in seven (7) undercover surveillance interviews of grand jury targets (in his personal residence) and provided IRS agents with two (2) tours of the companies' facilities while they were still operating. Amodeo also assisted the U.S. Attorney's Office in preparing questions for approximately twelve (12) different witnesses and targets related to this case. Furthermore, from February 2007 through May of 2007, Amodeo attended approximately (12) meetings at the U.S. Attorney's office, debriefing agents of the IRS Criminal Investigative Division, FBI and other government agents on the inner-workings of the conspiracy. The meetings lasted anywhere from three to eight hours a piece. During the meetings, Amodeo provided the government with volumes of background information on the criminal case and its relevant participants. Additionally, Amodeo provided the United States summarized corporate governance documents on over eighty (80) companies, summarized bank account information

91

covering over one hundred and forty (140) different accounts, and answered a variety of general and specific questions relating to a host of legal and factual issues.

Throughout the government's ongoing investigation, Amodeo has responded to regular requests by the United States for extremely specific information. During the past two years, it was not uncommon for Amodeo and his counsel to deliver two or three detailed packages of information to the United States in a given week. These packages consisted of a wide variety of information including: (i) original evidence (ii) video clips involving witnesses and targets (iii) summaries of documents found in the Summation database (iv) corporate emails of targets and witnesses (v) transcripts of important meetings and depositions (vi) banking information (vii) corporate governance information and (viii) other requested information.

Moreover, Amodeo created and provided the United States with thousands of pages of explanatory work product (both in narrative and chronological form) specifically designed to educate the government on the details of the case, including the complex corporate structure of both Mirabilis and Presidion. These documents broke down the 80+ affiliate and subsidiary companies (which, combined, had over 1,000 employees) involved in this case and explained the roles and responsibilities of the principal officers, directors, and employees of Mirabilis and Presidion. Furthermore, at the request of the government, Amodeo provided seventy-five (75) summaries of other individuals involved in the conspiracy, including, 31 detailed notebooks describing specific acts committed by other co-conspirators and 11 extremely specific notebooks detailing express criminal conduct of other targets. Each of these notebooks included relevant conduct timelines indexed to the Summation database. Amodeo also provided the United

92

States with thousands of pages of accounting and banking records and assisted the government with the enormous task of calculating the exact tax loss caused by the conspiracy.

## Amodeo's post-offense mental health diagnosis and treatment

After several months of representing Amodeo, and receiving constant communications regarding Amodeo's seemingly deteriorating mental health condition from his co-counsel Bob Panoff and Amodeo's wife, attorney Slaughter had become convinced that Amodeo was suffering from mental problems serious enough to necessitate consulting with a psychiatrist. Slaughter referred Amodeo to Dr. Jeffrey Danziger, a local psychiatrist, who saw him on multiple occasions beginning in August 2007. During the first such meeting, on August 20, 2007, Amodeo expressed the belief that because of his economic prowess his company would grow to economically dominate the earth, governments would wither away and he would be appointed the emperor of the earth. Because of these delusional symptoms, and wishing to remain in a purely forensic role, Dr. Danziger referred Amodeo to another local psychiatrist, Dr. Jeffrey Krotenberg.

Amodeo thereafter began seeing Dr. Krotenberg, who began treating him with Depakote, a mood stabilizing agent. However, based on the reports from Dr. Krotenberg to Dr. Danziger, Amodeo was deliberately withholding his manic fantasies from Dr. Krotenberg. Amodeo subsequently confessed that, in much the same manner as he had withheld his grandiose view of his destiny from Ms. Holland for many years after she expressed concern about it, he simply decided to keep it to himself. Upon being apprised

of the situation, Dr. Krotenberg additionally prescribed Seroquel, an anti-psychotic medication.

On May 12, 2008, in the wake of the abrupt rupture in relations with the government and Amodeo's increasingly erratic behavior,[73] attorney Slaughter asked Dr. Daniziger to evaluate Amodeo with a view toward determining whether he was at that point competent to conduct his own affairs.    As reflected in Dr. Danziger's resulting report, dated May 28, 2008, Amodeo experienced episodes of mania "where his mood was elated, he believed that he had a religious destiny to rule the world, he had increased energy, racing thoughts, reckless spending, pressured speech and what could only be described as megalomania."    Amodeo also experienced episodes of depression during which "he slept a lot, had low energy, felt guilty and hopeless, had an extremely low mood, isolated himself and lost a great deal of weight."    According to Amodeo's wife, Claire Holland, these symptoms dated back to 1994.

When Dr. Danziger met with Amodeo on May 12, 2008, Ms. Holland informed him that Amodeo had recently been extremely irritable, angry and restless, and was once again talking about his destiny to rule the world.    He had also informed his wife that he was going to walk away unscathed from the legal charges, that his legal theory would win the day, that his lawyers were all wrong, and that he had the law on his side.    Amodeo reiterated this to Dr. Danziger, claiming that no charges should ever be brought against him, adding that ultimately he would receive preternatural powers of the Old Testament prophets.    He also reiterated his belief that he would be emperor of the earth and that the "Genesis System" would be at the core, with community enterprises with regional

---

[73]    Now known to have been caused – after consultation with    mental health professionals – by Seroquel, one of the drug prescribed to Amodeo.

94

managers and 3.5 million people every 30,000 square miles to build the infrastructure. Amodeo predicted: "In seven years I will take over the entire globe . . . the Terran Empire, my empire, is coming."

Dr. Danziger's conclusion, based not just on his interviews with Amodeo, his wife and his attorneys, but also on review of Mirabilis video and audio tapes, was that Amodeo suffers from Bipolar Disorder, Type I, with clear past episodes of mania and depression. He also concluded that Amodeo was at that time incompetent to proceed in any trial or handle himself in any criminal proceedings.

Based on Dr. Danziger's report, attorney Slaughter commenced Guardianship proceedings with respect to Amodeo in Orange County Circuit Court before the Hon. Judge Belvin Perry. The Examining Committee appointed on the case included Dr. Darlene Antonio, a local psychologist, who authored the Examining Committee's Report that was filed in this matter. According to Dr. Antonio, Amodeo presented with symptoms consistent with Bipolar Disorder, as well as an associated Delusion Disorder. With regard to Amodeo's prognosis, Dr. Antonio reported that it was "guarded," noting that Amodeo had been non-compliant with treatment in the past and that "his delusional beliefs appear to be quite long-standing and ingrained." The Committee concluded that Amodeo lacked the capacity at that time to make informed decisions regarding his right to contract, to sue or assist in the defense of suits of any nature against him, or to make informed decisions regarding his right to manage property or make dispositions of property.

On August 7, 2008, Amodeo was evaluated by Dr. Evan Murray, a Behavioral Neurologist. Amodeo reported feeling that he would be "emperor of the world" since the

95

age of 13 or 15, and still believed he would accomplish his goal by year 2015. He spoke with Dr. Murray about his plans for implementing a Mirabilis model of employment in all cities in the world, thereby making governments "irrelevant" and putting him in charge, and ultimately leading to peace in the world. He also reported a sort of inner dialogue, in which a voice in his own head tells him what to do, as well as being able to see apparitions at night or in dim light with whom he could converse. Dr. Murray's overall impression was that Amodeo exhibited grandiosity, delusional thought processes, slight impulsivity, mild attentional difficulties, and mild memory retrieval difficulties.

On August 12, 2008, Amodeo was given a neuropsychological battery of tests by Dr. Susan Parks, a Neuropsychologist who serves as the Training Director of the Neuropsychology Post Doctoral Training Program at Harvard Medical School. According to Dr. Parks, Amodeo put forth good effort on all of the tests, and the evaluation was regarded as an adequate representation of his current level of cognitive and psychological functioning. Cognitive testing suggested that Amodeo is a bright individual, with average cognitive test results, many well developed cognitive abilities and no indication of learning difficulties. Psychological testing indicated, *inter alia*, that Amodeo tends to take in more information than he can organize efficiently, and that in time demanding or more stressful situations, his over-incorporative style tends to interfere with effective decision-making processes. When Amodeo experiences intense emotions, he experiences a concomitant diminished ability to think coherently, and may demonstrate arbitrary and circumstantial reasoning and confused thought processes. Testing suggested the presence of ideas of reference (the belief that unrelated phenomena in the world refer directly to or have special personal significance for the individual),

feelings of grandiosity, and irrational jealousy reaching delusional, paranoid levels. Amodeo has difficulty anticipating the consequences of his own actions or recognizing the boundaries of appropriate behavior. While Amodeo does not appear to suffer from a pervasive psychotic disorder, his test results suggest that he may suffer from "mini episodes" marked by paranoia, disorganization or delusions, fluctuating in intensity with his mood state. According to Dr. Parks, Amodeo's results suggest that he is susceptible to episodes of affective disturbance with marked features of depression and mania. His manic episodes appear to involve a display of expansive and hostile character features, rather than euphoria. Evidence of emotional dyscontrol include feeling erratic, quick changing moods and feeling like things are out of control when things do not go as planned. Amodeo may purposely avoid self-examination; despite his narcissistic and grandiose features, his tendency toward avoidance may be an effort to avoid engaging in negative self-examination. He may attempt to deal with uncertainty about his image of himself or concerns about his self-value in an overly intellectualized manner and may distort or overlook realistic considerations. He tends to be a socially withdrawn and isolated person.

After reviewing all of the results of Amodeo's evaluation at McLean Hospital, including but not limited to the reports of Drs. Murray and Parks summarized above, Drs. Vuckovic and Choras confirmed a likely diagnosis on Axis I of a Bipolar Disorder, Manic, with psychotic features, as well as a history of stimulant dependency, presently in a degree of partial remission. On Axis II, it was established that Amodeo likely suffers from a Mixed Personality Disorder, with narcissistic and antisocial features. Dr. Choras had initiated a trial of anti-psychotic medication, olanzapine, and after a week of the

97

trial, Dr. Vockovic was able to report that "Amodeo's previously intractable delusional system appeared to soften considerably, as he acknowledged that he indeed be suffering from symptoms of Bipolar Illness, and also acknowledged that his hope of becoming emperor of the world was quite unrealistic." Amodeo was ultimately discharged on August 21, 2008, with prescriptions for both Geodon (an anti-psychotic medication) and Depakote ER. At the time of his discharge, he was reportedly non-suicidal, cooperative with treatment, and willing to follow the treatment team's recommendations.

Since his discharge from McLean Hospital, Amodeo has been under the care of Dr. Choras. On September 23, 2008, Dr. Danziger testified at Amodeo's change of plea hearing. Dr. Danziger testified that based on Amodeo's improvement since his departure for McLean Hospital, as well as his stabilization on a consistent medication regimen involving the Geodon and Depakote, that Amodeo was competent to enter into the plea agreement that he had executed with the government.[74]

**Polygraph examination results**

On April 10, 2008, Amodeo's attorneys retained retired FBI Agent Richard Keifer to administer a series of polygraph examinations to Amodeo.[75] The first series of questions involved the December 21, 2004 meeting Amodeo held with Holtz, Berman,

---

[74]    Dr. Danziger was unaware, however, of the quantity of prescribed Seroquel Amodeo had taken just before the hearing, in conjunction with the prescribed Geodon already in Amodeo's system. Moreover, Dr Danzinger was unaware of the grueling plea negotiations which had taken place over the course of several days leading up to the hearing, all taking place while medicated under both Seroquel and Geodon.

[75]    Mr. Keifer was a Special Agent with the FBI from 1970 until his retirement in 1996, and was a Certified Polygraph Examiner with the FBI starting in 1981. He served as a Supervisory Special Agent in the FBI's Polygraph Unit, where he conducted over 2000 polygraph examinations and was the quality control reviewer of approximately 20,000 examinations. During the years 1987-1988, he served as the national manager of the FBI's polygraph program.

98

Curry, and others to discuss the impending acquisition of the Sunshine Companies from PSI. In the course of the examination, Amodeo denied deliberately concealing any material facts from anyone at the meeting or denying anyone at the meeting access to information from the Sunshine Companies. Amodeo also denied that anyone at the meeting told him that there was anything wrong or illegal with the purchase of the Sunshine Companies. Mr. Keifer evaluated the test results as not indicative of deception.

The next series of questions involved Amodeo's involvement in the "Presidion Plan" a/k/a as the PBS Plan, which was explicitly defined in the polygraph examination to encompass a strategy to stop payments of payroll taxes to the IRS during the second half of 2005 so that the overall business could be rehabilitated through the payment of other creditors, the acquisition of new lines of business and cost cutting operations, with a planned resumption of payments to the IRS in January 2006. During the course of the examination, Amodeo maintained that he had told both Holtz and Berman about the Presidion Plan as previously defined, and that neither Holtz nor Berman indicated to him that there was anything illegal or criminal about the plan. Amodeo also indicated that during the same time period, between June 2005 and December 2005, he was not aware of any plan by Presidion Corporation or any of its subsidiaries to defraud the IRS or evade payment of taxes, and that he was not aware of any plan, through fraudulent representations, promises or premises to deprive any customer of the Presidion PEO's of property, money or services. Mr. Keifer evaluated the test results as not indicative of deception.

Amodeo was also questioned about his collection of the $5.5 million refund from Sunz Insurance in 2007, which, as discussed above, became a point of conflict between

99

Amodeo and the government during his cooperation with the government because of his failure to inform the government about the settlement and to pay the funds over to the government (he instead allocated only a portion of the funds to tax payments, and used the rest to paying various administrative expenses and costs of liquidating the company, including settling claims and paying the attorney's fees of various firms that were attempting to recover assets on the company's behalf). Amodeo denied attempting to defraud the government and affirmatively represented that he used the Sunz proceeds for the direct or indirect benefit of the IRS. Mr. Keifer evaluated the test results as not indicative of deception.[76]

Frank L. Amodeo
2875 S. Orange Ave.
Ste. 500 PMB1810
Orlando, FL. 32806

FCC-Coleman Low
48883-019 Unit B3
P.O. Box 1031
Coleman, FL. 33521

---

[76]     See **Addendum F** – "Polygraph Exam and Results."

# Addenda

A          -    Attorneys

B & C    -    Accountants and Experts

D          -    Charitable Activities

E          -    Extraordinary Events

F          -    Polygraph Results

# Addendum

# "A"

### *Attorneys*

| | |
|---|---|
| 1 | Baiers, Jim |
| 2 | Barks, Dan |
| 2 | Berman, Jeremy |
| 3 | Berman, Richard |
| 4 | Beyer, Hans |
| 5 | Broadhead, Tom |
| 6 | Chhaganlal, Kiran |
| 7 | Curry, Edie |
| 8 | Eplin, Bill |
| 9 | Fischer, Brian |
| 9 | Flynn, Kevin |
| 10 | Goldberg, Scott |
| 11 | Haber, Larry |
| 12 | Kaprow, Phil |
| 13 | Kazaglias, Ted |
| 13 | Leib, Bob |
| 14 | Leo, Karl |
| 15 | Maida, Tom |
| 16 | Miller, Mike |
| 16 | Mokwa, Matt |
| 17 | Moore, Matt |
| 18 | Musial, Mitch |
| 19 | Nugent, Brian |
| 20 | Sadaka, Tom |
| 21 | Sadrianna, James |
| 22 | Tomeo, Kellie |
| 23 | Waldvogel, Jim |
| 24 | Walters, Chad |
| 25 | Wildermuth, Elena |
| 26 | Berger Singerman, Attorneys at Law |
| 27 | Berman, Kean, and Riguera, PA |
| 27 | Buchanan Ingersoll Rooney PC |
| 28 | Burkett & Leo |
| 29 | Foley & Lardner, PA |
| 30 | Jackson Lewis, LLP |
| 30 | Kostelanetz & Fink, PA |
| 31 | Kunkel Miller & Hamnett |
| 32 | **Saxon, Gilmore, Carraway, Gibbons, Lash, & Wilcox, PA** |
| 33 | Speiser Krause, a Professional Corporation |

Addendum "A"

# Addendum

# "B & C"

## <u>Accountants & Financial Experts</u>

| | | |
|---|---|---|
| 1 | Archer, Allen | MSA |
| 2 | Bonck, Stephen P. | MST |
| 3 | Carlson, Jason W. | MBA |
| 4 | Claussen, Michele | MBA |
| 5 | Cline, Michelle | |
| 6 | Cole, Debra J. | CPA |
| 7 | Collins, Peter H. | MBA |
| 8 | Curry, Robert S. | CPA, MST |
| 9 | Glover, Paul S. | CPA |
| 10 | Hailstones, Frank | CA, JPFA, ACA |
| 11 | Holtz, Laurie S. | CPA |
| 12 | Hutto, Jay | CPA |
| 13 | Jarzynski, Brian | CPA |
| 14 | Khanorkar, Sharmila | ABV/CIRA |
| 15 | Leonard, Kevin V. | CMA, MBA |
| 16 | Marchewka, Robert P. | CPA |
| 17 | Moreyra, Robert | BBA, MBA |
| 18 | Munroe, Kevin D. | CPA |
| 19 | Myers, Daniel L. | CPA |
| 20 | O'Connor, Christopher | CPA |
| 21 | Palumbo, Robert | CPA |
| 22 | Schmedt, Peter | CPA |
| 23 | Schumacher, Sue A. | CPA |
| 24 | Simo, Fernando A. | |
| 25 | Stanley, Michael A. | CPA, CMA, MBA |
| 26 | Taylor, Tracy | CPA |
| 27 | Walsh, William F. | CPA |
| 28 | Warf, Christina R. | |

Addendum "B & C"

# Addendum

# "D"

8:12 PM
8/3/2009

## Charitable Activities

| | DOC ID | Description | Location |
|---|---|---|---|
| | 020206 | Mirabilis Ventures, Inc. sponsored John C. Hitt's UCF State of the University Address at UCF. | Orlando, FL |
| | 020306 | Mirabilis Ventures, Inc. sponsored the Mennello Museum's 5th Annual Gala. | Orlando, FL |
| | 021006 | Mirabilis Ventures, Inc. sponsored the American Heart Association's Heart Ball. | Orlando, FL |
| | 021106 | Mirabilis Ventures, Inc. sponsored the American Red Cross Valentines Rendevous charity event. | Orlando, FL |
| | 021806 | Mirabilis Ventures, Inc. sponsored the 5th Annual Diamond Gala benefiting the Leukemia & Lymphona Society. | Orlando, FL |
| | 032806 | Mirabilis Ventures, Inc. sponsored Junior Achievement Program to help educate and motivate students to stay in school. | |
| | 041306 | Donation to Central Florida Crimeline | |
| | 042106 | Mirabilis Ventures, Inc. sponsored Kiwanis Club Golf Tournament, benefiting Orange County Public School Programs and other Kiwanis Club of South Orlando charities. | Orlando, FL |
| | 050606 | American Diabetes Association Chocolate Champagne Casino Night - Mirabilis Ventures, Inc. sponsored the ADA. | |
| | 051106 | Donation to the History Center. | |
| | 051106.1 | Crimeline Golf Tournament - Mirabilis sponsored. | |
| | 051206 | Donation to Junior Achievement | |
| | 051706 | Donation to Rotary | |
| | 051906 | Mirabilis Ventures, Inc. sponsored CBC of Seminole "It Takes a Village" Breakfast, which helped support neglected and abused children in local foster care systems. | |
| | 060306 | Mirabilis Ventures, Inc. sponsored Make-A-Wish 2006 Wishmaker's Ball. | Orlando, FL |
| | 061506 | Mirabilis and affiliates host a fundraising reception for Tom Gallagher, Florida's Chief Financial Officer and Republican candidate for Governor. | Gentry Restaurant - Orlando, FL |
| | 090706 | Mirabilis sponsors Brian Hill's "Play for a Cure" golf tournament benefiting Cystic Fibrosis. | E-mail |
| | 091606 | Mirabilis Ventures, Inc. sponsored the Players Ball, benefiting The Bridges of Light Foundation, which raises money for foster children and the Great Oaks Village home for children in Orange County. | |
| | 092806 | Mirabilis Ventures, Inc. sponsored the Great Grown-Up Spelling Bee, which benefits the Adult Literacy League. | |
| | 092806.1 | Mirabilis Ventures, Inc. sponsored the Orlando Magic Players Championship for Charity golf tournament in support of the Orlando Magic Youth Foundation. | |
| | 102106 | Mirabilis Ventures, Inc. sponsored the 7th annual Shepherd's Hope Famous Faces Masquerade Ball, which helped benefit programs providing non-emergency medical services and access to health care for the uninsured. | |
| | 102106.1 | Mirabilis Ventures, Inc. sponsored the Clyde F. Green Memorial Golf Classic benefiting Central Florida's Children's Home. | |
| | 102106.2 | Mirabilis Ventures, Inc. sponsored the National Multiple Sclerosis Society's "The Vision, the Cure - The Future" party, benefiting over 70,000 people affected by MS in Central Florida. | |
| | 102706 | Mirabilis Ventures, Inc. sponsored Orlando Magic Community "Tip-Off" Luncheon. | |
| | 102806 | Mirabilis Ventures, Inc. sponsored Bishop Grady Villas' event which benefits a group home for mentally challenged adults. | |
| | 111106 | Donation to Canine Companions for Independence, which is a nonprofit organization that provides disabled children and adults with highly-trained assistance dogs and ongoing support. | Orlando, FL |
| | 111606 | Make-A-Wish Foundation Stories of Light Campaign - Mirabilis Ventures, Inc. was a sponsor of the event, which allowed wishes for three children to be granted. | |
| | 120206 | Joined Disney in sponsoring Annual Don Quijote Awards sponsored by the Hispanic Chamber of Commerce celebrating successful hispanic entreprenuers | Orlando, FL |
| | | After Huricane Katrina Mirabilis donates food and supplies to hurricane victims and relief workers. After learning that the satellite phones the relief worker were using were failing, Mirabilis located and acquired portable cell towers and the trucks needed to get the towers to New Orleans. Mirabilis provided the personnel to install the towers and set up and maintain the cell network for 8 months. | New Orleans |
| | | Donations to the Boys and Girls Club | |
| | | Donations to The Darrel Armstrong Foundation for Premture babies. | |
| | | Donations to Dream Flight, a UK based organization whos purpose is to send seriously ill children to their "Holiday of a Lifetime" at Central Florida theme parks. | |
| | | Donations to City of Orlando, Mayor Buddy Dyer's City Kidzi Fundraiser, which benefits the Parramore Kidz Zone. | |
| | April 2006 | Sponsored golf tournament benefiting Kissimmee Chamber of Commerce. | |
| | | Sponsored golf tournament benefiting South Seminole Optimist Club | |
| | | Donated to Darrell Armstrong's Ride for Babies | |
| | | Donation to Multiple Sclerosis Society | |
| 63 | April 28, 2006 | Donations to Rotary Club | |

Addendum "D"

8:12 PM
8/3/2009

| 133 | June 7, 2006 | Robert McFarlane thanks Frank Amodeo for arranging transportation for the soybean seed shipment to Afghanistan and giving hope to Afghani farmers. He also thanked Mr. Amodeo for making the effort to go to Washington and exchange thoughts on Frank's business and how to make it grow, especially overseas. He told Frank he has a sound strategy, founded on solid people. | E-mail |
| 99 | July 27, 2006 | Mirabilis hosts a meet and greet for Alex Sink, Democratic candidate for Chief Financial Officer of Florida. | Orlando, FL |
| 171 | November 15, 2006 | Shepherds Hope dinner where Frank Amodeo is honored for his philanthropic activities. | |
| 144 | November 26, 2006 | AQMI Strategy sponsors NATO Summit in Riga, Latvia | Riga, Latvia |
| 157 | | Frank Amodeo gets invitation to join International Fairness counsel from President Clinton | |
| 159 | | Frank Amodeo makes a donation to the a Congo church and school initiative | |
| 173 | | Mirabilis Sponsors the New Orleans Saints | |
| 174 | | Mirabilis Sponsors the Jacksonville Jaguars | |
| 175 | | Mirabilis Sponsors the Orlando Magic | |
| 176 | | Mirabilis Sponsors the UCF School of Music | |
| 177 | | Mirabilis Sponsors the Florida Gators | |
| 179 | | Hold a fundraising meeting at Suntrust offices for Alex Sink, now Florida CFO | |
| 59 | | Donations to Make- A- Wish foundation | |
| 80 | | AQMI Strategy Invest in hospital project in Mbujimayi, D. R. Congo. | |

Chaitable contributions

Addendum "D"

2

# Addendum

## "E"

7:33 PM
8/3/2009

## Extraordinary Events Timeline Index

| | DOC ID | Description | Location |
|---|---|---|---|
| | 013106 | Fernando Simo, COO or Mirabilis Ventures, Inc., featured on Triunfadores en Espanol (WTMO Channel 62) as one of Central Florida's Latin-American community leaders. | Orlando, FL |
| | 020206 | Mirabilis Ventures, Inc. sponsored John C. Hitt's UCF State of the University Address at UCF. | Orlando, FL |
| | 020306 | Mirabilis Ventures, Inc. sponsored the Mennello Museum's 5th Annual Gala. | Orlando, FL |
| | 021006 | Mirabilis Ventures, Inc. sponsored the American Heart Association's Heart Ball. | Orlando, FL |
| | 021106 | Mirabilis Ventures, Inc. sponsored the American Red Cross Valentines Rendevous charity event. | Orlando, FL |
| | 021806 | Mirabilis Ventures, Inc. sponsored the 5th Annual Diamond Gala benefiting the Leukemia & Lymphona Society. | Orlando, FL |
| | 032806 | Mirabilis Ventures, Inc. sponsored Junior Achievement Program to help educate and motivate students to stay in school. | |
| | 041306 | Donation to Central Florida Crimeline | |
| | 042106 | Mirabilis Ventures, Inc. sponsored Kiwanis Club Golf Tournament, benefiting Orange County Public School Programs and other Kiwanis Club of South Orlando charities. | Orlando, FL |
| | 050606 | American Diabetes Association Chocolate Champagne Casino Night - Mirabilis Ventures, Inc. sponsored the ADA. | |
| | 051106 | Donation to the History Center. | |
| | 051106.1 | Crimeline Golf Tournament - Mirabilis sponsored. | |
| | 051206 | Donation to Junior Achievement | |
| | 051706 | Donation to Rotary | |
| | 051906 | Mirabilis Ventures, Inc. sponsored CBC of Seminole "It Takes a Village" Breakfast, which helped support neglected and abused children in local foster care systems. | |
| | 060305 | Mirabilis Ventures, Inc. sponsored Make-A-Wish 2006 Wishmaker's Ball. | Orlando, FL |
| | 090706 | While in DC Amodeo learned of a project called "Seeds of Hope" which was supplying Afghani farmers with soybeans to grow food instead of poppy seeds for heroin. The project had been unable to raise money to get the seeds to Afghanistan . They were facing a crisis as the growing season deadline was June 30. Amodeo quickly arranged transportation and the seeds arrived on Jun 16. | Washington, DC |
| | 061206 | Florida Democratic Party host a reception/fundraiser at the Orlando, FL, with special guest former President Bill Clinton. | Orlando, FL |
| | 061506 | Mirabilis and affiliates host a fundraising reception for Tom Gallagher, Florida's Chief Financial Officer and Republican candidate for Governor. | Gentry Restaurant - Orlando, FL |
| | 081106 | Former National Security Advisor Robert McFarlane discusses the progress being made in Afghanistan with the soybean farming program. Mr. Amodeo played a critical role, securing transportation for the seeds to the farmers with days of the absolute deadline. | E-mail |
| | 090406 | Discussion of security protocols and agenda for AQMI/ Dutko meeting in Orlando. | E-mail |
| | 090506 | Discussion of Chinese source for construction materials. | E-mail |
| | 090706 | Mirabilis sponsors Brian Hill's "Play for a Cure" golf tournament benefiting Cystic Fibrosis. | E-mail |
| | 091606 | Mirabilis Ventures, Inc. sponsored the Players Ball, benefiting The Bridges of Light Foundation, which raises money for foster children and the Great Oaks Village home for children in Orange County. | |
| | 091906 | Discussion with attached intelligence report of Thailand coup attempt with a note that "This might be of use to some of your teams" to Frank Amodeo. | |
| | 091906.1 | Discussion related to Mirabilis investment of $30,000,000 into Brazilian Ethanol project | E-mail |
| | 091906.2 | Various e-mails and agreements related to Mirabilis investing $200,000,000- $300,000,000 in a sugar mill in Venezuela. Mr. Berman explicitly says that Mirabilis is interested after learning the price. | E-mail |
| | 092006 | Discussion related to AQMI Strategy sponsorship of NATO 2006 Riga Summit. | E-mail |
| | 092006.1 | Notice of full page ad in Orlando Sentinel by Mirabilis. | E-mail |
| | 092806 | Mirabilis Ventures, Inc. sponsored the Great Grown-Up Spelling Bee, which benefits the Adult Literacy League. | |
| | 092806.1 | Mirabilis Ventures, Inc. sponsored the Orlando Magic Players Championship for Charity golf tournament in support of the Orlando Magic Youth Foundation. | |
| | 100506 | Earthsource and Argent team up to work on ethanol project | e-mail - Houston, TX |
| | 101806 | Mirabilis Ventures and Nexia Strategy expand their offices to include an office in London. | London, England |
| | 101806.1 | WTS sponsors suite at Daytona 500 race. | Daytona Beach, FL |
| | 101906 | David Robinson working on acquisition of security training facility with Top Secret Clearance. | E-mail |
| | 102106 | Mirabilis Ventures, Inc. sponsored the 7th annual Shepherd's Hope Famous Faces Masquerade Ball, which helped benefit programs providing non-emergency medical services and access to health care for the uninsured. | |
| | 102106.1 | Mirabilis Ventures, Inc. sponsored the Clyde F. Green Memorial Golf Classic benefiting Central Florida's Children's Home. | |

Extraordinary Events Timeline Index.xls

Addendum "E"

1

7:33 PM
8/3/2009

| # | Date | Description | Location |
|---|------|-------------|----------|
| 95 | 102106.2 | Mirabilis Ventures, Inc. sponsored the National Multiple Sclerosis Society's "The Vision, the Cure - The Future" party, benefiting over 70,000 people affected by MS in Central Florida. | |
| 92 | 102706 | Mirabilis Ventures, Inc. sponsored Orlando Magic Community "Tip-Off" Luncheon. | |
| 112 | 102706.1 | Trip to DC | Washington, DC |
| 93 | 102806 | Mirabilis Ventures, Inc. sponsored Bishop Grady Villas' event which benefits a group home for mentally challenged adults. | |
| 114 | 110506 | Former National Security Advisor Robert McFarlane sends e-mail discussing the progress being made in Afghanistan with the soybean farming program. Mr. Amodeo played a critical role, securing transportation for the seeds to the farmers within days of the absolute deadline. | E-mail |
| 115 | 110506 | Discussion evaluating the merits of purchaing a new plane for $48,000,000. | E-mail |
| 78 | 111106 | Donation to Canine Companions for Independence, which is a nonprofit organization that provides disabled children and adults with highly-trained assistance dogs and ongoing support. | Orlando, FL |
| 91 | 111606 | Make-A-Wish Foundation Stories of Light Campaign - Mirabilis Ventures, Inc. was a sponsor of the event, which allowed wishes for three children to be granted. | |
| 00 | 112006 | All employees video conference, hosted by Frank Amodeo, to present Kevin Billings with his Secret Service credentials & badge, which were taken from him by the government in the Democratic Republic of Congo in May 2006.  The Secret Service provided a replacement badge for Billings and through Amodeo's relations to the DRC Ambassador and other contacts in country, Amodeo was able to recover Billings' original credentials, which are next to impossible to replace. | |
| 79 | 120206 | Joined Disney in sponsoring Annual Don Quijote Awards sponsored by the Hispanic Chamber of Commerce celebrating successful hispanic entreprenuers | Orlando, FL |
| 64 | | After Hurricane Katrina Mirabilis donates food and supplies to hurricane victims and relief workers. After learning that the satellite phones the relief worker were using ware failing, Mirabilis located and acquired portable cell towers and the trucks needed to get the towers to New Orleans. Mirabilis provided the personnel to install the towers and set up and maintain the cell network for 8 months. | New Orleans |
| | | Donations to the Boys and Girls Club | |
| | | Donations to The Darrel Armstrong Foundation for Premiure babies. | |
| 65 | | Donations to Dream Flight, a UK based organization whose purpose is to send seriously ill children to their "Holiday of a Lifetime" at Central Florida theme parks. | |
| 67 | | Donations to City of Orlando, Mayor Buddy Dyer's City Kidz! Fundraiser, which benefits the Parramore Kidz Zone. | |
| | April 2006 | Sponsored golf tournament benefiting Kissimmee Chamber of Commerce. | |
| 74 | | Sponsored golf tournament benefiting South Seminole Optimist Club | |
| 76 | | Donated to Darrell Armstrong's Ride for Babies | |
| 75 | | Donation to Multiple Sclerosis Society | |

| # | Date | Description | Location |
|---|------|-------------|----------|
| | February 24, 2006 | Orlando Philharmonic at Bob Carr Performing Arts Center | Orlando, FL |
| 172 | March 6, 2006 | Frank Amodeo meets with Oscar Kashala regarding Congo campaign | |
| 2 | March 21, 2006 | Congo, Kashala | Amsouth offices |
| 63 | April 28, 2006 | Donations to Rotary Club | |
| 3 | May 24, 2006 | Tracey Marshall observed events of Congo & discussed how Presidion helped get everything started. | Suntrust offices |
| 4 | | White House Meeting with President, disclosure of Amodeo's background and future plans | Conference Call |
| 131 | June 6, 2006 | Dave Robinson discusses security company consequences after DR Congo debacle. | E-mail |
| 132 | June 6, 2006 | Brian Gill discusses benefits of meeting with Mamuka Tsereteli, Executive Director of the America-Georgia Business Counsel while Mr Amodeo is in Washington, DC | E-mail |
| 133 | June 7, 2006 | Robert McFarlane thanks Frank Amodeo for arranging transportation for the soybean seed shipment to Afghanistan and giving hope to Afghani farmers. He also thanked Mr. Amodeo for making the effort to go to Washington and exchange thoughts on Frank's business and how to make it grow, especially overseas. He told Frank he has a sound strategy, founded on solid people. | E-mail |
| 129 | June 7, 2006 | Jeff Birrell, former CIA agent discusses how his company can help Frank Amodeo and Mirabilis succesfully re-enter the economic and political structure in Democratic Republic of Congo as this area is a cornerstone of Frank's strategy. | E-mail |
| 130 | June 7, 2006 | Jeff Birrell, former CIA agent updates Frank Amodeo on China being awarded contract in Gabon to mine last major deposit of iron ore on the planet, noting that "There are more resources here". | E-mail |
| 188 | June 7, 2006 | Amodeo in Washington to debrief with former CIA agents, currently CIA contracters, regarding the incident in the Congo whereby AQMI Strategy employees were kidnapped by government soldiers.  Amodeo updated them on attack helicopters and the failed attempt to rescue them. They also asked Amodeo to invest in the development of two new weapon systems. | Washington, DC |

Addendum "E"

7:33 PM
8/3/2009

| | | | |
|---|---|---|---|
| 134 | June 8, 2006 | Jeff Birrell discusses timing of Frank Amodeo's trip to DR Congo to work on Mirabilis' development plan for DR Congo. | E-mail |
| 135 | June 8, 2006 | Jeff Birrell discusses obstacle to Frank Amodeo's trip to DR Congo to work on Mirabilis' development plan for DR Congo being confusion in Congolese government on why so much fuss was raised over the arrest of Mirabilis people. "...when the Asst Sec. State for AF calls over these three, questions are raised and need to be answered". | E-mail |
| 128 | June 9, 2006 | Discussion attempting to utilize plane carrying "Seeds of hope" to Afhganistan to carry a young girl and her mother to the US for badly needed medical treatment on the return trip. | E-mail |
| 4 | June 9, 2006 | Discussion of PBS history and Saunders' campaign. | Suntrust offices and Boheme restaurant in Orlando |
| 136 | June 9, 2006 | Brian Gill discusses Eurasian Business Plan for company. | E-mail |
| 137 | June 14, 2006 | Interview with Jim Leusner with Orlando Sentinel. | Interview |
| 127 | June 17, 2006 | Discussion on providing security for the presidential candidates for the election in DR Congo, suggesting UN troops or working through the government to assemble a mix of personal security and local security | E-mail |
| 137 | June 14, 2006 | Interview with Jim Leusner with Orlando Sentinel. | Interview |
| 170 | June 26, 2006 | Seeds of Hope meeting with Dr. Kwon | |
| 138 | July 14, 2006 | Dept. of State; Congolese Ambassador; Latvian Embassy; Joint Session of Congress | State Department, US Congress, Latvian Embassy, DRC Embassy |
| 167 | July 25, 2006 | Joint Session of Congress | Washington, DC |
| 168 | July 25, 2006 | Frank Amodeo meets with Dr. Faida Mitifu, Ambassador to the Democratic Republic of Congo | Washington, DC |
| 139 | July 25, 2006 | Frank in DC; Profile of Amodeo in Van Zandt's view; Van Zandt look after daughter if problem arises while in summer program. | Dinner, Washington, DC |
| 139 | July 26, 2006 | Amodeo meets with Ms. Khaleda Atia, Commercial Attache', Embassy of Afghanistan | Washington, DC |
| 168 | July 26, 2006 | Amodeo meets with Department of State, Afghanistan Team | Washington, DC |
| 169 | July 26, 2006 | Amodeo meets with M. Katherine Friedrich, Special Advisor to the Under Secretary of State for Global Affairs | Washington, DC |
| 140 | July 26, 2006 | Amodeo meets Carol Thompson, US Deputy Assitant for African Affairs | Washington, DC |
| 140 | July 26, 2006 | Amodeo meets Mr. Atiq Panjshiri, President and Board Member, Afghan- American Chamber of Commerce | Washington, DC |
| 99 | July 27, 2006 | Mirabilis hosts a meet and greet for Alex Sink, Democratic candidate for Chief Financial Officer of Florida. | Orlando, FL |
| 120 | August 9, 2006 | Joe Robinson and Kevin Billings speak at the South Orlando Kiwanis Club and relate the story of their ordeal in the DR Congo, while supporting the presidential campaign of Dr . Oscar Kashala. | Orlando, FI |
| 169 | September, 2006 | Frank Amodeo agrees to pay for to NATO conference in Riga for Rudi Guilianni | |
| 125 | October 1, 2006 | Mirabilis Ventures, Inc. invested in the World Wrestling League (WWL) which a wrestle manis event for the old stars. | |
| 160 | October 26, 2006 | Frank Amodeo meets with Joe Robinson and Rene Gomes Souza regarding training program for Brazillian security personnel | |
| 140 | October 27, 2006 | Frank in DC to meet with President of the United States | Roosevelt Room |

| | | | |
|---|---|---|---|
| 171 | November 15, 2006 | Shepherds Hope dinner where Frank Amodeo is honored for his philanthropic activities. | |
| 141 | November 15, 2006 | General business mailers; Seeds of Hope | Meeting |
| 142 | November 15, 2006 | Plan Riga NATO Summit and business meeting of fees | Conference Call |
| 124 | November 17, 2006 | AQMI's white papers discussing Capital Genesis as it relates to The economic redevelopment plans for Afghanistan and The DR Congo. | E-mail |
| 126 | November 20, 2006 | Discussion of various investment projects in China | E-mall |
| 143 | November 25, 2006 | Riga NATO Summit; first day told Sally Painter and Karen Tramentano taxes were priority matter and reason for large fees; rest of representation was secondary; without reasonable repayment terms from IRS, Mirabilis growth would slow. | Riga, Latvia |
| 144 | November 26, 2006 | AQMI Strategy sponsors NATO Summit in Riga, Latvia | Riga, Latvia |
| 145 | November 27, 2006 | Riga NATO Summit - in session Amodeo discussed Capital Genesis economic model and how it can be used to help the Republic of latvia | Riga, Latvia |
| 146 | November 28, 2006 | Riga NATO Summit | Riga, Latvia |
| 85 | December 1, 2006 | Bob Sacco meets with Amodeo to get permission to continue discussion with covert intelligence officer from Patrick Air Force base. | Orlando, FL |
| 1 | | Ferrell the Virgina old guard, senators and Warner | |
| 147 | | Katrina Events | New Orleans |
| 148 | | Seed of Hope | |
| 149 | | Congo, Kashala | |
| 150 | | Joe Robinson and Oscar Kashala meet with the European Parliament to discuss the Democratic Republic of the Congo. | |
| 151 | | Meet with Senator Luger, Chairman of the Foreign Relations Committee. | |
| 152 | | Dan Barks visits Russian ICBM plant | |
| 153 | | Meet with Czechoslovakian Government | |
| 154 | | F-18s come to Orlando Executive | |
| 155 | | Frank Amodeo attends Karzai dinners | |

3

Addendum "E"

7:33 PM
8/3/2009

| | | | |
|---|---|---|---|
| 156 | | Mirabilis Baseball events | |
| 157 | | Frank Amodeo gets invitation to join International Fairness counsel from President Clinton | |
| 158 | | Frank Amodeo meets with Rutledge from CNN | |
| 159 | | Frank Amodeo makes a donation to the a Congo church and school initiative | |
| 161 | | Joe Robinson travels to Brazil to train security personnel | |
| 162 | | Kevin Munroe to Cuba | |
| 163 | | Costa Rica | |
| 164 | | Moreyra to Costa Rica | |
| 165 | | Hans Beyer, Steve Zedrick, and Linda Duncan to China | |
| 166 | | Pu Lang matters | |
| 172 | | Bob Pollack and Larry Haber visit the New Orleans Saints and Jacksonville Jaguars management and attend games in VIP box seats | |
| 173 | | Mirabilis Sponsors the New Orleans Saints | |
| 174 | | Mirabilis Sponsors the Jacksonville Jaguars | |
| 175 | | Mirabilis Sponsors the Orlando Magic | |
| 176 | | Mirabilis Sponsors the UCF School of Music | |
| 177 | | Mirabilis Sponsors the Florida Gators | |
| 178 | | Frank meets with Burt Saunders regarding his Campaign | |
| 179 | | Hold a fundraising meeting at Suntrust offices for Alex Sink, now Florida CFO | |
| 180 | | Sponsored  x who lost to Charlie Christ | |
| 181 | | Edie Curry, Toms, and Richard Ferrill meet with Senator Allen and Senator Warner | |
| 182 | | Joe Robinson sponsored Brazilian security officer meeting in Suntrust offices | |
| 183 | | Edie Curry, Toms, and Richard Ferrill meet with the Governor of Virginia | |
| 184 | | Edie Curry meets with the Department of Defense | |
| 185 | | Bruce Walko meets with the President of the Dominican Repulic regarding oil refineries, hotels, and airports and airlines. | |
| 186 | | Denny Kurir meets with government officials from Naru where AQMI is hired to help evaluate Naru's lawsuits against it's energy plant manufacturers | |
| 187 | | Amodeo's Capital Genesis theory is adapted by UREC and is widely published in DRC. | |
| 59 | | Donations to Make- A- Wish foundation | |

| | | | | |
|---|---|---|---|---|
| 65 | | | | |
| 66 | | | | |

| | | | | |
|---|---|---|---|---|
| 68 | | | | |

| | | | | |
|---|---|---|---|---|
| 70 | | | | |
| 71 | | | | |

| | | | |
|---|---|---|---|
| 80 | | AQMI Strategy invest in hospital project in Mbujmayi, D. R. Congo. | |
| | | | |

Addendum "E"



**Addendum "E"**



# GLOBAL FAIRNESS
I N I T I A T I V E

**BOARD OF DIRECTORS**

**William Jefferson Clinton**
BOARD CHAIR
*President of the United States, 1993-2001*

**José María Figueres**
*President of Costa Rica, 1994-1998*

**Shepard Forman**
*Director, Center on International Cooperation
at New York University, USA*

**Peter Gubbels**
*International Programs Director, World Neighbors,
Canada*

**Willem Kok**
*Prime Minister of The Netherlands, 1994-2002*

**Carlos Murillo-Rodriguez**
*Chairman, Inter-University Consortium
for Sustainable Development, Costa Rica*

**Reema Nanavaty**
*Director of Rural Development
The Self Employed Women's Association, India*

**Sally Painter**
*Managing Director, Dutko Worldwide, USA*

**Muchtar Pakpahan**
*President, Prosperity Trade Union, Indonesia*

**Iqbal Quadir**
*Founder, Grameen Phone Corp., Bangladesh*

**Petar Stoyanov**
*President of Bulgaria, 1997-2002*

**John Sweeney**
*President, AFL-CIO, USA*

**Karen Tramontano**
*President, Global Fairness Initiative, USA*

The Global Fairness Initiative
410 First St SE, Suite 300
Washington, DC 20003
(202) 479-7158 Tel
(202) 318-0505 Fax
www.globalfairness.org

May 9, 2006

Frank Amodeo
Senior Strategist
Mirabilis Ventures, Inc.
200 South Orange Avenue, 28th Floor
Orlando, FL 32801

Dear Mr. Amodeo,

As you discussed with President Karen Tramontano, I am writing to extend an invitation to join the Board of Directors of the Global Fairness Initiative (GFI). GFI's Board of Directors represents the highest level of global leadership from government, business, labor and civil society. Though this group has disparate views on many global economic issues, they share a strongly held common vision that through innovation and engagement, the benefits of globalization can be extended to all persons, regardless of wealth, politics, or geography.

Founded in 2003, GFI has worked in many parts of the world, and in many sectors of the global economy. For example, in Ukraine, we have promoted economic engagement with the Euro-Atlantic community; in Cambodia, we are promoting a uniquely just industrial development model in the garment sector; in Indonesia, we are helping implement incentives for sustainable forest management;    in Azerbaijan, we have advocated transparent and pro-poor use of public oil revenue; in Central America, we are promoting a competitiveness strategy based on labor rights compliance; and on a global scale, we have launched a unique social venture fund to bridge the finance gap for commercial enterprises of the working poor. And we have more projects in the pipeline.

Our Board of Directors has played a critical role in our growth, and has led to tremendous program success on 4 continents. The GFI Board feels strongly that your experience, perspective and expertise would be a huge benefit to the organization. Accordingly, on behalf of the Board, I wish to extend to you an invitation to serve.

The GFI Board has 3-year renewable terms. The basic demands of the Board of Directors are minimal: participation in one Board meeting per year and assisting GFI's President, Karen Tramontano and GFI's Executive Director, Steve Bennett in identifying potential funders and funds for our projects. Some Board members also choose to expand their role through work on committees, or participation in GFI programs. This is entirely at the discretion of individual members, and should you choose to join us, you can select your own level of involvement.

Karen will follow up with you in the coming days to answer any questions you may have about Board service with GFI. In closing, I would like to thank you for considering this offer.

Warm Regards

*William J Clinton*

Bill Clinton

**Addendum "E"**



PRNewswire

United Business Media

News & Information

We tell your story to the world.

50 YEARS SINCE 1954

**Orlando-Based AQMI Strategy Airlifts 'Seeds of Hope' to Afghanistan**

ORLANDO, Fla., June 12 /PRNewswire/ — With only days to spare, AQMI Strategy has provided the funding necessary to rush 45 tons of soybean seeds to more than 300 needy farmers in Afghanistan. AQMI Strategy is an Orlando- based global consulting firm.

Nutrition & Education International, a California-based humanitarian organization, purchased the seeds but was unable to raise the $1 million required to fly them to Afghanistan. "The seeds were sitting in an airport in Chicago with time running out." NEI Executive Director Dr. Steven Kwon said. "They have to be in the ground by June 20 or the farmers will miss the entire growing season. This airlift is a miracle from God through AQMI."

While in Washington, D.C. for a separate business meeting, AQMI President and CEO Frank Amodeo learned of the farmers' plight. With his penchant for taking on projects that address improving global economic conditions, Amodeo immediately began putting things in place to ship the seeds. They are slated to arrive in Kabul on June 15 and will be quickly distributed to farmers throughout the country. Planting is targeted for June 20 with the harvest running from late September thru mid-October. Once soybean production is established in Afghanistan, Kwon hopes to build a soybean factory to process the raw soybeans for national distribution.

After nearly three decades of constant war, Afghanistan has one of the most vulnerable and malnourished populations in the world. Poor diet has resulted in the highest maternal mortality rate in the world, as well as one of the highest infant and childhood mortality rates.

"This airlift allows us to not only help save lives by improving the diet of poor people but also helps wean farmers from growing illegal opium poppy, which is used to make heroin and finance terrorists," said Amodeo. "That, in turn, results in a more stable political climate and paves the way for future business relationships. AQMI is proud support for this worthwhile initiative," Amodeo said.

Focused primarily on solving complex global issues through expert consulting services, AQMI Strategy has a unique, proprietary business model that is ideally suited to assist third world economies and emerging democracies. The model creates sustainable revenue streams for building schools, roads, water supplies and other key infrastructure.

**Addendum "E"**

AQMI Strategy :: Orlando-Based AQMI Strategy Airlifts 'Seeds of Hope' to Afghanistan

"We find that the most successful private entities doing humanitarian and nation-building work in emerging democracies have been on the ground talking to the people who live there," said Amodeo. "The local population always has valuable advice on needs and priorities. Listening to them assures that resources have a lasting positive impact. We hope this airlift is the beginning of a business relationship with the people of Afghanistan."

Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the content. Terms and conditions, including restrictions on redistribution, apply.

Copyright © 1996-2003 PR Newswire Association LLC. All Rights Reserved.
A United Business Media company.

icrossing /:••/

Addendum "E"



# The Nexialist

*A Publication supporting the Nexia - Mirabilis Network*

Nexia Strategy Corporation
September 2005 | Issue V

## Nexia News
### Mirabilis September 2005 Convention Presents Global Initiatives

### Mirabilis Ventures Acquires New Florida Industrial Electric

**Inside this issue:**

| | |
|---|---|
| Opening of Nexia - Detroit | 2 |
| What We Are Looking For... | 3 |
| Hurricane Relief Sent to Gulf Coast | 3 |
| Allow us to Introduce You... Eric Miller | 3 |
| Contact Directory | 4 |

*"A Nexialist is one skilled in the science of joining together, in an orderly fashion, the knowledge of one field of learning with that of other fields."*

**In Our Next Issue...**

Mirabilis Ventures
opens it's new
worldwide
headquarters office in
Orlando, Florida.



**Nexia Strategy Corporation**
20 N. Orange Avenue, Suite 1600
Orlando, Florida 32801

Toll free 1-877-656-5724

We're on the web at:
www.nexiastrategy.com

## Contact Directory

**Corporate Offices**

**Regional Offices**

**The Power of Connections within the Network**

Addendum "E"

## The Nexalist

### Nexia Opens New Regional Office In Detroit, Michigan

"A wise man will make more opportunities than he finds."

Francis Bacon



### What We Are Looking For...

- Regional Partners with management expertise or previous turnaround experience.
- Companies in need of value enhancement or succession security.
- Publicly traded companies seeking Sarbanes-Oxley compliance assistance.
- Insurance, Printing and Construction Companies available for acquisition or investment.
- Clubs Stores available for acquisition or sale of regulations or in need of ROI Services.

- PEO (Leasing) companies or any other companies that are having lots of insurance issues.
- Companies in any industry sector that have significant PEO (Leasing) needs.
- Recovery of individuals with post-graduate degrees and industry-specific experience in their chosen career who are looking to build a portfolio of Subject Matter Experts in a vast number of fields.
- Relationships with a CPA or law firm that has a consideration or prospective clients or companies.

---

## Nexia Strategy Corporation

### Mirabilis and ISI come to the Aid of Hurricane Katrina Victims

### Allow us to Introduce You...
#### Eric Miller, Information Technology Specialist



NATO Summit 2006



**Event:**
NATO "Open House" event, November 25 - 26

This event is: in Latvia, public.

**Venue:**
Daile Theatre,

# NATO "Open House" event, November 25 - 26

Addendum "E"

NATO Summit 2006



*Photo by Miks Latvis*

24.11.2006

**On Saturday, November 25 everybody is welcome to attend the "Open House" from 13.00–20.00 and also on Sunday, November 26, from 11.00–20.00.**

Riga– for two days, during the weekend of November 25 and 26 all the residents of Latvia and guests are welcome to visit the renovated Daile theatre for a special NATO "Open House" event. This event will give those who attend a better perspective on the NATO Summit in Riga and will allow them to partake in various competitions and have a good time.

Upon entering the "Open House" a surprise event has been organized to welcome everyone and give everyone the opportunity to participate in a free lottery. For the youngest visitors, a special event has been organized being "The longest children's drawing in Latvia". The visitors to the "Open House" will also have the opportunity to see an installation artwork by Raimonds Kalējs that unifies several elements from the participants of the drawing competition "Learn about NATO" as well as the best drawings from the competition "Let's grow along with the soldiers!"

The Latvian "Mitten Renaissance", which happened purely because of the NATO Summit in Riga, will be presented in a room designed by the artists Kristīne Jurjane and visitors will have an opportunity to meet the ladies who actually knitted the mittens. The history of the Daile theatre will be presented in the "Daile Theatre exposition" in the ground floor foyer of the building and the Daile Theatre cafe will cater for the well being of all visitors. Representatives from the LATO organization and staff of the NATO informative tent will assist visitors in clarifying any NATO

Addendum "E"

questions they may have.

In the foyer on second floor of the Dalle theatre , where radio "Open House" will be operating, once every hour popular Latvian DJs: Fredis, Ēriks Loks, Jānis Vaišļa and others will hold interviews with publicly well-known persons and with visitors to the event. Next to the radio venue, artist Izolde Cēsniece will offer a fun time with an interactive game on NATO for children and adults with the winners receiving special prizes. The exhibition "Kolāža" will allow visitors to take on various images and then later see themselves in a special internet home page.

After partaking in the activities, the large hall of the Dalle theatre will offer a period for relaxation with visitors being able to enjoy the new sound and lighting equipment, the new seats and the stage setting for the show "The Other Sherlock Holmes".

Parents are invited to attend this event with their youngest children as a playground and professional baby-sitter services will be available.

On Saturday, November 25 everybody is welcome to attend the "Open House" from 13.00–20.00 and also on Sunday, November 26, from 11.00–20.00

For the media: On Saturday, November 25, at 12:00 In the small hall of the theatre an awards ceremony for NATO competition winners will take place. The culmination of the event will be at 15:00 when the President of the Republic Latvia, Vaira Vīķe-Freiberga will join the event and a photo session with the winners and event supporters will take place.
The working language is Latvian.

The NATO Summit in Riga support committee
The "Open House" at the Dalle theatre is being organized under the auspices of the NATO Riga Summit Support Committee. Support by the private sector in organizing a NATO Summit has become a tradition. This type of assistance has been provided to the organizers of prior NATO summits by creating support committees and presenting their positions on global security. The support committee has extended financial support to the Latvian government in organizing important events during the NATO summit in Riga, including a specialist conference on security issues, the Young Leader's forum, the city festival, art competitions, the Open House at the "Dalle" theatre and other informative and educational events regarding NATO. The international support committee for the NATO Summit in Riga is headed by three co-chairpersons - Timothy P. McKone, Vice-President of the US telecommunications company AT&T, Robert G. Liberatore, Vice-President of Daimler-Chrysler and Alvis Ronis, Chairman of the Board of the Latvian-American finance forum. The Support committee function is to attract donations for the NATO Riga Summit. The support committee has received financial support from Latvian and American private companies such as Parex banka, AT&T, Daimler-Chrysler, Liepājas Metalurgs, SIA Statoil Latvija, PBK, EADS, ĀČDA, Health Centre Joker Klubs, Tris A Brokeris, OVI, and the Bank of Georgia.

Information prepared by Sandra Dauburе, NATO Summit in Riga in 2006 support committee, Detailed information Daiga Holma, Porter Novelli, 29723599

Addendum "E"

NATO Summit 2006

Page 4 of 4

© 2006 Riga NATO Summit. All rights reserved.

editor@rigasummit.lv

2/26/2008

Addendum "E"



RIGA

SUMMIT 29 29 V 2006 SAMMIT

NATO
OTAN

During this week-end everybody will have an opportunity to participate in the NATO Summit at the newly renovated Daile theatre



*Photo by Miks Latvis*

24.11.2006

Riga– for two days, during the weekend of November 25 and 26 all the residents of Latvia and guests are welcome to visit the renovated Daile

http://www.rigasummit.tv/en/id/newsin/nid/208/

2/26/2008

Addendum "E"

theatre for a special NATO "Open House" event. This event will give those who attend a better perspective on the NATO Summit in Riga and will allow them to partake in various competitions and have a good time.

Upon entering the "Open House" a surprise event has been organized to welcome everyone and give everyone the opportunity to participate in a free lottery. For the youngest visitors, a special event has been organized being "The longest children's drawing in Latvia". The visitors to the "Open House" will also have the opportunity to see an installation artwork by Raimonds Kalējs that unifies several elements from the participants of the drawing competition "Learn about NATO" as well as the best drawings from the competition "Let's grow along with the soldiers!"

The Latvian "Mitten Renaissance", which happened purely because of the NATO Summit in Riga, will be presented in a room designed by the artists Kristīne Jurjāne and visitors will have an opportunity to meet the ladies who actually knitted the mittens. The history of the Dalle theatre will be presented in the "Dalle Theatre exposition" In the ground floor foyer of the building and the Dalle Theatre cafe will cater for the well being of all visitors. Representatives from the LATO organization and staff of the NATO informative tent will assist visitors in clarifying any NATO questions they may have.

In the foyer on second floor of the Dalle theatre , where radio "Open House" will be operating, once every hour popular Latvian DJs: Fredis, Ēriks Loks, Jānis Vaišļa and others will hold interviews with publicly well-known persons and with visitors to the event. Next to the radio venue, artist Izolde Cēsniece will offer a fun time with an interactive game on NATO for children and adults with the winners receiving special prizes. The exhibition "Kolāža" will allow visitors to take on various images and then later see themselves in a special internet home page.

After partaking in the activities, the large hall of the Dalle theatre will offer a period for relaxation with visitors being able to enjoy the new sound and lighting equipment, the new seats and the stage setting for the show "The Other Sherlock Holmes".

Parents are invited to attend this event with their youngest children as a playground and professional baby-sitter services will be available.

On Saturday, November 25 everybody is welcome to attend the "Open House" from 13.00-20.00 and also on Sunday, November 26, from 11.00-20.00

For the media: On Saturday, November 25, at 12:00 in the small hall of the theatra an awards ceremony for NATO competition winners will take place. The culmination of the event will be at 15:00 when the President of the Republic Latvia, Vaira Vīķe-Freiberga will join the event and a photo session with the winners and event supporters will take place.
The working language is Latvian.

The NATO Summit in Riga Support Committee
The "Open House" at the Dalle theatre is being organized under the auspices of the NATO Riga Summit Support Committee. Support by the private sector in organizing a NATO Summit has become a tradition. This type of assistance has been provided to the organizers of prior NATO summits by creating support committees and presenting their positions on global security. The support committee has extended financial support to the Latvian government in organizing important events during the NATO summit in Riga, including a specialist conference on security issues, the Young Leader's forum, the city festival, art competitions, the Open House at the "Dalle" theatre and other informative and educational events regarding NATO. The international support committee for the NATO Summit in Riga is headed by three co-chairpersons - Timothy P. McKone, Vice-President of the US telecommunications company AT&T, Robert G. Liberatore, Vice-President of Daimler-Chrysler and Alvis Ronis, Chairman of the Board of the Latvian-American finance forum. The Support committee function is to attract donations for the NATO Riga

Addendum "E"

Summit. The support committee has received financial support from Latvian and American private companies such as Parex banka, AT&T, Daimler-Chrysler, Liepājas Metalurgs, SIA Statoil Latvija, PBK, EADS, ĀQM, Health Centre Joker Klubs, Tris A Brokeris, OVI, and the Bank of Georgia.

Information prepared by Sandra Daubure, NATO Summit in Riga in 2006 support committee, Detailed Information Daiga Holma, Porter Novelli, 29723599

## NATO "Open House" event, November 25 - 26

25.11.2006. Riga– for two days, during the weekend of November 25 and 26 all the residents of Latvia and guests are welcome to visit the renovated Daile theatre for a special NATO "Open House" event. This event will give those who attend a better perspective on the NATO Summit in Riga and will allow them to partake in various competitions and have a good time. Photo: Einārs Binders

View gallery

editor@rigasummit.lv

© 2006 Riga NATO Summit. All rights reserved.

Addendum "E"

NATO Summit 2006



## Riga NATO summit 2006 Support Committee



It has become a tradition for the private sector to provide support to organization of the NATO Summits. Private support committees were established to support previous NATO Summits, demonstrating that the business community supports the preservation of global security as provided by NATO. The goal of the NATO Riga Summit Support Committee is to provide assistance to the government in organizing the NATO Riga Summit and to promote understanding of the Latvian and international society about NATO. The International Riga NATO Support Committee is comprised of three chairmen – Mr. Timothy P. McKone, Executive Vice President of Federal Relations of AT&T, Mr. Robert G. Liberatore, Senior Vice President, Global External Affairs and Public Policy of DaimlerChrysler and Ambassador Alvis Ronis, the Chairman of the Latvian American Financial Forum.

## Riga Summit Support Foundation

The aim of the Riga Summit Support Found is to promote public and business involvement in strengthening the Transatlantic solidarity. The Found works to support public benefit initiatives and pays special attention to civic society development and support for research. The Fund extends financial support to Latvian government by organizing important events during the NATO summit in Riga, such as the think-tank

http://www.rigasummit.lv/en/id/cats/nid/1010/

Addendum "E"

conference on security issues, the Young Leaders Forum, the city festivals, art competition, "Open House" in the Daile theater and other informative and educational events about NATO. Fund is provisioned through private donations. Donors to the Fund are: AT&T, DaimlerChrysler, Parex banka, Liepājas Metalurgs, Statoil Latvija, PBK, EADS/АОМЗ, Health Center Joker Klubs, Trīs A Brokeris, Bank of Georgia and OVI.

Projects supported from the fund and NATO Riga Summit 2006 Support Committee:

Young Leaders Forum "Building Bridges for the Next Generation"

International conference of academics The Riga Conference "A Transforming NATO in a New Global Era"

Open House in Daile theatre

Discussion series for secondary school pupils

Competition on NATO for secondary school students

The town festivals – NATO informative tent and special hot-air balloon of the NATO Riga Summit in Latvian town festivals

Art competition

The scientific work competition for Latvian university students

The Guest lecture series in Latvian universities

© 2006 Riga NATO Summit. All rights reserved.

editor@rigasummit.lv

http://www.rigasummit.lv/en/id/cats/nid/1010/

Addendum "E"



Addendum "E"



Addendum "E"



Addendum E



Addendum "E"



Recently, Mirabilis donated a $50,000 sum to City of Orlando, Mayor Buddy Dyer's City Kidz! Fundraiser, which benefits the newly established Parramore Kidz Zone, directly assisting the children of the challenged Parramore neighborhood. In appreciation for Mirabilis' generous donation, Mayor Dyer invited twenty of Mirabilis' special guests to attend the evening event, witnessing the Mayor being "roasted," and to enjoy entertainment provided by SAK Comedy Club. Afterwards, Mirabilis' special guests were treated to a private party, hosted by Mayor Dyer, himself.

Addendum "E"

# Addendum

# "F"

## KEIFER GROUP INVESTIGATIONS

April 11, 2008

Harrison T. Slaughter Jr.
Attorney at Law
111 North Orange Ave., Ste 700
Orlando, FL 32801-2321

### FRANK LOUIS AMODEO
### POLYGRAPH EXAMINATION REPORT
### EXAMINATION DATED 4/10/08

Presidion Corporation, a Professional Employment Organization (PEO) acquired operating subsidiaries known as the various Sunshine Companies (PEO's). By 2004 Presidion was in financial trouble and had accrued significant payroll tax liabilities. In October 2004 Amodeo and his AQMI consulting team were retained (Presidion Consulting Agreement). Amodeo's recommended deconsolidating, divesting and liquidating the Sunshine Companies and using proceeds to pay the Internal Revenue Service (IRS) the unpaid payroll tax liability. Amodeo advised this would allow Presidion to deconsolidate its financials and thus separate itself from the liabilities of the Sunshine Companies (Sunshine Companies Plan). Amodeo retained a group of professionals, referred to collectively as the Holtz Team (Laurie Holtz, David Appel, Jose Marrero, Morris Hollander, Mathew Druckman, C. Khanorkar, Ken Levine, F. Cardenas, Eddie Curry, Jayson Carlson and other members of Rachlin Cohen and Holtz) to provide accounting and legal expertise. On December 21, 2004 Amodeo met with the Holtz Team regarding a detailed assignment of tasks with respect to the Sunshine Companies Plan. Amodeo specifically tasked contacting the United States Attorney's Office for South Florida as well as contacting the Criminal Investigative Division of the IRS. Amodeo advised that he did not conceal any material facts from the Holtz Team, that he authorized full disclosure of records, and that he never denied access to any information to the Holtz Team. Amodeo advised he was never told that there was anything wrong or illegal with the purchase of the Sunshine Companies and in carrying out his plan. The Sunshine Companies were sold to Wellington Capital Group, Inc., a wholly owned subsidiary of Amodeo and were dissolved  On  4/10/08  the  following  relevant questions were asked:

A. Did you deliberately conceal any material facts from the Holtz team and others present at the December 21st meeting?                  Answer-No

B. On December 21, 2004 did authorize a full disclosure of the company records to the Holtz team and others present?                  Answer-Yes

C. Did you deny access to information from the Sunshine Companies to any member of Holtz team or others present at the Dec 21st meeting?                  Answer-No

D. Did any member of the Holtz team or others present at the December 21st meeting ever tell you there was anything wrong or illegal with the purchase of the Sunshine companies?                  Answer-No

I evaluated the responses as not indicative of deception. I conducted a reliability check using Polyscore Version 6, Volume 8.07.07. Polyscore is a computerized scoring system developed by the John Hopkins University Applied Physics Laboratory. Polyscore's decision was that no deception was indicated and the probability of deception less than .01. It is my opinion that Amodeo was truthful.

_Richard W. Keifer_                  _4/11/08_
Richard W. Keifer, Polygraph Examiner                  Date

**Keifer Group Investigations**
1203 Tall Pine Drive
Apopka, FL 32712
407 880-1411

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

### FRANK LOUIS AMODEO
### POLYGRAPH EXAMINATION REPORT
### EXAMINATION DATED 4/10/08

**Pre-Test Procedures:** This examination was conducted in Orlando, Florida in the law offices of Harrison B. Slaughter. Prior to the examination the nature of the polygraph and all procedures to be followed during the examination were discussed with the examinee. The allegations and the case facts were discussed with the examinee. The examination questions were formulated and reviewed in with the examinee who agreed with all the questions. The examinee indicated that the meaning of all terms and the significance of all questions were understood. In the conduct of this examination I used procedures I formerly used with the FBI and further conducted this examination in accordance with the standards of practice of the American Polygraph Association.

**Medical History:** The examinee stated that he takes Depakote for the treatment of his Bi-Polar condition. The examinee advised no pain or discomfort was being experienced. The examinee appeared alert and understood the significance of this examination.

**Instrumentation:** A Lafayette LX 4000 computerized polygraph (Serial No. 343343) with LX Software V.9.9.7 dated 06/27/07 was utilized for this examination. This instrument is pre-calibrated by the manufacturer with a stable long-term circuit design. In accordance with manufacturer recommendations, self-calibration of the various sensors was conducted prior to the examination and all were found to be acceptable. The following standard inputs were recorded: respiratory (2), electrodermal and cardiovascular. The following auxiliary inputs were recorded: A Model 76878US Activity Sensor Pad and a Model 76604US photoelectric Plethysmograph.

**Examination Techniques:** A stimulation test was administered as the first chart to assess the examinee's reactivity by directing the examinee to lie about a particular number in a sequence of numbers. During this process the examinee's basic reactivity is assessed. This assessment is used to evaluate the examinees fitness for continued testing and for comparisons with the subsequent data. The examinee's response patterns were acceptable and there was an appropriate amount of reaction present. A Utah Zone Comparison Technique was utilized with probable lie comparison questions. The Utah Zone is a validated technique. Four relevant questions were asked and three charts were collected.

**Evaluation Methods and Conclusion:** Sufficient relative reactivity was observed and quantified, thus allowing for objective numerical scoring with the comparison question techniques. Numerical scoring is the standard method of evaluating polygraph examinations. I used standard validated scoring criteria. On 4/10/08 my scores by question were (5) +1, (6) +2, (8) +3 and (9) +4 for a total of +10. A + 6 overall or greater is required for a decision of non-deception. My scores and decision meet the decision criterion for investigative examinations. A reliability check was conducted using Polyscore Version 6, Volume 8.07.07. Polyscore is a computerized scoring system developed by the John Hopkins University Applied Physics Laboratory. Polyscore's decision was that no deception was indicated and the probability of deception was less than .01.

**Keifer Group Investigations**
1203 Tall Pine Drive
Apopka, FL 32712
407 880-1411

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

May 13, 2008

Harrison T. Slaughter Jr.
Attorney at Law
111 North Orange Ave., Ste 700
Orlando, FL 32801-2321

### FRANK LOUIS AMODEO
### POLYGRAPH EXAMINATION REPORT
### EXAMINATION DATED 4/15/08

### SUMMARY

Amodeo advised that on or about May 18, 2004 that he was again approached by Craig Vandenberg and James Baiers, the principles of Presidion, regarding further financial problems that included federal payroll tax liabilities and the potential cancellation of their workers compensation policy with FCIC. Amodeo advised that the lack of workers compensation coverage would in essence close up the business and have disastrous financial consequences. Amodeo agreed to assist and entered a consulting agreement with Presidion whereby Nexia would be paid $300,000 per month. Amodeo retained the accounting firm of Rachlin Cohen & Holtz and the law firm of Berman Kean Riguerra, as well as a team of professionals to implement his strategy. This strategy is known as the Presidion Plan. During the June and July Nexia worked to resolve Presidion's problems. On July 28, 2005 at a meeting with Holtz, Berman, and others Amodeo was advised that FCIC would not renew the workers compensation policy. Amodeo had developed with consultation and the approval of Holtz, Berman and others the Presidion Plan. After the notification of the cancellation of the workers compensation coverage the Presidion pan was immediately implemented.. Amodeo advised the Presidion Plan's objective was to protect the book of business of Professional Benefits Solutions (PBS) and Paradyme while building up a Mirabilis as their successor. To implement the Presidion Plan PBS would stop paying the payroll taxes and transfer the funds to Presidion Solutions to create capital for reorganization. Presidion Solutions was then to use these funds to:

1. Obtain new insurance carrier and a redundant carrier to protect the company.
2. Pay the secured and seller claims so that operations would not be disrupted.
3. Pay the professionals and consultants used to formulate and implement the plan.
4. Keep the unsecured creditors at an optimal level for creating a favorable bankruptcy class.
5. To start IRS repayments in January 2006. The IRS would have to be paid over 72 months if the company were in bankruptcy and paid over 120 months if the company were out of bankruptcy, but with an early repayment if the company was resold profitably.
6. Acquire additional entities which would increase the book of business and to increase their overall value more than the acquisitions cost.
7. Improve operations by lowering costs while still preserving customers even though services and account representatives are being eliminated.

Amodeo advised the Presidion situation required that a decision had to be made on whom not to pay. Amodeo stated it was clear that if all obligations were to be met that the workers compensation had to be paid immediately. This would prevent immediate closure and subsequent damages. The idea was not to pay the payroll taxes until workers compensation was stabilized and also to prevent certain creditors and stakeholders from shutting down the business. This was being done to permit the business to survive as a going concern. It was important to avoid negative publicity or bankruptcy filing because bankruptcy could result in the possible loss of business. Amodeo stated it was important to have an entity with a

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

pristine ownership and management to control the assets and go public. This entity was Mirabilis and its operating entity AEM. Mirabilis was to be owned and operated by Curry, Berman, Carlson, Holtz, Myers and others. Curry, Berman, Carlson, Holtz, Myers and others were consulted with and advised about the plan as were Vanderburg and Baiers, the officers of Presidion. Amodeo stated he did not hide any material facts.

On 4/15/08 the following relevant questions were asked:

A. In his representative capacity as your forensic accountant did you tell Laurie Holtz about the Presidion plan as previously described?  **Answer-Yes**

B. In his representative capacity as your attorney did you tell Richard Berman about the Presidion plan as previously described?  **Answer-Yes**

C. Did Laurie Holtz ever tell you that any part of the Presidion plan as described was illegal and criminal?  **Answer-No**

D. Did Richard Berman ever tell you that any part of the Presidion plan was illegal or criminal?  **Answer-No**

I evaluated the responses as not indicative of deception. I conducted a reliability check using Polyscore Version 6, Volume 8.07.07. Polyscore is a computerized scoring system developed by the John Hopkins University Applied Physics Laboratory. Polyscore's decision was that no deception was indicated and the probability of deception less than .01. It is my opinion that Amodeo was truthful.

Richard W. Keifer, Polygraph Examiner

5/13/08
Date

Keifer Group Investigations
1203 Tall Pine Drive
Apopka, FL 32712
407 880-1411

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

### FRANK LOUIS AMODEO
### POLYGRAPH EXAMINATION REPORT
### EXAMINATION DATED 4/15/08

**Pre-Test Procedures:** This examination was conducted in Orlando, Florida in the law offices of Harrison B. Slaughter. Prior to the examination the nature of the polygraph and all procedures to be followed during the examination were discussed with the examinee. The allegations and the case facts were discussed with the examinee. The examination questions were formulated and reviewed in with the examinee who agreed with all the questions. The examinee indicated that the meaning of all terms and the significance of all questions were understood. In the conduct of this examination I used procedures I formerly used with the FBI and further conducted this examination in accordance with the standards of practice of the American Polygraph Association.

**Medical History:** The examinee stated that he takes Depakote for the treatment of his Bi-Polar condition. The examinee advised no pain or discomfort was being experienced. The examinee appeared alert and understood the significance of this examination.

**Instrumentation:** A Lafayette LX 4000 computerized polygraph (Serial No. 343343) with LX Software V.9.9.7 dated 06/27/07 was utilized for this examination. This instrument is pre-calibrated by the manufacturer with a stable long-term circuit design. In accordance with manufacturer recommendations, self-calibration of the various sensors was conducted prior to the examination and all were found to be acceptable. The following standard inputs were recorded: respiratory (2), electrodermal and cardiovascular. The following auxiliary inputs were recorded: A Model 76878US Activity Sensor Pad and a Model 76604US photoelectric Plethysmograph.

**Examination Techniques:** A stimulation test was administered as the first chart to assess the examinee's reactivity by directing the examinee to lie about a particular number in a sequence of numbers. During this process the examinee's basic reactivity is assessed. This assessment is used to evaluate the examinees fitness for continued testing and for comparisons with the subsequent data. The examinee's response patterns were acceptable and there was an appropriate amount of reaction present. A Utah Zone Comparison Technique was utilized with probable lie comparison questions. The Utah Zone is a validated technique. Four relevant questions were asked and three charts were collected.

**Evaluation Methods and Conclusion:** Sufficient relative reactivity was observed and quantified, thus allowing for objective numerical scoring with the comparison question techniques. Numerical scoring is the standard method of evaluating polygraph examinations. I used standard validated scoring criteria. On 4/10/08 my scores by question were (5) +1, (6) +4, (8) +3 and (9) +3 for a total of +11. A + 6 overall or greater is required for a decision of non-deception. My scores and decision meet the decision criterion for investigative examinations. A reliability check was conducted using Polyscore Version 6, Volume 8.07.07. Polyscore is a computerized scoring system developed by the John Hopkins University Applied Physics Laboratory. Polyscore's decision was that no deception was indicated and the probability of deception was less than .01.

**Keifer Group Investigations**
1203 Tall Pine Drive
Apopka, FL 32712
407 880-1411

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

May 13, 2008

Harrison T. Slaughter Jr.
Attorney at Law
111 North Orange Ave., Ste 700
Orlando, FL 32801-2321

### FRANK LOUIS AMODEO
### POLYGRAPH EXAMINATION REPORT
### EXAMINATION DATED 4/24/08

### SUMMARY

Amodeo advised that with regard to his complete involvement with the implementation of the Presidion Plan that he did not commit mail fraud or wire fraud. Amodeo furnished printed out copies of 18 USC 1341, 1346, 1343, 1346, and 1956. The elements of theses statutes were reviewed with Amodeo and the following relevant questions were then asked:

A. During the period between June 2005 and December 2005 were you aware of
   a plan by Presidion Corporation or any of Presidion's subsidiaries to defraud
   the IRS or evade payment of taxes?                                    Answer-No

B. Are you aware of any plan whether through fraudulent representations,
   promises or premises to deprive any customer of the Presidion PEO's of
   property, money or services?                                          Answer-No

I evaluated the responses as not indicative of deception. As a reliability check I ran the computerized evaluation program Objective Scoring System (OSS V.3). This program's decision was that no specific reactions were observed and that there was a .038 probability these reactions were produced by a deceptive person. It is my opinion that Amodeo was truthful.

Richard W. Keifer, Polygraph Examiner                5/13/08
                                                     Date

Keifer Group Investigations
1203 Tall Pine Drive
Apopka, FL 32712
407 880-1411

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

**FRANK LOUIS AMODEO**
**POLYGRAPH EXAMINATION REPORT**
**EXAMINATION DATED 4/24/08**

**Pre-Test Procedures:** This examination was conducted at 3660 Maguire Blvd. Ste 101, Orlando, Florida. Prior to the examination the nature of the polygraph and all procedures to be followed during the examination were discussed with the examinee. The allegations and the case facts were discussed with the examinee. The examination questions were formulated and reviewed in with the examinee who agreed with all the questions. The examinee indicated that the meaning of all terms and the significance of all questions were understood. In the conduct of this examination I used procedures I formerly used with the FBI and further conducted this examination in accordance with the standards of practice of the American Polygraph Association.

**Medical History:** The examinee stated that he takes Depakote for the treatment of his Bi-Polar condition. The examinee advised no pain or discomfort was being experienced. The examinee appeared alert and understood the significance of this examination.

**Instrumentation:** A Limestone Technologies computerized polygraph (Serial No. L01044) with PolygraphPro Software Version 2.7.1.1 was utilized for this examination. This instrument is pre calibrated by the manufacturer with a stable long term circuit design. In accordance with the manufacturer's recommendations, self calibration of the various sensors was conducted prior to the examination and all were functioning acceptably. A StingRay SE Piezo electronic countermeasure cushion was utilized. The following standard physiological inputs were recorded: respiration, electrodermal and cardiovascular.

**Examination Techniques:** A Zone Comparison Technique was utilized with probable lie comparison questions. The Zone Comparison is a validated technique. Two relevant questions were asked and four charts were collected.

**Evaluation Methods and Conclusion:** Sufficient relative reactivity was observed and quantified, thus allowing for objective numerical scoring with the comparison question techniques. Numerical scoring is the standard method of evaluating polygraph examinations. I used standard validated scoring criteria. On 4/10/08 my scores by question were (5) +2, and (7) +4 for a total score of +6. A + 6 overall or greater is required for a decision of non-deception. My scores and decision meet the decision criterion for investigative examinations. For a reliability check I ran the data through a computerized evaluation system known as the Objective Scoring System (OSS V.3). This program's decision was that no specific reactions were observed and that there was a .038 probability these reactions were produced by a deceptive person.

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

May 13, 2008

Harrison T. Slaughter Jr.
Attorney at Law
111 North Orange Ave., Ste 700
Orlando, FL 32801-2321

### FRANK LOUIS AMODEO
### POLYGRAPH EXAMINATION REPORT
### EXAMINATION DATED 5/9/08

### SUMMARY

An element of the Presidion plan was that once FCIC cancelled the workers compensation coverage for Presidion, a new carrier needed to be obtained. Presidion had negotiated with Sunz for coverage, and Sunz declined to provide coverage to Presidion, but agreed to provide coverage to AEM d/b/a Mirabilis HR. AEM was in the process of acquiring Presidion's book of business. Sunz coverage for AEM became effective on August 1, 2006. In the financial agreement with SUNZ, AEM provided a letter of credit to cover future losses, provided money to pay current claims, and paid a premium on a monthly basis that could be adjusted based on the total number of employees, . AEM collected money from its clients for payroll, services, workers compensation and taxes. Amodeo advised SUNZ was then paid as were the trust fund taxes. AEM's contract with SUNZ was in effect until May 2007 when AEM sold its business. A settlement agreement and release was negotiated whereby SUNZ paid $5.5 million dollars to AEM.

On 5/9/08/08 the following relevant questions were asked:

A. To your knowledge was Sunz being paid with trust fund monies between
   August 06 and May 07?                                              Answer-No

B. Did you or are you attempting to defraud the government?            Answer-No

C. When you negotiated a settlement of the collateral account with Sunz were
   those monies to your knowledge workers compensation overpayments?   Answer-Yes

D. Did you use the Sunz proceeds for the direct or indirect benefit of the IRS?   Answer-Yes

I evaluated the responses as not indicative of deception. I conducted a reliability check using Polyscore Version 6, Volume 8.07.07. Polyscore is a computerized scoring system developed by the John Hopkins University Applied Physics Laboratory. Polyscore's decision was that no deception was indicated and the probability of deception less than .01. It is my opinion that Amodeo was truthful.

Richard W. Keifer, Polygraph Examiner

Date  5/13/08

Keifer Group Investigations
1203 Tall Pine Drive
Apopka, FL 32712
407 880-1411

Addendum "F"

## KEIFER GROUP INVESTIGATIONS

### FRANK LOUIS AMODEO
### POLYGRAPH EXAMINATION REPORT
### EXAMINATION DATED 5/9/08

**Pre-Test Procedures:** This examination was conducted at 3660 Maguire Blvd., Ste 101, Orlando, Florida. Prior to the examination the nature of the polygraph and all procedures to be followed during the examination were discussed with the examinee. The allegations and the case facts were discussed with the examinee. The examination questions were formulated and reviewed in with the examinee who agreed with all the questions. The examinee indicated that the meaning of all terms and the significance of all questions were understood. In the conduct of this examination I used procedures I formerly used with the FBI and further conducted this examination in accordance with the standards of practice of the American Polygraph Association.

**Medical History:** The examinee stated that he takes Depakote for the treatment of his Bi-Polar condition. The examinee advised no pain or discomfort was being experienced. The examinee appeared alert and understood the significance of this examination.

**Instrumentation:** A Lafayette LX 4000 computerized polygraph (Serial No. 343343) with LX Software V.9.9.7 dated 06/27/07 was utilized for this examination. This instrument is pre-calibrated by the manufacturer with a stable long-term circuit design. In accordance with manufacturer recommendations, self-calibration of the various sensors was conducted prior to the examination and all were found to be acceptable. The following standard inputs were recorded: respiratory (2), electrodermal and cardiovascular. The following auxiliary inputs were recorded: A Model 76878US Activity Sensor Pad and a Model 76604US photoelectric Plethysmograph.

**Examination Techniques:** A Utah Zone Comparison Technique was utilized with probable lie comparison questions. The Utah Zone is a validated technique. Four relevant questions were asked and three charts were collected.

**Evaluation Methods and Conclusion:** Sufficient relative reactivity was observed and quantified, thus allowing for objective numerical scoring with the comparison question techniques. Numerical scoring is the standard method of evaluating polygraph examinations. I used standard validated scoring criteria. On 4/10/08 my scores by question were (5) +5 (6) +7, (8) +4 and (9) +1 for a total of +17. A + 6 overall or greater is required for a decision of non-deception. My scores and decision meet the decision criterion for investigative examinations. A reliability check was conducted using Polyscore Version 6, Volume 8.07.07. Polyscore is a computerized scoring system developed by the John Hopkins University Applied Physics Laboratory. Polyscore's decision was that no deception was indicated and the probability of deception was less than .01.

**Keifer Group Investigations**
1203 Tall Pine Drive
Apopka, FL 32712
407 880-1411

Addendum "F"

**Curriculum Vitae**

**of**

**Richard W. Keifer**
1203 Tall Pine Drive
Apopka, Fl 32712-2586
Tel/Fax (407) 880-1411

Addendum "F"

## CURRICULUM VITAE

Richard W. Keifer
1203 Tall Pine Drive
Apopka, Fl 32712-2586
Tel/Fax (407) 880-1411
Email rkeifer@cfl.rr.com

DOB: July 17, 1942
POB: Johnstown, Pa.

## CONTENTS

I.    EDUCATION AND GENERAL BACKGROUND

II.   POLYGRAPH TRAINING AND CONTINUING EDUCATION

III.  PROFESSIONAL EXPERIENCE AND ASSOCIATIONS

IV.   TRAINING AND LECTURES

V.    EXPERT WITNESS, RECOGNITION AND AWARDS

Addendum "F"

I.

A.        EDUCATION AND GENERAL BACKGROUND

    1.    Indiana University of Pennsylvania, Indiana, Pa., BS in Education 1964. Member of PI Gamma Mu, National Honorary Social Science Society.

    2.    United States Navy 1964-1967, Vietnam Service as Division Officer on CVA-43 and AE-31. Member USNR through 1970, Rank: Lieutenant.

    3.    New York Institute of Finance 1968.  Registered Representative New York Stock Exchange

    4.    C.S.Mckee & Co., Pittsburgh, Pa., 1968-1970 Stockbroker and Municipal Bond Trader.

    5.    Federal Bureau of Investigation 1970-1996. Assigned as Special Agent to Tampa, FL; New York City, Alexandria, Va.; and FBI Headquarters as Supervisory Special Agent.

    6.    University of Virginia, Charlottesville, Va., 1982. Graduate of the Advanced Polygraph Studies Program, obtained nine graduate hours in the sciences underlying polygraph.

    7.    University of Virginia, Charlottesville, Va., 1989. MS in Education (Instructional Design)

    8.    Keifer Group Investigations Inc., 1996-present. Polygraph examinations, quality control reviews, polygraph consulting and confidential investigations.

Addendum "F"

## II

A.    <u>POLYGRAPH TRAINING AND CONTINUING EDUCATION</u>

1.    Basic Polygraph Examiner Training, Fort McClellan, AL. 1981.
This course is conducted by the Department of Defense and was 12
weeks long focusing on physiology, psychology, chart
interpretation, conducting examinations, instrumentation, interview
and interrogation and other related polygraph matters.

2.    Advanced Polygraph Studies Program, University of Virginia,
1982. Attended the first session and received nine graduate credits
in the various sciences underlying polygraph. (Physiology,
psychology, pharmacology, psychiatry; and communications)

3.    National Security Agency, 1981. Attended one week school on
Personnel Screening Examinations.

4.    FBI Polygraph Examiner In-Service training at the FBI Academy,
1982, 1983, 1993.  FBI Regional Polygraph Conferences 1984
through 1993. One week training sessions focusing on a variety of
techniques and trends, as well as current research and case
management strategies.

5.    Federal Interagency Polygraph Seminars, 1982-1988, 1991, 1993.
One week annual seminar sponsored by various Federal Agencies
covering all aspects of Polygraph.

6.    John F. Reid School of Interview and Interrogation, 1984. A one
week course in interrogation fundamentals as well as the legal
issues involved in interrogation.

7.    University of Utah Detection of Deception Workshop, Salt Lake
City Utah, 1986.  A one-week course taught by Dr. David Raskin
focusing on polygraph research and advanced polygraph
techniques.

8.    Delta College, Saginaw, Michigan, 1988.  A one week seminar on
polygraph fundamentals and techniques.

9.    American Polygraph Association Annual Seminars, 1983, 1991-
2001, 2004, 2006, 2007. One week seminar on polygraph
fundamentals, techniques and research. Florida Polygraph
Association Continuing Education Seminars 1995, 1996, 2002,
2005, 2007.

10.   Clinical Testing of Sexual Offenders.  One-week school regarding
      testing sexual offenders on probation. May 3-7, 1999.  Post
      Conviction Sex Offender Testing qualified.

III.

A.        PROFESSIONAL EXPERIENCE AND ASSOCIATIONS

1.    Certified FBI Polygraph Examiner, 1981-1996.

2.    Polygraph Examiner for the Alexandria, Va. field office of the FBI, 1981-
      1982. Conducted examinations regarding criminal, foreign intelligence,
      and applicant  matters.

3.    Supervisory Special Agent, FBI Polygraph Unit, FBIHQ.
      As a supervisor, I have managed all portions of the FBI Polygraph
      Program.  These responsibilities included conducting examinations and
      doing quality controls in sensitive, high profile cases, including internal
      affairs cases for the Office of Professional Responsibility.  I have
      reviewed the work product and did performance evaluations on all FBI
      field examiners during this time period.  I developed and had accredited
      by the University of Virginia both the graduate level, "Advanced
      Polygraph Studies Program", and the undergraduate, "Law Enforcement
      Polygraph Course".  I served as the training coordinator, and the Foreign
      Intelligence Program  Coordinator. I served as the FBI's quality control
      reviewer for the research study (Validity of an Expanded Issue, Modified
      General Question Polygraph Technique in a simulated distributed-crimes-
      roles context) conducted by Dr. John Podlesney.  I have officially
      reviewed articles regarding polygraph submitted to the Journal of Forensic
      Sciences for publication.  I quality controlled the FBI cases that were used
      in the development of the computer Algorithm "Score", by the John
      Hopkins Applied Physics Laboratory.  I have conducted the quality
      control reviews of approximately 20,000 polygraph examinations, and
      have conducted over 2000 examinations.

4.    Polygraph Program Coordinator, 1987-1988.  I was selected to function as
      the national manager of the FBI's polygraph program. This
      position had management responsibilities over 4 Supervisory Special
      Agents and 47 Special Agent Examiners.  Responsibilities included
      performance evaluations of the supervisors, performance reviews of
      all field examiners, examiner selection, establishment and maintenance of
      standards of operation, insuring quality control standards were
      maintained, and providing assistance and coordination on research
      projects.

5.    Member of the Federal Interagency Polygraph Committee 1987-1988.
      Served as liaison member 1983-87 and 1989-94. This committee
      coordinates training and policy matters for the Federal Polygraph
      Community.

6

Addendum "F"

6.    Member of the Federal Interagency Countermeasures Committee 1987-94. This committee was formed to collect data on Foreign Intelligence Agency polygraph capabilities and to establish policies and procedures to counter their efforts.

7.    Member of the American Polygraph Association 1982-Present.

Elected to the Board of Directors of the American Polygraph Association, 1990-92, and 1995-97.

Elected President of the American Polygraph Association, 1997-1998

Chairman, Board of Directors, American Polygraph Association, 1998 – 2000.

8.    Member Florida Polygraph Association 1995 –present.

9.    Former Member of the American Society of Testing and Materials, Former Chairman of the Subcommittee on Polygraph Examination Testing Standards. 1997-2002.

10.    Former member of the American Association of Police Polygraphists.

Former member of the Virginia Polygraph Association.

Former licensed examiner, State of Virginia.

IV.

A.        LECTURES AND TRAINING PROVIDED

1.    Advanced Polygraph Studies Program, University of Virginia, 1984,
      1985, 1986, 1987, and 1989. Seminar Instructor on Polygraph
      Applications as Adjunct Faculty Member.

2.    American Polygraph Association's Annual Seminar
      1992 Standard Techniques-Advanced Applications.
      1993, 1994, 1995. Chart Evaluation Techniques.
      1997, 1999 Standards of Practice for the Conduct of Polygraph
      Examinations, 2004 Criminal Defense Polygraph Testing

3.    American Association of Police Polygraphists, 1987.
      Advanced Examination Techniques. (MRI)

4.    Barry University Law School, Opinion & Scientific Opinion, Sept. 2005.

5.    Central Intelligence Agency, 1991.
       FBI examination techniques in Foreign Intelligence Testing

6.    Delta College, Michigan, 1988.
      Review of the Relevant/Irrelevant Technique.

7.    Department of Justice (Office of Professional Responsibility)
      1988.  The Use of the Polygraph in Internal Affairs Cases.

8.    FBI Academy
      1984-94. Use of the Polygraph in FBI Investigations. New Agent
            Training.
      1985-87. Critical Issues in Law Enforcement (Polygraph). FBI National
            Academy
      1984-92. Inservice training for the Use of the Polygraph regarding
            Applicants, Informants, Émigrés, Espionage, Using Interpreters,
            and Interview and Interrogation.
      1996.     Chart Evaluation for FBI Polygraph Examiners.

9.    FBI Regional Training Conferences, 1984-93.
      All FBI Agent Examiner training regarding Polygraph.

10.   Florida Polygraph Association, 1995.
      Chart Evaluation Techniques.

11.   International Association of Chiefs of Police (IACP), 1991.
      Use of the polygraph in Law Enforcement.

8
Addendum "F"

12. Law Enforcement Polygraph Course (FBI Academy), 1985, 1986, and 1987. Curriculum design and Primary Instructor for standard practices for police examiners course.

13. National Security Agency, 1986.
    Employee Screening Using a Specific Issue Format.

14. United States Attorneys Conference (San Francisco), 1988.
    Polygraph in Public Corruption Cases.

15. University of Central Florida, June 2002
    Use of the Polygraph in Death Investigations

16. Western Regional Joint Drug Task Force, 1988.
    The Polygraph of Informants.

Additional Training provided to the USAFOSI, Virginia Polygraph Association, Pennsylvania State Police, NW Polygraph Association, and the Texas Department of Public Safety.

9
Addendum "F"

V.

A.       <u>EXPERT WITNESS</u>

    1.       Courtroom Testimony
US v. Robert L. Moultrie
United States District Court
Northern District of Mississippi
Honorable Chief Judge Michael P. Mills
Criminal Number 3:08CR014
May 1, 2008

State of Florida v. Scott Dallon
Fifth Judicial Circuit, Marion County
Honorable Hale R. Stancil
Circuit Court Judge
December 7, 2006

US v. Joseph A. Caron
United States District Court
Middle District of Florida, Orlando Division
Honorable Patricia C. Faucett, Chief Judge
Case No. 6:05-CR-15-ORL-19
September 25, 2006

State of Florida v. Michael Lewis Wininger
Fifth Judicial Circuit, Citrus County
Honorable Richard A. Howard
Circuit Court Judge
September 25, 2006

State of Florida v. Dr. David Mackey
Ninth Judicial Circuit Orange County
Honorable Lisa Taylor Munyon
Circuit Court Judge
Case No. 48-2003-CF-011842-0
October 12, 2005

US v. Randal Kimbrell
United States District Court
Middle District of Florida, Ocala Division
Honorable Wm.Terrell Hodges
Case No. 5:04-CR-43-0
March 10, 2005

Addendum "F"

State of Florida v. J. Patrick Swett
Ninth Judicial Circuit Orange Co.
Honorable Bob Wattles
Circuit Court Judge
Case No. CR 96 2991
March 17, 1998

Florida State Court
Honorable Victor J. Musleh
Circuit Court Judge
Fifth Judicial Circuit
Case No. 96-1196-CA-FC
May 1997

US v. Harvey Horvath
United States District Court
Northern District of Georgia, Rome Division
Case No. 90-cv-130-HLM
1991

B.    AWARDS AND RECOGNITION

1.    Received two FBI incentive awards and letters of commendation for performance in two complex investigations.Received two awards for public service from the US Attorney's Office in Washington, D.C. for polygraph related matters.

2.    Awarded lifetime membership in the American Polygraph Association.

3.    In July 2000 I was awarded by the ASTM Committee E 52 on Forensic Psychophysiology for the authorship of E3062-00. The Guide for PPD Examinations Standards of Practice.

4.    In November 2002 I was awarded a Certificate of Proficiency by the Florida Polygraph Association for Polygraph Techniques and Procedures

5.    In August 2007 I was presented the Cleve Backster Award that honors an individual or group that advances the polygraph profession through tireless dedication to the standardization of polygraph principles and practices.

Addendum "F"