# EXHIBIT C

## SHAREHOLDERS' AGREEMENT

THIS SHAREHOLDERS' AGREEMENT, dated as of this 22ⁿᵈ day of September, 2005, between and among each and every Shareholder identified on Schedule 1, attached hereto and incorporated by reference herein, as modified from time to time (each and together with any transferee, assignee or other Shareholder of the Company's shares who has agreed to be bound hereby, a "Shareholder") and Mirabilis Ventures, Inc., a Nevada Corporation (the "Company").

## WITNESSETH:

WHEREAS, the Company has been authorized to issue seventy-five thousand (75,000) shares of Class A capital common stock ("Black Stock" or "Black Shares"), one million (1,000,000) shares of Class B preferred stock ("Green Stock" or "Green Shares"), one million (1,000,000) shares of Class P preferred stock ("Gold Stock" or "Gold Shares"), four hundred thousand (400,000) shares of Class T preferred stock ("Platinum Stock" or "Platinum Shares"), and twenty-five thousand (25,000) shares of Class Z preferred stock ("Blue Stock" or "Special Preferred Stock" or "Blue Shares") (collectively, the "Shares"), all of which have no par value; and

WHEREAS, the Shareholders each own and hold the number of shares of Black Stock of the company as identified on Schedule 2, Green Stock of the company as identified on Schedule 3, Gold Stock of the company as identified on Schedule 4, Platinum Stock of the company as identified on Schedule 5, and Blue Stock of the company as identified on Schedule 6, attached hereto and incorporated by reference herein, as modified from time to time; and

WHEREAS, the Shareholders wish to enter into this Agreement to set forth their mutual understandings regarding the operation and control of the Company and the disposition of the Shares held by them.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and conditions set forth herein, the parties hereto agree as follows:

## Article I
## Class A Common Stock: Black Stock

1.01    **Black Stock Defined**.  The Company shall issue, to each Recipient of Class A Common Stock, shares of Black Stock as a means of evidencing ownership interest and participation in the business of the Company.  As used in this Agreement, the term "Recipient" shall mean any individual who purchases or receives any class or classes of Company Stock.

1.02    **Non Registration and Illiquidity of Black Stock**.  Black Stock has not been and will not be registered under the laws or regulations of any jurisdiction for offer or sale to any of the Shareholder or subsequent third parties.  Each party hereby represents and warrants that he or she has acquired such Black Shares for his or her own account, for investment only, and without a view to any transfer, redistribution or resale of any of the Black Shares to be acquired by such party.  The parties acknowledge that the Company has relied upon such representations in issuing such Black Shares without prior registration.  The parties recognize that their investment in the Company will

- 1 -

be illiquid, and that applicable securities laws and regulations may require them to hold their Black Shares indefinitely unless they can affect a registration of such stock or obtain an exemption from such registration.

1.03   Waiver of Transfer Rights of Black Stock.  Each party forever waives, denounces, foregoes, and yields any right they may have pursuant to current state or federal law to transfer their Black Shares.

1.04   Additional Distributions.  Shareholders of Black Stock shall be entitled to share, pro-rata, one-third (1/3) of the total sum of any additional distribution approved pursuant to Section 6.05 of this Agreement.

1.05   Limited Alienability of Black Stock.  Each party understands, upon accepting the Black Shares, that such shares are non-alienable other than to the AQMI Trust which shall become funded immediately upon the incapacity, death, or disability of a Shareholder of Black Stock, as those terms are defined in said AQMI Trust; provided, however, that if seventy-five (75%) percent of the Shareholder of Platinum Shares (each such Shareholder hereinafter referred to individually as "Tenured Shareholder" or jointly as "Tenured Shareholder") and fifty (50%) percent of the Shareholders of Gold Shares (each such Shareholder hereinafter referred to individually as "Preferred Shareholder" or jointly as "Preferred Shareholder") approve, then said Black Shares may be transferred to any such identified and approved party. Each party agrees, as a condition to any transfer of stock permitted by this Agreement, other than to the AQMI Trust, to obtain an opinion of legal counsel, in form and substance reasonably satisfactory to the Company and its legal counsel, that such transfer will not result in a violation of any securities law or regulation stock will bear the legend set forth in Section 6, below, as notice to any prospective transferee that such common stock is unregistered.

1.06   Veto Rights of Black Stock.  Except as provided herein, any Shareholder of at least twenty-five thousand (25,000) Black Shares shall have the ability to veto of any decision made by the other classes of Shareholders, within twenty (20) days of notice of said decision ("Veto Power"). Notice may be satisfied by posting a copy of said modification to the Company webpage in a clearly designated location where Shareholders can access the information.  Notwithstanding the foregoing, the Veto Power shall not extend to:

A.   Veto the issuance of Gold Shares;
B.   Veto the issuance of Platinum Shares; or
C.   Veto the authorization of an additional distribution.

1.07   Amendments to Bylaws or Articles of Incorporation.  Other than to amend the number of shares authorized for distribution, Black Shares may not amend the bylaws or articles of incorporation of the Company without the consent of 1/3 of the Preferred Shareholder and a majority of the Tenured Shareholder; provided however, that Black Shares may cause an amendment to the bylaws or articles without consent if there is sufficient funds to cause the redemption of all Green Shares, Gold Shares, and Platinum Shares at seventy-five (75%) percent of their face value  of One Thousand Dollars ($1,000) per share (hereinafter "Face Value").  In the event that the Black Shares cause the amendment to the bylaws or articles without consent, notice

shall be given to the Shareholder of said change within seventy-two (72) hours. Notice may be satisfied by posting a copy of said modification to the Company webpage in a clearly designated location where Shareholder can access the information. For a period of thirty (30) days thereafter, any Shareholder of Green Shares, Gold Shares or Platinum Shares may present to the Company their shares for redemption in accordance with the terms of this Agreement. After said thirty (30) day period has lapsed, no further requests for redemption resulting from the modification shall be entertained by the Company and each such remaining Shareholder shall be deemed to have waived any objection to said modification, and shall be further deemed to have given their tacit approval to said modification.

1.08    Redemption of Black Stock Upon Bankruptcy or Marital Dissolution. Upon the filing by any Shareholder of Black Stock for Marital Dissolution (whether as a Petitioner or Respondent) or for Bankruptcy, whether voluntary or involuntary, or the attachment, seizure by legal process, or other involuntary transfer of any Black Stock, the Company shall automatically transfer to the AQMI Trust any such shares to which a spouse would be entitled, or to which a bankruptcy trustee or insolvency or judgment could attach, with such transfer being made for the sum of One Hundred Thousand Dollars ($100,000). Said payment by the AQMI Trust shall be made in the form of a promissory note for the full redemption price, plus simple interest accruing at a rate of three (3%) percent per annum, payable by the Company in a lump sum payment of all principal and accrued interest at the end of one year; provided, however, that there shall be no prepayment penalty under the terms of the promissory note. Nothing in this paragraph shall be deemed to give any ownership interest in the Black Stock to any spouse. It is specifically acknowledged that it is the intention of the Company that each such share given to an individual is given as their sole and separate property, and was given or sold to the individual based on their unique and individual contribution to the Company. In furtherance hereof, at the time the Black Shares are distributed, each such non-Shareholder spouse shall be required to execute an acknowledgement and waiver of any communal interest in the Black Shares, which shall be attached to this Agreement as Schedule 7.

## Article II
## Class B Standard Preferred Stock:  Green Stock

2.01    Green Stock Defined.  The Company shall issue, to each Recipient of Class B Standard Preferred Stock, shares of Green Stock as a means of evidencing ownership interest and participation in the business of the Company.

2.02    Non Registration and Illiquidity of Green Stock.  Green Stock has not been and will not be registered under the laws or regulations of any jurisdiction for offer or sale to any of the Shareholder or subsequent third parties. Each party hereby represents and warrants that he or she has acquired such Green Shares for his or her own account, for investment only, and without a view to any transfer, redistribution or resale of any of the Green Shares to be acquired by such party. The parties acknowledge that the Company has relied upon such representations in issuing such Green Shares without prior registration. The parties recognize that their investment in the Company will be illiquid, and that applicable securities laws and regulations may require them to hold their Green Shares indefinitely unless they can affect a registration of such stock or obtain an exemption from such registration.

- 3 -

2.03    Waiver of Transfer Rights of Green Stock.  Each party forever waives, denounces, foregoes, and yields any right they may have pursuant to current state or federal law to transfer their Green Shares, other than as specifically provided for in this Agreement.

2.04    Non-Alienability of Green Stock.  Each party understands, upon accepting the Green Shares that such shares are non-alienable; provided, however, that upon acceptance as a Preferred Shareholder, any such Green Stock held by said Preferred Shareholder shall be assumed by the Company as treasury shares and shall be exchanged in accordance with the terms of Article III of this Agreement.

2.05    Voting Rights of Green Stock.  Green Stock shall have limited voting rights. Holders of Green Stock shall have the right to vote their shares only on the approval of an additional distribution or any such vote which, by state law, requires the approval of each class of shares. No other voting rights shall be conferred on to the Green Shares.

2.06    Additional Distributions.  Holders of Green Stock shall be entitled to share, in conjunction with all Holders of Gold Stock, pro-rata, one-third (1/3) of the total sum of any additional distribution approved pursuant to Section 6.05 of this Agreement.

2.07    Redemption Upon Departure of the Company.  Upon the termination, retirement, resignation, or legal determination of incompetence (hereinafter collectively referred to as "Triggering Event") of a Shareholder of Green Shares, then said Green Shares shall be redeemed by the Company at fifty (50%) percent of Face Value, with such payment being made in the form of an unsecured promissory note payable in equal installments, over a period of sixty (60) months, and accruing simple interest at the rate of three (3%) percent per annum. Said note shall be delivered to said Shareholder of Green Shares within thirty (30) days of the occurrence of a Triggering Event.

2.08    Redemption of Green Stock Upon Bankruptcy or Marital Dissolution.  Upon the filing by any Shareholder of Green Stock for Marital Dissolution (whether as a Petitioner or Respondent) or for Bankruptcy, whether voluntary or involuntary, or the attachment, seizure by legal process, or other involuntary transfer of any Green Stock, the Company shall redeem any such shares to which a spouse would be entitled, or to which a bankruptcy trustee or insolvency or judgment could attach, with such redemption being made at a price equal to fifty (50%) percent of Face Value multiplied by the number of Green Shares. Said payment shall be made in the form of a promissory note for the full redemption price, payable by the Company over a period of sixty (60) months, and which shall accrue interest at a rate of three (3%) percent per annum. Nothing in this paragraph shall be deemed to give any ownership interest in the Green Stock to any spouse. It is specifically acknowledged that it is the intention of the Company that each such share given to an individual is given as their sole and separate property, and was given or sold to the individual based on their unique and individual contribution to the Company. In furtherance hereof, at the time the Shares are distributed, each such non-Shareholder spouse shall be required to execute an acknowledgement and waiver of any communal interest in the Shares, which shall be attached to this Agreement as Schedule 7.

- 4 -

2.09    Redemption of Green Shares Upon Death of Shareholder.  Upon the death of any Shareholder, the Company shall redeem all of such deceased Shareholder's Green Shares at one hundred (100%) percent face vale and distribute them to the decedent's estate and or beneficiaries by paying one-half (1/2) of the money to the spouse of the Shareholder, and one-half (1/2) of the money to all of the Shareholder's issue, *per stirpes*.  Said redemption shall occur according to the following payout schedule:

A.    Twenty-five (25%) percent of the total redemption price shall be paid within forty-five (45) days of death;

B.    Twenty-five (25%) percent of the total redemption price shall be paid on the first anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest;

C.    Twenty-five (25%) percent of the total redemption price shall be paid on the second anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest; and

D.    Twenty-five (25%) percent of the total redemption price shall be paid on the third anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest.

### ARTICLE III
### Class P Preferred-Status Preferred Stock: Gold Stock

3.01    Gold Stock Defined.  The Company shall issue, to each Recipient of Class P Preferred-Status Preferred Stock, shares of Gold Stock as a means of evidencing ownership interest and participation in the business of the Company.

3.02    Eligibility for Gold Stock.    In order to be eligible for Gold Stock, an individual must hold at least three thousand (3,000) Green Shares.  Thereafter, at the next convened regular Gold Stock Committee meeting or special Gold Stock Committee meeting convened for the purpose of considering the same, any such eligible Shareholder of Green Shares shall be considered for Gold Stock.  Said regular meeting shall occur not less than once in every twelve month period.  The determination of the Gold Stock Committee shall be final, and approval for Gold Stock may be withheld in the Gold Stock Committee's sole and unfettered discretion.  Any individual not granted approval for Gold Stock shall be reconsidered during subsequent Gold Stock Committee meetings which consider the extension of invitations for the issuance of Gold Stock.

3.03    Gold Stock Committee.  As used in this Agreement, the "Gold Stock Committee" refers to any individual who holds Gold Stock.  Decisions of the Gold Stock Committee shall be based on majority vote.  Gold Stock Committee members may appear in person, via phone, or other communication method to actively participate in the meeting.  Members holding Gold Stock as of the date of this Agreement shall not require Gold Stock Committee approval.

- 5 -

3.04    Issuance of Gold Stock.  Each individual who has been authorized to receive Gold Stock shall surrender three thousand (3,000) shares of their Green Stock to the Company, which shall be assumed as treasury shares.  In exchange for the surrendered Green Stock, the Company shall issue on a 1:1 basis Gold Stock to the individual.  Nothing in this Section 3.04 shall preclude a Gold Shareholder from obtaining additional shares of Green Stock, however, no individual shall, in any case, own greater than 5,000 shares of Gold Stock.

3.05    Non Registration and Illiquidity of Gold Stock.  Gold Stock has not been and will not be registered under the laws or regulations of any jurisdiction for offer or sale to any of the Shareholder or subsequent third parties.  Each party hereby represents and warrants that he or she has acquired such Gold Shares for his or her own account, for investment only, and without a view to any transfer, redistribution or resale of any of the Gold Shares to be acquired by such party.  The parties acknowledge that the Company has relied upon such representations in issuing such Gold Shares without prior registration.  The parties recognize that their investment in the Company will be illiquid, and that applicable securities laws and regulations may require them to hold their Gold Shares indefinitely unless they can affect a registration of such stock or obtain an exemption from such registration.

3.06    Waiver of Transfer Rights of Gold Stock.  Each party forever waives, denounces, foregoes, and yields any right they may have pursuant to current state or federal law to transfer their Gold Shares, other than as specifically provided for in this Agreement.

3.07    Non-Alienability of Gold Stock.  Each party understands, upon accepting the Gold Shares that such shares are non-alienable; provided, however, that upon acceptance as a Tenured Shareholder, any such Gold Stock held by said Tenured Shareholder, shall be assumed by the Company as treasury shares and shall be exchanged in accordance with the terms of Article IV of this Agreement.

3.08    Voting Rights of Gold Stock.  Gold Stock shall vote on the following matters:  all matters put to a vote of the Shareholders pursuant to statute or the Company bylaws, subscription invitations to Shareholders of Green Shares for their exchange into Gold Stock, subject to the minimum requirements set forth in this Agreement, and for the authorization of additional distributions.  No other voting rights shall be conferred on to the Gold Shares.

3.09    Additional Distributions.  Holders of Gold Stock shall be entitled to share, in conjunction with all Holders of Green Stock, pro-rata, one-third (1/3) of the total sum of any additional distribution approved pursuant to Section 6.05 of this Agreement.

3.10    Redemption Upon Departure of the Company.  Upon the termination, retirement, resignation, or legal determination of incompetence (hereinafter collectively referred to as "Triggering Event") of a Shareholder of Gold Shares, then said Gold Shares shall be redeemed by the Company at eighty (80%) percent of Face Value, with such payment being made in the form of an unsecured promissory note payable in equal installments, over a period of sixty (60) months, and accruing simple interest at the rate of three (3%) percent per annum.  Said note shall be delivered to said Shareholder of Gold Shares within thirty (30) days of the occurrence of a Triggering Event.

3.11    Redemption of Gold Stock Upon Bankruptcy or Marital Dissolution. Upon the filing by any Shareholder of Gold Stock for Marital Dissolution (whether as a Petitioner or Respondent) or for Bankruptcy, whether voluntary or involuntary, or the attachment, seizure by legal process, or other involuntary transfer of any Gold Stock, the Company shall redeem any such shares to which a spouse would be entitled, or to which a bankruptcy trustee or insolvency or judgment could attach, with such redemption being made at a price equal to fifty (50%) percent of Face Value multiplied by the number of Gold Shares. Said payment shall be made in the form of a promissory note for the full redemption price, payable by the Company over a period of sixty (60) months, and which shall accrue interest at a rate of three (3%) percent per annum. Nothing in this paragraph shall be deemed to give any ownership interest in the Gold Stock to any spouse. It is specifically acknowledged that it is the intention of the Company that each such share given to an individual is given as their sole and separate property, and was given or sold to the individual based on their unique and individual contribution to the Company. In furtherance hereof, at the time the Shares are distributed, each such non-Shareholder spouse shall be required to execute an acknowledgement and waiver of any communal interest in the Shares, which shall be attached to this Agreement as Schedule 7.

3.12    Redemption of Gold Shares Upon Death of Shareholder. Upon the death of any Shareholder, the Company shall redeem all of such deceased Shareholder's Gold Shares at one hundred (100%) percent face vale and distribute them to the decedent's estate and or beneficiaries by paying one-half (1/2) of the money to the spouse of the Shareholder, and one-half (1/2) of the money to all of the Shareholder's issue, *per stirpes*. Said redemption shall occur according to the following payout schedule:

A.    Twenty-five (25%) percent of the total redemption price shall be paid within forty-five (45) days of death;

B.    Twenty-five (25%) percent of the total redemption price shall be paid on the first anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest;

C.    Twenty-five (25%) percent of the total redemption price shall be paid on the second anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest; and

D.    Twenty-five (25%) percent of the total redemption price shall be paid on the third anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest.

## ARTICLE IV
## Class T Tenured-Status Preferred Stock: Platinum Stock

4.01    Platinum Stock Defined. The Company shall issue, to each Recipient of Class T Preferred-Status Preferred Stock, shares of Platinum Stock as a means of evidencing ownership interest and participation in the business of the Company.

- 7 -

4.02    Eligibility for Platinum Stock. In order to be eligible for Platinum Stock, an individual must hold five thousand (5,000) Gold Shares. Thereafter, at the next convened regular Platinum Stock Committee meeting or special Platinum Stock Committee meeting convened for the purpose of considering the same, any such eligible Shareholder of Gold Shares shall be considered for Platinum Stock. Said regular meeting shall occur not less than once in every twelve month period. The determination of the Platinum Stock Committee shall be final, and approval for Platinum Stock may be withheld in the Platinum Stock Committee's sole and unfettered discretion. Any individual not granted approval for Platinum Stock shall be reconsidered during subsequent Platinum Stock Committee meetings which consider the extension of invitations for the issuance of Platinum Stock.

4.03    Platinum Stock Committee. As used in this Agreement, the "Platinum Stock Committee" refers to any individual who holds Platinum Stock. Decisions of the Platinum Stock Committee shall require two-thirds (2/3) of the Committee's affirmative vote. Platinum Stock Committee members may appear in person, via phone, or other communication method to actively participate in the meeting. Until such time as there are six (6) Shareholders of Platinum Shares, decisions reserved for the Platinum Stock Committee shall be made by a majority vote of the Shareholders of Black Stock.

4.04    Issuance of Platinum Stock. Each individual who has been authorized to receive Platinum Stock shall surrender all five thousand (5,000) shares of their Gold Stock to the Company, which shall be assumed as treasury shares. In exchange for the surrendered Gold Stock, the Company shall issue on a 1:1 basis Platinum Stock to the individual. Nothing in this Section 4.04 shall preclude a Platinum Shareholder from obtaining additional shares of Green Stock, however, no individual shall, in any case, own greater than 5,000 shares of Platinum Stock.

4.05    Non Registration and Illiquidity of Platinum Stock. Platinum Stock has not been and will not be registered under the laws or regulations of any jurisdiction for offer or sale to any of the Shareholder or subsequent third parties. Each party hereby represents and warrants that he or she has acquired such Platinum Shares for his or her own account, for investment only, and without a view to any transfer, redistribution or resale of any of the Platinum Shares to be acquired by such party. The parties acknowledge that the Company has relied upon such representations in issuing such Platinum Shares without prior registration. The parties recognize that their investment in the Company will be illiquid, and that applicable securities laws and regulations may require them to hold their Platinum Shares indefinitely unless they can affect a registration of such stock or obtain an exemption from such registration.

4.06    Waiver of Transfer Rights of Platinum Stock. Each party forever waives, denounces, foregoes, and yields any right they may have pursuant to current state or federal law to transfer their Platinum Shares.

4.07    Non-Alienability of Platinum Stock. Each party understands, upon accepting the Platinum Shares that such shares are non-alienable.

4.08    Voting Rights of Platinum Stock. Platinum Stock shall vote on the following matters: subscription invitations to Shareholders of Gold Shares for their exchange into Platinum

- 8 -

Stock, subject to the minimum requirements set forth in this Agreement, for the authorization of additional distributions, and any such vote which, by state law, requires the approval of each class of shares. No other voting rights shall be conferred on to the Platinum Shares.

4.09    Additional Distributions.  Holders of Platinum Stock shall be entitled to share, pro-rata, one-third (1/3) of the total sum of any additional distribution approved pursuant to Section 6.05 of this Agreement.

4.10    Redemption Upon Departure of the Company.  Upon the termination, retirement, resignation, or legal determination of incompetence (hereinafter collectively referred to as "Triggering Event") of a Shareholder of Platinum Shares, then said Platinum Shares shall be redeemed by the Company at one hundred (100%) percent of Face Value, with such payment being made in the form of an unsecured promissory note payable in equal installments, over a period of sixty (60) months, and accruing simple interest at the rate of three (3%) percent per annum. Said note shall be delivered to said Shareholder of Platinum Shares within thirty (30) days of the occurrence of a Triggering Event.

4.11    Redemption of Platinum Stock Upon Bankruptcy or Marital Dissolution.  Upon the filing by any Shareholder of Platinum Stock for Marital Dissolution (whether as a Petitioner or Respondent) or for Bankruptcy, whether voluntary or involuntary, or the attachment, seizure by legal process, or other involuntary transfer of any Platinum Stock, the Company shall redeem any such shares to which a spouse would be entitled, or to which a bankruptcy trustee or insolvency or judgment could attach, with such redemption being made at a price equal to fifty (50%) percent of Face Value multiplied by the number of Platinum Shares. Said payment shall be made in the form of a promissory note for the full redemption price, payable by the Company over a period of sixty (60) months, and which shall accrue interest at a rate of three (3%) percent per annum. Nothing in this paragraph shall be deemed to give any ownership interest in the Platinum Stock to any spouse. It is specifically acknowledged that it is the intention of the Company that each such share given to an individual is given as their sole and separate property, and was given or sold to the individual based on their unique and individual contribution to the Company. In furtherance hereof, at the time the Shares are distributed, each such non-Shareholder spouse shall be required to execute an acknowledgement and waiver of any communal interest in the Shares, which shall be attached to this Agreement as Schedule 7.

4.12    Redemption of Platinum Shares Upon Death of Shareholder.  Upon the death of any Shareholder, the Company shall redeem all of such deceased Shareholder's Platinum Shares at one hundred (100%) percent face vale and distribute them to the decedent's estate and or beneficiaries by paying one-half (1/2) of the money to the spouse of the Shareholder, and one-half (1/2) of the money to all of the Shareholder's issue, *per stirpes*. Said redemption shall occur according to the following payout schedule:

A.    Twenty-five (25%) percent of the total redemption price shall be paid within forty-five (45) days of death;

B.    Twenty-five (25%) percent of the total redemption price shall be paid on the first anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest;

- 9 -

C.    Twenty-five (25%) percent of the total redemption price shall be paid on the second anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest; and

D.    Twenty-five (25%) percent of the total redemption price shall be paid on the third anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest.

## ARTICLE V
### Class Z Special Preferred Stock: Blue Stock

5.01    Blue Stock Defined.  The Company shall issue, to each Recipient of Class Z Special Preferred Stock, shares of Blue Stock as a means of evidencing ownership interest and participation in the business of the Company.

5.02    Issuance of Blue Stock.  Blue Stock shall be special stock issued from time to time by the Company, at the direction of the Board of Directors.

5.03    Non Registration and Illiquidity of Blue Stock.  Blue Stock has not been and will not be registered under the laws or regulations of any jurisdiction for offer or sale to any of the Shareholder or subsequent third parties.  Each party hereby represents and warrants that he or she has acquired such Blue Shares for his or her own account, for investment only, and without a view to any transfer, redistribution or resale of any of the Blue Shares to be acquired by such party.  The parties acknowledge that the Company has relied upon such representations in issuing such Blue Shares without prior registration.  The parties recognize that their investment in the Company will be illiquid, and that applicable securities laws and regulations may require them to hold their Blue Shares indefinitely unless they can affect a registration of such stock or obtain an exemption from such registration.

5.04    Waiver of Transfer Rights of Blue Stock.  Each party forever waives, denounces, foregoes, and yields any right they may have pursuant to current state or federal law to transfer their Blue Shares, other than as specifically provided for in this Agreement.

5.05    Non-Alienability of Blue Stock.  Each party understands, upon accepting the Blue Shares that such shares are non-alienable.

5.06    Voting Rights of Blue Stock.  Blue Stock shall have no voting rights other any such vote which, by state law, requires the approval of each class of shares.

5.07    Distributions.  Holders of Blue Stock shall not be entitled to any distributions whatsoever.

5.08    Redemption Upon Departure of the Company.  Upon the termination, retirement, resignation, or legal determination of incompetence (hereinafter collectively referred to as "Triggering Event") of a Shareholder of Blue Shares, then said Blue Shares shall be redeemed by the Company at fifty (50%) percent of Face Value, with such payment being made in the form of an

unsecured promissory note payable in equal installments, over a period of sixty (60) months, and accruing simple interest at the rate of three (3%) percent per annum. Said note shall be delivered to said Shareholder of Blue Shares within thirty (30) days of the occurrence of a Triggering Event.

5.09    Redemption of Blue Stock Upon Bankruptcy or Marital Dissolution. Upon the filing by any Shareholder of Blue Stock for Marital Dissolution (whether as a Petitioner or Respondent) or for Bankruptcy, whether voluntary or involuntary, or the attachment, seizure by legal process, or other involuntary transfer of any Blue Stock, the Company shall redeem any such shares to which a spouse would be entitled, or to which a bankruptcy trustee or insolvency or judgment could attach, with such redemption being made at a price equal to fifty (50%) percent of Face Value multiplied by the number of Blue Shares. Said payment shall be made in the form of a promissory note for the full redemption price, payable by the Company over a period of sixty (60) months, and which shall accrue interest at a rate of three (3%) percent per annum. Nothing in this paragraph shall be deemed to give any ownership interest in the Blue Stock to any spouse. It is specifically acknowledged that it is the intention of the Company that each such share given to an individual is given as their sole and separate property, and was given or sold to the individual based on their unique and individual contribution to the Company. In furtherance hereof, at the time the Shares are distributed, each such non-Shareholder spouse shall be required to execute an acknowledgement and waiver of any communal interest in the Shares, which shall be attached to this Agreement as Schedule 7.

5.10    Redemption of Blue Shares Upon Death of Shareholder. Upon the death of any Shareholder, the Company shall redeem all of such deceased Shareholder's Blue Shares at one hundred (100%) percent face vale and distribute them to the decedent's estate and or beneficiaries by paying one-half (1/2) of the money to the spouse of the Shareholder, and one-half (1/2) of the money to all of the Shareholder's issue, *per stirpes*. Said redemption shall occur according to the following payout schedule:

        A.    Twenty-five (25%) percent of the total redemption price shall be paid within forty-five (45) days of death;

        B.    Twenty-five (25%) percent of the total redemption price shall be paid on the first anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest;

        C.    Twenty-five (25%) percent of the total redemption price shall be paid on the second anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest; and

        D.    Twenty-five (25%) percent of the total redemption price shall be paid on the third anniversary of the date of death, plus interest on the total outstanding redemption price from the date of death through the date the payment is made, accruing at six (6%) percent, simple interest.

## ARTICLE VI
### Ministerial Matters

6.01   Precondition to Issuance of Stock.   Before issuing any new stock, the Company must have funds sufficient after the proposed issuance. Sufficiency shall be presumed if two-thirds (2/3) Net Book Value equals or exceeds the cost to redeem all of the Green, Gold, Platinum, and Blue stock then issued and outstanding. The Net Book Value shall be published on the Company web page. For purposes of this Section 6.01, the Net Book Value to be used in determining the ability to issue new stock shall be the Net Book Value effective on the last day of the prior year.

6.02   Stock Transfer Records.   The Company shall maintain at its office records relating to the current ownership of the various classes of stock. This information may be viewed during reasonable business hours by any Company Shareholder.

6.03   Legends on Share Certificates.   The Secretary of the Company is hereby authorized and directed to write on the face or reverse side of such stock certificate representing the Shares the following legend:

> "The shares represented by the within certificate are subject to certain restrictions regarding transfer and voting rights under the terms of a Shareholder Agreement dated as of September 1, 2005, as amended, a copy of which is on file at the principal office of the Company, and available for inspection during regular business hours. Upon payment of duplication expenses, the Company will furnish a copy of such agreement to any party upon receipt of a direction to do so from the Shareholder of these shares. These shares have not been registered under the securities laws or regulations of any jurisdiction, and may not be transferred in any manner. These shares may only be redeemed at the request of the Company, and thereon only subject to the terms and conditions set forth in the Shareholder Agreement dated as of September 1, 2005."

6.04   Time Delay for Items Subject to Vote.   Any issue voted on by the Shareholder's, other than by a vote or veto of the Black Shares, shall not become effective for a period of thirty (30) days thereafter.

6.05   Distributions.   The Green, Gold, and Platinum Stock have a unique benefit which allows the Shareholder of Class Green. Gold, and Platinum Stock to participate, on an annual basis, in a six (6%) percent non-cumulative dividend. In the event that there are insufficient funds to pay a six (6%) dividend to the Green, Gold, and Platinum Shareholder, then a pro-rata distribution of available funds shall be made to the Green, Gold, and Platinum Shareholder. Nothing in this paragraph, however, shall give any carryover rights to a future year, to any Shareholder, for a distribution made in an amount less than the full six (6%) percent identified herein.

Additionally, a vote by a majority of the Preferred Shareholder and a majority of the Tenured Shareholder may result in additional dividend distributions beyond six (6%) percent, contingent on sufficient funds to make said additional distribution. Any such additional distribution shall be paid out in accordance with Sections 1.04, 2.06, 3.09, and 4.09 of this Agreement. As used in this Section 6.05, sufficient funds exist when, after the Company makes

- 12 -

the additional distribution the Company will (i) not be insolvent and (ii) will have enough funds to cover the costs of redemption of all of the authorized and outstanding Shares.

## ARTICLE VII
### Management

7.01    Management of the Company.  The Board of Directors of the Company shall consist of not less than three (3) nor more than fifteen (15) Directors who shall govern the Company by majority rule, subject to the Black Stock Veto Power, unless otherwise agreed in writing with respect to a particular action.  The number of Directors shall be identified at the annual meeting of the Shareholder or on an interim basis.  The number of Directors shall be voted on by two-thirds (2/3) of existing Directors and the majority of the Black Shares.  The election of such Shareholder as Directors shall be deemed to have occurred annually as provided in the Bylaws without the requirement of a specific Shareholder resolution to that effect.  Pursuant to the bylaws of the Company, Tenured Shareholder shall be entitled to vote for officers and directors as needed for Company subsidiaries and for the directors of the Company; provided, however that if any Shareholder holds more than twenty-five thousand (25,000) thousand shares of Black Stock, then the Tenured Shareholder shall have no voting rights as to the Directors of the Company.

7.02    Officers.  The Company shall have the following statutory officers: a president, a vice president, a secretary, and a treasurer.  Said statutory officers shall have the sole ability to bind the Company.  From time to time, additional titles may be appointed from time to time for the respective operative positions being filled, however, no such authority to bind the Company shall be bestowed upon them at any time.  The statutory officers shall be elected by the Board of Directors at the annual meeting of the Board and shall hold office for the term of one year, and until their successors are elected and qualified, unless sooner removed by the Board of Directors.  Any person may hold two or more offices.  The failure to elect a president, secretary or treasurer shall not affect the existence of the Company.  The functions and descriptions of the officers shall have the meaning ascribed to them in the Bylaws of the Company.  Nothing in this Section 7.02 shall preclude the same individual from serving in more than one capacity.

## ARTICLE VIII
### Miscellaneous Matters

8.01    Superseding Agreements.  In the event of a dispute between the terms of this Shareholder's Agreement and the terms of any employment agreement, solely as it relates to redemption price, the employment agreement shall prevail.  Further, any legend on a Company stock certificate which has been approved in writing by 2/3[rds] of the directors and a majority of the Black Stock Shareholders, shall supersede this Agreement.  In all other matters, the Shareholder's Agreement shall prevail.

8.02    Specific Performance.  The Shares of the Company cannot be readily purchased or sold in the open market, and for that reason, among others, the parties will be irreparably damaged in the event that this Agreement is not specifically enforced.  Should any dispute arise concerning the sale or disposition of any Shares, an injunction may be issued restraining any sale of disposition pending the determination of such controversy.

- 13 -

8.03    Amendment. This Agreement may be terminated or amended in whole or in part by an instrument in writing signed by the Company, and a majority of the Shareholder of each class.

8.04    Term of Agreement. This Agreement shall continue in full force and effect until the dissolution of the Company.

8.05    Agreement Binding. This Agreement shall be binding upon the parties hereto, and upon the successors and assigns of each of them, and said parties do hereby agree for themselves and their successors and assigns, to execute any instruments in writing, and to do any and all acts which may be necessary, convenient or expedient to carry out the purposes and intent of this Agreement.

8.06    Governing Law – Arbitration. This Agreement shall be subject to and governed by the internal laws of the State of Florida. The parties agree, except as otherwise expressly set forth herein, that all disputes involving the construction or enforcement of this Agreement and any disputes between the Shareholder regarding the management or operation of the Company shall be resolved by binding arbitration Rules of the American Arbitration Association ("AAA") and the Florida Arbitration Act. The parties agree that the location of any such arbitration shall be Orlando, Florida, unless otherwise agreed at the time the dispute is submitted to the AAA. In accordance with the Florida Arbitration Act, any party may apply to any court of competent jurisdiction to compel arbitration in accordance with this subsection or to enforce any award rendered by the arbitrator in a proceeding conducted hereunder in accordance with its term.

8.07    Jurisdiction and Venue. The laws of the State of Florida shall govern any disputes in connection with this Agreement. Venue shall be in Broward County, Florida.

8.08    Marriage After Receipt of Shares. The parties specifically recognize that after the receipt of Company Shares, a Shareholder may choose to enter into a marital, life-mate, or other arrangement which may result in attachment of any of the Company Stock as a portion of the assets, which may be divided upon the separation of the parties in situations including without limitation, the division of community property, equitable distribution, palimony, alimony, or separation of a life partner. The parties further acknowledge and agree that prior to entering into any such arrangement, a waiver shall be obtained from the Shareholder's significant other. Failure to obtain such waiver shall result in the complete liquidation of the Shareholder's Shares in accordance with the terms of this agreement.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands and seals as of the date first set forth above.

Mirabilis Ventures, Inc.,
a Nevada corporation

By: _____
Jason Carlson, Director

- 14 -

## SCHEDULE 1
### Shareholder List

| Printed Name | Address | Signature |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

- 16 -

**SCHEDULE 2**
**Black Stock List (Names and Numbers of Shares)**

Mirabilis Ventures. Inc. Shareholder Agreement

**SCHEDULE 3**
**Green Stock List (Names and Numbers of Shares)**

**SCHEDULE 4**
**Gold Stock List (Names and Numbers of Shares)**

**SCHEDULE 5**
**Platinum Stock List (Names and Numbers of Shares)**

Mirabilis Ventures, Inc. Shareholder Agreement

**SCHEDULE 6**
**Blue Stock List (Names and Numbers of Shares)**

Mirabilis Ventures, Inc. Shareholder Agreement

## SCHEDULE 7
## WAIVER OF INTEREST

As the spouse/life-mate/partner of _____, a Shareholder of Class ___ Stock and/or Class ____ Stock of Mirabilis Ventures, Inc., a Nevada corporation, and in consideration of the issuance of said Shares to _____, I hereby represent and warrant and covenant to Mirabilis Ventures, Inc. as follows:

I hereby acknowledge and agree to the treatment of any Shares in Mirabilis Ventures, Inc. titled in the name of _____ ("Shareholder"), are to be treated as his/her sole and separate property. To the extent that any such communal property interest attaches to the Shares, I hereby waive any such rights I may have, including those rights known as "Community Property Rights" or "Equitable Distribution Rights". I hereby attest and affirm that I shall not assert or enforce, and do hereby waive, any rights granted under any community property, equitable distribution, palimony, alimony, or division of life-mate asses statutes with respect the Shares which would adversely affect the covenants made by Shareholder pursuant to this Agreement or the sale and transfer of such Shares to Mirabilis Ventures, Inc.; provided, however, that I shall not be prohibited from asserting any rights I may have against the initial consideration received by Shareholder in exchange for such Shares. Additionally, should any Final Judgment of Dissolution contemplate value being given to me for the Shares, then I acknowledge and agree that said value shall be given as a cash payout in accordance with the terms of the relevant portion of Sections 1.08, 2.08, 3.11, 4.11, or 5.09 of the Shareholder's Agreement dated September 22, 2005. Provided, however, that in no event shall any stock be issued to me pursuant to any Final Judgment of Dissolution or other distribution of assets.

I acknowledge receipt and their review of a copy this Agreement, and have had the same reviewed by independent counsel or waive my right to do so.

Dated: _____

Print Name: _____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 20___, by _____. S/he is personally known to me or produced _____ as identification and did (did not) take an oath.

NOTARY PUBLIC:

SIGN: _____
PRINT: _____
State of _____ at Large
My Commission Expires: _____

- 22 -