# EXHIBIT J

—1—

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIRABILIS VENTURES, INC., et al.,

       Plaintiffs,

VS.               CASE NO. 6:07-CV-1788-ORL-28GJK

PALAXAR GROUP, LLC, et al.,

       Defendants.

------------------------------------------------------------

**January 25, 2008**
**TRANSCRIPT OF PROCEEDINGS**
**HEARING ON PRELIMINARY INJUNCTION**

**Before the Honorable JOHN ANTOON II**
**United States District Judge**

APPEARANCES:

<u>For the Plaintiff</u>:

**Allen M. Estes**
Balch & Bingham, LLP
1710 Sixth Ave N
Birmingham, AL 35203-2015

**Aaron C. Bates**
Goldberg Bates, PLLC
3660 Maguire Blvd., Suite 102
Orlando, FL 32803

**<u>For the Defendants</u>:**

**Donald E. Christopher**
Litchford & Christopher, PA
390 N Orange Ave - Ste 2200
Orlando, FL 32802-1549

**Jane S. Raskin**
Raskin & Raskin, PA
2601 S. Bayshore Dr., Suite 600
Miami, FL 33133

    Proceedings recorded by mechanical stenography,
transcript produced with computer-aided transcription.

—2—

```
 1                   P R O C E E D I N G S

 2              (CASE CALLED.)

 3              THE COURT:  Each side has 30 minutes.  You may

 4      proceed.

 5              MR. ESTES:  Allen Estes.  Again, Aaron Bates with

 6      the law firm of Goldberg and Bates.  Jodi Jaiman who is the

 7      president of Nexia and Mirabilis are also going to join us

 8      here today.  They are not quite with us.  They will join us.

 9              Your Honor, today we are here on a motion for

10      preliminary injunction filed by my clients, Mirabilis

11      Ventures and Nexia Strategy.  This motion for preliminary

12      injunction relates to a product or a suite of antifraud

13      services known as Nexia Certification.  Nexia Certification

14      was paid for, developed under the auspices of Nexia Strategy

15      and is owned by Nexia Strategy.  It has been taken by the

16      defendants and we are here today to ask for it back.

17              The issues here today I believe we have four

18      issues to look at.  The first is, you know, who owns Nexia

19      Certification, that suite of antifraud services.  The

20      evidence, I believe is clear, that it was paid for and it is

21      owned by Nexia.

22              The second one is who has it today.  Well, it's

23      undisputed, based upon the affidavit of Miss Curry and other

24      evidence in this case, that the defendants have it.  They

25      took it with them when they left Nexia Strategy.
```

1          Do they have a right to have it?  They claim that

2     they do.  We say they don't.  That's the second issue.

3          The third would be what is the harm that is being

4     suffered by my clients by the fact that the defendants took

5     the product with them and they have it today?  We think there

6     is great harm that is being suffered.

7          And fourthly would be were you to enter the

8     injunctive relief that we request, is it even a factor to

9     consider what harm will be suffered by the defendants, and if

10     it is a factor, is there any harm that they will suffer.

11          Now, the standard in this case, this is not a

12     common motion to enforce a non-compete for injunctive relief.

13     This is a motion to obtain back a trade secret that is owned

14     and was paid for by my clients.  Therefore, the Florida

15     Uniform Trade Secrets Act which is 638.007 applies in this

16     case, and that statute specifically states that injunctive

17     relief is appropriate.

18          Also, in addition to the traditional common law

19     factors for injunctive relief, you have Florida, the Florida

20     statutes related to restrictive covenants.  Specifically you

21     have statute 542.335, and that statute we'll talk about here

22     in a moment specifically states that harm to the defendants

23     is not a factor to be considered.  But when we talk about in

24     a moment, even if it is to be considered, we don't believe

25     there is any harm.

1              Firstly, who owns Nexia Certification?  Well, the

2      evidence in this case is undisputed that Nexia and Mirabilis

3      paid for Nexia Certification.  They paid no less than 1.5

4      million dollars and probably going --

5                   THE COURT:  You say that's not disputed?

6                   MR. ESTES:  I do not believe it is disputed.

7                   THE COURT:  Is that disputed?

8                   MR. CHRISTOPHER:  It most certainly is, Your

9      Honor.

10                  THE COURT:  Be careful in your representations,

11     sir.

12                  MR. ESTES:  Your Honor, if I would, we provided

13     this morning --

14                  THE COURT:  No.  Go ahead.  I just want you to be

15     careful, just don't over overstate things.

16                  MR. ESTES:  And I would understand that.  And

17     what I would like to point out is that Miss Curry said that

18     they said --

19                  THE COURT:  They accounted for the statement and

20     it wasn't exactly as you're representing either.

21                  MR. ESTES:  It is undisputed that they paid for

22     Nexia Certification based upon Miss Curry's affidavit that

23     they paid the legal bills, they paid the employees.  Now,

24     what their argument is that that was not all just for Nexia

25     Certification, I certainly understand that and want to

1    concede that.

2              THE COURT:  I want you to be careful in what you

3    represent to me, sir.  I've read the papers.

4              MR. ESTES:  Certainly.  Yes, sir.

5              Who owns Nexia Certification?  Well, I think the

6    most compelling evidence is the March 2, 2006 email that Miss

7    Curry wrote.  You have a white binder that we provided this

8    morning to your assistant and tab one in that binder is that

9    email.  And if you'd look at page 2 of tab one, the email

10   from Miss Curry to others says you do realize that Nexia

11   Strategy owns the patent for Nexia Certification.  In March

12   of 2006, after signing her employment agreement with Nexia,

13   and that employment agreement says that any proprietary

14   rights that are developed while she's employed there belong

15   to Nexia.  She knows that.  And in March of 2006 she says

16   that Nexia Strategy owns the patent for Nexia Certification.

17   It is our contention, Your Honor, that she should be

18   estopped.

19             THE COURT:  Was there a patent at that time?

20             MR. ESTES:  There was not, Your Honor.  So she

21   certainly misspoke related to who owns the patent, but it is

22   our contention that the clear intent is that the Nexia

23   Certification was owned by Nexia, and Miss Curry acknowledged

24   that in March of 2006, we believe.

25             She now says that she misspoke.  And with all due

1   respect, I think that is revisionist history to say that she

2   misspoke with respect to who owns Nexia Certification at that

3   time.

4          Further, who owned Nexia Certification is

5   evidenced by the assignment agreements, and there are at

6   least three that the defendants rely upon in this case, two

7   of which were attached I believe to their motion for judgment

8   on the pleadings, which you denied recently, and one of which

9   is the handwritten note that Miss Curry says she got from Mr.

10  Amodeo in July of 2006.  That is the Earth Goddess note based

11  upon what is in the first sentence.

12         Now, what do all three of these agreements tell

13  us?  Whether or not they're valid, we make the assertion that

14  they are not valid, but they tell us that Miss Curry believed

15  that Nexia owned Nexia Certification, and she needed to have

16  the rights assigned to her.

17         THE COURT:  Either that or she wanted to avoid a

18  lawsuit.

19         MR. ESTES:  That is certainly the -- the problem

20  with that, Your Honor, is there's no documentary evidence.

21  The argument the defendants make today is that she either

22  wanted to avoid a lawsuit or she was doing this in an

23  abundance of caution.  We've had a number of documents

24  exchanged.  Certainly we have not had full blown discovery

25  and we think that that is certainly needed.  But in none of

— 7 —

1   the documents that we've seen to date does Miss Curry say I'm

2   doing that out of an abundance of caution or I'm doing this

3   to avoid a lawsuit, that I've seen.  She just wants the

4   assignment.  And the presumption is that Mirabilis and Nexia

5   had something to assign, otherwise these would be meaningless

6   documents.

7           Now, are those assignments valid leads us into

8   the second prong or issue that I believe we need to address

9   which is who has it today.  Well, it is undisputed that they

10  have it today.  Miss Curry in her affidavit says that they

11  are operating, they are testing it, they are trying to use

12  it.  They have no contracts to date.  They have not gotten

13  any revenue --

14          THE COURT:  What does the record say about how

15  your client came to own the property?  I mean it was

16  developed or in the process of being developed prior to Miss

17  Curry's association with your client or clients?

18          MR. ESTES:  We certainly dispute that, Your

19  Honor.

20          THE COURT:  Oh, you dispute that.

21          MR. ESTES:  The only evidence that it was in

22  development prior to her --

23          THE COURT:  So what is the evidence of ownership

24  other than the statements made by Miss Curry and her request

25  for an assignment in the record?

8

1          MR. ESTES:  The evidence of ownership would be

2     the employment agreements signed by Miss Curry with Nexia

3     which state that any confidential information or proprietary

4     rights that are developed while she's employed at Nexia

5     remain the right of the employer.

6          THE COURT:  So it's necessary to your claim that

7     it be clear at this point that the property did not exist as

8     a result of that employment.

9          MR. ESTES:  No, sir, it is not.  I mean she

10    certainly, if the evidence were to show that she brought some

11    ideas into the company, that does not say that the fact that

12    those ideas obviously were not ready to be marketed at the

13    time.  She had not applied for a patent.  She had not

14    produced any commercial application of that product.  The

15    payments that were made by my client, that was done by

16    employees of my client, she came in and she used Nexia

17    Strategy employees and funds to develop this product.

18    Whether or not she had the idea --

19          THE COURT:  Those were the people in Virginia?

20          MR. ESTES:  Yes, sir, they were.  At least the

21    people in Virginia.  I'm not aware, there could have been

22    people from elsewhere as well.  We have not fleshed that out

23    in discovery.

24          THE COURT:  Okay.  And what affidavit do you have

25    that resources were spent in Virginia by your client to

1    support this project?

2            MR. ESTES:  The affidavit of Jodi Jaiman, the

3    president of Nexia Strategy.

4            THE COURT:  She wasn't there, right?

5            MR. ESTES:  She was not, but she has reviewed the

6    business records and the business records show the monies

7    that were expended at the time; number one.  Number two; Miss

8    Curry admits in her affidavit --

9            THE COURT:  Well, you agree that that is disputed

10   by the people who were there.

11           MR. ESTES:  Certainly.  And we filed a motion to

12   strike this week to at least address some of our concerns

13   with the evidence filed by the defendants which we believe

14   much of it is hearsay or legal conclusions or trying to get

15   into the minds of other people.  But that motion to my

16   understanding is not set for hearing today.  But I would

17   highlight the fact that we have some serious concerns with

18   the filing made by the defendants and the evidence that they

19   rely upon in the case, both the affidavit testimony and the

20   documentary evidence that they attached to those affidavits.

21           Going back to your question as far as what is the

22   showing that it was paid for by my clients and was owned by

23   my clients, I mean you number one have Miss Jaiman's

24   affidavit that addresses the money.  Number two, you have

25   Miss Curry's affidavit that at least implicitly agrees that

1   she used other Nexia employees in the development of this

2   product.  You have the title.  Miss Curry even says that

3   everyone referred to it as Nexia Certification.  That's

4   pretty compelling evidence.  They weren't referring to it as

5   Curry Certification.  They weren't referring to it as some

6   other certification.  And as best I know, Nexia Strategy was

7   not --

8              THE COURT:  That's all explained though.  Whether

9   it's right or wrong, I'm not here really to determine whether

10  it's right or wrong, I'm here to look at what these issues

11  are and the likelihood of your prevailing.

12             MR. ESTES:  Correct.

13             THE COURT:  But, you know, she says that the deal

14  was that it was going to be funded by your client and in

15  return for that they were going to get to use it.

16             MR. ESTES:  And there's no evidence that supports

17  that statement.

18             THE COURT:  Well, there's an affidavit that

19  supports it.

20             MR. ESTES:  Your Honor, there's no evidence

21  beyond the self-serving affidavit of a defendant --

22             THE COURT:  But I'm here to look at what the

23  issues are.

24             MR. ESTES:  All right.  And let's look at whether

25  if it was owned by my clients, by Nexia and Mirabilis, the

—11—

1    defendants' argument is that it was somehow assigned to them,

2    and so they can have it today no matter what.  It doesn't

3    matter who owned it.  They say we owned it all the time

4    anyway, but even if you owned it, you assigned it to us.  So

5    are those assignments valid?  We can take them in order

6    starting with the handwritten assignment which is tab three

7    in the binder that we provided this morning.

8              The Earth Goddess handwritten note.  That note is

9    in no way valid.  Mr. Amodeo had no authority to assign away

10   any rights of Mirabilis or Nexia.  There's no consideration

11   for this note.  But more importantly, this note is subject to

12   further negotiations and it was never approved or ratified by

13   either the board of Nexia, the board of Mirabilis or the

14   shareholders of either company.

15             Florida statutes, and the bylaws of both

16   Mirabilis and Nexia are very clear that if you're going to

17   assign away a substantial asset of the company, especially if

18   you're going to sign it away in a self dealing manner, which

19   this transaction would have been, you're talking about the

20   company giving it to the president, that you must get

21   board -- the board must either approve it or they must

22   recommend it to the shareholders, and then the majority of

23   all shareholders must approve it.  None of those things

24   happened in this case.

25             THE COURT:  Who was the sole shareholder?

1          MR. ESTES:  Of which company?

2          THE COURT:  Of the company who was giving the

3     product away.

4          MR. ESTES:  It is my understanding that the sole

5     shareholder of Nexia was Mirabilis.  Mirabilis had 70 some

6     odd shareholders at this time.  Their claim is that Mr.

7     Amodeo was the sole class A shareholder, which I don't have

8     any documentary evidence that he was.  The only evidence that

9     I've seen is that there were 70 or 80 shareholders --

10          THE COURT:  What evidence do I have, if any?

11          MR. ESTES:  I'm going to have to say I don't

12     know, Judge.  I don't know that that was an issue that we

13     felt needed to be addressed.

14          THE COURT:  I didn't think it did either, but you

15     just brought it up.

16          MR. ESTES:  It was addressed by the defendants in

17     their filing.

18          THE COURT:  Well, they said he was the sole

19     shareholder.

20          MR. ESTES:  She said he was the sole class A

21     shareholder, and what I would point out is even if he was the

22     sole class A shareholder, the statute doesn't say only class

23     A shareholders, the majority of them need to approve it, it

24     says all shareholders.  My understanding is there were four

25     different classes of Mirabilis stock at that time and there

1    were 70 or 80 people and that at no point in time, I don't

2    know that there's any evidence right now to support this, but

3    my understanding is at no point in time did Mr. Amodeo own

4    more than about a half a percent of Mirabilis.

5                    Their argument is based more on the fact that

6    they allege that the corporate formalities were not enforced

7    at Mirabilis and so therefore you can't enforce them in this

8    case.

9                    I think there's a major flaw in that argument.

10   The statute says what it says, which is if you're involved in

11   self dealing, which if you look at tab number five, which is

12   the August assignment agreement from Mirabilis to Miss Curry

13   that they say is valid, and you look at the signature page,

14   Miss Curry's co-defendant, Frank Hailstones, signs on behalf

15   of Mirabilis as its president.  He's the only person that

16   signs it.  And then if you go right to the right, Mr.

17   Hailstones also signs on behalf of himself because he's

18   assigning it away to himself and four other people, one of

19   which is Miss Curry, his co-defendant, the other is Miss

20   Laurie Holtz, who filed an affidavit in this case on behalf

21   of the defendants, and then Mr. Mike Demint, and I don't know

22   where he is.  I don't know why he didn't file an affidavit in

23   this case.

24                   But I think we clearly have self dealing, and so

25   therefore you have two Florida statutes that are going to

—14—

```
 1    apply.  One is 607.0832, and that deals with director

 2    conflicts of interest, and it says specifically that if

 3    you've got a conflict of interest, if you're going to make an

 4    assignment to yourself basically, it must be authorized,

 5    approved or ratified by a vote of the board of directors.

 6              And the evidence that you do have, Judge, which

 7    is tab one to Miss Jaiman's affidavit, are the minutes of the

 8    board meetings of Mirabilis and of Nexia.  These assignment

 9    agreements never come up.  They're never mentioned, they're

10    certainly never recommended, and they're certainly never

11    approved.  If they're not mentioned, they can't be approved.

12    Because none of that happened, if you go to a different

13    Florida statute, just the general disposing of corporate

14    assets which is 607.1202, that says that the company may only

15    dispose of a substantial asset if the board recommends it to

16    the shareholders and then the shareholders, a majority of all

17    shareholders approve it.  Again, you've got the board minutes

18    from this timeframe.  It's not even mentioned.  So it

19    certainly cannot be recommended by the board, and there's no

20    evidence that it was ever approved by the shareholders.  So

21    all these assignment agreements are invalid under Florida

22    law.  They're also invalid under the bylaws of the companies

23    which have similar provisions which prohibit self dealing.

24              The only mention that I'm aware of any of these

25    agreements came in mid December at a board meeting of
```

1    Mirabilis where Mr. Richard Berman, the lawyer of which they

2    have submitted some of his privileged emails, which we

3    vigorously object to them waiving a privilege that they do

4    not have a right to waive, it is my understanding in mid

5    December Mr. Berman informs the board that the deal, there's

6    no deal with Miss Curry yet.  Still working on it.  So what

7    happened is do these assignments show something?  Yes, I

8    believe they show that Nexia owned the rights to Nexia

9    Certification, and Mirabilis owned the rights.  Do they

10   evidence a valid assignment?  No.  Because they do not

11   comport with Florida law and they do not comport with the

12   bylaws of the companies.

13              Do they have it today?  I think they do.  Are

14   they trying to use it?  They are.  Have they been successful

15   in using it to date?  No.  That doesn't mean there's no harm

16   being suffered by Nexia or Mirabilis at this time.

17              What's Nexia doing today?  Well, Nexia is not in

18   the antifraud business any more, and it's not because its

19   president walked out the door and took its antifraud business

20   with her.  Miss Curry took not only the Nexia Certification

21   program, she took the client lists, she took the prospects,

22   she took the employees, she took the IT related to it, she

23   took the notes.  So therefore, we're not in the business.

24              Luckily though, the Florida Trade Secrets Act

25   says that there is a presumption that when you're seeking to

1      enforce a restrictive covenant related to a trade secret,

2      there is a presumption that there has been irreparable harm

3      by the taking of that trade secret.  That of course is a

4      rebuttable presumption, but we do not believe there's any

5      evidence in the case to date that would rebut that

6      presumption.

7              If Nexia's not in the antifraud business, what

8      business is it in?  Nexia is in the liquidation business.

9      Nexia exists today to marshal its assets and liquidate them

10     for the benefit of its creditors.  Unless you've been not

11     paying attention to the media, I believe it is well

12     established in the public domain that at least one of the

13     creditors of Mirabilis or Nexia or any of the other

14     subsidiaries is most likely going to be the IRS.  There are

15     tax issues.  So Mirabilis is liquidating assets which will

16     most likely end up at least a portion of being paid to the

17     IRS.  Time value of money says Mirabilis and Nexia need to

18     liquidate the assets as soon as possible.  They need to get

19     the money in so that they can pay the money out.  Therefore,

20     there is harm every day that goes by that they are not

21     allowed to liquidate the asset which they own, which they

22     paid for.

23              Secondly, the harm to Nexia is the value of that

24     asset diminishes every day that it is in the hands of

25     Palaxar.  Every day that Palaxar either markets that to a

1    potential client or to a prospect or tells people at a fraud
2    seminar this they have this product, it is diminished in
3    value to the seller.  If company A is in the antifraud
4    business and Nexia potentially can sell this suite of
5    antifraud services to company A, are they willing to pay the
6    same amount of money a year from now after Palaxar's had it
7    and has marketed it and has told everybody in the market that
8    it's theirs?  And now all of a sudden it's going to go to
9    company A and company A is going to go to the same people?  I
10   think the diminishing value is a real harm that is being
11   suffered by my client today.

12              And so what we're asking for is injunctive relief
13   to not only stop them from using the product, but to give it
14   back and to give back all the associated documents, all the
15   notes, everything that our contention is that we paid for.

16              Lastly, what is the harm to the defendants should
17   injunctive relief be entered?  As I mentioned earlier, the
18   Florida statute on restrictive covenants is very clear and it
19   says that harm to the defendants shall not be considered.
20   That statute is 542.335, and it's tab 13 in the notebook that
21   we provided this morning.  And at section F, excuse me,
22   section G1, the specific quote is that the court shall not
23   consider any individualized economic or other hardship that
24   might be caused to the person against whom enforcement is
25   sought.

1          Now, the public policy of the State of Florida is

2     very clear that restrictive covenants are to be enforced if

3     at all possible.  This says that harm to the defendant shall

4     not be considered.  But even if you were to consider it,

5     Judge, is there any harm to them?  Palaxar was incorporated

6     17 months ago.  They've had the product since then.  Mr.

7     Terrence Chu and Miss Curry have both filed affidavits in

8     this case that say they have not received a dime of revenue

9     in 17 months.  Not a dime.  I fail to see how there is any

10    harm in enjoining them from continuing to use a product that

11    they have not been able to get to market and realize any

12    revenue from.  We're not talking profits, we're talking

13    revenue.  For 17 months.  Zero harm.

14         Mr. Hailstones, there's even less harm.  He

15    claims I don't have anything to do with Nexia Certification.

16    I don't have anything to do with Palaxar.  Now, the evidence,

17    I believe, shows otherwise.  Mr. Hailstones is listed on at

18    least three brochures as being a co-founder of Palaxar.  The

19    London office of Palaxar is on the Palaxar website.  Now,

20    they have an explanation for that as well.  If you would, the

21    brochures are tab 12 and the last page of tab 12 is a

22    conference that they're on the agenda for April of 2008,

23    three months from now, and it lists Edith L. Curry, JD,

24    founding member, Palaxar, LLC, and it also lists Frank

25    Hailstones, CA, founding member, Palaxar LLC.  Now, this is a

1    antifraud seminar.

2            What's their explanation for this?  Well, Mr.

3    Hailstones in his affidavit says that's just wrong.  And in

4    fact, he says it's misleading.  So Mr. Hailstones' sworn

5    testimony is that he allowed a seminar, I mean a brochure for

6    an antifraud seminar to mislead the people that are coming to

7    that antifraud seminar.  With all due respect, Your Honor,

8    that is not a very credible explanation for why he is listed

9    repeatedly as a member of Palaxar.

10           But because he says he's not a member, and

11   because he says he's not doing anything with Nexia

12   Certification, there certainly is no harm to enjoining Mr.

13   Hailstones from using that product or from telling him to

14   give it back.

15           Your Honor, I intended to save at least some of

16   my time for rebuttal.

17           THE COURT:  You did.  If you quit now, you have

18   two minutes.

19           MR. ESTES:  I have two minutes for rebuttal.

20   Well, I guess I'll save it then.  Thank you, Your Honor.

21           THE COURT:  Thank you, sir.

22           MR. CHRISTOPHER:  Good morning, Judge.  Again,

23   Don Christopher on behalf of Frank Hailstones.

24           Mr. Hailstones, as I'm sure you've discerned from

25   the papers, is a former director and for a year was the

1    president of Mirabilis.  He was also a director of Nexia.  I

2    think the evidence reflects that at all times Mr. Hailstones

3    acted in those roles pursuant to the directions of an

4    individual by the name of Frank Amodeo, and pursuant to

5    constraints that Mr. Amodeo put on him.  Mr. Amodeo was the

6    sole class A shareholder, the sole voting shareholder of

7    Mirabilis.  He thereby controlled Mirabilis.  And since

8    Mirabilis was the sole shareholder of Nexia, he also

9    ultimately controlled Nexia.

10            If there's one thing that's certain in this

11    Oz-like proceeding is that the man behind the curtain pulling

12    the levers and making things happen or not happen in these

13    various companies was Mr. Amodeo, and --

14            THE COURT:  Well, does his de facto role control

15    with regard to the ability to transfer assets or is his

16    authority under the law and the bylaws of the corporation?

17            MR. CHRISTOPHER:  I think as a shareholder he can

18    choose at any time to disregard corporate formalities.

19    Certainly in closely held corporations you see all the time

20    where the corporation takes action pursuant to the consent or

21    sometimes even just pursuant to the knowledge of the

22    shareholders and or of the directors, and there's no

23    documentation of that.  And yet the corporate officers in

24    this case, the president, Mr. Hailstones, are instructed by

25    the owners of the company to execute various documents and to

1    enter into various transactions on behalf of the corporation,

2    and those individuals do with both apparent and actual

3    authority.  So I think that it's kind of a hollow argument

4    here to say that, well, you know, this isn't exactly

5    documented.

6              I also call your attention to, I think you've

7    read those board minutes that they put in here of Mirabilis

8    and Nexia where the board candidly discusses at the end of

9    2006, beginning of 2007, Mr. Amodeo is out of control, he

10   won't give us the information about what he's doing with the

11   company, we can't even run the company.  That's the kind of

12   entity we're talking about here, Your Honor.  And that's why

13   it's important to look at what actually happened here rather

14   than a theoretical construct of a hypothetical corporation

15   and how it should act following every single corporate

16   formality that exists in the statute.

17             THE COURT:  I think Mr. Bates conceded, maybe not

18   directly, but conceded that there is a dispute as to when

19   this intellectual property came into existence, and then

20   argued that notwithstanding that dispute, in other words,

21   giving the benefit of the doubt to the defendant, that

22   somehow it became the property of the plaintiff corporation

23   as a result of the employment agreement between the plaintiff

24   and Miss Curry.  What is the record evidence before the court

25   on that issue?

1           MR. CHRISTOPHER:   The record evidence is that

2    there's no employment agreement between Miss Curry and the

3    company, I don't believe.  The employment agreement was with

4    a different company that's not a party here called Common

5    Paymaster, I believe.  So that's the first distinction.  And

6    there's no explanation anywhere in the papers that I've seen

7    of the relationship, if any, between Common Paymaster and

8    either Nexia Strategy Corporation or Mirabilis.  So that's

9    the first answer.

10          The second answer is I think we have to first get

11   our hands around what we're talking about here.  Nexia

12   Strategy is not a thing.  It's an inchoate idea in process.

13   It's not something, for instance, if you were to command us,

14   produce Nexia Strategy here for the court, there's nothing in

15   material form that I could lay down on the table in front of

16   the clerk and say, okay, here's the computer program, here's

17   the documentation for it, this is what Nexia Strategy is.

18   It's an inchoate idea in process that's been developed by

19   Miss Curry and also from separate input from my client, Mr.

20   Hailstones, all of which they had with them before they ever

21   came to these companies.  And I don't read those employment

22   agreements as saying that whatever you have with you that you

23   bring in here, that all of a sudden it's automatically the

24   company's.

25          But even assuming arguendo that was the case,

1    we've got what I would term these quitclaim agreements, these

2    assignments Miss Curry got in 2006 of all the rights from

3    Mirabilis, and Mirabilis again is the sole corporate parent

4    of Nexia, they assign all the rights to Miss Curry and to the

5    three other individuals, and it's reflected in Mr.

6    Hailstone's affidavit, he executed a separate assignment, so

7    actually everything just went to Miss Curry for purposes of

8    doing the patent application.  And it's just a patent

9    application.  No patent is even pending now, no patent has

10   been issued as we speak.

11               With respect to my client, --

12               THE COURT:  I should ask you about that, Mr.

13   Christopher.  How much of the 30 minutes are you going to

14   use?  All of it or --

15               MR. CHRISTOPHER:  I'm going to use it until Miss

16   Raskin grabs my arm and pulls me down, Your Honor.

17               THE COURT:  Okay.  She may not want to actually

18   get up and do it, so I'll look for a signal from her to cut

19   you off.

20               MR. CHRISTOPHER:  If she gives me the evil eye,

21   you tell me to sit down, please.

22               Some key facts as to my client, Your Honor.  He

23   is not a founder of Palaxar or Palaxar Holdings.  There's no

24   evidence to the contrary other than those event brochures

25   which he said are erroneous.  He's not a member of Palaxar or

1     Palaxar Holdings. All the evidence is consistent on that.

2     There's nothing to the contrary there. He hasn't received

3     any type of financial remuneration or gain thus far from

4     Palaxar Holdings. That's clear.

5             Mr. Hailstones has denied ever conspiring with

6     Miss Curry or anyone else to act to the detriment of either

7     one of the plaintiffs in this particular case. And

8     significantly, Your Honor, there's no evidence I would submit

9     that the plaintiffs can point to that indicates that Mr.

10    Hailstones did conspire with somebody.

11            Now, Mr. Hailstones was involved in executing the

12    assignment agreement and was involved in executing the

13    separation agreement of Miss Curry. But significantly,

14    you've got before you tons and tons of email correspondence

15    where that separation agreement was negotiated within the

16    company, and all the company officers are talking about it

17    and the company's counsel is talking about it and they're

18    going back and forth. It's not like after hours Mr.

19    Hailstones got together with Miss Curry and they said we're

20    going to steal all the company jewels, we're going to take

21    them out the back door, and the company didn't know about

22    them. And that's a significant point for considering

23    issuance of an injunction in this case because one of the

24    important factors the court has to consider is in determining

25    irreparable harm is what was the delay here by the

1  │ plaintiffs?  How can they explain their delay?  They haven't
2  │ explained any delay.

3  │          Let's assume arguendo that this assignment
4  │ agreement is bogus and Miss Curry, in fact, took all this
5  │ stuff from Nexia in October of 2006.  And again, there's no
6  │ evidence as to what she took, if anything, but let's assume
7  │ she took it all then.  Query:  Why didn't somebody at Nexia
8  │ at that point say, wait a minute, our assets just went out
9  │ the door, let's go back out and get them.  This is the end of
10 │ 2006, the beginning of 2007.  The obvious reason is because
11 │ Mr. Amodeo said I'm not going to fund the Nexia Certification
12 │ operation any more.  Miss Curry, you're out of a job.  The
13 │ assignment agreement was negotiated, talked about among all
14 │ the high officers of the company and it went out.  It wasn't
15 │ a back door, late at night conspiracy between Mr. Hailstones
16 │ saying I'm going to use my position as president of the
17 │ company and I'm going to give company assets away to Miss
18 │ Curry.  This was all done in the bright light of day.  All
19 │ the company's attorneys, accountants and so forth and the
20 │ chairman of the board, they were all involved in this
21 │ exercise.

22 │          And yet, even if they were all involved in it, it
23 │ was somehow a mistake and the agreement never got done,
24 │ contrary to the email that you have in there from Richard
25 │ Berman, the company counsel where he was specifically asked,

—26 —

1    wait a minute, this has a header on here, draft agreement, do

2    we need to reexecute it to make it formal?

3          MR. ESTES:  Your Honor, at this time I'm going to

4    object to counsel referring to a clearly privileged email

5    that counsel has no right to waive.  We have made that part

6    of our motion to strike.  The only person that can waive that

7    privilege is Nexia and Nexia does not waive the privilege in

8    this case.

9          MR. CHRISTOPHER:  Judge, that's the most absurd

10   argument I've heard in a long time.  My client as president

11   is involved in a discussion with an attorney.  This is

12   analogous to where you have two partners, for instance, in a

13   company and they seek legal advice.  Then the partners get

14   crosswise afterwards and there's a dispute between them.  At

15   that point there is no attorney-client privilege any more.

16   They can't use this as a sword to muzzle my client to say,

17   wait a minute, you know, we're claiming attorney-client

18   privilege here --

19         THE COURT:  You don't need to talk about that

20   right now.  Go ahead and move on.

21         MR. CHRISTOPHER:  All right.  My point being that

22   there's a clear unexplained one year delay here, while they

23   filed this lawsuit.  And I've been able to come up with, at

24   best, three reasons of motive why they filed this lawsuit.

25   That they are attempting to injure and embarrass my clients.

1      And I refer you specifically to paragraph 35 of my client's

2      affidavit, paragraph 24 of Miss Curry's affidavit which

3      recites the manner in which they were served with this

4      lawsuit when attorneys and other former company employees

5      came along holding up copies of a newspaper that had a story

6      that they just got published through a press release in an

7      attempt to embarrass my clients in front of people that they

8      were dealing with.

9              MR. ESTES:  Your Honor, do I need to object to

10     the hearsay that is being discussed by counsel or are you

11     going to deal with that in the motion to strike?  I'm a

12     little unclear as to whether -- our opinion is that that is

13     not admissible evidence and should not be discussed.

14             THE COURT:  Well, it's difficult to determine

15     what is admissible and what is not with regard to the merits

16     of the case.  That's one of the issues, your main issue, your

17     main obstacle in this case, Mr. Bates, is likely that of

18     success on the merits.

19             MR. ESTES:  I understand, Your Honor, but what I

20     don't like is complete hearsay.  And if you read those

21     paragraphs, what he's referring to are statements of third

22     parties made outside of court that are -- it's complete

23     hearsay.  And what I don't like is the sword being used

24     against us in this hearing of inadmissible evidence.

25             THE COURT:  I'm not going to take any more of Mr.

—28—

1    Christopher's time.  He's allowed to argue what is in the

2    affidavits.

3                    MR. ESTES:  Thank you, Your Honor.

4                    MR. CHRISTOPHER:  The second motive for the

5    delay, Your Honor, it appears to me, we recently, I think

6    everybody involved in the corporation has gotten demand

7    letters from the plaintiff's law firm in this case seeking to

8    sue them under the company's D and O coverage and they're

9    trying to use this lawsuit as a conduit to get to the

10   company's D and O insurer to get to the funds and we're kind

11   of a pawn in that process.

12                   (BRIEF PAUSE.)

13                   MR. CHRISTOPHER:  A third motive, Your Honor, is

14   we think an attempt to intimidate my client, Frank

15   Hailstones, as well as Edith Curry, to deter them from

16   cooperating with the federal grand jury that's investigating

17   Mr. Amodeo and Mirabilis, and that's set forth in paragraph

18   25 of Miss Curry's affidavit.

19                   One of the four factors, the first factor is

20   irreparable harm, the second factor that the court has to

21   consider before entering an injunction in this case is it

22   does have to balance the harm to the defendants against the

23   harm to the plaintiffs.  And in this case, Your Honor, I

24   submit that on this record that there would be no harm to the

25   plaintiffs if an injunction is not issued, but the converse

1    is not true.  If an injunction is issued, essentially

2    defendants would have to shut down further development and

3    marketing of the Nexia Certification process.  And as I

4    earlier said, it's not something that if you ordered them to

5    produce it here in court, we could lay it out on the table or

6    something like that.  It's not a tangible thing at this

7    point.  And no patent has issued.  And moreover, in that

8    assignment agreement Mirabilis has an irrevocable

9    non-exclusive license to use the technology anyway, so they

10   can still use it.

11            As plaintiffs have now conceded, Mirabilis and

12   Nexia aren't even in business.  And I think under the Florida

13   statutes that you have to consider whether they're in

14   business or not because you can't enforce trade secrets, you

15   can't enforce injunctive provisions if you're no longer in

16   business because, again, that's contrary to the public

17   policy.  You're taking a product totally off the market, it's

18   not just that you're attempting to restrain a competitor is

19   the rationale of that.

20            And finally, Your Honor, the third factor I'm

21   going to address and Miss Raskin will address the likelihood

22   of success on the merits, is this court has to consider would

23   an injunction in this case be contrary to the public

24   interest, and I would strongly submit that in this case it

25   would be contrary to the public interest.  In most cases this

| | |
|---|---|
| 1 | factor doesn't come into play.  But we have to look at what |
| 2 | Nexia Certification is.  It's a process that looks at |
| 3 | organizations, and it can be private businesses, |
| 4 | corporations, as well as governmental agencies and bureaus of |
| 5 | entities, and you look first at the positions within the |
| 6 | organization.  The organizational structure, how is it set |
| 7 | up.  Are there particular positions in the organization where |
| 8 | somebody has too much authority, there's too few checks and |
| 9 | balances on them?  Is there insufficient oversight of that |
| 10 | person's particular job or position?  Then you look at all |
| 11 | the individuals in an organization that are occupying its |
| 12 | various positions and you look to say, you know, evaluating |
| 13 | their background financial circumstances, you know, are they |
| 14 | someone, given those circumstances, that may be subject to |
| 15 | undue influence?  Are they somebody that it looks like that |
| 16 | they've got undocumented sources of income such that they're |
| 17 | already receiving money from illegitimate sources which would |
| 18 | indicate that they might have a motive to act contrary to the |
| 19 | best interest of the organization? |
| 20 | Recently, as reflected in Miss Curry's affidavit, |
| 21 | some tests have been conducted of some pilot projects with |
| 22 | both government agencies and private security firms of the |
| 23 | current version of this process and program, and it's been |
| 24 | remarkably successful.  Albeit nothing's been sold yet, |
| 25 | nothing's been implemented.  The public interest in this |

1    case, Your Honor, demands that this program, if it can work

2    and can be made to be effective, should be developed and

3    should be widely deployed because it can prevent things, you

4    know, the classic cases of Enron here in this country, what

5    we just heard about a couple days ago, one individual in the

6    Societe Generale in France supposedly makes off with six

7    billion dollars or costs the bank six billion dollars because

8    of malfeasance in his position, one 31 year old man.  This is

9    the kind of conduct that this particular program is designed

10   to ferret out.

11            It's not a completed product or process.

12   Considerable further development is required and development

13   is required in the field.  You have to actually implement

14   this, you have to customize it for a particular organization,

15   and only when that's done on an extended field trial can

16   deficiencies and shortcomings be revealed, can further

17   enhancements and improvements be conceived, and can then,

18   once you've determined those items, can you expeditiously

19   complete it and actually implement it as part of the program.

20            An injunction in this case would only serve to

21   stop that whole process, clearly contrary to the public

22   interest, and there's no evidence in this case that Mirabilis

23   or Nexia either has the capacity or the ability to market

24   these programs.  And significantly, one of the key elements

25   of this is a mathematical algorithm that Miss Curry developed

1    before she ever came to Nexia, never disclosed to anybody at

2    Nexia, and still has herself.  And that algorithm would be

3    obviously disclosable to the court like as a source code, but

4    if there is a trade secret in this case, that's the core, the

5    kernel trade secret, and that's something that Miss Curry had

6    before she went there, never disclosed to anybody there, and

7    still has it after she left.  And there's no evidence in this

8    case, not a scintilla, that they're entitled to that.  And

9    the evidence is to the contrary this they quitclaimed away

10   all their rights in return for two things:  One, a license to

11   use the software; and second, an agreement by Miss Curry to

12   pay them the first $500,000 out of any profits.

13                Again, if an injunction doesn't issue, they can

14   recover whatever damages that they can prove, assuming they

15   could prove entitlement --

16                THE COURT:  So you're saying that injunctive

17   relief isn't available because there is an adequate remedy at

18   law, they could get what they bargained for.

19                MR. CHRISTOPHER:  Most certainly, Your Honor.

20   Thank you.

21                THE COURT:  Thank you.

22                Miss Raskin.

23                MS. RASKIN:  Thank you, Your Honor.

24                Even assuming plaintiffs could survive the first

25   three tests for injunctive relief that Mr. Christopher has

| 1  | addressed, which I think the record is clear they cannot,
| 2  | they have no likelihood of success on the merits.  There are
| 3  | two reasons for this:  First of all, as a matter of black
| 4  | letter patent law, neither Mirabilis nor Nexia has or ever
| 5  | had an ownership interest in the intellectual property that
| 6  | we're referring to as Nexia Certification.
| 7  |            Secondly, even if one were to ignore patent law
| 8  | --
| 9  |            THE COURT:  Are you saying there is no
| 10 | intellectual property?
| 11 |            MS. RASKIN:  No.  I'm saying there is
| 12 | intellectual property and, as I will explain later, I'm
| 13 | saying that patent law makes it clear that on the facts of
| 14 | this record, the plaintiffs do not own it and never owned it.
| 15 | It is and was owned by Edith Curry and the other inventors
| 16 | listed in the agreements.  It's now owned entirely by Edith
| 17 | Curry because they've assigned their rights, but she was the
| 18 | inventor, she is the owner.  They were never the inventors
| 19 | and they are not now and never were the owners of the
| 20 | property.  And if they're not the owners of the property,
| 21 | their complaint fails as a matter of law.
| 22 |            Secondly, however, even if one were to disregard
| 23 | the patent law argument, they have assigned away any
| 24 | ownership interest they might have had by the two agreements
| 25 | that we've been discussing, and I understand Your Honor is

1    aware of.

2            First, on the issue of the patent law, the

3    uncontroverted evidence in this record is that Edith Curry

4    conceived of this idea before she ever became associated with

5    Nexia or Mirabilis.  Now, plaintiff's counsel has suggested

6    that they dispute that fact, but there is no record evidence

7    to support their position.  None whatsoever.  She brought it

8    with her when she came to Mirabilis.  Not only did she bring

9    it with her, she then presented it to Frank Amodeo and

10   Mirabilis as a business opportunity for them to work with her

11   on, and she did so by offering them a license to use her

12   product if they would agree to fund it.  They did.  And

13   during a portion of her employment by Mirabilis and Nexia,

14   Mirabilis did contribute some funding to the further

15   development of this process pursuant to that agreement.  That

16   did not give them an ownership right to Miss Curry's

17   intellectual property.

18            According to 35 U.S.C. 261 which defines patent,

19   the patent law statute, she is the presumptive owner of the

20   patent as the inventor, and if she is going to assign her

21   ownership rights, she must do so in writing.  There is no

22   writing assigning Edith Curry's patent rights to anyone.

23            Secondly, to the extent the plaintiffs would

24   argue that somehow they came into some ownership interest in

25   the patent by virtue of her employment by them, they're also

—35 —

1      wrong.  Patent law is very clear.  I quote from the city of

2      Cocoa versus Leffler.  An employer seeking patent rights to

3      an employee's invention must prove that the contract of

4      employment by express terms or unequivocal inference shows

5      that the employee was hired for the express purpose of

6      producing the thing patented, close quote.

7                    There is an employment agreement between Miss

8      Curry and Nexia Strategy.

9                    THE COURT:  And the job description is completely

10     separate.

11                   MS. RASKIN:  It's completely at odds with that,

12     Your Honor.  It makes no mention of this invention or any

13     other invention, and the standard language in that agreement

14     dealing with confidentiality, etcetera, is completely

15     inapposite to this case.  It has nothing to do with the

16     invention she brought in and developed while she was there.

17     So that is a completely specious argument.

18                   And as Mr. Christopher pointed out, as to Mr.

19     Hailstones, there is no such agreement and he was certainly

20     not hired for the express purpose of inventing this product.

21                   Furthermore, to the extent that they did continue

22     to work on it and Nexia contributed any monies, they recouped

23     what they invested pursuant to the assignment agreement and

24     the separation agreement.  It's not even as if somehow patent

25     law, which had there been no agreements would have left them

1    with nothing --

2              THE COURT:  Your position is they've limited any

3    relief they might seek by the agreement that is referred to

4    in your papers which is not rebutted in any other place in

5    the record, is that right?

6              MS. RASKIN:  Absolutely.  By two agreements.

7    Absent the assignment agreement and absent the separation

8    agreement, Mirabilis and Nexia would have nothing as a result

9    of black letter patent law.

10             But in order to avoid litigation -- apparently

11   that didn't work -- Miss Curry insisted on these written

12   agreements to make sure there would be no dispute that no one

13   would later claim that somehow, because of her agreement with

14   Frank Amodeo and Mirabilis, she had in any sense forfeited

15   her ownership rights to these properties.  So pursuant to the

16   assignment agreement, she gave to Mirabilis a worldwide

17   license to use the product.

18             Further, when Mirabilis stopped funding Nexia

19   Strategy, thereby placing their ability to even use the

20   product as had been agreed in jeopardy, she negotiated a

21   separation agreement with Mirabilis and Nexia.  As Mr.

22   Christopher described, these negotiations went on for weeks.

23   They were incredibly detailed.  They focused on the Nexia

24   Strategy issue.  They focused on the parties' disagreements

25   as to how much or how little Mirabilis had contributed to the

1  development of this product. And what resulted was an
2  agreement that made it abundantly clear that Nexia Strategy
3  belonged to Edith Curry, that a new corporation would be
4  formed by Miss Curry after her departure into which so-called
5  Nexia Certification would be placed, that Mirabilis itself
6  would also create a new company that would work in a joint
7  venture with Miss Curry's new company to market the product,
8  to provide consulting services, to the joint benefit of Miss
9  Curry and Mirabilis and Nexia.

10        Furthermore, Miss Curry agreed, pursuant to that
11  separation agreement, in order to seal off any claim that
12  Mirabilis had placed monies into the development of this
13  project which it had not recouped, she agreed to sign a note
14  for $500,000 that was payable to Mirabilis out of the first
15  $500,000 of profit that Nexia made.

16        So there is no question as to what went on in
17  that company dealing with this. It was negotiated at arm's
18  length, not only with Mr. Berman, who is being described as
19  counsel. He was also an executive vice president of
20  Mirabilis at the time. He was on the board of directors of
21  Mirabilis at the time. So from my viewpoint there's
22  substantial question whether privilege is even an issue,
23  aside from the sword and shield argument. It was negotiated
24  with Laurie Holtz who was the chairman of the board of
25  directors. Mr. Hailstones who was the president of the

1    corporation and had actual and apparent authority to sign and

2    do what he did.  He signed these agreements in the presence

3    of and at the express direction of Mr. Amodeo, who the

4    evidence is unrebutted at this point was the controlling

5    shareholder.

6            Mr. Estes came up with a lot of speculation as to

7    what he may have looked at and who may be the shareholders

8    and how many there ought to be or there might be.  The only

9    evidence before you, Your Honor, is the testimony of former

10   officers and directors of this corporation who lived with it,

11   who worked there, who say they knew, and everyone else there

12   knew that Mr. Amodeo was the controlling shareholder and the

13   de facto CEO of this company.

14           THE COURT:  Okay.  Thank you, Miss Raskin.

15           You've got two minutes.

16           MR. ESTES:  Two minutes.  Thank you, Your Honor.

17   And I will try to have true rebuttal.  So taking in order

18   that I wrote them down.

19           First of all, the law in the State of Florida is

20   that when you're dealing with a taking of a trade secret, you

21   can have both equitable and legal remedies.  So that is not

22   the issue here and it's not you can go get a legal remedy

23   possible.  There is a presumption of irreparable harm when

24   the trade secret is taken.

25           Secondly, the patent law that Miss Raskin refers

1    to, I refer you back to what Mr. Christopher said, there is

2    no patent.

3                THE COURT:  Did you look at that law carefully?

4    Is there an exception or a variation when you have an

5    agreement that specifically provides for compensation in the

6    contract that you're seeking to enforce?  I mean here we have

7    a fairly specific provision.

8                MR. ESTES:  We have an employment agreement that

9    Miss Curry had which is with Nexia.  If you look at tab six

10   in the binder that we gave you, I mean the signature page is

11   the employer is Nexia Strategy and she signed it in June of

12   '05.  So that is not the case.  That employment agreement

13   says that the proprietary confidential information, the trade

14   secrets that are developed while she's there remain with the

15   employer, Nexia Strategy.

16               What I was pointing out though with the patent

17   law that they cite in their brief and that Miss Raskin just

18   referred to, there is no patent.  We're dealing with Florida

19   Trade Secrets Law.  They took a trade secret.  There is no

20   patent.  Patent law, you must have a written assignment of

21   the patent.  It's not applicable here.  We're dealing with

22   the Florida trade secrets, uniform trade secrets act.

23               Thirdly, they make a lot of arguments about Mr.

24   Amodeo and he told them to do this, and he told them to do

25   that, and that he can choose to disregard the corporate

—40—

1    formalities.  They were, both Miss Curry and Mr. Hailstones

2    were directors of this company.  There's nothing and there's

3    no support in the record that would say that any shareholder

4    could tell them to disregard Florida law.  Florida law says

5    to engage in self dealing you must have board approval or

6    board recommendation and a majority shareholder approval.

7    That's the issue that we have here.

8              Finally, he talks about how Nexia Certification,

9    there is nothing.  I suspect there are plenty of notes,

10   customer lists, prospect lists, valuable information that can

11   be transferred to my client and that my client can utilize at

12   this time.

13             So we would ask that the court enter the

14   injunctive relief, require that the defendants not only stop

15   using the Nexia Certification product that my company paid

16   for, but give it back.

17             THE COURT:  Well, there are many disputed facts

18   in this record and the court concludes that the plaintiff has

19   failed to establish a likelihood of success and the

20   injunction will not issue.  I will issue a short order to

21   that effect.

22             Court is in recess for five minutes.

23             (HEARING CONCLUDED.)

24

25

41

1

2              I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5

6                              _____

7                              ANTHONY ROLLAND

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25