# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                      CASE NO. 6:08-bk-04327-KSJ

MIRABILIS VENTURES, INC.,                   CHAPTER 11

Debtor.

_____/

## OBJECTION TO CLAIM NO. 20-2 SUBMITTED BY
## DIANE M. HENDRICKS, INDIVIDUALLY AND AS
## TRUSTEE OF THE KENNETH A. & DIANE M. HENDRICKS ITA

---

### NOTICE OF OPPORTUNITY TO OBJECT AND FOR HEARING

Pursuant to Local Rule 2002-4, the Bankruptcy Court will consider this motion without further notice of hearing unless a party in interest files a response within thirty (30) days from the date of service of this objection. If you object to the relief requested in this paper, you must file your objection with the Clerk of the Court at 311 West Monroe Street, Jacksonville, Florida 32202, and serve a copy on the counsel for the Debtors, R. Scott Shuker, Esq., LATHAM, SHUKER, EDEN & BEAUDINE, LLP, 390 North Orange Avenue, Suite 600, Orlando, Florida 32802-3353.

If you file and serve a response within the time permitted, the Court will schedule a hearing and you will be notified. If you do not file an objection within the time permitted, the Court will consider that you do not oppose the granting of the relief requested in the motion, will proceed to consider the motion without further notice of hearing, and may grant the relief requested.

---

**MIRABILIS VENTURES, INC.** ("Mirabilis"), along with its related entities, Hoth Holdings, LLC ("Hoth"), and AEM, INC. ("AEM")(collectively, "Debtors"), by and through their undersigned attorneys, and pursuant to Local Rule 2002-4(b)(ii) and Federal Rule of Bankruptcy Procedure 3007(a), object ("Objection") to the claim of Diane M. Hendricks, individually and as Trustee of the Kenneth A. & Diane M. Hendricks ITA ("Hendricks") in the amount of $2,802,075.25, which Hendricks states is fully secured (Claim No. 20-2)[1], and in support thereof, state as follows:

---

[1] Hendricks previously filed Claim No. 20-1 and subsequently amended said claim through Claim No. 20-2.

**Jurisdiction**

1.      This Court has jurisdiction over this Objection pursuant to 28 U.S.C. § 1334. This matter is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicate for the relief sought herein is Rule 3007 of the Federal Rules of Bankruptcy Procedure.

**Procedural and Factual Background**

3.      On May 27, 2008, the Debtors filed voluntary petitions for relief with the United States Bankruptcy Court for the Middle District of Florida: *In re Mirabilis Ventures, Inc.*, Case No. 6:08-bk-04327-KSJ, *In re Hoth Holdings, LLC*, Case No. 6:08-bk-04328-KSJ, and *In re AEM, Inc.*, Case No. 6:08-bk-04681 ("Bankruptcy Cases"). (Bankr. Doc. No. 1). .

4.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

5.      On April 25, 2008, the United States of America ("USA") filed an *in rem* Civil Forfeiture Complaint Case No. 6:08-cv-00067-MSS-KRS in the District Court for the Middle District of Florida, Orlando Division ("Civil Complaint") against certain property owned by Mirabilis. (Civil Complaint Doc No. 1). On September 4, 2008 the USA amended the Civil Complaint to add additional property, including property owned by Mirabilis. (Civil Complaint Doc. No. 67).

6.      On August 6, 2008, USA indicted Frank L. Amodeo ("Amodeo"), for conspiracy, failure to remit payroll taxes, wire fraud, and obstruction of an agency investigation. *See United State of America v. Frank L. Amodeo*, Case No.: 08-cr-176-Orl-28-GJK (Dist. Court Doc. No. 1).

7.     The indictment contains criminal forfeiture provisions which seek the forfeiture, *inter alia*, of all assets of the estates of the Debtors and their related entities.

8.     On August 14, 2008, USA filed a motion to intervene and to stay the Debtors' bankruptcy cases with this Court ("Intervener Motion")(Bankr. Doc. No. 48).

9.     In the Motion, USA sought to stay the Bankruptcy Case in an effort to pursue a forfeiture action against property of the Debtors including, but not limited to, proceeds seized in the various law firm trust accounts, vehicles, real estate, and other personal property. (Bankr. Doc. No. 48)

10.     Furthermore, USA represented to the Bankruptcy Court that if the items are forfeited, "they will become property of the United States and will not remain in the related bankruptcy estates." (Bankr. Doc. No. 48 at para. 6).

11.     On September 23, 2008, Amodeo pled guilty to five counts of the indictment. (Dist. Court Doc. No. 28 and 33). The plea agreement included an agreement by Amodeo to forfeit all of the proceeds of his conspiracy charged in Count One, including the assets of the Debtors' bankruptcy estates.

12.     On September 29, 2008 the USA filed a motion in the Amodeo Criminal Case for entry of a Preliminary Order of Forfeiture ("Forfeiture Motion")(District Court Case Doc. No. 40). In its Motion, the USA sought the forfeiture of a significant number of assets, including the Debtors' assets, and authority to seize all of the assets sought for forfeiture.

13.     On October 2, 2008, the District Court entered a Preliminary Order of Forfeiture ("Preliminary Forfeiture Order"). (Dist. Court Doc. No. 46). Pursuant to the Preliminary Forfeiture Order, the USA may have seized property forfeited under the Order immediately, regardless of the Debtors' appeal.

14.     On October 8, 2008, and subsequent to this date, Debtors' counsel and USA met to discuss possible global resolutions of all issues which have been raised, or could be raised, between USA and the Debtors, including the resolution of the subject forfeiture motions.

15.     On November 25, 2008, Mirabilis and the USA reached an accord and filed a Joint Motion to Approve Compromise of Controversy that otherwise resolves the forfeiture issues ("Compromise") (Doc. No. 101).

16.     On March 4, 2009, the Court approved the Compromise ("Compromise Order"). (Doc. No. 145).

17.     Pursuant to the Compromise Order, The Debtors' assets were divided between those that will continue to be administered by the Debtors' bankruptcy estate and those forfeited to the USA.

18.     Among others, the following assets were forfeited to the USA:

        a.     All assets of the following corporations:  AQMI Strategy Corporation, Nexia Strategy Corporation, **Presidion Solutions, Inc.**, Professional Benefit Solutions, Inc., d/b/a Presidion Solutions VII, Inc, Quantum Delta Enterprises, Inc., d/b/a Siren Resources, Inc., Titanium Technologies, Inc., f/k/a Titanium Consulting Services, Inc., Tenshi Leasing, Inc., Wellington Capital Group, Inc.  (Emphasis added).

19.     In essence, the items listed above are no longer part of the Debtors' estates.

20.     In addition, under the Compromise Order and Compromise, the Debtors and the USA agreed that the Debtors shall amend their schedules to include an unsecured forfeiture claim in the Mirabilis and AEM cases for USA in the amount of $200,000,000.00 ("Forfeiture Claim"). The Debtors complied.

21.     Nevertheless, on April 22, 2009, Hendricks filed her amended proof of claim in Mirabilis Ventures, Inc (Claim No. 20-2). A true and correct copy of Claim No. 20-2 and its attachments are attached hereto as **Exhibit "A"**.

22.     In the Hendricks' claim, Hendricks alleges that she is owed $2,802,075.25 from Mirabilis based on a note between Mirabilis and Hendricks ("Note") and that the Note is fully secured by the following "collateral": (1) a Presidion Solutions, Inc. promissory note and its related assets; (2) assignment of rents, assignment of rents relating to the lawsuit and judgment against William J. Leyton and Strategic Capital Investments, LLC, in the lawsuit captioned *Kenneth A. Hendricks and Diane M. Hendricks v. Strategic Capital Investments, LLC, William J. Leyton, et al.*, Case No. CV04-9639-SVW, In the United States District Court, Central District of California, Western Division; and (3) all proceeds from the aforementioned collateral (collectively, the "Collateral"). *See Exhibit* "A".[2]

## OBJECTION TO CLAIM NO. 20-2

23.     Hendricks has no secured claim against Mirabilis. None of the Collateral is property of the Debtors' estates. Any interest the Debtors may have had in any and all assets of Presidion Solutions, Inc. was forfeited to the USA through the Compromise Order. In essence, Hendricks' action against the Collateral does not lie with the Debtors. Therefore, Hendricks does not have a secured claim against Mirabilis.

24.     The Note upon which Hendricks claim is based was executed by Mirabilis, not AEM. Therefore, any remedy Hendricks may have based on the note is against Mirabilis only. In response, Hendricks may claim that there was a "fraudulent transfer" of the note from

---

[2] Hendricks has also filed a claim in the AEM, Inc. case alleging that they are fully secured based on the same Collateral. *See* Claim No. 23 filed in AEM, Inc. AEM has objected to the same.

Mirabilis to AEM. However, there is no evidence of any such transfer. As such, Hendricks' claim is only against Mirabilis, but only as an unsecured claim.

<u>**REQUESTED RELIEF**</u>

25.     Mirabilis requests this Court enter an order sustaining the objection to Claim No. 20-2.

26.     Mirabilis Ventures, Inc. requests this Court enter an order finding Hendricks' Claim No. 20-2 is fully unsecured.

**WHEREFORE**, Mirabilis Ventures, Inc. respectfully requests this Court enter an Order sustaining this Objection, reclassifying the Hendricks' claim as an unsecured claim, and for such other and further relief as the Court deems just and proper in the circumstances.

**RESPECTFULLY SUBMITTED** this <u>4th</u> day of September, 2009.

/s/ Elizabeth A. Green
Elizabeth A. Green, Esq.
Florida Bar No. 0600547
Justin M. Luna, Esq.
Florida Bar No.  0037131
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
390 N. Orange Avenue, Suite 600
P. O. Box 3353 (32802-3353)
Orlando, Florida 32801
Telephone:  407-481-5800
Facsimile:  407-481-5801
Attorneys for Mirabilis Ventures, Inc.

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                          CASE NO. 6:08-bk-04327-KSJ

**MIRABILIS VENTURES, INC.,**                   CHAPTER 11

                    Debtor.
_____/

## Certificate of Service

I HEREBY CERTIFY that a true copy of **OBJECTION TO CLAIM NO. 20-2** has been furnished either electronically and/or by U.S. First Class, postage prepaid mail to: AEM, Inc., c/o R.W. Cuthill, Jr., President of Mirabilis Ventures, Inc., 341 N. Maitland Ave, Suite 210, Maitland, Florida 32751; Diane Hendricks, Ind. & as Trustee of Kenneth & Diane Henricks Irrevocable Trust, c/o Charles A. Carlson, Esq., Barnett, Bolt, Kirkwood, Long & Bride, P.A., 601 Bayshore Boulevard, Suite 700, Tampa, Florida 33606 as listed on the proof of claim; I. Randall Gold, United States Attorney's Office, 501 West Church Street, Suite 300, Orlando, FL 32805; to the Local Rule 1007-2 Parties-in-Interest list; and the U. S. Trustee, 135 W. Central Boulevard, Suite 620, Orlando, Florida 32801, this 4th day of September 2009.

/s/ Elizabeth A. Green, Esq.
Elizabeth A. Green, Esquire

Label Matrix for local noticing
113A-6
Case 6:08-bk-04327-KSJ
Middle District of Florida
Orlando
Fri Sep  4 13:49:35 EDT 2009

Advantage Collection Prof
2775 Jade Street
Mora, MN 55051-6240

American Express
2965 West Corporate Lakes Bl
Weston, FL 33331-3626

BNA Tax Management
9435 Key West Ave.
Rockville, MD 20850-3339

Richard Lee Barrett
18 Wall St
Orlando, FL 32801-2421

Kimberly Bartley
Waldron & Schneider LLP
15150 Middlebrook Drive
Houston, TX 77058-1226

Brandywine Grande C. LP
c/o Cantor Arkema, PC
1111 East Main Street
Richmond, VA 23219-3531

Buchanan Ingersoll & Rodney
401 E Jackson St.
Suite 2500
Tampa, FL 33602-5236

Corporate Personnel Network, Inc
c/o David T. Ward
15615 Alton Pkwy #175
Irvine, CA 92618-7303

Joseph A DeMaria
Tew Cardenas LLP
1441 Brickell Avenue
Suite 1500
Miami, FL 33131-3431

Denise D Dell-Powell
Akerman Senterfitt
Post Office Box 231
Orlando, FL 32802-0231

Elena L Escamilla
United States Trustee
135 W Central Blvd  Suite 620
Orlando, FL 32801-2440

First Commercial Ins. Corp.
POB 126160
Hialeah, FL 33012-1602

Forge Capital Partners LLC
c/o Bart Valdes
609 W Horatio St
Tampa FL 33606-2272

Frank L. Amodeo
3875 South Orange Ave
Suite 500 -PMB 1810
Orlando, FL 32806

Fred Sandlin
161 Mallard Lane
Daytona Beach, FL 32119-8331

Gill R Geldreich
Tennessee Attorney General's Office
Post Office 20207
Nashville, TN 37202

Gilbert Weisman
c/o Becket and Lee LLP
POB 3001
Malvern PA 19355-0701

I Randall Gold
United States Attorney's Office
501 West Church Street
Suite 300
Orlando, FL 32805-2281

Elizabeth A Green
Latham Shuker Eden & Beaudine LLP
390 North Orange Avenue
Suite 600
Orlando, FL 32801-1684

Horton Johnson
3211 Northglenn Drive
Orlando, FL 32806-6371

Humana/RMS
77 Hartland Street
Suite 401
East Hartford, CT 06108-3253

Jackson Lewis
Attn:Anne Krupman
One North Broadway
White Plains, NY 10601-2310

Jeffrey Reichel
c/o Gary Barnes
3414 Peachtree Rd #1600
Atlanta, GA 30326-1164

Jeffrey Reichel
c/o Jill E. Kelso, Esquire
Akerman Senterfitt
PO Box 231
Orlando FL 32802-0231

Kenneth & Diane Hendricks
One ABC Parkway
Beloit, WI 53511-4466

Gordon L Kiester
Florida Department of Revenue
P O Box 2299
Mango, FL 33550-2299

LeClair Ryan Trust
P.O. Box 2499
Richmond, VA 23218-2499

LexisNexis
P.O. Box 7247-7090
Phildelphia, PA 19170-0001

On Target Solutions
3491 Woodley Park Place
Oviedo, FL 32765-5104

```
Jimmy D Parrish                          PaySource USA VII, Inc.              Saxon Gilmore, PA
Latham Shuker Eden & Beaudine LLP        650 Poe Ave.                         201 E. Kennedy Blvd.
Post Office Box 3353                     Dayton, OH 45414                     Suite 600
Orlando, FL 32802-3353                                                        Tampa, FL 33602-5819


Tennessee Dept of Labor & Workforce      Tenshi Leasing                       Titanium Technologies
Dev-Unemployment Ins                     2875 S. Orange Ave.                  2875 S. Orange Ave.
c/o TN Atty General Ofc Bankruptcy Div   Suite 500 PMB 1810                   Suite 500 PMB 1810
PO Box 20207                             Orlando, FL 32806-5455               Orlando, FL 32806-5455
Nashville TN 37202-4015


United States Trustee - ORL              Bart R Valdes                        Joseph H Varner III
135 W. Central Blvd., Suite 620          deBeaubien Knight Simmons Mantzaris Neal   Holland & Knight, LLP
Orlando, FL 32801-2440                   332 North Magnolia Avenue            101 North Tampa Street, Suite 4100
                                         Orlando, FL 32801-1609               Tampa, FL 33602


David T Ward                             C Brent Wardrop                      Gilbert Barnett Weisman
15615 Alton Pkwy #175                    deBeubien Knight Simmons Mantzaris  Neal   Becket & Lee LLP
Irvine, CA 92618-7303                    332 North Magnolia Avenue            16 General Warren Blvd
                                         Orlando, FL 32801-1609               P O Box 3001
                                                                              Malvern, PA 19355-0701
```

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(d)Corporate Personnel Network, Inc      (u)John Burcham                      (u)Mark J. Bernet
c/o David T. Ward                        undeliverable                        no city
15615 Alton Pkwy #175                                                         no state
Irvine, CA 92618-7303
```

```
End of Label Matrix
Mailable recipients    41
Bypassed recipients     3
Total                  44
```

B 10 (Official Form 10) (12/07)

<table>
<tr><td colspan="2"><strong>UNITED STATES BANKRUPTCY COURT</strong>    Middle District of Florida</td><td><strong>PROOF OF CLAIM</strong></td></tr>
</table>

| Name of Debtor:<br>Mirabilis Ventures, Inc. | Case Number:<br>6:08-bd-04327-KSJ |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Diane Hendricks, Ind. & as Trustee of Kenneth & Diane Henricks Irrevocable Trust | ✓ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br><br>Charles A. Carlson, Esq.<br>Barnett Bolt Kirkwood Long & McBride, Post office Box 3287, Tampa, Florida 33601<br><br>Telephone number:<br>(813) 253-2020 | Court Claim Number: __20-1_____<br>*(If known)*<br><br>Filed on: __09/19/2009____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br>Telephone number: | Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**    $ _____2,802,075.25____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>✓Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:**   Note-Loan/Fraud.Tran.*<br>(See instruction #2 on reverse side.) | Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>   **3a. Debtor may have scheduled account as:** _____<br>   (See instruction #3a on reverse side.) | Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:    Real Estate     Motor Vehicle   ✓Other<br>Describe:<br>See Security Agreement (Negotiable Collateral) attached.<br>Value of Property:$ _____    Annual Interest Rate ___ %<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $ _____     Basis for perfection: _____<br><br>Amount of Secured Claim: $ __2,802,075.25__   Amount Unsecured: $ _____ | Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>**Amount entitled to priority:**<br><br>$ _____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date:<br>04/22/2009<br><br>Charles A. Carlson, Esq. | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

*This claim includes claim that the debtor fraudulently transferred the assets that collateralized the loan included herein to its related/alter ego entity, AEM, Inc., the debtor in Case No. 6:08-bk-04681-KSJ. Contemporaneously with this Amended Proof of Claim the creditor, Diane Hendricks, as Trustee, is filing a Motion for Enlargement of Time for Filing Proof of Claim in the AEM, Inc. bankruptcy matter.

**Interest Calculation on Note**

| | | | # Days | |
|---|---|---|---|---|
| Principal | $ 1,887,118.58 | | 22 | 1/9/2007 |
| Interest | 7% | | 28 | 2/28/2007 |
| | $ 132,098.30 | Principal x Intetest = Annual Interest | 26 | 3/26/2007 |
| Per Diem | $ 361.91 | Interest per day | **76** | |
| # of Days | 76 | | | |
| | $ 27,505.40 | Interest per day x # days | | |
| Total Principal and Interest | **$ 1,914,623.98** | | | |

**Interest Calculation After Default**

| | | | | |
|---|---|---|---|---|
| Principal | $ 1,914,623.98 | | 5 | 3/31/2007 |
| Interest | 18% | | 365 | 3/31/2008 |
| | $ 344,632.32 | Principal x Intetest = Annual Interest | 30 | 4/30/2008 |
| Per Diem | $ 944.20 | Interest per day | 31 | 5/31/2008 |
| # of Days | 756 | | 30 | 6/30/2008 |
| | $ 713,813.78 | Interest per day x # days | 31 | 7/31/2008 |
| Total Principal and Interest | **$ 2,628,437.76** | | 31 | 8/31/2008 |
| Fees and Costs | $ 173,637.49 | | 30 | 9/30/2008 |
| Total Due | **$ 2,802,075.25** | | 31 | 10/31/2008 |
| | | | 30 | 11/30/2008 |
| | | | 31 | 12/31/2008 |
| | | | 31 | 1/31/2009 |
| | | | 28 | 2/28/2009 |
| | | | 31 | 3/31/2009 |
| | | | 21 | 4/21/2009 |
| | | | **756** | |

## SECURITY AGREEMENT (NEGOTIABLE COLLATERAL)

As of February 16, 2006, for value received, the undersigned ("Borrower") grants to Kenneth A. Hendricks and Diane M. Hendricks (together, "Lender"), whose address is One ABC Parkway, Beloit, WI 53511, a continuing security interest and lien (any pledge, assignment, security interest or other lien arising hereunder is sometimes referred to herein as a "security interest") in the Collateral (as defined below) to secure payment when due, whether by stated maturity, demand, acceleration or otherwise, of all existing and future indebtedness ("Indebtedness") to the Lender of Borrower arising under or related to the Note and Loan Agreement dated February 16, 2006, in the principal amount of $2,347,196.39 by Borrower payable to Lender (as amended, modified, renewed or replaced, the "Note"), this Agreement and/or the Loan Sale Agreement dated February 16, 2006, between Borrower and Lender (in each case as amended or modified from time to time, the "Loan Documents"). Indebtedness includes any and all obligations or liabilities of Borrower to the Lender arising under the Loan Documents, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown; any and all obligations or liabilities for which the Borrower would otherwise be liable to the Lender were it not for the invalidity or unenforceability of them by reason of any bankruptcy, insolvency or other law, or for any other reason; any and all amendments, modifications, renewals and/or extensions of any of the above; all costs incurred by Lender in establishing, determining, continuing, or defending the validity or priority of its security interest, or in pursuing its rights and remedies under this Agreement or under any other Loan Documents or in connection with any proceeding involving Lender as a result of any financial accommodation to Borrower; and all other costs of collecting Indebtedness, including without limit attorney fees. Borrower agrees to pay Lender all such costs incurred by the Lender, immediately upon demand, and until paid all costs shall bear interest at the highest per annum rate applicable to any of the Indebtedness, but not in excess of the maximum rate permitted by law. Any reference in this Agreement to attorney fees shall be deemed a reference to reasonable fees, costs, and expenses of both in-house and outside counsel and paralegals, whether or not a suit or action is instituted, and to court costs if a suit or action is instituted, and whether attorney fees or court costs are incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding or otherwise. Borrower further covenants, agrees and represents as follows:

1. **"Collateral"** shall mean all of the following property Borrower now or later owns or has an interest in, wherever located:

    (a) specific items listed below and/or on attached Schedule A, if any:

     (i) that certain Third Replacement Promissory Note dated April 15, 2003, from Presidion Solutions, Inc. to Lender (the "Presidion Note"), together with all security therefor, including but not limited to the security agreements and guaranties described in the Loan Sale Agreement.

     (ii) that Assignment of Rights relating to the lawsuit and judgment against William J. Leyton and Strategic Capital Investments, LLC, d/b/a Strategic Bancorp and arising out of letter of credit GMB 556 20 5575 in the amount of $2,673,000 given by Strategic Bancorp in conjunction with a transaction between Assignor

and Presidion Corporation, in the lawsuit captioned *Kenneth A. Hendricks and Diane M. Hendricks v. Strategic Capital Investments, LLC, William J. Leyton, et al.*, Case No. CV04-9639-SVW (PJWx), in the United States District Court, Central District of California, Western Division

(b)  all additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind (including but not limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the Collateral described in Section 1(a) above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Borrower.

In the definition of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

2.  **Warranties, Covenants and Agreements.** Borrower warrants, covenants and agrees as follows:

2.1  Borrower shall furnish to Lender, in form and at intervals as Lender may request, any information Lender may reasonably request and allow Lender to examine, inspect, and copy any of Borrower's books and records. Borrower shall, at the request of Lender, mark its records and the Collateral to clearly indicate the security interest of Lender under this Agreement.

2.2  At the time any Collateral becomes, or is represented to be, subject to a security interest in favor of Lender, Borrower shall be deemed to have warranted that (a) Borrower is the lawful owner of the Collateral and has the right and authority to subject it to a security interest granted to Lender; (b) none of the Collateral is subject to any security interest other than that in favor of Lender; (c) there are no financing statements on file, other than in favor of Lender; and (d) no person, other than Lender, has possession or control (as defined in the Uniform Commercial Code) of any Collateral of such nature that perfection of a security interest may be accomplished by control. Notwithstanding anything to the contrary in the Loan Sale Agreement between Lender and Borrower of even date herewith, Borrower agrees that the Presidion Note and all security therefor shall not be delivered to Borrower, but shall continue to be held by Lender as security for the Indebtedness, pursuant to this Agreement.

2.3  Borrower will keep the Collateral free at all times from all claims, liens, security interests and encumbrances other than those in favor of Lender. Borrower will not, without the prior written consent of Lender, sell, transfer or lease, or permit to be sold, transferred or leased, any or all of the Collateral. Lender or its representatives may at all reasonable times inspect the Collateral and may enter upon all premises where the Collateral is kept or might be located.

2

H0209

2.4    Borrower will do all acts and will execute or cause to be executed all writings requested by Lender to establish, maintain and continue an exclusive perfected and first security interest of Lender in the Collateral. Borrower agrees that Lender has no obligation to acquire or perfect any lien on or security interest in any asset(s), whether realty or personalty, to secure payment of the Indebtedness, and Borrower is not relying upon assets in which the Lender may have a lien or security interest for payment of the Indebtedness.

2.5    Borrower will pay within the time that they can be paid without interest or penalty all taxes, assessments and similar charges which at any time are or may become a lien, charge, or encumbrance upon any Collateral, except to the extent contested in good faith and bonded in a manner satisfactory to Lender. If Borrower fails to pay any of these taxes, assessments, or other charges in the time provided above, Lender has the option (but not the obligation) to do so and Borrower agrees to repay all amounts so expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any Indebtedness.

2.6    If Lender, acting in its sole discretion, redelivers Collateral to Borrower or Borrower's designee for the purpose of (a) the ultimate sale or exchange thereof; or (b) presentation, collection, renewal, or registration of transfer thereof; or (c) loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with it preliminary to sale or exchange; such redelivery shall be in trust for the benefit of Lender and shall not constitute a release of Lender's security interest in it or in the proceeds or products of it unless Lender specifically so agrees in writing. If Borrower requests any such redelivery, Borrower will deliver with such request a duly executed financing statement in form and substance satisfactory to Lender. Any proceeds of Collateral coming into Borrower's possession as a result of any such redelivery shall be held in trust for Lender and immediately delivered to Lender for application on the Indebtedness. Lender may (in its sole discretion) deliver any or all of the Collateral to Borrower, and such delivery by Lender shall discharge Lender from all liability or responsibility for such Collateral. Lender, at its option, may require delivery of any Collateral to Lender at any time with such endorsements or assignments of the Collateral as Lender may request.

2.7    At any time and without notice, Lender may (a) cause any or all of the Collateral to be transferred to its name or to the name of its nominees; (b) receive or collect by legal proceedings or otherwise all dividends, interest, principal payments and other sums and all other distributions at any time payable or receivable on account of the Collateral, and hold the same as Collateral, or apply the same to the Indebtedness, the manner and distribution of the application to be in the sole discretion of Lender; (c) enter into any extension, subordination, reorganization, deposit, merger or consolidation agreement or any other agreement relating to or affecting the Collateral, and deposit or surrender control of the Collateral, and accept other property in exchange for the Collateral and hold or apply the property or money so received pursuant to this Agreement; and (d) take such

3

H0210

actions in its own name or in Borrower's name as Lender, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the Uniform Commercial Code) over any Collateral of such nature that perfection of Lender's security interest may be accomplished by control.

2.8 Lender may assign any of the Indebtedness and deliver any or all of the Collateral to its assignee, who then shall have with respect to Collateral so delivered all the rights and powers of Lender under this Agreement, and after that Lender shall be fully discharged from all liability and responsibility with respect to Collateral so delivered.

2.9 Borrower shall defend, indemnify and hold harmless Lender, its employees, agents, shareholders, affiliates, officers, and directors from and against any and all claims, damages, fines, expenses, liabilities or causes of action of whatever kind, including without limit consultant fees, legal expenses, and attorneys fees, suffered by any of them as a direct or indirect result of any actual or asserted violation of any law, **INCLUDING ANY CLAIMS, FINES, EXPENSES, LIABILITIES OR CAUSES OF ACTION OF WHATEVER KIND RESULTING FROM LENDER'S OWN NEGLIGENCE**, except and to the extent (but only to the extent) caused by Lender's gross negligence or willful misconduct.

2.10 Borrower shall not release, amend, modify, or replace any security it may hold for the Presidion Note, or amend, replace, or modify the Presidion Note in any manner whatsoever, without the prior written consent of Lender.

3. **Collection of Proceeds.** Borrower agrees to collect and enforce payment of all Collateral until Lender shall direct Borrower to the contrary. Immediately upon notice to Borrower by Lender and at all times after that, Borrower agrees to fully and promptly cooperate and assist Lender in the collection and enforcement of all Collateral and to hold in trust for Lender all payments received in connection with Collateral and from the sale, lease or other disposition of any Collateral, all rights by way of suretyship or guaranty and all rights in the nature of a lien or security interest which Borrower now or later has regarding Collateral. Immediately upon and after such notice, Borrower agrees to (a) endorse to Lender and immediately deliver to Lender all payments received on Collateral or from the sale, lease or other disposition of any Collateral or arising from any other rights or interests of Borrower in the Collateral, in the form received by Borrower without commingling with any other funds, and (b) immediately deliver to Lender all property in Borrower's possession or later coming into Borrower's possession through enforcement of Borrower's rights or interests in the Collateral. Borrower irrevocably authorizes Lender or any Lender employee or agent to endorse the name of Borrower upon any checks or other items which are received in payment for any Collateral, and to do any and all things necessary in order to reduce these items to money. Lender shall have no duty as to the collection or protection of Collateral or the proceeds of it, nor as to the preservation of any related rights, beyond the use of reasonable care in the custody and preservation of Collateral in the possession of Lender. Borrower agrees to take all

4

steps necessary to preserve rights against prior parties with respect to the Collateral. Nothing in this Section 3 shall be deemed a consent by Lender to any sale, lease or other disposition of any Collateral.

4. **Defaults, Enforcement and Application of Proceeds.**

4.1 Upon the occurrence of any of the following events (each an "Event of Default"), Borrower shall be in default under this Agreement:

(a) Any failure to pay the Indebtedness or any other indebtedness when due, or such portion of it as may be due, by acceleration or otherwise and continuance thereof beyond any applicable period of cure; or

(b) Any failure or neglect to comply with, or breach of or default under, any term of this Agreement which, except for a breach of Section 2.3 above (which breach shall not be subject to cure and shall result in an immediate default), continues for fifteen (15) days after notice thereof by Lender to Borrower, or any other agreement or commitment between Borrower, Borrower, or any guarantor of any of the Indebtedness ("Guarantor") and Lender and continuance thereof beyond any applicable period of cure; or

(c) Any warranty, representation, financial statement, or other information made, given or furnished to Lender by or on behalf of Borrower, or any Guarantor shall be, or shall prove to have been, false or misleading in any material advance respect when made, given, or furnished; or

(d) Any loss, theft, substantial damage or destruction to or of any material part of the Collateral, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any Collateral or of any other judicial process of, upon or in respect of Borrower, any Guarantor, or any Collateral; or

(e) Sale or other disposition by Borrower or any Guarantor of any substantial portion of its assets or property or voluntary suspension of the transaction of business by Borrower or any Guarantor, or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Borrower or any Guarantor; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Borrower or any Guarantor; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of Borrower or any Guarantor; or

(f) Sale or other disposition by Presidion Corporation, Presidion Solutions, Inc., ABS IV, Inc., Paradyme, Inc., or Paradyme National Insurance Brokers, Inc. (each, a "Presidion Entity") of any substantial portion of its assets or property or voluntary suspension of the transaction of business by any Presidion Entity, or dissolution, termination of existence, merger,

5

H0212

consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by any Presidion Entity; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Presidion Entity; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of any Presidion Entity; or

(g) Lender deems the margin of Collateral insufficient or itself insecure, in good faith believing that the prospect of payment of the Indebtedness or performance of this Agreement is impaired; or

(h) A default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Indebtedness and continuance thereof beyond any applicable period of cure.

4.2 Upon the occurrence of any Event of Default, Lender may at its discretion and without prior notice to Borrower declare any or all of the Indebtedness to be immediately due and payable, and shall have and may exercise any one or more of the following rights and remedies:

(a) Exercise all the rights and remedies upon default, in foreclosure and otherwise, available to secured parties under the provisions of the Uniform Commercial Code and other applicable law;

(b) Institute legal proceedings to foreclose upon the lien and security interest granted by this Agreement, to recover judgment for all amounts then due and owing as Indebtedness, and to collect the same out of any Collateral or the proceeds of any sale of it;

(c) Institute legal proceedings for the sale, under the judgment or decree of any court of competent jurisdiction, of any or all Collateral; and/or

(d) Personally or by agents, attorneys, or appointment of a receiver, enter upon any premises where Collateral may then be located, and take possession of all or any of it and/or render it unusable; and without being responsible for loss or damage to such Collateral, hold, operate, sell, lease, or dispose of all or any Collateral at one or more public or private sales, leasings or other dispositions, at places and times and on terms and conditions as Lender may deem fit, without any previous demand or advertisement; and except as provided in this Agreement, all notice of sale, lease or other disposition, and advertisement, and other notice or demand, any right or equity of redemption, and any obligation of a prospective purchaser or lessee to inquire as to the power and authority of Lender to sell, lease, or otherwise dispose of the Collateral or as to the application by Lender of the proceeds of sale or otherwise, which would otherwise be required by, or available to Borrower under, applicable law are expressly waived by Borrower to the fullest extent permitted.

6

H0213

At any sale pursuant to this Section 4.2, whether under the power of sale, by virtue of judicial proceedings or otherwise, it shall not be necessary for Lender or a public officer under order of a court to have present physical or constructive possession of Collateral to be sold. The recitals contained in any conveyances and receipts made and given by Lender or the public officer to any purchaser at any sale made pursuant to this Agreement shall, to the extent permitted by applicable law, conclusively establish the truth and accuracy of the matters stated (including, without limit, as to the amounts of the principal of and interest on the Indebtedness, the accrual and nonpayment of it and advertisement and conduct of the sale); and all prerequisites to the sale shall be presumed to have been satisfied and performed. Upon any sale of any Collateral, the receipt of the officer making the sale under judicial proceedings or of Lender shall be sufficient discharge to the purchaser for the purchase money, and the purchaser shall not be obligated to see to the application of the money. Any sale of any Collateral under this Agreement shall be a perpetual bar against Borrower with respect to that Collateral. At any sale or other disposition of Collateral pursuant to this Section 4.2, Lender disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including without limit a disclaimer of any warranty relating to title, possession, quiet enjoyment or the like, and Lender may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable.

4.3    Borrower shall at the request of Lender, notify the account debtors or obligors of Lender's security interest in any Collateral and direct payment of it to Lender. Lender may, itself, upon the occurrence of any Event of Default so notify and direct any account debtor or obligor. At the request of Lender, whether or not an Event of Default shall have occurred, Borrower shall immediately take such actions as Lender shall request to establish exclusive control (as defined in the Uniform Commercial Code) by Lender over any Collateral which is of such a nature that perfection of a security interest may be accomplished by control.

4.4    The proceeds of any sale or other disposition of Collateral authorized by this Agreement shall be applied by Lender first upon all expenses authorized by the Uniform Commercial Code and all reasonable attorney fees and legal expenses incurred by Lender; the balance of the proceeds of the sale or other disposition shall be applied in the payment of the Indebtedness, first to interest, then to principal, then to remaining Indebtedness and the surplus, if any, shall be paid over to Borrower or to such other person(s) as may be entitled to it under applicable law. Borrower shall remain liable for any deficiency, which it shall pay to Lender immediately upon demand. Borrower agrees that Lender shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable. If Lender agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Lender may ascribe any commercially reasonable value to such proceeds. Without limiting

7

H0214

the foregoing, Lender may apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Lender.

4.5 Nothing in this Agreement is intended, nor shall it be construed, to preclude Lender from pursuing any other remedy provided by law for the collection of the Indebtedness or for the recovery of any other sum to which Lender may be entitled for the breach of this Agreement by Borrower. Nothing in this Agreement shall reduce or release in any way any rights or security interests of Lender contained in any existing agreement between Borrower, Borrower, or any Guarantor and Lender.

4.6 No waiver of default or consent to any act by Borrower shall be effective unless in writing and signed by an authorized officer of Lender. No waiver of any default or forbearance on the part of Lender in enforcing any of its rights under this Agreement shall operate as a waiver of any other default or of the same default on a future occasion or of any rights.

4.7 Borrower (a) irrevocably appoints Lender or any agent of Lender (which appointment is coupled with an interest) the true and lawful attorney of Borrower (with full power of substitution) in the name, place and stead of, and at the expense of, Borrower and (b) authorizes Lender or any agent of Lender, in its own name, at Borrower's expense, to do any of the following, as Lender, in its reasonable discretion, deems appropriate:

(i) to demand, receive, sue for, and give receipts or acquittances for any moneys due or to become due on any Collateral (including without limit to draft against Collateral) and to endorse any item representing any payment on or proceeds of the Collateral;

(ii) to execute and file in the name of and on behalf of Borrower all financing statements or other filings deemed necessary or desirable by Lender to evidence, perfect, or continue the security interests granted in this Agreement; and

(iii) to do and perform any act on behalf of Borrower permitted or required under this Agreement.

4.8 Upon the occurrence of an Event of Default, Borrower also agrees, upon request of Lender, to assemble the Collateral and make it available to Lender at any place designated by Lender which is reasonably convenient to Lender and Borrower.

4.9 The following shall be the basis for any finder of fact's determination of the value of any Collateral which is the subject matter of a disposition giving rise to a calculation of any surplus or deficiency under Section 9.615 (f) of the Uniform Commercial Code (as in effect on or after July 1, 2001): (a) the Collateral which is the subject matter of the disposition shall be valued in, an "as is" condition as

8

H0215

of the date of the disposition, without any assumption or expectation that such Collateral will be repaired or improved in any manner; (b) the valuation shall be based upon an assumption that the transferee of such Collateral desires a resale of the Collateral for cash promptly (but no later than 30 days) following the disposition; (c) all reasonable closing costs customarily borne by the seller in commercial sales transactions relating to property similar to such Collateral shall be deducted including, without limitation, brokerage commissions, tax prorations, attorneys' fees, whether inside or outside counsel is used, and marketing costs; (d) the value of the Collateral which is the subject matter of the disposition shall be further discounted to account for any estimated holding costs associated with maintaining such Collateral pending sale (to the extent not accounted for in (c) above), and other maintenance, operational and ownership expenses; and (e) any expert opinion testimony given or considered in connection with a determination of the value of such Collateral must be given by persons having at least 5 years experience in appraising property similar to the Collateral and who have conducted and prepared a complete written appraisal of such Collateral taking into consideration the factors set forth above. The "value" of any such Collateral shall be a factor in determining the amount of proceeds which would have been realized in a disposition to a transferee other than a secured party, a person related to a secured party or a secondary obligor under Section 9-615(f).

5. Miscellaneous.

5.1 Until Lender is advised in writing by Borrower to the contrary, all notices, requests and demands required under this Agreement or by law shall be given to, or made upon, Borrower at the first address indicated in Section 5.14 below.

5.2 Borrower will give Lender not less than 90 days prior written notice of all contemplated changes in Borrower's name, location, chief executive office, principal place of business, and/or location of any Collateral, but the giving of this notice shall not cure any Event of Default caused by this change.

5.3 Lender assumes no duty of performance or other responsibility under any contracts contained within the Collateral.

5.4 Lender has the right to sell, assign, transfer, negotiate or grant participations or any interest in, any or all of the Indebtedness and any related obligations, including without limit this Agreement. In connection with the above, but without limiting its ability to make other disclosures to the full extent allowable, Lender may disclose all documents and information which Lender now or later has relating to Borrower, the Indebtedness or this Agreement, however obtained. Borrower further agrees that Lender may provide information relating to this Agreement or relating to Borrower to the Lender's parent, affiliates, subsidiaries, and service providers.

5.5 In addition to Lender's other rights, any indebtedness owing from Lender to Borrower can be set off and applied by Lender on any Indebtedness at any time(s)

9

H0216

either before or after maturity or demand without notice to anyone. Any such action shall not constitute an acceptance of collateral in discharge of the Indebtedness.

5.6   Borrower, to the extent not expressly prohibited by applicable law, waives any right to require the Lender to: (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from Borrower or any other person, or otherwise comply with the provisions of Sections 9-611 or 9-621 of the Uniform Commercial Code; or (c) pursue any other remedy in the Lender's power.

5.7   In the event that applicable law shall obligate Lender to give prior notice to Borrower of any action to be taken under this Agreement, Borrower agrees that a written notice given to Borrower at least ten days before the date of the act shall be reasonable notice of the act and, specifically, reasonable notification of the time and place of any public sale or of the time after which any private sale, lease, or other disposition is to be made, unless a shorter notice period is reasonable under the circumstances. A notice shall be deemed to be given under this Agreement when delivered to Borrower or when placed in an envelope addressed to Borrower and deposited, with postage prepaid, in a post office or official depository under the exclusive care and custody of the United States Postal Service or delivered to an overnight courier. The mailing shall be by overnight courier, certified, or first class mail.

5.8   Notwithstanding any prior revocation, termination, surrender, or discharge of this Agreement in whole or in part, the effectiveness of this Agreement shall automatically continue or be reinstated in the event that any payment received or credit given by Lender in respect of the Indebtedness is returned, disgorged, or rescinded under any applicable law, including, without limitation, bankruptcy or insolvency laws, in which case this Agreement, shall be enforceable against Borrower as if the returned, disgorged, or rescinded payment or credit had not been received or given by Lender, and whether or not Lender relied upon this payment or credit or changed its position as a consequence of it. In the event of continuation or reinstatement of this Agreement, Borrower agrees upon demand by Lender to execute and deliver to Lender those documents which Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of Borrower to do so shall not affect in any way the reinstatement or continuation.

5.9   This Agreement and all the rights and remedies of Lender under this Agreement shall inure to the benefit of Lender's successors and assigns and to any other holder who derives from Lender title to or an interest in the Indebtedness or any portion of it, and shall bind Borrower and the heirs, legal representatives, successors, and assigns of Borrower. Nothing in this Section 5.9 is deemed a consent by Lender to any assignment by Borrower.

H0217

5.10  Except as otherwise provided in this Agreement, all terms in this Agreement have the meanings assigned to them in Article 9 (or, absent definition in Article 9, in any other Article) of the Uniform Commercial Code, as those meanings may be amended, revised or replaced from time to time. "Uniform Commercial Code" means the Uniform Commercial Code as enacted in the state of Florida, as amended, revised or replaced from time to time. Notwithstanding the foregoing, the parties intend that the terms used herein which are defined in the Uniform Commercial Code have, at all times, the broadest and most inclusive meanings possible. Accordingly, if the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the Uniform Commercial Code in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning. If the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the Uniform Commercial Code in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

5.11  No single or partial exercise, or delay in the exercise, of any right or power under this Agreement, shall preclude other or further exercise of the rights and powers under this Agreement. The unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement. This Agreement constitutes the entire agreement of Borrower and Lender with respect to the subject matter of this Agreement. No amendment or modification of this Agreement shall be effective unless the same shall be in writing and signed by Borrower and an authorized officer of Lender. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida, without regard to conflict of laws principles.

5.12  To the extent that any of the Indebtedness is payable upon demand, nothing contained in this Agreement shall modify the terms and conditions of that Indebtedness nor shall anything contained in this Agreement prevent Lender from making demand, without notice and with or without reason, for immediate payment of any or all of that Indebtedness at any time(s), whether or not an Event of Default has occurred.

5.13  Headings in this Agreement are included for the convenience of reference only and shall not constitute a part of this Agreement for any purpose.

5.14  Borrower represents and warrants that Borrower's exact name is the name set forth in this Agreement. Borrower further represents and warrants the following and agrees that Borrower is, and at all times shall be, located in the following place:

Borrower is a corporation which is organized under the laws of the state of Nevada. Borrower is located (as determined pursuant to the Uniform Commercial

.11

H0218

Code) in the state under the laws of which it was organized, which is (street address, state, zip code and county or parish):

ADDRESS:_____

Borrower's tax identification number and state organizational identification number are as set forth on the signature page below.

If Collateral is located at other than the address specified above, such Collateral is located and shall be maintained at

_III N. ORANGE AVE, Suite 2000_____
STREET ADDRESS

_ORLANDO____FL_____32801_____
CITY            STATE           ZIP CODE            COUNTY

Collateral shall be maintained only at the locations identified in this Section 5.14.

5.14    A carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement under the Uniform Commercial Code and may be filed by Lender in any filing office.

5.15    This Agreement shall be terminated only by the filing of a termination statement in accordance with the applicable provisions of the Uniform Commercial Code, but the obligations contained in Section 2.9 of this Agreement shall survive termination.

6.    **JURY TRIAL WAIVER. DEBTOR AND BANK ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE INDEBTEDNESS.**

H0219

BORROWER:

MIRABILIS VENTURES, INC.

By: ~~[signature]~~

Its: ~~FRANK HAILSTONES~~
~~PRESIDENT~~

Tax Identification No::
20 - 1833196

State of Nevada Organizational ID No.:

C28003-2003

SECURITY AGREEMENT SIGNATURE PAGE

13

H0220



<u>THIRD REPLACEMENT PROMISSORY NOTE</u>

$3,672,662.88                                                    April 15, 2003

FOR VALUE RECEIVED, the undersigned Presidion Solutions, Inc. (formerly known as Affinity Business Services, Inc.), a Florida corporation (the "Borrower"), hereby promises to pay to the order of Kenneth A. Hendricks and Diane M. Hendricks as joint tenants, assignees of Amfinity Capital, L.L.C., ("Lender"), at One ABC Parkway, Beloit, WI, 53511 or at such other place as Lender may direct, in lawful money of the United States of America constituting legal tender in payment of all debts and dues, public and private, together with interest thereon calculated at the rate and in the manner set forth herein, the principal amount of Three Million, Six Hundred Seventy-Two Thousand, Six Hundred Sixty-Two Dollars and Eighty-Eight Cents ($3,672,662.88), or so much thereof as may be advanced and outstanding hereunder. This Note replaces that certain Second Replacement Promissory Note from Borrower to Kenneth A. Hendricks and Diane M. Hendricks as joint tenants dated January 15, 2003 (the "Second Replacement Note"), and includes liability for all accrued interest thereon and unpaid as of the date hereof. No payment of principal was made under the Replacement Note.

1.  **Payments.**  Borrower will make a payment of $1,000,000 on this Note upon execution by all parties of the Release and Settlement Agreement dated effective as of April 15, 2003, to which this Note is attached as Exhibit A, between Borrower, Lender, and certain other parties. Beginning on January 15, 2004, Borrower will establish an escrow account for the sole benefit of Lender and make twelve (12) equal monthly principal payments to pay off the balance of this Note. Upon payment in full, the Strategic Bancorp letter of credit attached hereto (the "LOC") will be returned. Not more than quarterly, the parties may agree to transfer funds from the escrow account to the Lender with a corresponding reduction to the LOC. Any draws on the LOC will be applied to sums due under this Note and the LOC shall be reduced to correspond to the unpaid balance of this Note.

2.  **Interest.**  All unpaid principal balance amounts due hereunder shall bear interest from the date of this Note at the rate of ten percent (10%) per annum. Borrower shall make monthly payments of all interest then accrued hereunder on the fifteenth (15th) day of each month beginning May 15, 2003, and continuing until this Note has been paid in full. In the event of a default as set forth in paragraph 4 below, interest shall accrue at a rate of fourteen percent (14%) per annum. Interest on all principal amounts outstanding from time to time hereunder shall be calculated on the basis of a 365-day year applied to the actual number of days upon which principal is outstanding, by multiplying the product of the principal amount and the applicable rate set forth herein by the actual number of days elapsed, and dividing by 365. In no event shall the rate of interest calculated hereunder exceed the maximum rate allowed by law. Any principal amounts outstanding hereunder after maturity shall continue to bear interest at the rates set forth herein.

3.  **Prepayment**  The sums due hereunder may be prepaid by Borrower, in part or in full, at any time, without paying any prepayment charge or penalty. If Borrower make a partial

C:\WINDOWS\Temporary Internet Files\OLK6083\Hendrick's Note 6-30 clean.DOC

H0186

prepayment, there will be no changes in the due date unless the Lender agrees in writing to those changes.

4.  **Events of Default.** Upon the occurrence of any one or more of the following events ("Events of Default"):

(a)  Default in the payment of the principal of or interest on this Note, as and when due and payable; or

(b)  Failure by Borrower to observe any covenant or obligation contained in any other instrument between the parties including but not limited to a breach of the Share Purchase Agreement between Borrower and Kenneth A. Hendricks, Diane M. Hendricks, Jeffrey W. Stentz, and Karl W. Leo and Amfinity Capital, L.L.C., dated January 16, 2002 (the "Share Purchase Agreement") or the Consulting Agreement between Amfinity Capital, L.L.C. and Borrower dated January 16, 2002 or the Release and Settlement Agreements dated April 30, 2002, January 15, 2003 and April 15, 2003; or

(c)  Borrower becomes insolvent, or makes an assignment for the benefit of creditors, or a voluntary or involuntary case in bankruptcy, receivership or insolvency is commenced by or against either Borrower; or

(d)  A levy, writ of attachment, garnishment, execution or similar process is issued against or placed upon Borrower or any property of Borrower; or

(e)  A default by Borrower under the terms of that certain Promissory Note between Borrower and Fred J. Sandlin dated May 3, 2001 (as amended, the "Sandlin Note"), as the same has been amended by a settlement agreement among the parties to the Sandlin Note and other related parties dated August 15, 2001 ("First Settlement Agreement"), and as further amended by an agreement among the same parties dated effective as of March 31, 2002 ("Second Settlement Agreement"); or

(f)  A failure of Borrower to comply with any material term of the Second Settlement Agreement (and/or the First Settlement Agreement to the extent the same may remain in effect after the execution of the Second Settlement Agreement); or

(g)  A default by Borrower under the terms of that certain Promissory Note between Borrower and the Robert A. Gaines Trust dated May 3, 2001 (as amended, the "Gaines Note"), as the same has been amended by a settlement agreement among the parties to the Gaines Note other related parties dated August 15, 2001 ("Gaines Settlement Agreement"); or

(h)  A failure of Borrower to comply with any material term of the Gaines Settlement Agreement; or

(i)  A failure of Borrower to comply with any material term of the Eighth Standstill agreement dated   February 8, 2003, by and between Borrower and Gaines (the "Standstill Agreement") ; or

(j)     A default by Borrower and/or any of its subsidiaries with respect to any obligation of Borrower and/or any of its subsidiaries due to Comerica Bank which default cannot be waived without Lender's consent, which consent shall not be unreasonably withheld ;

(k)     At any time, the holder of this Note, for any reason in good faith, believes that the prospect of payment or performance of any indebtedness or obligation of Borrower is impaired;

(l)     Failure to keep the LOC in force and effect in an amount equal to the unpaid balance of this Note;

(m)     Notice from Strategic Bancorp that the LOC will not be renewed;

(n)     A default by Borrower or any of its subsidiaries with respect to any obligation or covenant of Borrower or the applicable subsidiary to Mercator Advisory Group, LLC and/or its subsidiaries and affiliates (including but not limited to Mercator Momentum Fund, L.P., Mercator Momentum Fund III, L.P., and Mercator Focus Fund, L.P.) which default cannot be waived without Lender's consent, which consent shall not be unreasonably withheld;

then, at any time ten (10) days thereafter during the continuance of any such event, the holder may, upon written notice to the Borrower, declare this Note and indebtedness evidenced hereby to be forthwith due and payable, whereupon this Note and the indebtedness evidenced hereby shall become forthwith due and payable, both as to principal and interest, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived, anything contained herein or in any other instrument executed in connection with or securing this Note to the contrary notwithstanding, and holder may draw upon the LOC.

5.     Waivers.  Except as expressly required herein, Borrower hereby waives all rights of notice or procedure, including without limitation demand, presentment for payment, notice of dishonor, protest, and notice of protest and diligence in collection or bringing suit and agrees that the holder hereof may accept partial payment, or release or exchange security or collateral, without discharging or releasing any unrealized collateral or the obligations evidenced hereby. Borrower further waives any and all rights of exemption, both as to personal and real property, under the constitution or laws of the United States, the State of Florida or any other state or country.

6.     Payment When Due Date Is Not a Business Day.  If payment hereunder becomes due and payable on a day which is not a business day, as that term is defined in generally accepted usage, the due date thereof shall be extended thereon until the next business day.

7.     Checks, Drafts, and Similar Items.  Checks, drafts or similar items of payment received by Lender shall not constitute payment, but credit therefor shall be given on the date the same is honored by Lender's depository bank and final settlement thereof is reflected by irrevocable credit to Lender's account in such bank.

8.     Refund of Excess Interest.  In no contingency or event whatsoever shall interest

charged hereunder, however such interest may be characterized or computed, exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such a court determines that Lender has received interest hereunder in excess of the highest rate applicable hereto, Lender shall promptly refund such excess interest to Borrowers.

9. **Attorneys' Fees.** Borrower agrees to pay all attorneys' fees and costs incurred by the holder hereof in collecting or attempting to collect this Note, whether by suit or otherwise.

10. **Cumulative Remedies.** The remedies of the Lender provided in this Note and any other remedies available to Lender, at law or in equity, shall be cumulative and concurrent and may be pursued separately, successively, or together at the sole discretion of the Lender, who may exercise them whenever necessary. The failure to exercise any right or remedy shall in no event be construed as a waiver or release of the right or remedy.

11. **Giving of Notices.** Unless applicable law requires a different method, any notice that must be given to Lender under this Note will be given by either delivering it or mailing it by first class mail to Lender at One ABC Parkway, Beloit, WI, 53511, with a copy to Karl W. Leo at 200 Randolph Avenue, Suite 200, Huntsville, AL 35801 or at a different address if Borrowers are given a notice of that different address.

Any notice that must be given to the Borrower under this Note will be given to them by either delivering it or mailing it by first class mail to the Borrower at Presidion Solutions, Inc., attn: Craig A. Vanderburg and James E. Baiers, 755 W. Big Beaver, Suite 1700, Troy, MI 48084 or at a different address if Lender is given a notice of that different address.

12. **Choice of Law and Severability.** This Note has been negotiated, and is being executed and delivered in DuPage County, in the State of Illinois; provided, however, that Lender shall have no obligation to give, nor shall Borrowers be entitled to receive, any notice of such acceptance for this Note to become a binding obligation of Borrower. To the extent allowed by applicable law, Borrowers hereby submits to jurisdiction in the State of Florida. This Note shall be governed by and be construed in accordance with the laws of the State of Florida without regard to its conflicts of laws principles. Whenever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

13. **Captions and Headings.** The captions or headings at the beginning of each paragraph, section or subsection of this Note are for the convenience of the parties only and are not to be construed as defining, limiting, or expanding, in any way, the scope or intent of the provisions of this Note.

14. **Setoff Rights.** This Note is not subject to any set-off, all rights to which are suspended.

15. __Condition Precedent.__ The effectiveness of this Note, and Lender's acceptance thereof, is conditioned upon Borrower and Lender and the other parties thereto entering into that certain settlement agreement between the parties of even date herewith, to which this Note is attached as Exhibit A.

16. __Miscellaneous.__ As used herein, the terms "Borrower", "Lender" and "holder" shall be deemed to include their respective successors, legal representatives and assigns, whether by voluntary action of the parties or by operation of law. The provisions of this Note shall be binding upon Borrowers and their successors and assigns, and shall inure to the benefit of Lender and his successors and assigns. This Note may not be modified except by a written agreement signed by the Borrowers and the holder hereof, or by their respective successors or assigns.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed, sealed and delivered as of the 15th day of April, 2003.

BORROWER:

PRESIDION SOLUTIONS, INC.

By:
Craig A. Vanderburg, President

H0190

EXHIBIT C-1

## Security Agreement
## AMFINITY BUSINESS SOLUTIONS, INC.
(All Assets)

As of January 16, 2002, for value received, the undersigned ("Obligor") grants to Amfinity Capital, L.L.C., assignee of Kenneth A. Hendricks, Diane M. Hendricks, Karl W. Leo, and Jeffrey W. Stentz ("Lender"), whose address is Karl W. Leo, 200 Randolph Avenue, Suite 200, Huntsville, AL 35803 a continuing security interest and lien (any pledge, assignment, security interest or other lien arising hereunder is sometimes referred to herein as a "security interest") in the Collateral (as defined below). This Security interest is a purchase money security interest given to secure payment when due, whether by stated maturity, demand, acceleration or otherwise, of all existing and future indebtedness ("Indebtedness") to the Lender of Affinity Business Services, Inc., ("Debtor") including but not limited to indebtedness incurred in connection with the acquisition of Obligor by Debtor and is given in order to induce Lender to extend credit to Debtor. Indebtedness includes without limit any and all obligations or liabilities of the Debtor to the Lender, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, known or unknown; any and all obligations or liabilities for which the Debtor would otherwise be liable to the Lender were it not for the invalidity or unenforceability of them by reason of any bankruptcy, insolvency or other law, or for any other reason; any and all amendments, modifications, renewals and/or extensions of any of the above; all costs incurred by Lender in establishing, determining, continuing, or defending the validity or priority of its security interest, or in pursuing its rights and remedies under this Agreement or under any other agreement between Lender and Debtor or in connection with any proceeding involving Lender as a result of any financial accommodation to Debtor; and all other costs of collecting Indebtedness, including without limit attorney fees. Obligor agrees to pay Lender all such costs incurred by the Lender, immediately upon demand, and until paid all costs shall bear interest at the highest per annum rate applicable to any of the Indebtedness, but not in excess of the maximum rate permitted by law. Any reference in this Agreement to attorney fees shall be deemed a reference to reasonable fees, costs, and expenses of both in-house and outside counsel and paralegals, whether or not a suit or action is instituted, and to court costs if a suit or action is instituted, and whether attorney fees or court costs are incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding or otherwise. Obligor further covenants, agrees and represents as follows:

1.  **Collateral** shall mean all of the following property Obligor now or later owns or has an interest in, wherever located:

    (a)  all Accounts Receivable (for purposes of this Agreement, "Accounts Receivable" consists of all accounts; general intangibles; chattel paper (including without limit electronic chattel paper and tangible chattel paper); contract rights; deposit accounts; documents; instruments; rights to payment evidenced by chattel paper, documents or instruments; health care insurance receivables; commercial tort claims; letters of credit; letter of credit rights; supporting obligations; and rights to payment for money or funds advanced or sold),

    (b)  all Inventory,

    (c)  all Equipment and Fixtures,

    (d)  all Software (for purposes of this Agreement, "Software" consists of all (i) computer programs and supporting information provided in connection with a transaction relating to the program, and (ii)



EXHIBIT NO. _____

ANN BEILSTEIN

RRFP.Defendants.09.20.07.000090
(165-001)

computer programs embedded in goods and any supporting information provided in connection with a transaction relating to the program whether or not the program is associated with the goods in such a manner that it customarily is considered part of the goods, and whether or not, by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods, and whether or not the program is embedded in goods that consist solely of the medium in which the program is embedded),

(e)    specific items listed below are also included in Collateral:
all contracts and/or service agreements with employee leasing clients
all contracts and other agreements related to the employee leasing business

(f)    all goods, instruments, documents, policies and certificates of insurance, deposits, money, investment property (including but not limited to stock in Paradyme National Insurance Brokers, Inc., and Amfinity H.R. Solutions, Inc.) or other property (except real property which is not a fixture) which are now or later in possession or control of Lender, or as to which Lender now or later controls possession by documents or otherwise,

(g)    all other assets in which a security interest can be granted; and

(h)    all additions, attachments, accessions, parts, replacements, substitutions, renewals, interest, dividends, distributions, rights of any kind (including but not limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Obligor;

In the definition of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

2. **Warranties, Covenants and Agreements.** Obligor warrants, covenants and agrees as follows:

2.1    Obligor shall furnish to Lender, in form and at intervals as Lender may reasonably request, any information Lender may reasonably request and allow Lender to examine, inspect, and copy any of Obligor's books and records. Obligor shall, at the request of Lender, mark its records and the Collateral to clearly indicate the security interest of Lender under this Agreement.

2.2    At the time any Collateral becomes, or is represented to be, subject to a security interest in favor of Lender, Obligor shall be deemed to have warranted that (a) Obligor is the lawful owner of the Collateral and has the right and authority to subject it to a security interest granted to Lender; (b) none of the Collateral is subject to any security interest other than that in favor of Lender and the senior security interest in favor of AmSouth Bank, N.A. ("Permitted Liens"); (c) there are no financing statements on file, other than in favor of Lender and those filed with respect to Permitted Liens; (d) no person, other than Lender, has possession or control (as defined in the Uniform Commercial Code) of any Collateral of such nature that perfection of a security interest may be accomplished by control; and (e) Obligor acquired its rights in the Collateral in the ordinary course of its business.

2.3    Obligor will keep the Collateral free at all times from all claims, liens, security interests and encumbrances other than those in favor of Lender and Permitted Liens. Obligor will not, without the prior written consent of Lender, sell, transfer or lease, or permit to be sold, transferred or leased, any or all of the Collateral, except for Inventory in the ordinary course of its business and will not return any Inventory to its supplier. Lender or its representatives may at all reasonable

times inspect the Collateral and may enter upon all premises where the Collateral is kept or might be located.

2.4      Obligor will do all acts and will execute or cause to be executed all writings requested by Lender to establish, maintain and continue an exclusive, perfected and first security interest of Lender in the Collateral. Obligor agrees that Lender has no obligation to acquire or perfect any lien on or security interest in any asset(s), whether realty or personalty, to secure payment of the Indebtedness, and Obligor is not relying upon assets in which the Lender may have a lien or security interest for payment of the Indebtedness.

2.5      Obligor will pay within the time that they can be paid without interest or penalty all taxes, assessments and similar charges which at any time are or may become a lien, charge, or encumbrance upon any Collateral, except to the extent contested in good faith and bonded in a manner satisfactory to Lender. If Obligor fails to pay any of these taxes, assessments, or other charges in the time provided above, Lender has the option (but not the obligation) to do so and Obligor agrees to repay all amounts so expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any Indebtedness.

2.6      Obligor will keep the Collateral in good condition and will protect it from loss, damage, or deterioration from any cause. Obligor has and will maintain at all times (a) with respect to the Collateral, insurance under an "all risk" policy against fire and other risks customarily insured against, and (b) public liability insurance and other insurance as may be required by law or reasonably required by Lender, all of which insurance shall be in amount, form and content, and written by companies as may be satisfactory to Lender, containing a lender's loss payable endorsement acceptable to Lender. Obligor will deliver to Lender immediately upon demand evidence satisfactory to Lender that the required insurance has been procured. If Obligor fails to maintain satisfactory insurance, Lender has the option (but not the obligation) to do so and Obligor agrees to repay all amounts so expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any Indebtedness.

2.7      On each occasion on which Obligor evidences to Lender the account balances on and the nature and extent of the Accounts Receivable, Obligor shall be deemed to have warranted that except as otherwise indicated (a) each of those Accounts Receivable is valid and enforceable without performance by Obligor of any act; (b) each of those account balances are in fact owing, (c) Obligor has not received notice of setoffs, recoupments, credits, contra accounts, counterclaims or defenses against any of those Accounts Receivable, (d) as to any Accounts Receivable represented by a note, trade acceptance, draft or other instrument or by any chattel paper or document, the same have been endorsed and/or delivered by Obligor to Lender, (e) Obligor has not received with respect to any Account Receivable, any notice of the death of the related account debtor, nor of the dissolution, liquidation, termination of existence, insolvency, business failure, appointment of a receiver for, assignment for the benefit of creditors by, or filing of a petition in bankruptcy by or against, the account debtor, and (f) as to each Account Receivable, except as may be expressly permitted by Lender to the contrary in another document, the account debtor is not an affiliate of Obligor, the United States of America or any department, agency or instrumentality of it, or a citizen or resident of any jurisdiction outside of the United States. Obligor will do all acts and will

3

MI-124176 v1 0950000-102

execute all writings requested by Lender to perform, enforce performance of, and collect all Accounts Receivable. Obligor shall neither make nor permit any modification, compromise or substitution for any Account Receivable without the prior written consent of Lender. Obligor shall, at Lender's request, arrange for verification of Accounts Receivable directly with account debtors or by other methods acceptable to Lender.

2.8    Obligor at all times shall be in strict compliance with all applicable laws, including without limit any laws, ordinances, directives, orders, statutes, or regulations an object of which is to regulate or improve health, safety, or the environment ("Environmental Laws").

2.9    If Lender, acting in its sole discretion, redelivers Collateral to Obligor or Obligor's designee for the purpose of (a) the ultimate sale or exchange thereof; or (b) presentation, collection, renewal, or registration of transfer thereof; or (c) loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with it preliminary to sale or exchange; such redelivery shall be in trust for the benefit of Lender and shall not constitute a release of Lender's security interest in it or in the proceeds or products of it unless Lender specifically so agrees in writing. If Obligor requests any such redelivery, Obligor will deliver with such request a duly executed financing statement in form and substance satisfactory to Lender. Any proceeds of Collateral coming into Obligor's possession as a result of any such redelivery shall be held in trust for Lender and immediately delivered to Lender for application on the Indebtedness. Lender may (in its sole discretion) deliver any or all of the Collateral to Obligor, and such delivery by Lender shall discharge Lender from all liability or responsibility for such Collateral. Lender, at its option, may require delivery of any Collateral to Lender at any time with such endorsements or assignments of the Collateral as Lender may request.

2.10   At any time and without notice, Lender may (a) cause any or all of the Collateral to be transferred to its name or to the name of its nominees; (b) receive or collect by legal proceedings or otherwise all dividends, interest, principal payments and other sums and all other distributions at any time payable or receivable on account of the Collateral, and hold the same as Collateral, or apply the same to the Indebtedness, the manner and distribution of the application to be in the sole discretion of Lender; (c) enter into any extension, subordination, reorganization, deposit, merger or consolidation agreement or any other agreement relating to or affecting the Collateral, and deposit or surrender control of the Collateral, and accept other property in exchange for the Collateral and hold or apply the property or money so received pursuant to this Agreement; and (d) take such actions in its own name or in Obligor's name as Lender, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the Uniform Commercial Code) over any Collateral of such nature that perfection of Lender's security interest may be accomplished by control.

2.11   Lender may assign any of the Indebtedness and deliver any or all of the Collateral to its assignee, who then shall have with respect to Collateral so delivered all the rights and powers of Lender under this Agreement, and after that Lender shall be fully discharged from all liability and responsibility with respect to Collateral so delivered.

2.12   Obligor shall use its good faith commercially reasonable efforts to retain its employee leasing clients (including but not limited to the employee leasing clients of Amfinity H.R. Solutions, Inc.

4

RRFP.Defendants.09.20.07.000093
(165-001)

and Obligor's other subsidiaries), consistent with Obligor's current underwriting, legal business, and other guidelines (which shall not be altered without Lender's prior written consent, which may not be unreasonably withheld). Obligor may terminate any client in its reasonable discretion. Obligor shall have no obligation to reinstate a client who has been terminated in accordance with these provisions.

2.13    Obligor shall defend, indemnify and hold harmless Lender, its employees, agents, shareholders, affiliates, officers, and directors from and against any and all claims, damages, fines, expenses, liabilities or causes of action of whatever kind, including without limit consultant fees, legal expenses, and attorney fees, suffered by any of them as a direct or indirect result of any actual or asserted violation of any law, including, without limit, Environmental Laws, or of any remediation relating to any property required by any law, including without limit Environmental Laws.

## 3.  Collection of Proceeds.

3.1    Obligor agrees to collect and enforce payment of all Collateral until Lender shall direct Obligor to the contrary. Immediately upon notice to Obligor by Lender and at all times after that, Obligor agrees to fully and promptly cooperate and assist Lender in the collection and enforcement of all Collateral and to hold in trust for Lender all payments received in connection with Collateral and from the sale, lease or other disposition of any Collateral, all rights by way of suretyship or guaranty and all rights in the nature of a lien or security interest which Obligor now or later has regarding Collateral. Immediately upon and after such notice, Obligor agrees to (a) endorse to Lender and immediately deliver to Lender all payments received on Collateral or from the sale, lease or other disposition of any Collateral or arising from any other rights or interests of Obligor in the Collateral, in the form received by Obligor without commingling with any other funds, and (b) immediately deliver to Lender all property in Obligor's possession or later coming into Obligor's possession through enforcement of Obligor's rights or interests in the Collateral. Obligor irrevocably authorizes Lender or any Lender employee or agent to endorse the name of Obligor upon any checks or other items which are received in payment for any Collateral, and to do any and all things necessary in order to reduce these items to money. Lender shall have no duty as to the collection or protection of Collateral or the proceeds of it, nor as to the preservation of any related rights, beyond the use of reasonable care in the custody and preservation of Collateral in the possession of Lender. Obligor agrees to take all steps necessary to preserve rights against prior parties with respect to the Collateral. Nothing in this Section 3.1 shall be deemed a consent by Lender to any sale, lease or other disposition of any Collateral.

3.2    Obligor agrees that immediately upon Lender's request (whether or not any Event of Default exists) the Indebtedness shall be on a "remittance basis" as follows: Obligor shall at its sole expense establish and maintain (and Lender, at Lender's option may establish and maintain at Obligor's expense): (a) an United States Post Office lock box (the "Lock Box"), to which Lender shall have exclusive access and control. Obligor expressly authorizes Lender, from time to time, to remove contents from the Lock Box, for disposition in accordance with this Agreement. Obligor agrees to notify all account debtors and other parties obligated to Obligor that all payments made to Obligor (other than payments by electronic funds transfer) shall be remitted, for the credit of Obligor, to the Lock Box, and Obligor shall include a like statement on all invoices; and (b) a non-interest bearing deposit account with Lender which shall be titled as designated by Lender (the

5

MI-124176 v1 0950000-102

"Cash Collateral Account") to which Lender shall have exclusive access and control. Obligor agrees to notify all account debtors and other parties obligated to Obligor that all payments made to Obligor by electronic funds transfer shall be remitted to the Cash Collateral Account, and Obligor, at Lender's request, shall include a like statement on all invoices. Obligor shall execute all documents and authorizations as required by Lender to establish and maintain the Lock Box and the Cash Collateral Account.

3.3     All items or amounts which are remitted to the Lock Box, to the Cash Collateral Account, or otherwise delivered by or for the benefit of Obligor to Lender on account of partial or full payment of, or with respect to, any Collateral shall, at Lender's option, (a) be applied to the payment of the Indebtedness, whether then due or not, in such order or at such time of application as Lender may determine in its sole discretion, or, (b) be deposited to the Cash Collateral Account. Obligor agrees that Lender shall not be liable for any loss or damage which Obligor may suffer as a result of Lender's processing of items or its exercise of any other rights or remedies under this Agreement, including without limitation indirect, special or consequential damages, loss of revenues or profits, or any claim, demand or action by any third party arising out of or in connection with the processing of items or the exercise of any other rights or remedies under this Agreement. Obligor agrees to indemnify and hold Lender harmless from and against all such third party claims, demands or actions, and all related expenses or liabilities, including, without limitation, attorney fees.

4.   **Defaults, Enforcement and Application of Proceeds.**

4.1     Upon the occurrence of any of the following events (each an "Event of Default"), Obligor shall be in default under this Agreement:

(a)     Any failure to pay the Indebtedness or any other indebtedness when due, or such portion of it as may be due, by acceleration or otherwise and continuation beyond any applicable period of cure; or

(b)     Any failure or neglect to comply with, or breach of or default under, any term of this Agreement, or any other agreement or commitment between Debtor, Obligor, or any guarantor of any of the Indebtedness ("Guarantor") and Lender and continuation beyond any applicable period of cure; or

(c)     Any warranty, representation, financial statement, or other information made, given or furnished to Lender by or on behalf of Debtor, Obligor, or any Guarantor shall be, or shall prove to have been, false or materially misleading when made, given, or furnished; or

(d)     Any loss, theft, substantial damage or destruction to or of any Collateral, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any Collateral or of any other judicial process of, upon or in respect of Obligor any Guarantor, or any Collateral; or

(e)     Sale or other disposition by Debtor, Obligor, or any Guarantor of any substantial portion of its assets or property or voluntary suspension of the transaction of business by Debtor,

6

RRFP.Defendants.09.20.07.000095
(165-001)

Obligor, or any Guarantor, or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Borrower, Debtor, Obligor, or any Guarantor; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Debtor, Obligor, or any Guarantor; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of Debtor, Obligor, or any Guarantor; or

(f)     Lender shall in good faith fear material deterioration, removal, or waste of Collateral; or

(g)     A default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Indebtedness, or

(h)     the senior security interest of AmSouth Bank, N.A., is not released within sixty (60) days after the date of this Agreement.

4.2     Upon the occurrence of any Event of Default, Lender may at its discretion and without prior notice to Obligor declare any or all of the Indebtedness to be immediately due and payable, and shall have and may exercise any one or more of the following rights and remedies:

(a)     Exercise all the rights and remedies upon default, in foreclosure and otherwise, available to secured parties under the provisions of the Uniform Commercial Code and other applicable law;

(b)     Institute legal proceedings to foreclose upon the lien and security interest granted by this Agreement, to recover judgment for all amounts then due and owing as Indebtedness, and to collect the same out of any Collateral or the proceeds of any sale of it;

(c)     Institute legal proceedings for the sale, under the judgment or decree of any court of competent jurisdiction, of any or all Collateral; and/or

(d)     Personally or by agents, attorneys, or appointment of a receiver, enter upon any premises where Collateral may then be located, and take possession of all or any of it and/or render it unusable; and without being responsible for loss or damage to such Collateral, hold, operate, sell, lease, or dispose of all or any Collateral at one or more public or private sales, leasings or other disposition, at places and times and on terms and conditions as Lender may deem fit, without any previous demand or advertisement; and except as provided in this Agreement, all notice of sale, lease or other disposition, and advertisement, and other notice or demand, any right or equity of redemption, and any obligation of a prospective purchaser or lessee to inquire as to the power and authority of Lender to sell, lease, or otherwise dispose of the Collateral or as to the application by Lender of the proceeds of sale or otherwise, which would otherwise be required by, or available to Obligor under, applicable law are expressly waived by Obligor to the fullest extent permitted.

At any sale pursuant to this Section 4.2, whether under the power of sale, by virtue of judicial proceedings or otherwise, it shall not be necessary for Lender or a public officer

7

MI-124176 v1 0950000-102

under order of a court to have present physical or constructive possession of Collateral to be sold. The recitals contained in any conveyances and receipts made and given by Lender or the public officer to any purchaser at any sale made pursuant to this Agreement shall, to the extent permitted by applicable law, conclusively establish the truth and accuracy of the matters stated (including, without limit, as to the amounts of the principal of and interest on the Indebtedness, the accrual and nonpayment of it and advertisement and conduct of the sale); and all prerequisites to the sale shall be presumed to have been satisfied and performed. Upon any sale of any Collateral, the receipt of the officer making the sale under judicial proceedings or of Lender shall be sufficient discharge to the purchaser for the purchase money, and the purchaser shall not be obligated to see to the application of the money. Any sale of any Collateral under this Agreement shall be a perpetual bar against Obligor with respect to that Collateral. At any sale or other disposition of Collateral pursuant to this Section 4.2, Lender disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including without limit a disclaimer of any warranty relating to title, possession, quiet enjoyment or the like, and Lender may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable.

4.3     Obligor shall at the request of Lender, notify the account debtors or obligors of Lender's security interest in the Collateral and direct payment of it to Lender. Lender may, itself, upon the occurrence of any Event of Default so notify and direct any account debtor or obligor. At the request of Lender, whether or not an Event of Default shall have occurred, Obligor shall immediately take such actions as Lender shall request to establish exclusive control (as defined in the Uniform Commercial Code) by Lender over any Collateral which is of such a nature that perfection of a security interest may be accomplished by control.

4.4     The proceeds of any sale or other disposition of Collateral authorized by this Agreement shall be applied by Lender first upon all expenses authorized by the Uniform Commercial Code and all reasonable attorney fees and legal expenses incurred by Lender; the balance of the proceeds of the sale or other disposition shall be applied in the payment of the Indebtedness, first to interest, then to principal, then to remaining Indebtedness and the surplus, if any, shall be paid over to Obligor or to such other person(s) as may be entitled to it under applicable law. Obligor shall remain liable for any deficiency, which it shall pay to Lender immediately upon demand. Obligor agrees that Lender shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable. If Lender agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Lender may ascribe any commercially reasonable value to such proceeds. Without limiting the foregoing, Lender may apply any commercially reasonable discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Lender.

4.5     Nothing in this Agreement is intended, nor shall it be construed, to preclude Lender from pursuing any other remedy provided by law for the collection of the Indebtedness or for the recovery of any other sum to which Lender may be entitled for the breach of this Agreement by Obligor. Nothing in this Agreement shall reduce or release in any way any rights or security interests of Lender

8

RRFP.Defendants.09.20.07.000097
(165-001)

contained in any existing agreement between Debtor, Obligor, or any Guarantor and Lender.

4.6 No waiver of default or consent to any act by Obligor shall be effective unless in writing and signed by an authorized officer of Lender. No waiver of any default or forbearance on the part of Lender in enforcing any of its rights under this Agreement shall operate as a waiver of any other default or of the same default on a future occasion or of any rights.

4.7 Obligor (a) irrevocably appoints Lender or any agent of Lender (which appointment is coupled with an interest) the true and lawful attorney of Obligor (with full power of substitution) in the name, place and stead of, and at the expense of, Obligor and (b) authorizes Lender or any agent of Lender, in its own name, at Obligor's expense, to do any of the following, as Lender, in its sole discretion, deems appropriate:

(i) to demand, receive, sue for, and give receipts or acquittances for any moneys due or to become due on any Collateral (including without limit to draft against Collateral) and to endorse any item representing any payment on or proceeds of the Collateral;

(ii) to execute and file in the name of and on behalf of Obligor all financing statements or other filings deemed necessary or desirable by Lender to evidence, perfect, or continue the security interests granted in this Agreement; and

(iii) to do and perform any act on behalf of Obligor required under this Agreement.

4.8 Upon the occurrence of an Event of Default, Obligor also agrees, upon request of Lender, to assemble the Collateral and make it available to Lender at any place designated by Lender which is reasonably convenient to Lender and Obligor.

4.9 The following shall be the basis for any finder of fact's determination of the value of any Collateral which is the subject matter of a disposition giving rise to a calculation of any surplus or deficiency under Section 679.615 of the Uniform Commercial Code (as in effect on or after January 1, 2002): (a) the Collateral which is the subject matter of the disposition shall be valued in an "as is" condition as of the date of the disposition, without any assumption or expectation that such Collateral will be repaired or improved in any manner; (b) the valuation shall be based upon an assumption that the transferee of such Collateral desires a resale of the Collateral for cash promptly (but no later than 30 days) following the disposition; (c) all reasonable closing costs customarily borne by the seller in commercial sales transactions relating to property similar to such Collateral shall be deducted including, without limitation, brokerage commissions, tax prorations, attorneys' fees, whether inside or outside counsel is used, and marketing costs; (d) the value of the Collateral which is the subject matter of the disposition shall be further discounted to account for any estimated holding costs associated with maintaining such Collateral pending sale (to the extent not accounted for in (c) above), and other maintenance, operational and ownership expenses; and (e) any expert opinion testimony given or considered in connection with a determination of the value of such Collateral must be given by persons having at least 5 years experience in appraising property similar to the Collateral and who have conducted and prepared a complete written appraisal of such Collateral taking into consideration the factors set forth above. The "value" of any such Collateral shall be a factor in determining the amount of proceeds which would have been

9

RRFP.Defendants.09.20.07.000098
(165-001)

realized in a disposition to a transferee other than a secured party, a person related to a secured party or a secondary obligor under Section 679.615.

5. **Miscellaneous.**

5.1      Until Lender is advised in writing by Obligor to the contrary, all notices, requests and demands required under this Agreement or by law shall be given to, or made upon, Obligor at the first address indicated in Section 5.15 below with such copies as may be required for notices under the Loan Agreement.

5.2      Obligor will give Lender not less than 90 days prior written notice of all contemplated changes in Obligor's name, location, chief executive office, principal place of business, and/or location of any Collateral, but the giving of this notice shall not cure any Event of Default caused by this change.

5.3      Lender assumes no duty of performance or other responsibility under any contracts contained within the Collateral.

5.4      Lender has the right to sell, assign, transfer, negotiate or grant participations or any interest in, any or all of the Indebtedness and any related obligations, including without limit this Agreement. In connection with the above, but without limiting its ability to make other disclosures to the full extent allowable, Lender may disclose all documents and information which Lender now or later has relating to Obligor, the Indebtedness or this Agreement, however obtained. Obligor further agrees that Lender may provide information relating to this Agreement or relating to Obligor to the Lender's parent, affiliates, subsidiaries, and service providers.

5.5      In addition to Lender's other rights, any indebtedness owing from Lender to Obligor can be set off and applied by Lender on any Indebtedness at any time(s) either before or after maturity or demand without notice to anyone. Any such action shall not constitute an acceptance of collateral in discharge of the Indebtedness.

5.6      Obligor, to the extent not expressly prohibited by applicable law, waives any right to require the Lender to: (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from Borrower or any other person, or otherwise comply with the provisions of Fla. Stat. §679.611 or §679.621; or (c) pursue any other remedy in the Lender's power. Obligor waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Indebtedness, any and all other notices to which the undersigned might otherwise be entitled, and diligence in collecting any Indebtedness, and agree(s) that the Lender may, once or any number of times, modify the terms of any Indebtedness, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Indebtedness, or permit Obligor to incur additional Indebtedness and without affecting in any manner the unconditional obligation of Obligor under this Agreement. Obligor unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of Obligor under this Agreement, and acknowledges that such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other

1

RRFP.Defendants.09.20.07.000099
(165-001)

document from Obligor now or later securing the Indebtedness, and acknowledges that as of the date of this Agreement no such defense or setoff exists.

5.7   This Agreement shall be terminated only by the filing of a termination statement in accordance with the applicable provisions of the Uniform Commercial Code, but the obligations contained in Section 2.13 of this Agreement shall survive termination.

5.8   In the event that applicable law shall obligate Lender to give prior notice to Obligor of any action to be taken under this Agreement, Obligor agrees that a written notice given to Obligor at least ten days before the date of the act shall be reasonable notice of the act and, specifically, reasonable notification of the time and place of any public sale or of the time after which any private sale, lease, or other disposition is to be made, unless a shorter notice period is reasonable under the circumstances. A notice shall be deemed to be given under this Agreement when delivered to Obligor or when placed in an envelope addressed to Obligor and deposited, with postage prepaid, in a post office or official depository under the exclusive care and custody of the United States Postal Service or delivered to an overnight courier. The mailing shall be by overnight courier, certified, or first class mail.

5.9   Notwithstanding any prior revocation, termination, surrender, or discharge of this Agreement in whole or in part, the effectiveness of this Agreement shall automatically continue or be reinstated in the event that any payment received or credit given by Lender in respect of the Indebtedness is returned, disgorged, or rescinded under any applicable law, including, without limitation, bankruptcy or insolvency laws, in which case this Agreement, shall be enforceable against Obligor as if the returned, disgorged, or rescinded payment or credit had not been received or given by Lender, and whether or not Lender relied upon this payment or credit or changed its position as a consequence of it. In the event of continuation or reinstatement of this Agreement, Obligor agrees upon demand by Lender to execute and deliver to Lender those documents which Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of Obligor to do so shall not affect in any way the reinstatement or continuation.

5.10   This Agreement and all the rights and remedies of Lender under this Agreement shall inure to the benefit of Lender's successors and assigns and to any other holder who derives from Lender title to or an interest in the Indebtedness or any portion of it, and shall bind Obligor and the heirs, legal representatives, successors, and assigns of Obligor. Nothing in this Section 5.10 is deemed a consent by Lender to any assignment by Obligor.

5.11   If there is more than one Obligor, all undertakings, warranties and covenants made by Obligor and all rights, powers and authorities given to or conferred upon Lender are made or given jointly and severally.

5.12   Except as otherwise provided in this Agreement, all terms in this Agreement have the meanings assigned to them in Article 9 (or, absent definition in Article 9, in any other Article) of the Uniform Commercial Code, as those meanings may be amended, revised or replaced from time to time. "Uniform Commercial Code" means Title XXXIX Chapters 670-680 of the Florida Statutes.

1

RRFP.Defendants.09.20.07.000100
(165-001)

Notwithstanding the foregoing, the parties intend that the terms used herein which are defined in the Uniform Commercial Code have, at all times, the broadest and most inclusive meanings possible. Accordingly, if the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the Uniform Commercial Code in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning. If the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the Uniform Commercial Code in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

5.13    No single or partial exercise, or delay in the exercise, of any right or power under this Agreement, shall preclude other or further exercise of the rights and powers under this Agreement. The unenforceability of any provision of this Agreement shall not affect the enforceability of the remainder of this Agreement. This Agreement constitutes the entire agreement of Obligor and Lender with respect to the subject matter of this Agreement. No amendment or modification of this Agreement shall be effective unless the same shall be in writing and signed by Obligor and an authorized officer of Lender. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida, without regard to conflict of laws principles.

5.14    To the extent that any of the Indebtedness is payable upon demand, nothing contained in this Agreement shall modify the terms and conditions of that Indebtedness nor shall anything contained in this Agreement prevent Lender from making demand, without notice and with or without reason, for immediate payment of any or all of that Indebtedness at any time(s), whether or not an Event of Default has occurred.

5.15    Obligor represents and warrants that Obligor's exact name is the name set forth in this Agreement. Obligor further represents and warrants the following and agrees that Obligor is, and at all times shall be, located in the following place:

Obligors' registered office located at 6950 Central Avenue, Suite 170, St. Petersburg, FL 33707.

If Collateral is located at other than the address specified above, such Collateral is located and shall be maintained at the locations set forth on the attached Schedule of Collateral Locations.

Collateral shall be maintained only at the locations identified in this Section 5.15 and on the attached Schedule of Collateral Locations.

5.16    A carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement under the Uniform Commercial Code and may be filed by Lender in any filing office.

6.    OBLIGOR AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS

1

RRFP.Defendants.09.20.07.000101
(165-001)