

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:                                                    **CASE NO. 6:08-bk-04327-KSJ**

**MIRABILIS VENTURES, INC.,**                **CHAPTER 11**

      **Debtor.**

-----------------------------------------------/

### RESPONSE TO MIRABILIS VENTURES, INC.'S OBJECTION TO ALLOWANCE OF CLAIM NO. 6 SUBMITTED BY PAUL GLOVER

**Mr. Paul Glover pro se**, in support of his claim in the total amount of $2,854,949.39 ("Claim No. 6"), states as follows:

The Debtor bases the Objection to Claim No. 6 on three statements. The first, as referenced in Item 7 of the Objection, that "Mirabilis is not liable for any debt accumulated by Common Paymaster Corporation ("CPC")", and the second, as referenced in Item 8 of the Objection, that "there is no evidence in the Debtor's books and records that Mirabilis received value for the Glover claim", and lastly as referenced in Item 9 of the Objection in the alternative, that "Glover's Claim is based on his equitable interest in the Debtor... and not properly classified as an unsecured claim".

Reference Item 7 of the Objection: Common Paymaster Corporation ("CPC") was a 100% owned subsidiary of Mirabilis Ventures, Inc. ("Mirabilis"), and was represented to Mirabilis employees and recruits as the common paymaster for all Mirabilis affiliates. Mirabilis was the face behind of all recruiting and employment communication. In December of 2005 Mr. Glover was recruited by Mr. Bruce Walko, Mirabilis's Board of Directors, the executive team of Mirabilis (Messrs. Dan Myers, Bob Pollack, Jim Sadrianna, Frank Hailstones), Mr. Frank Amodeo and others, to be the new Mirabilis CFO. In connection with the audit of the Mirabilis Consolidated Group for the period from inception through December 31, 2005, a significant purpose for the hiring of Mr. Glover by Mirabilis, CPC was represented to the company auditors James Moore and Company (Mr. Jay Hutto – Engagement Partner), as a wholly owned subsidiary of Mirabilis and included in the Mirabilis consolidation (see Mirabilis Ventures, Inc. and Subsidiaries Consolidated Financial Statements attached hereto as Exhibit 1). Further, Mirabilis relied on the fact that CPC was processing payroll for Mirabilis as a wholly owned subsidiary to operate as such without the otherwise required state of Florida PEO licensing. All employees of Mirabilis were paid through CPC during the period of Mr. Glover's employment with Mirabilis. Mr. Glover is also on record with the state of Florida Division of Corporations as the Executive Vice President and Treasurer of Mirabilis Ventures, Inc. as reported in Mirabilis's 2006 Annual Report. Officers are deemed employees under the rules of the U.S. Internal Revenue Service. Mirabilis should maintain liability for unpaid services rendered under employment agreements processed by a wholly owned subsidiary functioning under the rules of the Internal Revenue Code as a common paymaster.

Reference Item 8 of the Objection: Mr. Glover contends that the claim that "there is no evidence in the Debtors' books and records that Mirabilis received value for the Glover claim" is totally unfounded, frivolous and in total disregard of the obvious. The very existence of accounting books and records of Mirabilis during the period from inception in 2003 through December 31, 2005, compiled in support of Mirabilis's audit (Exhibit 1), evidences the level of Mr. Glover's contribution as Mirabilis's CFO during the term of his employment. Mr. Glover was hired to review the documentation of over 100 acquisitions and to compile a set of consolidated financial statements for Mirabilis from its inception in 2003 through December 31, 2005 in sufficient detail to serve as the foundation for a subsequent planned public offering. At the time Mirabilis was struggling to obtain financial information on the entities it had acquired, and its internal systems and controls were dysfunctional at best. This was an extremely arduous task to say the least, and resulted in many 60-80 or more hour work weeks. The Mirabilis Consolidated Financial Statements attached hereto as Exhibit 1, were initially compiled and drafted by Mr. Paul Glover. A challenge consistent with the level of compensation negotiated for in the Mirabilis Employment Agreement (a copy of which is attached hereto as Exhibit 2), and consistent with Mr. Glover's previous earnings history. (See also Mirabilis Stock Certificate #28 issued in recognition of services rendered to Mirabilis Ventures, Inc., attached hereto as Exhibit 3).

Reference Item 9 of the Objection: Mr. Glover states that pursuant to the terms of the Mirabilis Ventures, Inc. Green Shares of stock, "Upon the termination, retirement, resignation, or legal determination of incompetence (hereinafter collectively referred to as "Triggering Event") of a Shareholder of Green Shares, then said Green Shares shall be redeemed by the Company at a price of $1,000 per Green Share with such payment being made in the form of an unsecured promissory note payable in equal installments, over a period of sixty (60) months, and accruing simple interest at the rate of three (3%) percent per annum." Mr. Glover further references that he resigned from service to Mirabilis and its affiliates on March 6, 2007 due to the non-payment of wages and further breaches in regards to Mr. Glover's Employment Agreement. At that time the 2,750 shares of Green Shares of stock were redeemed for an unsecured promissory note as set forth above. Mr. Glover's claim is not an equitable interest, but an unsecured promissory note.

## **Requested Relief**

**WHEREFORE**, Mr. Glover respectfully requests this Court enter an Order overruling the Objection to Claim No. 5, affirming the validity of Claim No. 5 in its entirety, and for such other and further relief as the Court deems just and proper in the circumstances.

**RESPECTFULLY SUBMITTED** this 28th day of October, 2009.

_____
Paul S. Glover, pro se
1312 Winter Springs Boulevard
Winter Springs, Florida 32708
Paul_Glover3@yahoo.com
Telephone: 407-920-0668

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of this **RESPONSE TO MIRABILIS VENTURES, INC'S OBJECTION TO ALLOWANCE OF CLAIM NO. 5 SUBMITTED BY PAUL GLOVER** has been furnished by U.S. First Class, postage prepaid mail to the counsel for the Debtors, Mr. R. Scott Shuker, Esq., Latham, Shuker, Eden & Beaudine, LLP 390 North Orange Avenue, Suite 600, Orlando, Florida 32802-3353, this 28th day of October, 2009.

Paul S. Glover, pro se
1312 Winter Springs Boulevard
Winter Springs, Florida 32708
Paul_Glover3@yahoo.com
Telephone:  407-920-0668

MIRABILIS VENTURES, INC.
AND SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS
AND INDEPENDENT AUDITORS' REPORT

FOR THE YEARS ENDED
DECEMBER 31, 2005 AND 2004

**MIRABILIS VENTURES, INC. AND SUBSIDIARIES**
**TABLE OF CONTENTS**
**DECEMBER 31, 2005 AND 2004**

| | Page(s) |
|---|---|
| **Independent Auditors' Report** | 1 |
| | |
| **Consolidated Financial Statements** | |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Operations | 3 |
| Consolidated Statements of Stockholders' Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 – 26 |

# JAMES MOORE & CO., P.L.

CERTIFIED PUBLIC ACCOUNTANTS
AND CONSULTANTS

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors of
  Mirabilis Ventures, Inc.:

We have audited the accompanying consolidated balance sheets of Mirabilis Ventures, Inc. and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

Except as discussed in the third paragraph, we conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

We did not perform audit procedures on management's determination of variable interest entities and the primary beneficiary of such variable interest entities that may exist because sufficient appropriate audit evidence was not available. Generally accepted accounting principles (primarily Financial Accounting Standards Board (FASB) Interpretation 46(R)(FIN 46(R)) "Consolidation of Variable Interest Entities") require the Company consolidate variable interest entities in which it is a primary beneficiary of such variable interest entities and make various disclosures related thereto. We were unable to satisfy ourselves about management's determination of whether the Company is the primary beneficiary of entities in which it has a variable interest and the adequacy of related disclosures by means of other auditing procedures.

In our opinion, except for the effects of such adjustments, if any, as might have been determined to be necessary had we been able to apply adequate procedures to the determination of whether the Company is the primary beneficiary of entities in which it has a variable interest as described in the third paragraph, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Mirabilis Ventures, Inc. and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*James Moore & Co., P.L.*

Gainesville, Florida
July 17, 2006

- 1 -

|  | 2005 | 2004 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 6,099,736 | $ - |
| Restricted cash | 14,750,000 | 993,982 |
| Accounts receivable, net | 12,122,950 | - |
| Unbilled receivables | 3,553,401 | |
| Related party receivables | 6,931,985 | 878,750 |
| Inventory | 66,037 | - |
| Investments | - | 4,407,149 |
| Prepaid expenses and deposits | 1,553,562 | - |
| Other current assets | 24,852 | - |
| Total current assets | 45,102,523 | 6,279,881 |
| **Property and equipment, net** | 2,131,842 | - |
| **Other assets** | | |
| Investments, non-current | 2,226,404 | 1,356,158 |
| Deposits, non-current | 2,442,839 | - |
| Deferred income taxes | 28,431 | - |
| Goodwill | 3,520,872 | - |
| Other intangible assets | 100,105 | - |
| Other non-current assets | 17,333 | - |
| Total other assets | 8,335,984 | 1,356,158 |
| **Total Assets** | $ 55,570,349 | $ 7,636,039 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Accounts payable | $ 6,013,463 | $ - |
| Advance billings | 554,704 | |
| Related party payables | 28,737 | 830,000 |
| Accrued compensation and benefits | 2,488,061 | - |
| Accrued payroll taxes | 269,393 | - |
| Accrued workers compensation premiums | 227,312 | - |
| Deferred revenue | - | 2,000,000 |
| Income taxes payable | 1,574,866 | 2,252 |
| Lines of credit | 75,274 | - |
| Notes payable, current maturities | 3,609,222 | 1,751,416 |
| Related party notes payable, current maturities | 4,579,852 | - |
| Other accrued liabilities | 292,364 | - |
| Total current liabilities | 19,713,248 | 4,583,668 |
| **Long-term liabilities** | | |
| Long-term notes payable | 9,576,659 | 3,041,891 |
| Long-term related party notes payable | 17,337,640 | - |
| Total long-term liabilities | 26,914,299 | 3,041,891 |
| **Minority interest** | 46,329 | - |
| **Stockholders' equity** | | |
| Class B standard preferred stock, no par value, 1,000,000 shares authorized, 156,750 shares issued and outstanding | 515,625 | - |
| Class Z special preferred stock, no par value, 25,000 shares authorized, 6,000 shares issued and outstanding | 6,000,000 | - |
| Class A common stock, no par value, 75,000 shares authorized, 100 shares issued and outstanding | 100 | 100 |
| Retained earnings | 2,380,748 | 10,380 |
| Total stockholders' equity | 8,896,473 | 10,480 |
| **Total Liabilities and Stockholders' Equity** | $ 55,570,349 | $ 7,636,039 |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

| | 2005 | 2004 |
|---|---:|---:|
| **Payroll service revenues** | | |
| Revenues, gross | $ 7,296,970 | $ - |
| | | |
| Direct expenses | | |
| Direct wage costs | 6,256,321 | - |
| Payroll taxes | 466,466 | - |
| Benefits and workers compensation | 270,896 | - |
| Payroll service revenues, net | 303,287 | - |
| | | |
| **Construction revenues** | | |
| Construction revenues, gross | 9,658,102 | - |
| Direct construction costs | 8,245,874 | - |
| Construction revenues, net | 1,412,228 | - |
| | | |
| **Consulting revenues** | 21,132,950 | 55,000 |
| | | |
| **Sales commissions** | 5,622,011 | - |
| | | |
| **Other revenues** | 754,478 | - |
| Total revenues | 29,224,954 | 55,000 |
| | | |
| **Operating expenses** | | |
| Selling, general and administrative expenses | 17,315,098 | 42,368 |
| Depreciation and amortization | 87,291 | - |
| Total expenses | 17,402,389 | 42,368 |
| | | |
| **Operating income** | 11,822,565 | 12,632 |
| | | |
| **Other income (expense)** | | |
| Interest income | 24,003 | - |
| Interest expense | (427,780) | - |
| Equity in earnings (loss) of unconsolidated investees, net | (72,900) | - |
| Investment gain (loss), net | (7,386,734) | - |
| Total other income (expense) | (7,863,411) | - |
| | | |
| **Income before provision for income taxes and minority interest** | 3,959,154 | 12,632 |
| | | |
| **Income tax expense** | (1,544,183) | (2,252) |
| | | |
| **Minority interest** | (44,603) | - |
| | | |
| **Net income** | $ 2,370,368 | $ 10,380 |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

## MIRABILIS VENTURES, INC.
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### FOR THE YEARS ENDED DECEMBER 31, 2005 AND 2004

| | Class B Standard Preferred Stock | Class Z Special Preferred Stock | Class A Common Stock | Additional Paid-in Capital | Retained Earnings | Total |
|---|---|---|---|---|---|---|
| Balance, January 1, 2004 | $ - | $ - | $ 100 | $ - | $ - | $ 100 |
| Issuance of common stock | - | - | - | - | - | - |
| Net income | - | - | - | - | 10,380 | 10,380 |
| Dividends | - | - | - | - | - | - |
| Balance, December 31, 2004 | - | - | 100 | - | 10,380 | 10,480 |
| Issuance of common stock | 515,625 | 6,000,000 | - | - | - | 6,515,625 |
| Net income | - | - | - | - | 2,370,368 | 2,370,368 |
| Dividends | - | - | - | - | - | - |
| Balance, December 31, 2005 | $ 515,625 | $ 6,000,000 | $ 100 | $ - | $ 2,380,748 | $ 8,896,473 |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 4 -

**MIRABILIS VENTURES, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2005 AND 2004**
Increase (Decrease) in Cash and Cash Equivalents

| | 2005 | 2004 |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net income | $ 2,370,368 | $ 10,380 |
| Adjustments to reconcile net income to net cash | | |
| provided by (used in) operating activities: | | |
| Realized loss on investments | 4,281,879 | - |
| Realized gain on investments | (500,000) | - |
| Write off of bad debts | 1,396,500 | - |
| Depreciation and amortization | 87,291 | - |
| Changes in assets and liabilities: | | |
| Restricted cash | (13,756,018) | (993,982) |
| Accounts receivable | (1,779,701) | - |
| Unbilled receivables | 997,610 | - |
| Related party receivables | (3,494,189) | (878,750) |
| Inventory | (66,037) | - |
| Prepaid expenses | (1,552,162) | - |
| Other current assets | 25,905 | - |
| Deposits, non-current | (2,442,839) | - |
| Deferred income taxes | (28,431) | - |
| Goodwill | (1,432,400) | - |
| Other intangible assets | 6,018 | - |
| Other non-current assets | 80,492 | - |
| Accounts payable | 770,685 | - |
| Advanced billings | (161,562) | - |
| Related party payables | (876,287) | 830,000 |
| Accrued expenses | 584,132 | - |
| Deferred revenue | (2,000,000) | 2,000,000 |
| Income taxes payable | 1,556,864 | 2,252 |
| Other accrued liabilities | 292,364 | - |
| Minority interest | 46,329 | - |
| Total adjustments | (17,963,557) | 959,520 |
| | | |
| Net cash provided by (used in) operating activities | (15,593,189) | 969,900 |
| | | |
| **Cash flows from investing activities** | | |
| Purchases of property and equipment | (91,940) | - |
| Purchases of investments | (244,976) | (5,763,307) |
| | | |
| Net cash used in investing activities | (336,916) | (5,763,307) |
| | | |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of lines of credit | 75,274 | - |
| Proceeds from issuance of notes payable | 2,829,871 | 4,793,307 |
| Principal payments on notes payable | (2,693,438) | - |
| Proceeds from issuance of related party notes payable | 15,802,509 | - |
| Proceeds from issuance of common stock | 6,015,625 | 100 |
| | | |
| Net cash provided by financing activities | 22,029,841 | 4,793,407 |
| | | |
| **Net increase in cash and cash equivalents** | 6,099,736 | - |
| | | |
| **Cash and cash equivalents, beginning of year** | - | - |
| | | |
| **Cash and cash equivalents, end of year** | $ 6,099,736 | $ - |
| | | |
| **Supplemental cash flow information** | | |
| Non-cash investing and financing transactions: | | |
| Acquisition of subsidiaries and equity method investees | $ 6,940,890 | $ - |
| with debt financing | | |
| Acquisition of subsidiaries with existing liabilities and equity | 22,821,576 | - |
| | | |
| Cash paid during the year for: | | |
| Income taxes | $ - | $ - |
| Interest | 318,718 | - |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

**(1)  Basis of Presentation and Summary of Significant Accounting Policies:**

The following is a summary of the more significant accounting policies of Mirabilis Ventures, Inc. and subsidiaries (hereafter collectively referred to as the "Company"), which affect significant elements of the accompanying consolidated financial statements:

(a)  **Nature of operations**—Mirabilis Ventures, Inc. (hereafter referred to as the "Parent"), a company organized on November 3, 2003 under the laws of the State of Nevada, is a rapidly growing private equity holding company, which conducts its business through its operating subsidiaries.  The Company is a diversified conglomerate and currently provides products and services in six business segments; Staffing and Human Resource Services Division, Business Consulting Services Division, Security Services Division, Construction Services Division, Manufactured Products Division, and Other Services Division.

For the year ended December 31, 2005, the Company's business segments are made up of the following companies:

| Division | Company | Acquisition Date |
|---|---|---|
| Staffing and Human Resource Services | Common Paymaster Corp | August 1, 2005 |
| | AEM, Inc. | April 29, 2005 |
| | National Med-Staff, Inc. d/b/a Premier HR | July 27, 2005 |
| | The Human Resource Enterprise Corporation | September 15, 2005 |
| | Payroll Concepts, Inc. | September 1, 2005 |
| Business Consulting Services | Nexia Strategy Corporation | April 15, 2005 |
| Security Services | Digiteyes Corporation | October 21, 2005 |
| | Gibraltar Integrity Incorporation | December 30, 2005 |
| | Security Imaging Systems, Inc. | November 8, 2005 |
| Construction Services | Quasar Construction, Inc. | August 10, 2005 |
| | The New Florida Industrial Electric, Inc. | September 5, 2005 |
| | RKT Constructors, Inc. | December 13, 2005 |
| Manufactured Products | Synergy Technology Fabrication, LLC | December 1, 2005 |
| Other Services | Siren Resources, Inc. | January 1, 2005 |
| | Ionic Services, Inc. | May 26, 2005 |
| | Legend Holdings of America, Inc. | June 9, 2005 |

(1)   <u>Basis of Presentation and Summary of Significant Accounting Policies</u>:  (Continued)

| Division | Company | Acquisition Date |
|---|---|---|
| Other Services (Continued) | Information Systems, Inc. | June 20, 2005 |
| | Creative Insurance Concepts, Inc. | July 28, 2005 |
| | P.R.B. Design Studio, Inc. | November 1, 2005 |
| | Pacific Atlantic STF Corporation | December 7, 2005 |
| | Empire Global Strategies, Inc. | December 15, 2005 |
| | General Analytics, Inc. | December 15, 2005 |

The Parent is considered part of the Business Consulting Services Division. None of the companies acquired in any of the business segments were disposed of in 2005.

For the year ended December 31, 2004, the only operating business segment was the Business Consulting Services Division, and consisted only of the Parent. No companies were acquired or disposed of in 2004.

(b)  **Principles of consolidation**—The consolidated financial statements include the consolidated accounts of the parent and its subsidiaries, and have been prepared in United States of America Dollars, and in accordance with generally accepted accounting principles in the United States of America (GAAP).  All significant intercompany transactions have been eliminated in consolidation.

The Company consolidates companies in which it owns or controls more than fifty percent of the voting shares and variable interest entities in which the Company bears a majority of the risk to the entities potential losses or stands to gain from the majority of the entities expected returns. Investments in which the Company does not have a majority voting or financial controlling interest are accounted for under the equity method of accounting. The results of companies acquired or disposed of during the year are included in the consolidated financial statements from the effective date of acquisition or up to the date of disposal.

(c)  **Cash and cash equivalents**—For purposes of the statement of cash flows, the Company considers cash on hand and highly liquid investments with original maturities of three months or less to be cash and cash equivalents. These investments are recorded at cost, which approximates fair value.

(d)  **Receivables**—Accounts receivable and related party receivables are recorded at cost net of any allowance for doubtful accounts. Related fees and costs are immaterial to the receivable balances and are included in the face amount of the receivables. A general allowance for doubtful accounts is based on management's estimate of the collectibility of accounts receivable according to prior experience. There was an allowance for doubtful accounts on accounts receivable of $354,101 at December 31, 2005. There was no allowance for doubtful accounts on accounts receivable at December 31, 2004. Related party receivables are directly written off when deemed uncollectible. There was a write-off of approximately $1.9 million of related party receivables due from unconsolidated investees deemed uncollectible during the year ended December 31, 2005. No

(1)   **Basis of Presentation and Summary of Significant Accounting Policies:** (Continued)

related party receivables were deemed uncollectible during the year ended December 31, 2004. Financing receivables represent sales of installment contracts to various banks. Interest income generally is not recognized on past due loans unless the likelihood of further loss is remote.

(e)   **Unbilled receivables**—The Company recognizes revenues within the Construction Services Group on the percentage-of-completion method. Costs and estimated revenues in excess of billings on uncompleted contracts are represented as unbilled receivables.

(f)   **Allowance for doubtful accounts**—The Company carries accounts receivable at the amount it deems to be collectible. Accordingly, the Company provides allowances for accounts receivable it deems to be uncollectible based on management's best estimates. Recoveries are recognized in the period they are received. The ultimate amount of accounts receivable that becomes uncollectible could differ from that estimated.

(g)   **Advanced billings**—Billings in excess of costs and estimated revenues on uncompleted contracts are represented as advanced billings and are recognized within the Construction Services Group for contracts under the percentage-of-completion method.

(h)   **Inventories**—Inventories are stated at cost, determined on the first-in, first-out (FIFO) basis, which is not in excess of market.

(i)   **Property and equipment**—Property and equipment are recorded at cost and depreciated using the straight-line method over the estimated useful lives of the respective assets, ranging from 3 to 20 years. Leasehold improvements are amortized over the life of the lease or the life of the improvement, whichever is shorter. Gains or losses on disposal of assets are credited or charged to income.

(j)   **Impairment of long-lived assets**—The Company evaluates its long-lived assets and certain identifiable intangibles whenever events or changes in circumstances indicate that the carrying amounts of an asset may not be recoverable and estimated, future, undiscounted cash flows attributed to the assets are less than their carrying values.

(k)   **Investments**—The Company uses the equity method to account for investments in investees when significant influence but not control over its operations exists. Under the equity method, the investment is recorded at cost and is adjusted to recognize the Company's proportional share of the investee's net income (loss). In addition, dividends received from the investee reduce the carrying value of the Company's investment.

In accordance with Statement of Financial Accounting Standards No. 115 (SFAS 115), "*Accounting for Certain Investments in Debt and Equity Securities*", the Company records investments classified as available-for-sale securities at fair value in other noncurrent assets on the consolidated balance sheets. Any change in the fair value of these securities is recorded in accumulated other comprehensive income (loss), unless such change is a decline in value that is deemed to be other than temporary.

The Company records investments classified as trading securities at fair value in current assets on the consolidated balance sheets and recognize changes in the fair value of these securities in Other Income (Expense) within the consolidated statements of operations.

(1)  **Basis of Presentation and Summary of Significant Accounting Policies:** (Continued)

The Company evaluates its investments for impairment and adjusts the carrying amount of the investments when it is not recoverable and the fair value of the investments is less than their carrying values.

(l)  **Intangible assets**—The Company has adopted Statement of Financial Accounting Standards No. 142 (SFAS 142), *"Goodwill and Other Intangible Assets."* Under SFAS 142, goodwill and indefinite lived intangible assets are no longer amortized, but are reviewed for impairment annually. Intangible assets that are not deemed to have an indefinite life will continue to be amortized using the straight-line method over their useful lives. The Company evaluates the recoverability of goodwill and other intangible assets to determine whether an adjustment to carrying values is appropriate through a two-step process. In the first step, recoverability is determined by comparing the fair value of a reporting unit with its carrying amount, including goodwill. If the carrying amount of a reporting unit exceeds its fair value, the second step it performed to measure the amount of the impairment loss, if any; otherwise the reporting unit is considered not impaired and the test is complete. In the second step, if the carrying amount of reporting unit goodwill and other intangible assets exceeds the implied fair value of that goodwill or other intangible assets, an impairment loss will be recognized in an amount equal to that excess. No impairment of goodwill or other intangible assets was indicated during the years ended December 31, 2005 and 2004. The carrying value is based on management estimates of future operations. Future changes and conditions may occur, which could cause actual results to differ materially.

(m)  **Revenue recognition**—The Company recognizes revenue principally on four types of transactions; service fees charged to clients, subscriber service agreements, contract sales, and sales of products.

Revenue from the sale of services is recognized as services are rendered. The Company's revenues within the Staffing and Human Resource Division principally represent gross billings charged to clients and subscriber service agreements. Applicable worksite wages are recognized ratably over the period of service these employees perform at client worksites. Subscriber billings for services not yet rendered are deferred and recognized as revenue as the services are rendered, and the associated deferred revenue is included in current liabilities or long-term liabilities, as appropriate.

Revenues from contract sales, principally within the Construction Services Division are recorded primarily on the percentage-of-completion method. Profits on contracts in process are recognized based upon the estimated contract revenue and related cost to completion. Cost to completion is measured based on the ratio of actual cost incurred to total estimated cost. Revisions in cost estimates as contracts progress have the effect of increasing or decreasing profits in the current period. Provisions for anticipated losses are made in the period in which they first become determinable. This method is used because management considers job costs incurred to be the best available measure of progress on these contracts. Revenues from cost-plus-fee contracts are recognized on the basis of costs incurred during the period plus the fee earned. Because of the inherent uncertainties in estimating costs, it is at least reasonably possible that the Company's estimates of costs and revenues will change in the near term. Contract costs include all direct material and labor costs and those indirect costs related to contract performance, such as indirect labor, supplies, tools, repairs, and depreciation costs. Selling, general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are determined. Changes in job performance, job conditions, and

(1)  **Basis of Presentation and Summary of Significant Accounting Policies:** (Continued)

estimated profitability, including those arising from contract penalty provisions, and final contract settlements may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

Revenue from the sales of products is recognized at the time title and risks and rewards of ownership pass. This is generally when the products reach the free-on-board shipping point, the sales price is fixed and determinable, and collection is reasonably assured.

(n)  **Advertising costs**—The Company charges advertising costs to operations as incurred. Advertising costs, included in selling, general and administrative, totaled approximately $162,000 in 2005. The Company did not incur advertising costs in 2004.

(o)  **Deferred revenue**—In certain instances, customers pay for consulting services prior to services being rendered. These prepayments are recorded as deferred revenue. The Company may be required to refund unused service revenue at the termination of a contract.

(p)  **Start-up costs**—Cost of start-up activities, including organizational costs, are expensed as incurred.

(q)  **Income taxes**—The Company accounts for income taxes in accordance with Statement of Financial Accounting Standards No. 109 (SFAS 109), *"Accounting for Income Taxes"*. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

(r)  **Use of estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates and assumptions include the allowance for doubtful accounts, the estimated percentage of completion of construction contracts, the carrying value of long-lived assets, and the recoverability of goodwill. Although management is not currently aware of any factors that would significantly change its estimates and assumptions in the near term, future changes and conditions may occur, which could cause actual results to differ materially.

(s)  **Recent accounting pronouncements**—The Financial Accounting Standards Board ("FASB") and other entities issued new or modifications to, or interpretations of, existing accounting guidance during 2005 and 2004. The Company has considered the new pronouncements, and other than as disclosed in these notes to the consolidated financial statements, does not believe that any other new or modified principles will have a material impact on the Company's reported financial position or operations in the near term.

(1) **Basis of Presentation and Summary of Significant Accounting Policies:** (Continued)

(t)    **Going concern**—The accompanying consolidated financial statements of the Company have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the normal course of business. The Company has incurred substantial consolidated operating losses subsequent to December 31, 2005. A stockholder has committed financial support to the Company to allow it to continue activities for at least the following year, as needed. There can be no guarantee that the Company will be able to generate cash flow in the future or that the Company will be able to obtain financing. The consolidated financial statements do not include any adjustments relating to the recoverability of asset amounts or the amounts of liabilities should the Company be unable to continue as a going concern.

(2) **Restricted Cash:**

Restricted cash as of December 31, 2005, includes a restricted certificate of deposit held as bank collateral for a letter of credit issued to a workers' compensation insurance company to cover worksite employees within the Human Resource Services Division.   This letter of credit and the underlying restricted certificate of deposit are renewable within 1 year or less.  Restricted cash also includes the balance of an escrowed acquisition cash account maintained by legal counsel to effect capital transactions on behalf of the Company.  The balance of restricted cash is summarized as follows as of December 31:

|  | 2005 | 2004 |
|---|---|---|
| Restricted certificate of deposit | $  6,750,000 | $          - |
| Acquisition escrow account | 8,000,000 | 993,982 |
| Total restricted cash | $  14,750,000 | $   993,982 |

(3)  **Accounts Receivable:**

Accounts receivable at December 31, 2005 and 2004, are as follows:

|  | 2005 | 2004 |
|---|---|---|
| Construction services | $  11,976,222 | $          - |
| Security services | 262,402 | - |
| Manufactured products | 68,230 | - |
| Staffing and human resource services | 14,380 | - |
| Other services | 155,817 | - |
|  | 12,477,051 | - |
| Less: Allowance for doubtful accounts | (354,101) | - |
| Total accounts receivable, net | $  12,122,950 | $          - |

(3)  **Accounts Receivable:**  (Continued)

Accounts receivable in the Construction Services Division as reported above at December 31, 2005 and 2004 includes contracts receivable summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Billed: | | |
| Completed contracts | $ 2,819,483 | $ - |
| Contracts in progress | 4,459,971 | - |
| Retained | 3,825,873 | - |
| Unbilled | 870,895 | - |
| | 11,976,222 | - |
| Less: Allowance for doubtful accounts | (328,738) | - |
| | $ 11,647,484 | $ - |

The Company's gross contracts receivable at December 31, 2005 and 2004, are summarized by funding source as follows:

|  | 2005 | 2004 |
|---|---|---|
| Federal government | $ - | $ - |
| State government | 2,050,698 | - |
| Local government | 8,197,780 | - |
| Commercial | 1,727,744 | - |
| | $ 11,976,222 | $ - |

The Company has no policy requiring collateral or other security to support its contracts receivable, although it has statutory rights to file liens on real property for amounts owed the Company on nongovernmental contracts for which amounts due are not paid.

(4)  **Related Party Receivables:**

Related party receivables as of December 31, 2005 and 2004 are summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Non-interest bearing advances due on demand to unconsolidated investees | $ 31,406 | $ - |
| Due from entities under common shareholder ownership | 6,787,176 | 378,750 |
| Due from a minority shareholder of a consolidated subsidiary | 27,379 | - |
| Due from a Company shareholder | - | 500,000 |
| Due from other related parties | 86,024 | - |
| | $ 6,931,985 | $ 878,750 |

(5)  **Investments, Current:**

Investments classified as available-for-sale are reported at fair value with unrealized gains and losses included in comprehensive income in accordance with FASB 115, and consist of the following as of December 31:

|  | 2005 | 2004 |
|---|---|---|
| Common stock – publicly traded company | $ - | $ 3,907,149 |
| Public company debt security | - | 300,000 |
| Other investment | - | 200,000 |
| Total investments, current, at cost | - | 4,407,149 |
| Unrealized holding gains (losses) | - | - |
| Total investments, current, at fair value | $ - | $ 4,407,149 |

No unrealized gains or losses were recognized during the years ending December 31, 2005 and 2004. During the year ended December 31, 2005, the public company debt security was collected in full, the other investment was sold for no gain or loss to an unaffiliated third party, and the common stock of a publicly traded company was transferred to a third party in partial settlement for an indemnification agreement which together with services rendered resulted in consulting revenues of $12,302,952.  In addition, during the year ended December 31, 2005, $2,822,631 of public company stock owned by a consolidated subsidiary acquired was written off as worthless, and a private stock investment of $500,000 was acquired and sold at a $500,000 gain.

(6)  **Property and Equipment:**

Property and equipment at December 31, 2005 and 2004, are as follows:

|  | 2005 | 2004 |
|---|---|---|
| Machinery and construction equipment | $ 1,267,719 | $ - |
| Vehicles | 674,112 | - |
| Leasehold improvements | 149,385 | - |
| Furniture, office equipment and other | 117,787 | - |
|  | 2,209,003 | - |
| Less: Accumulated depreciation | (77,161) | - |
| Property and equipment, net | $ 2,131,842 | $ - |

Depreciation expense for the years ended December 31, 2005 and 2004 was $77,161 and $0, respectively.

(7) **Investments, Non-current:**

The Company invests as a minority shareholder in both the equity securities of emerging growth businesses and distressed entities and leverages its shared services divisions to assist investees in turnaround consulting activities. As such, the Company has experienced a higher than usual level of realized losses in investments originally intended to be held long-term.

Equity investments in unconsolidated investees and the activity for the years ending December 31, 2005 and 2004 are summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Balance, beginning of year | $ 1,356,158 | $ - |
| Investments during the year | 6,581,183 | 1,356,158 |
| Realized losses on unconsolidated investees | (4,281,879) | - |
| Equity in earnings (loss) of unconsolidated investees recognized during the year | (72,900) | - |
| Investments transferred to consolidated subsidiary investments | (1,356,158) | - |
| Balance, end of year | $ 2,226,404 | $ 1,356,158 |

Realized losses of $4,281,879 and $0 for 2005 and 2004, respectively, are included in the total investment loss of $7,386,734 and $0 for 2005 and 2004, respectively, in the consolidated financial statements.

At December 31, 2005, the Company owned 20% or more of the equity ownership in A Very Private Eye, Inc. and FLHP-MS, LLC, owning equity interest of 25% and 50%, respectively. The Company's equity interest in these entities is reflected in the investment balances above. Summarized information on these entities at December 31, 2005 is as follows:

|  | Assets | Liabilities | Net income (loss) |
|---|---|---|---|
| A Very Private Eye, Inc. | $ 97,921 | $ 24,263 | $ (70,342) |
| FLHP-MS, LLC | 10,268,437 | 6,268,437 | - |

At December 31, 2004, the Company's only non-current investment was in Siren Resources, Inc., an entity that became a wholly-owned subsidiary in the Other Services Division in 2005.

(8) **Intangible Assets - Goodwill:**

The Company had $3,520,872 of unamortized goodwill, which was subject to the provisions of Statement of Financial Accounting Standards No. 142 ("SFAS 142"). The Company assessed the impact of SFAS 142 and has determined that no material effect on the Company's financial position, results of operations or cash flows, including any impairment losses, would be required to be recognized. Under SFAS 142, the Company did not recognize any goodwill amortization expense during the years ended December 31, 2005 and 2004.

(8)   **Intangible Assets - Goodwill:**  (Continued)

The following table includes the components of goodwill at December 31, 2005 and 2004, and the activity for the year ended December 31, 2005:

| | Staffing & Human Resources Services Division | Business Consulting Services Division | Construction Services Division | Security Services Division | Other Services Division | Total |
|---|---|---|---|---|---|---|
| Balance, December 31, 2004 | $    - | $    - | $    - | $    - | $    - | $    - |
| Acquisitions | 222,166 | 500,000 | 1,538,337 | 56,223 | 1,204,146 | 3,520,872 |
| Impairment charges | - | - | - | - | - | - |
| Balance, December 31, 2005 | $  222,166 | $  500,000 | $  1,538,337 | $  56,223 | $  1,204,146 | $  3,520,872 |

(9)   **Other Intangible Assets:**

A security services patent for background checking automated through a drivers' license swiping device was acquired for $4,112 in November 2005, and a web based software product marketed in the Other Services Division was acquired in April 2005 for $106,123.   Amortization is being computed on a straight-line basis over 20 years for the security services patent and over 7 years for the web based software product and amortization expense for the year ended December 31, 2005, was $29 and $10,101, respectively.

The future amortization expense on the other intangible assets as of December 31, 2005 are summarized as follows:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $    5,894 |
| 2007 | 5,894 |
| 2008 | 5,894 |
| 2009 | 5,894 |
| 2010 | 5,894 |

(10) **Related Party Payables:**

The related party payables balances as of December 31, 2005 and 2004 are summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Non-interest bearing balance payable to an unconsolidated investee resulting from unpaid services rendered principally at fair market value | $ 24,000 | $ - |
| Non-interest bearing balance payable to an entity under common shareholder ownership resulting from unpaid services rendered principally at fair market value | 4,737 | - |
| Non-interest bearing balance payable to the Company's controlling shareholder resulting from cash advances | - | 830,000 |
|  | $ 28,737 | $ 830,000 |

(11) **Operating Leases:**

The Company is committed under operating leases on real property and equipment. The payments required under these commitments are as follows:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $ 741,856 |
| 2007 | 885,750 |
| 2008 | 894,794 |
| 2009 | 887,528 |
| 2010 | 714,367 |
| Thereafter | 1,912,045 |
|  | $ 6,036,340 |

The Company incurred rent expense for the years ended December 31, 2005 and 2004 in the amounts of $272,433 and $0, respectively.

The Company entered into an agreement with TenShi Enterprises, Inc., an entity under common shareholder ownership, to sell certain fixed assets of the Company on December 31, 2005. The Company subsequently leased these fixed assets back under leases dated April 1, 2006. The commitment associated with these leases is included above.

(12) **Deferred Revenue:**

The deferred revenue balance as of December 31, 2004 consisted of $2,000,000 of an advance payment received on a management services contract of the Human Resource Services division, the revenue from which was recognized in 2005, and is included in consulting revenues. There were no deferred revenues as of December 31, 2005.

(13) **Concentrations of Credit Risk:**

Information related to significant concentrations of credit risk for financial instruments owned by the Company, except as otherwise disclosed, is as follows:

(a) **Demand deposits**—The Company had demand deposits related to its cash and cash equivalents accounts with bank balances of $7,162,178 and $0 at December 31, 2005 and 2004, respectively. The Company had demand deposits related to is restricted cash accounts with bank balances of $6,750,000 and $993,982 at December 31, 2005 and 2004, respectively (see Note 2). In addition, the Company had a deposit in an attorney escrow account of $8,000,000 at December 31, 2005. The Company has no policy requiring collateral or other security to support its deposits, although all demand and time deposits with banks are federally insured up to $100,000 by the FDIC. The Company places its cash and temporary investments with high credit quality financial institutions. At times, such investments may be in excess of FDIC insurance limits. The Company does not believe it is exposed to any significant credit risk on cash and cash equivalents.

(b) **Accounts receivable**—The Company has accounts receivable from trade customers, finance companies, related parties and manufacturers. The Company does not charge interest on outstanding receivables. The Company has no policy requiring collateral or other security to support its accounts receivable.

(14) **Letters of Credit:**

At December 31, 2005, the Company had one bank letter of credit of $6,750,000 outstanding. The letter of credit is collateralized by a certificate of deposit held by the bank and is due October 2006.

(15) **Lines of Credit:**

As of December 31, 2005, the Company has various bank lines of credit with a maximum available commitment of $1,585,000 and unused credit capacity of $1,509,726. Interest on $75,274 of unsecured bank lines of credit outstanding as of December 31, 2005 is due monthly at rates ranging from 6.44% to prime plus 3% (approximately 10.25% as of December 31, 2005). Included in the total bank lines of credit is a bank line of credit with an undrawn capacity of $1,500,000 as of December 31, 2005, which is available to the Company secured by assets of a construction subsidiary, and requires monthly interest only payments at 30 day LIBOR plus 2.75%, (approximately 7.14% as of December 31, 2005), and expires on September 7, 2007. Terms of the available bank lines of credit, among other covenants, requires maintenance of tangible net worth and certain financial ratios with which the Company is in full compliance as of December 31, 2005. The Company also has a related party line of credit with a maximum available commitment of $30,000,000, more fully described in Note 17.

(16) **Notes Payable:**

Notes payable consist of the following as of December 31:

| | 2005 | 2004 | |
|---|---|---|---|
| Secured installment notes payable | | | |
| Due in monthly installments of principal and interest ranging from $421 to $3,062 per month at interest rates ranging from 0% to 7%, due through 2009, collateralized by vehicles and equipment of Construction Services Division subsidiaries | $ 238,524 | $ - | |
| Unsecured note payable to insurance company | | | |
| Due in monthly installments of $100,000 with a balloon payment of $4,800,000 due August 30, 2008, which includes interest at 6.5% | 6,957,852 | - | |
| Unsecured installment note payable to an individual | | | |
| Due in semi-monthly installments of $20,000 through November 30, 2010, which includes interest at 6.0% | 2,041,891 | 2,533,307 | * |
| Unsecured notes payable to an individual | | | |
| Non-interest bearing note due in ten monthly installments of $100,000 through October 2006 | 1,000,000 | 2,260,000 | * |
| Bank note payable | | | |
| Due in monthly installments of $30,918 for three months, then $49,782 until maturity at September 7, 2007, representing principal and interest at 7.09%, collateralized by unbounded accounts receivable of a Construction Services Division subsidiary | 924,501 | - | |
| Unsecured bank note payable | | | |
| Due on demand at an interest rate of 7.75% | 100,000 | - | |
| Note payable to public company | | | |
| Due in quarterly principal payments of $162,562 plus interest at prime plus 4% (11.25% as of December 31, 2005) through September 7, 2008, collateralized by assets of a Construction Services Division subsidiary | 1,788,187 | - | |

(16) **Notes Payable:** (Continued)

|  | 2005 | 2004 |
|---|---|---|
| Other notes payable | | |
| Due in monthly installments ranging from $726 to $8,333 at interest rates ranging from 0% to 5.75%, uncollateralized | $ 134,926 | $ - |
| Total notes payable | 13,185,881 | 4,793,307 |
| Less: Notes payable, current maturities | 3,609,222 | 1,751,416 |
| Total long term notes payable | $ 9,576,659 | $ 3,041,891 |

*As of December 31, 2004, these balances were non-interest bearing repayment commitments. During 2005 they were formalized as unsecured notes payable as referenced. Amounts have been presented as notes payable for comparability purposes.

The future maturities of these notes payable as of December 31, 2005, are summarized as follows:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $ 3,609,222 |
| 2007 | 2,385,338 |
| 2008 | 6,301,998 |
| 2009 | 461,296 |
| 2010 | 428,027 |
| Thereafter | - |
|  | $ 13,185,881 |

The Company is current and in compliance with all covenants required by the applicable notes as of December 31, 2005.

(17) **Related Party Notes Payable:**

Related party notes payable consist of the following as of December 31:

|  | 2005 | 2004 |
|---|---|---|
| Note payable to investee minority shareholder, non-interest bearing, due on demand | $ 804,852 | $ - |
| Note payable to investee minority shareholder, non-interest bearing, due in three installments, with final payment due December 15, 2006 | 825,000 | - |

(17) <u>Related Party Notes Payable:</u> (Continued)

|  | 2005 | 2004 |
|---|---|---|
| Note payable to an entity under common shareholder ownership supporting $30,000,000 line of credit, due in monthly installments of interest only at an annual rate of 7.2%, with a balloon payment due September 1, 2010, and the full $30,000,000 line is available through the maturity date | $ 17,258,340 | $ - |
| Note payable to controlling shareholder, non-interest bearing, due August 2006 | 79,300 | - |
| Note payable to an entity under common shareholder ownership, due in full on June 15, 2006 with accrued interest at 9.0% per annum | 1,750,000 | - |
| Note payable to investee minority shareholder, interest at 6.0% per annum, $600,000 payment due June 13, 2006, with balance due December 13, 2006 | 1,200,000 | - |
| Total related party notes payable | 21,917,492 | - |
| Less: Related party notes payable, current maturities | 4,579,852 | - |
| Total long-term related party notes payable | $ 17,337,640 | $ - |

The future maturities of these related party notes payable are summarized as follow:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $ 4,579,852 |
| 2007 | - |
| 2008 | - |
| 2009 | - |
| 2010 | 17,337,640 |
| Thereafter | - |
|  | $ 21,917,492 |

(18) <u>Stockholders' Equity:</u>

The Company has authorized the issuance of 75,000 shares of Class A Capital Common Stock ("Black Stock" or "Black Shares"), 1,000,000 shares of Class B Preferred Stock ("Green Stock" or "Green Shares"), 1,000,000 shares of Class P Preferred Stock ("Gold Stock" or "Gold Shares"), 400,000 shares of Class T Preferred Stock ("Platinum Stock" or "Platinum Shares"), and 25,000 shares of Class Z Preferred Stock ("Blue Stock" or "Special Preferred Stock" or "Blue Shares") (collectively, the "Shares"), all of which have no par value. The Green, Gold and Platinum Stock participate on an annual basis in a six percent (6%) non-cumulative preferred dividend. Each of the three classes of Black Stock, Green and Gold Stock collectively as a class of stock, and the Platinum Stock are entitled to one-third of

(18) **Stockholders' Equity:** (Continued)

any additional distributions beyond non-cumulative preferential dividends. Green Stock may be exchanged on a share for share basis into Gold Stock, after the accumulation of a minimum of 3,000 Green shares and subject to the approval by a majority of Gold Stock shareholders. Similarly, Gold Stock may be exchanged on a share for share basis into Platinum Stock, after the accumulation of a 5,000 Gold shares and subject to the approval by a majority of Platinum Stock shareholders. No individual can own more than 5,000 Gold shares or 5,000 Platinum shares. Upon separation of services from the Company, bankruptcy or marital dissolution, Green, Gold, Platinum, and Blue Stock may, at the Company's option, be redeemed by the Company. Upon separation from service from the Company other than upon death of the shareholder, the optional redemption price of the Green Stock and Blue Stock is 50% of the face value of the applicable outstanding shares, for Gold Stock it is 80% of the face value of the applicable outstanding shares, and for Platinum Stock it is 100%. Green Stock has the right to vote only on the approval of an additional distribution and any such vote, which requires the approval of each class of shares. Gold Stock has the right to vote on all matters put to a vote of the shareholders, on subscription invitations to shareholders of Green shares for their exchange into Gold Stock, and for the authorization of additional distributions. Platinum Stock shall vote on all subscription invitations to shareholders of Gold shares for their exchange into Platinum Stock, on the approval of an additional distribution, and on any such vote which requires the approval of each class of shares. Black Stock shareholders have the ability to veto any decision made by the other classes of shareholders within twenty days of notice of said decision except the exchange into Gold or Platinum shares, or the authorization of an additional distribution. Blue Stock is subject to the special terms established by the Company's Board of Directors from time to time. However, Blue Stock shall not have voting rights, shall not be entitled to any distributions whatsoever, and will be subject to the optional redemption privileges as previously described.

On October 24, 2003 in exchange for $100 of services in kind, the Company issued 100 Black Shares. On February 10, 2005 the Company issued 500 Green Shares in exchange for a $500,000 payment on a non-interest bearing note previously issued in connection with the purchase by the Company of an investment. On February 28, 2005 the Company issued 2,000 Blue Shares in exchange for $500,000 of cash contributions and a $1,500,000 non-interest bearing note receivable. The note receivable was subsequently realized in the form of investments acquired and cash. On March 31, 2005 the Company issued 2,000 Blue Shares for $2,000,000 of cash contributions. On August 21, 2005 the Company issued 2,000 Blue Shares for $1,500,000 of cash contributions and 100% ownership of Nexia Strategy Corporation at an agreed upon purchase price of $500,000. On December 31, 2005 the Company issued 156,250 Green Shares to one shareholder, who subsequently transferred 155,750 Green Shares to a list of 78 shareholders approved solely by the original shareholder for an aggregate purchase price of $15,625.

No dividends were declared during the years ended December 31, 2005 and 2004.

(19) **Investment Gains (Losses):**

During the year ended December 31, 2005 investment gains (losses) consisted of equity investments in unconsolidated subsidiaries written off as worthless in the amount of $4,281,879, public company stock written off of $1,957,631, and $1,629,224 of unrecoverable advances to investees net of a $500,000 gain on the sale of a private equity investment.

(20) **Income Taxes:**

The following table presents the income tax provision from continuing operations for the years ended December 31:

|  | 2005 | 2004 |
|---|---|---|
| Federal | $ 1,266,984 | $ 1,832 |
| State | 305,630 | 420 |
| Total current | 1,572,614 | 2,252 |
| Deferred: |  |  |
| Federal | (24,786) | - |
| State | (3,645) | - |
| Total deferred | (28,431) | - |
| Total provision for income taxes | $ 1,544,183 | $ 2,252 |

The primary temporary difference which gives rise to the deferred tax assets for the year ended December 31, 2005 relates to equity in net loss of unconsolidated subsidiaries. At December 31, 2005 and 2004, the current tax liability was $1,574,866 and $2,252, respectively. At December 31, 2005, the deferred tax asset was $28,431.

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the projected future taxable income and tax planning strategies in making this assessment. As of December 31, 2005 and 2004, the Company determined a valuation allowance was unnecessary.

For the years ended December 31, 2005 and 2004, the effective tax rate approximated the statutory rate.

(21) **Significant Customer:**

During the years ended December 31, 2005 and 2004, all of the consulting revenues and sales commissions were generated by a single public company customer that is related by common shareholder ownership, which were approximately 89% and 100%, respectively, of total revenues. In addition, during 2005 the Company recognized a $1,957,631 loss on the investment in common stock of this significant customer.

(22) **Commitments:**

The Company has committed to acquire various companies, real estate and other acquisitions. The deposits for these acquisitions are included in deposits, non-current.

(23) **Variable Interest Entities – FIN 46(R):**

In December 2003, the Financial Accounting Standards Board (FASB) issued revised Interpretation 46(R) (FIN 46(R)), *"Consolidation of Variable Interest Entities"*. FIN 46(R) requires that a company that holds variable interests in an entity consolidate the entity if the company's interest in the variable interest entity (VIE) is such that they will absorb a majority of the VIE's expected losses and/or receive a majority of the VIE's expected residual returns, if they occur. The Company is related to numerous unconsolidated investees and entities under common shareholder ownership. The Company is involved with various entities described in Notes 4, 5, 7, 11, 17 and 21 that may qualify as variable interest entities. While management believes that it has performed an appropriate analysis to identify whether it is the primary beneficiary of all potentially material variable interest entities, the ultimate determination is very subjective and sufficient information may not always be available.

(24) **Minority Interest:**

The Parent acquired less than 100% ownership in certain subsidiaries during 2005, summarized as follows:

|  | Shares | Percentage Ownership |
|---|---|---|
| The New Florida Industrial Electric, Inc. | 75 | 75% |
| RKT Constructors, Inc. | 48 | 80% |
| Security Imaging Systems, Inc. | 1,299 | 50% |
| Empire Global Strategies, Inc. | 500 | 50% |
| Ionic Services, Inc. | 400,000 | 80% |

The Company has eliminated investment in these subsidiaries and all intercompany transactions in consolidation.

At December 31, 2005, the minority interest in equity and in earnings is as follows:

|  | Minority interest in equity | Minority interest in earnings |
|---|---|---|
| The New Florida Industrial Electric, Inc. | $ 43,138 | $ 43,138 |
| RKT Constructors, Inc. | 1,465 | 1,465 |
| Security Imaging Systems, Inc. | 1,701 | - |
| Empire Global Strategies, Inc. | 25 | - |
| Ionic Services, Inc. | - | - |
|  | $ 46,329 | $ 44,603 |

(25) **Contracts in Progress:**

Information with respect to contracts in progress in the Construction Services Division at December 31, 2005 and 2004 is as follows:

|  | 2005 | 2004 |
|---|---|---|
| Costs incurred on uncompleted contracts | $ 33,013,330 | $ - |
| Estimated earnings thereon | 5,914,405 | - |
|  | 38,927,735 | - |
| Less: Billings to date | 35,929,038 | - |
|  | $ 2,998,697 | $ - |

Included in the accompanying consolidated balance sheets under the following captions:

|  | 2005 | 2004 |
|---|---|---|
| Unbilled receivables | $ 3,553,401 | $ - |
| Advance billings | (554,704) | - |
|  | $ 2,998,697 | $ - |

The gross revenue on work to be performed on signed contracts at December 31, 2005 is approximately $28,400,000. The Company had no backlog at December 31, 2004.

(26) **Workers' Compensation Costs:**

A subsidiary in the Staffing and Human Resource Services Division entered into a workers' compensation program on August 1, 2005 with an insurance company through August 1, 2006. The program provides insurance coverage for claims incurred in each plan year but which will be paid out over future periods. The Company added a related entity under common shareholder ownership as an additional insured to this policy. (See Note 28 regarding the transfer of the related entity's book of business). The subsidiary has made certain deposits on this workers' compensation and employers' liability policy.

Workers' compensation expense for the year is included in Payroll Service Direct Expenses and is based upon premiums paid to the carrier for the current year coverage, estimated total cost of claims to be paid by the Company that fall within the policy deductible, the administrative costs of the programs, the return on investment premium dollars paid as part of the program and the discount rate used to determine the present value of future payments to be made under the program. Additionally, any revisions to the estimates of the prior year loss sensitive programs are recognized in the current year. A workers' compensation receivable (liability) is established when premium dollars paid into the plan are in excess of (less than) required reserves. Because of the inherent uncertainties in estimating costs, it is at least reasonably possible the Company's estimates of costs and liabilities will materially change in the near term.

(26) <u>Workers' Compensation Costs:</u> (Continued)

The subsidiary has obtained a calculation of the estimated cost of claims incurred based on the subsidiary's current and historical loss development trends, which is used in the subsidiary's development of overall loss estimates related to each open policy year. Any loss is to be reimbursed by the related entity covered under the program for the year ending December 31, 2005. The Company is subject to certain risks associated with the workers' compensation policy and the actual loss incurred under the policy.

(27) <u>Employee Benefit Plans</u>:

Certain subsidiaries of the Company provide 401(k) profit sharing plans that are available to all employees who have satisfied certain eligibility requirements. Employee contributions are discretionary. The Company subsidiaries may match employee contributions and may also make general discretionary contributions for all eligible employees based upon their total compensation. The total Company match was $6,492 for the year ended December 31, 2005.

(28) <u>Subsequent Events:</u>

In addition to the sale-leaseback transactions disclosed in Note 11, the Company entered into eight additional operating leases beginning in April 1, 2006 with the same related entity under common shareholder ownership. The annual rents range from $20,152 to $336,000 with initial annual rents totaling approximately $921,000. The lease expiration dates range from March 2008 to August 2010.

The Company entered into transactions to acquire additional subsidiaries in 2006.

(29) <u>Litigation:</u>

A subsidiary in the Construction Services Division reached an agreement in 2006 with the prior owner of the company to pay an additional $900,000 as a "true up" to the purchase price of the stock. The amount will be paid in $100,000 increments plus interest at 9% through April 2008. Upon final execution, management expects to record the additional amount as goodwill. There is currently no goodwill recorded for this subsidiary.

In the normal course of business, the Company is subject to certain claims or lawsuits. Management is not aware of any claims or lawsuits that will have a material or adverse effect on the consolidated financial position or results of operations of the Company. However, depending on the amount and timing of an unfavorable resolution of the claims or lawsuits, it is possible that the Company's financial condition, results of operations, or liquidity could be materially affected.

(30) **Related Party Transactions:**

In addition to the related party transactions disclosed in Notes 4, 17, 18, 21, and 28, the Company entered into the following related party transactions during the year ended December 31, 2005. The Company paid consulting fees to a controlling shareholder in the amount of $1.5 million. In addition, the Company paid consulting fees to certain shareholders in the amount of approximately $1.4 million. The Company also incurred $100,000 in expenses related to Capital Genesis to a controlling shareholder, of which $79,300 is included in related party notes payable.


# EMPLOYMENT AGREEMENT

This Agreement made on the 5th day of January, 2005, between **Common Paymaster Corporation,** a Florida corporation, with its principal office located at 20 North Orange Avenue, Suite 1400, Orlando, Florida 32801, hereinafter referred to as "**Employer,**" and **Paul Glover,** who resides at 1312 Winter Springs Boulevard, Winter Springs, Florida 32708, hereinafter referred to as "**Employee.**" **Employer** and **Employee** are hereinafter jointly referred to as the "**Parties.**"

**WHEREAS, Employer** provides general business consulting activities to a number of different companies, which may or may not be affiliated or controlled by **Employer,** and

**WHEREAS, Employee** seeks to secure a position with **Employer**. **Employer** desires to hire **Employee** for that position under the terms set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and other good and valuable consideration received in hand, the sufficiency and receipt of which is hereby acknowledged, the **Parties** agree as follows:

## TERMS AND CONDITIONS

### 1. NATURE OF EMPLOYMENT

(a)      **Employer** hereby hires **Employee** and **Employee** accepts such employment and agrees to perform at all times faithfully, industrially, and to the best of his ability, experience and talent, all the duties **Employer** may require of him pursuant to the expressed and implicit terms of this Agreement. **Employee,** during the term of this Agreement, agrees to diligently perform all services that may be assigned to him and shall exercise such powers and authority as may, from time to time, be delegated to him, including such powers and authority usually pertaining and attributed by law, custom, or otherwise to a management level associate in a professional firm.  The initial primary classification for **Employee** will be as **Master Strategist** (the "Initial Primary Classification"), and **Employee's** title shall be Executive Vice President.  **Employee's** Job Description is set forth in Schedule "A," attached hereto and incorporated by reference herein.

(b)      **Employer** shall have the right, in its sole discretion, to change the job description to include responsibilities reasonably related to the position or to remove responsibilities from the description of the position.

(c)      **Employee** acknowledges that by signing this Agreement **Employee** shall be available to any of **Employer's** affiliates during the Employment Term of this Agreement.

(d)      **Employee** hereby acknowledges that he has received a copy of the Employee Handbook and has reviewed its provisions.  **Employee** agrees to comply with **Employer's** policies and procedures as set forth in the Employee Handbook.  **Employee** agrees to follow the policies and procedures set forth in Schedule "B," attached hereto and incorporated by reference herein, regardless of whether such policies and procedures are set forth in the Employee Handbook.

### 2.   DURATION OF THIS AGREEMENT

**Employer** employs **Employee,** and **Employee** accepts such employment with **Employer,** for a period of thirty-six (36) months, beginning on January 30, 2006 and terminating on January 29, 2009.  As used in this Agreement, "Employment Term" refers to the period of employment of **Employee** under this

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 1 of 15

Initials _____
Employee

(Ver H05)

Agreement, whether for the aforementioned period above, termination earlier as provided elsewhere in this Agreement, or as extended by mutual agreement of **Employer** and **Employee**.

## 3. COMPENSATION AND BENEFITS

(a) **Employer** shall pay **Employee**, and **Employee** agrees to accept from **Employer**, in full payment for **Employee's** services under this Agreement, the Compensation as set forth opposite **Employee's** Initial Primary Classification in Schedule "C" attached hereto and incorporated by reference herein.

(b) In addition to the Compensation set forth in Paragraph 3(a) hereinabove, **Employee** shall be entitled to _____ () directorship(s) in **Employer** and/or its affiliated companies, which shall be in **Employer's** sole and absolute discretion, and shall be compensated _____ () per month for the directorship(s) position(s); provided, however, that **Employee's** directorship(s) compensation shall never be greater than the "Directors Fee (Incentive Compensation)" set forth in Schedule "C-1a" attached hereto and incorporated by reference herein.

(c) **Employee** shall receive no other fringe benefits, and disability, medical, dental, life or other insurance except those benefits that are generally available to any employee of **Employer**.

(d) **Employee** shall be granted considerable autonomy on establishing **Employee's** schedule. **Employee** shall exercise informed and reasonable judgment concerning appropriate hours and vacation time. Notwithstanding anything to the contrary contained in the Employee Handbook, **Employee** may not receive lesser benefits than the benefits contained in the Handbook in effect at the execution date of this Agreement.

(e) **Employer** shall reimburse **Employee** for all actual, reasonable and necessary business expenses incurred by **Employee** in connection with the business of **Employer**. Payments to **Employee** for such business expenses shall be made within seven (7) days after receipt of an approved expense report from **Employee**, or such ordinary day of the calendar month as **Employer** pays employees' accounts, whichever day is later in time. **Employer** shall determine whether expense reports are to be submitted weekly or monthly.

(f) **Employee's** entitlement to receive Compensation under this Agreement shall be offset against any other compensation otherwise paid to **Employee** under any employment arrangement with **Employer** or any **Employer** affiliate (regardless of the number of years), on a cumulative basis from the date of execution of this Agreement.

(g) Notwithstanding any other provision regarding dispute resolution set forth elsewhere in this Agreement, any dispute regarding the Compensation shall be exclusively decided in accordance with the laws of the State of Florida. Such dispute shall first be submitted to non-binding mediation and shall thereafter be determined by final binding arbitration, and not litigation, with the agreed venue for mediation and arbitration being in Orlando, Florida. The mediation and, if needed, arbitrator, shall be selected in each case by the applicable regional manager of **Employer** and by **Employee**. In the event of a disagreement between Employer and Employee as to the arbitrator, the parties shall have a mutually agreeable independent third party select an arbitrator. **Employee** agrees to waive all other enforcement rights with respect to any dispute regarding the Compensation.

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 2 of 15

Initials _____
Employee

(Ver H05)

## 4.   TERMINATION/SEVERANCE

(a)   Notwithstanding any contrary provision in this Agreement, **Employer** may terminate this Agreement for cause without notice.   For the purpose of this paragraph, "cause" is defined as (1) **Employee** convicted of, or pleading guilty or no contest to, a felony under applicable law; (2) Willful material breach of **Employee's** fiduciary duty to **Employer**; (3) **Employee** willfully failing to perform any material explicit or implicit duty that is within the normal duties of **Employee** or is a reasonable request or directive of **Employer**; (4) **Employee** committing any breach of a material term of this Agreement, provided that **Employee**, after receiving twenty (20) days written notice from **Employer**, has not cured such breach; (5) **Employee** willfully failing to adhere to any material rule, policy or directive set forth by **Employer**; (6) **Employee** committing willful insubordination, corruption and/or disruption in the workplace; or (7) **Employee** committing a harassment violation of law against an employee, affiliate, owner, client, invitee, or licensee of **Employer**.

(b)   Upon termination, **Employee** shall immediately provide to **Employer** all documents and items of any nature or description, including computer files, that pertain to actual potential customers or leads that **Employee** developed or obtained during employment, any phase or aspect of **Employer's** operations, any phase or aspect of **Employer's** future operations or plans, and any other items, lists, documents, or the like, that in any way may pertain to **Employer's** business.

(c)   Except for termination of **Employee** due to breaches of paragraphs 4(a)(1) and 4(a)(7) above, if **Employer** terminates this Agreement for any reason, including for cause, or as a result of a merger, acquisition, sale or "Change in Control" (as defined below in paragraph 4(e)), in addition to the Compensation up until date of termination, **Employee** shall be entitled to a lump sum severance payment within thirty (30) days of the termination date of employment.   This severance payment shall be an amount equal to one (1) month's base compensation for every two (2) years of employment by **Employee** under this Agreement but shall never be less than one (1) month's base compensation.

*For illustrative purposes: If Employee's average monthly Base Compensation is $8,000, and Employee has worked for 4 years and 3 months and is terminated, Employee is entitled to $8,000 times 2 = $16,000.*

(d)   In the event it shall be determined that any payment, distribution or other action by **Employer**, to or for the benefit of **Employee**, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, would be taxable as an excise tax under the Internal Revenue Code 1986, **Employer** shall make a payment to **Employee** in an amount equal to any such excise tax imposed upon said payments.   Should any interest or penalties accrue to **Employee** with respect to any such excise tax, **Employer** will also reimburse those costs.

(e)   For purposes of this Agreement, the term "Change in Control" shall be defined as:

(i)   The approval by the shareholders of **Employer** of a reorganization, merger, consolidation or other form of corporate transaction or series of transactions, in each case, where the persons who were the shareowners of **Employer** immediately prior to such organization, merger or consolidation or other transaction do not immediately thereafter, own more than fifty percent (50%) of the combined voting power of the succeeding corporation. This voting power is generally entitled to vote for election of directors of the newly reorganized, emerged, or consolidated company resulting in new outstanding voting shares, or

(ii)   **Employer** liquidates or dissolves the company, or

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 3 of 15

Initials _____
Employee

(Ver H05)

(iii)    The acquisition by any person, entity or "group" of more than fifty percent (50%) of the then outstanding shares of **Employer's** common voting stock, or

(iv)    The sale of all or substantially all of the assets of **Employer**.

5.    **UNIQUENESS OF SERVICES OF EMPLOYEE**

**Employee** hereby warrants and represents that the services he intends to provide under this Agreement are of a special, unique, unusual, extraordinary and intellectual character that gives him a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in an action at law. **Employee**, therefore, expressly agrees that **Employer** shall be entitled to injunctive and other equitable relief to prevent a breach of this Agreement by **Employee** in addition to any other rights or remedies that **Employer** may possess and to the maximum extent permitted by law. Any action for injunctive relief under this paragraph should not be subject to the provisions in this Agreement related to the alternative dispute resolution process.

6.    **NON-DISCLOSURE OF CONFIDENTIAL INFORMATION COVENANTS**

(a)    "Confidential Information" shall include, but not be limited to, regardless of form, all: (i) customer lists, affiliates, referral source lists, prospect lists, investor lists, vendor lists, client lists, databases, and personnel records; (ii) financial information concerning **Employer** and its operations; (iii) methods of organizing and conducting **Employer's** business as such methods, relate to **Employer's** sales, accounts, borrowers, customers, financing products or techniques, employees and referral sources; (iv) information relating to **Employer's** proprietary rights prior to any permitted public disclosure thereof, including, but not limited to, the nature of the proprietary rights, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including trademarks and trade names); and, (v) other information, whether or not originated by **Employee**, which is used in **Employer's** business and is (a) proprietary to, about, or created by or for **Employer**; (b) information which gives **Employer** some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of **Employer**; (c) designated as confidential information by **Employer**, or from all of the relevant circumstances should reasonably be assumed by **Employee** to be confidential and proprietary to **Employer**, or (d) is not generally known by persons other than **Employer**, all of which information, lists, schedules, records or methods are obtained by **Employee** from **Employer** or through **Employee's** performance of duties hereunder. Confidential Information shall include all of the foregoing whether the same are produced by **Employee** or any other employee, agent or affiliate of **Employer** and all physical, tangible, or intangible embodiments or repositories (including any and all photocopies thereof) of the foregoing but shall not include information or matters that are a trade secret under applicable law.

(b)    **Employee** acknowledges and agrees that (i) **Employer** has expended and will continue to expend considerable and substantial time, effort and capital resources to develop the Confidential Information, (ii) the Confidential Information is innovative and proprietary in nature to **Employer** and must receive confidential treatment to protect **Employer's** proprietary interest therein from irreparable damage, (iii) **Employee** by virtue of **Employee's** employment relationship with **Employer**, will have access to the Confidential Information, and (iv) the Confidential Information and all physical, tangible and intangible embodiments or other repositories of the Confidential Information shall be and at all times remain the sole and exclusive property of **Employer**. **Employee** further acknowledges that specialized training, unique to **Employer** and not otherwise available from any other source, has been provided to **Employee** at much cost, time and expense to **Employer**. This training is not available from any school, available courses or from any source whatsoever but from the continued intense training offered by **Employer** to **Employee** as partial consideration for this Agreement.

(c)     For the period of the Employment Term through the date which is three (3) years after termination of employment, **Employee** agrees that **Employee** will not, without the prior written consent of **Employer**, which consent may be withheld in the **Employer's** sole and absolute discretion, disclose or make available any Confidential Information to any person or entity (verbally or in writing), nor shall **Employee** make or cause to be made, or permit or allow, either on **Employee's** own behalf or on behalf of others, any use of the Confidential Information then in **Employee's** knowledge, custody, control or possession. **Employee** further agrees that immediately upon termination of **Employee's** employment with **Employer** for any reason or at any other time requested by **Employer** and as a condition precedent to **Employee's** receipt of any payments then due **Employee** from **Employer** under this Agreement, **Employee** shall promptly deliver to **Employer** any and all property belonging to **Employer**, including without limitation, all Confidential Information (including all physical, electronic, or other repositories thereof) in **Employee's** custody, control or possession.

(d)     **Employee** acknowledges that during the Employment Term, from time to time, **Employee** may have access to (directly or indirectly) or receive information from or regarding the **Employer** or its affiliates in the nature of trade secrets, the release of which may be damaging to **Employer** or its affiliates. **Employee** agrees to hold in strict confidence any information it receives regarding the **Employer** or its affiliates that is considered a trade secret and shall not disclose such information to any other person or entity, and will take all necessary steps to prevent any other person or entity from discovering the trade secrets. Accordingly, **Employee** agrees that the provisions of this Paragraph 6(d) may be enforced by temporary and permanent injunction, in addition to all other remedies provided by law and equity. Furthermore, **Employee** acknowledges and agrees that theft of trade secrets may subject **Employee** to certain sanctions and criminal penalties under the Economic Espionage Act of 1996 (18 U.S.C., Sections 1831 to 1839).

7.     **PROTECTIVE COVENANTS**

(a)     "Protected Parties" or "Protected Party" shall mean (i) all prospective customers, affiliates, partners, borrowers and referral sources of **Employer** with whom **Employee** has had direct contact as an employee of **Employer** during the eighteen (18) month period immediately preceding the termination of **Employee's** employment with **Employer**; (ii) all customers, affiliates, partners, borrowers and referral sources who have purchased, contracted, engaged or referred others to **Employer** for products, services or financing from **Employer** during the eighteen (18) month period immediately preceding the termination of **Employee's** employment with **Employer** and with whom **Employee** had direct contact as an employee of **Employer**; and (iii) all employees of **Employer** employed by **Employer** as of the termination date with whom **Employee** had direct contact while employed by **Employer**.

(b)     Except for or on behalf of **Employer**, **Employee** agrees that for the period of the Employment Term through the date which is two (2) years after termination of employment, **Employee** shall not on **Employee's** own behalf or in the service or on behalf of others, solicit, divert, pirate or appropriate, or attempt to solicit, divert, pirate or appropriate, to **Employee** or any other person or entity, any of the Protected Parties in connection with the provision of services, products or financing in competition with **Employer**, or otherwise interfere or attempt to interfere with **Employer's** relationship with the Protected Parties.

8.     **RESTRICTIVE COVENANTS – INDEPENDENT COVENANTS**

(a)     **Employee** agrees that while working for the **Employer** and for a period of eighteen months (18) immediately following the termination of employment for any reason whatsoever or no reason at all, **Employee** shall not provide, directly or indirectly, services similar to those **Employee** is

---

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 5 of 15

Initials _____
Employee

(Ver 1105)

providing to **Employer** under this Agreement, to any person or entity that provides services substantially similar to those of **Employer**.

(b)     Except in performance of this Agreement, **Employee** shall not during the term of this Agreement and for eighteen (18) months following termination of employment for any reason whatsoever or no reason at all, solicit, either directly or indirectly, any Protected Party for the purpose of encouraging or inducing such Protected Party to purchase or obtain specialized financial services or related to any other product/services provided by **Employer** as of the date of this Agreement and through the date of the termination of **Employee's** employment.

(c)     **Employee** further acknowledges that this covenant is an independent covenant within this Agreement. **Employee** acknowledges actual receipt of good and valuable consideration for the purpose of executing this covenant, as well as other consideration stated herein and including the consideration of continued employment by **Employer**.

(d)     **Employee** recognizes that the terms of this covenant found in Paragraphs 6, 7 and 8 are reasonable and necessary for the protection of the **Employer's** unique and national business, and shall survive the termination of this Agreement.

(e)     The provisions of the covenants found in Paragraphs 6, 7 and 8, as well as the period of time, geographical areas and types and scope of restrictions of **Employee's** activities specified herein are intended to be divisible; and, in the event any provision herein shall be deemed invalid or unenforceable in any respect, as to any one or more periods of time, geographical areas, business or activities, the remaining provisions shall not thereby be effected but shall, to the extent allowed by law, remain in full force and effect; and this Agreement shall, to the extent allowed by law, be deemed to be amended without further action by the parties hereto to the extent necessary to render it valid and enforceable.

(f)     **Employee** acknowledges that the covenants in Paragraphs 6, 7 and 8 are independent of the existence of any agreement, claim or cause of action that **Employee** may ever have against **Employer**, whether predicated on this Agreement or otherwise and shall not constitute a defense to the enforcement by **Employer** of this Agreement not to compete.

## 9.     DEVOTION BY EMPLOYEE OF FULL-TIME TO BUSINESS

(a)     Except as otherwise agreed to by **Employer** in writing, **Employee** shall devote all of his time, attention, knowledge and skills solely and exclusively to the business and interests of **Employer** during normal working hours. **Employer** shall retain all of the benefits, emoluments, profits or other returns from or incidental to any and all work, services, advice and mental efforts of **Employee** that arise during the term of this Agreement, or such other amount as agreed to in writing by **Employer's** Board of Directors.

(b)     **Employee** shall not directly or indirectly, act as a partner, officer, director, stockholder, adviser, employee, or affiliate in any other business or trade that is related to that of **Employer**, except as otherwise agreed to in writing. **Employee** may invest his funds in the capital stock of a direct or indirect competitor of **Employer** only if said holdings represent less than five percent (5%) of the total number shares or principal amount of the securities of said issuer outstanding.

(c)     **Employee** shall provide **Employer** a confidential list of all current business and commercial interests, other than holdings inside of an ERISA qualified retirement account or any holdings of any kind or nature that are less than five percent (5%) of the value of any enterprise or venture (whether such holdings are held directly or indirectly by **Employee**).

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 6 of 15

Initials _____
Employee

(Ver H05)

(d)     Any future business and commercial interests, other than those set forth under Paragraphs 9(b) and 9(c) hereinabove, must be disclosed to **Employer** at least thirty (30) days prior to **Employee** acquiring any such interests. **Employee** acknowledges that the reason for the disclosure of such interests is because **Employer** and its affiliates have diverse holdings and are subject to various federal and state securities laws, as well as certain contractual vendor obligations with both public and private companies, making it necessary to disclose such information so that **Employer** does not violate any contracts, covenants, federal or state laws.

(e)     Failure of **Employee** to provide **Employer** with a list of all current business and commercial interests and/or failure of **Employee** to disclose any future business and commercial interests in accordance with Paragraph 9 shall subject **Employee** to default under this Agreement, resulting in the immediate termination of this Agreement and **Employee's** forfeiture of all benefits, compensation and interests held pursuant to this Agreement, at the time of termination.

## 10.     INDEMNIFICATION OF EMPLOYER AND INDEMNIFICATION OF EMPLOYEE

(a)     Unless acting under the direction of **Employer**, **Employee** shall hold harmless, indemnify and defend **Employer** from any and all claims, demands, damages, losses, expenses, attorneys' fees, causes of action, judgments and liability arising out of or in connection with **Employee's** breach of any representation, warranty, or agreement made under this Agreement, or arising out of any fraudulent or deliberate wrongful acts of **Employee** during **Employee's** engagement or representation to others as an **Employee**, independent contractor, or other affiliate of **Employer**.

(b)     **Employer** shall hold harmless, indemnify and defend **Employee** from any and all claims, demands, damages, losses, expenses, attorneys fees, causes of action, judgments and liability arising out of any fraudulent or deliberate wrongful acts of **Employer**, independent contractor or other affiliate of **Employer** and further for any acts or omissions arising out of **Employee's** employment with **Employer** unless caused by the active gross negligence of **Employee**.

## 11.     RELEASE OF PRIOR CLAIMS

**Employee**, for and in consideration of the payment of One Dollar ($1.00), and other good and valuable consideration, in hand paid, the receipt and sufficiency of which is hereby acknowledged, hereby agrees, to release, cancel, forgive and forever discharge **Employer**, each of its predecessors, parent corporations or companies, holding companies, subsidiaries, affiliates, divisions, successors and assigns, and all of its/their officers, directors, members and employees from all actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, which have arisen, or may have arisen, or shall arise by reason of the prior employment by **Employer** of **Employee**. Furthermore, **Employee** hereby acknowledges that **Employee** has no present or past claims of any nature against **Employer**. **Employee** specifically waives any claim or right to assert any cause of action or alleged cause of action or claim or demand which has, through oversight or error, intentionally or unintentionally or through a mutual mistake, been omitted from this section. This release shall be effective from the beginning of time until the date hereof.

## 12.     ALTERNATIVE DISPUTE RESOLUTION

All claims, duties, disputes and other matters in question by and between **Employee** and **Employer** shall be decided by final binding Arbitration under and in accordance with the provisions of Chapter 682, Florida Statutes, with exclusive venue for such Arbitration, and for any judicial proceedings to enforce the terms and conditions of this provision requiring Arbitration, or to confirm such Arbitration Award, to

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 7 of 15

Initials _____
Employee

(Ver H05)

be only in the Court of appropriate jurisdiction in Orange County, Florida. Provided further, that in the event for any reason a dispute under this Agreement is not subject to the Florida Arbitration Code, then in such event such dispute shall be decided by final binding Arbitration under and in accordance with the provisions of the Federal Arbitration Code, with exclusive venue likewise to be in Orange County, Florida, in the same manner as provided above. If there is no jurisdiction for such dispute under the Federal Arbitration Code, then such disputes shall be decided by Arbitration in accordance with Rules of the American Arbitration Association then in effect, with exclusive venue likewise to be in Orange County, Florida, in the same manner as provided above. The prevailing party in any Arbitration under this Agreement, including in any litigation required to enforce the terms and conditions of this Arbitration Provision, including to confirm an Arbitration Award, shall be entitled to recover their reasonable attorney's fees and consulting fees, and in addition, any taxable costs (including Arbitrator compensation) as are otherwise allowed in the Arbitration and for litigation to enforce the terms of this Arbitration provision or to confirm any Arbitration Award. This provision specifically authorizes the Arbitrator(s), within his (their) discretion, to tax in favor of the prevailing party that fees and costs of the Arbitration proceedings, to include Arbitrator compensation, filing fees, subpoena service fees, expert witness fees and costs, and out-of-pocket costs for a hearing room to conduct the proceeding.

## 13. MISCELLANEOUS PROVISIONS

(a)    This Agreement contains the sole and entire agreement between the **Parties** and shall supersede any and all other agreements between the **Parties** except for any covenant not to compete, covenant not to solicit, confidentiality agreement, or amended compensation agreement signed by both **Parties**. The **Parties** acknowledge that they have read this Agreement in its entirety and that any oral or written statements to the contrary are void and that neither **Party** has relied on any such representation in connection with this Agreement.

(b)    The **Parties** agree that no waiver or modification of this Agreement or of any covenant, condition, or limitation contained within it is valid unless it is in writing, clearly identified as a modification or waiver of this Agreement, or one of the clauses of this Agreement, and duly executed by both **Parties**. The **Parties** further agree that neither shall submit or attempt to submit any waiver or modification into evidence in any proceeding, arbitration, or litigation between the **Parties** arising out of or affecting this Agreement, or the rights or obligations of any **Party** under it, unless such waiver or modification is in writing, clearly identified as a modification or waiver of this Agreement or one of the clauses of this Agreement, and duly executed by both **Parties**.

(c)    The laws of the State of Florida govern this Agreement and performance under it at the exclusion of the laws of any other forum or jurisdiction irrespective of the particular jurisdiction in which any action or proceeding is instituted.

(d)    In the event that one or more provisions in this Agreement are held invalid or unenforceable, the remaining provisions shall remain in full force and effect.

(e)    Any waiver or modification of any breach of one or several provisions contained in this Agreement shall not be considered as a waiver of any subsequent breach of the same or other provisions of this Agreement.

(f)    The headings and titles used in this Agreement are for the reference and convenience of the **Parties** and do not serve to limit or change the meaning of any provision contained in this Agreement. All personal pronouns used in this Agreement, whether in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural; and the plural shall include the singular.

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 8 of 15

Initials _____
Employee

(Ver H05)

(g)     Any **Party** required to provide notice to the other **Party** pursuant to this Agreement may affect such notice by personal delivery in writing or by certified mail, postage prepaid, return receipt requested. A **Party** mailing a notice shall address it to the relevant **Parties** at the addresses appearing in the introductory paragraph of this Agreement, but any **Party** may change its notice address in accordance with this paragraph. The **Parties** hereby deem any personally delivered notice as delivered on the date of actual receipt, provided the notice is signed by the person named in the notice or if the receipt refuses to sign such notice, then by the date of a notation as the delivering **Party** may show that communicates an attempted, but unclaimed or refused, delivery.

(h)     Failure to insist upon strict compliance with any of the terms, covenants or conditions hereof, shall not be deemed a waiver of such terms, covenants or conditions, nor shall any waiver or relinquishment of any right or power hereunder, at any one time or more times, be deemed a waiver or relinquishment of such right or power at any other time or times.

(i)     This Agreement shall be binding on, and inure to the benefit of, the successors and assigns of **Employer**. **Employee** shall have no right to assign this Agreement, but **Employer**, at its sole discretion, shall have the right to assign it.

(j)     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall comprise but a single instrument.

(k)     No provision of this Agreement shall be construed against, or interpreted to the disadvantage of, any **Party** hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have drafted, structured, dictated or required such provision.

**EMPLOYEE CERTIFIES THAT EMPLOYEE READ THE ENTIRE CONTENTS OF THIS AGREEMENT BEFORE EXECUTING SAME; THAT EMPLOYEE FULLY UNDERSTANDS ALL THE TERMS, CONDITIONS AND PROVISIONS SET FORTH IN THIS AGREEMENT, PARTICULARLY INCLUDING, BUT NOT LIMITED TO, EMPLOYEE'S FIDUCIARY AND CONFIDENTIAL RELATIONSHIP WITH EMPLOYER AND EMPLOYEE'S PROTECTIVE COVENANTS AND AGREEMENTS; THAT EMPLOYEE HAS RECEIVED A COPY OF THIS AGREEMENT AS SIGNED BY EMPLOYEE; AND THAT EMPLOYEE BEING BOUND BY THIS AGREEMENT IS A CONDITION PRECEDENT TO EMPLOYER'S ENGAGEMENT OF EMPLOYEE'S SERVICES AND EMPLOYER'S EXECUTION OF THIS AGREEMENT.**

**BY SIGNING BELOW AND INITIALING THE BOTTOM OF EACH OF THE PRECEDING EIGHT (8) PAGES, AS WELL AS THE ATTACHED SCHEDULES, THE PARTIES AGREE TO THE TERMS AND CONDITIONS HEREOF.**

**EMPLOYER:**                                             **EMPLOYEE:**
**Common Paymaster Corp**
A Florida corporation

By: _____                 By: _____

Print Name:    Martin C. Flynn, Jr.              Print Name: _Paul S. Glover_

Print Title:        President                           Print Title: _____

Date: _1/16/0__                                         Date: _1/5/2006_

                                                              Social Security Number: _386 50 3788_

## Schedule "A"
## JOB DESCRIPTION

**Employee's** duties and responsibilities shall include, but not be limited to:
- The business development and/or management of any current or prospective client-related activities.

Initials _____     Common Paymaster Corp Employment Agreement – Paul Glover     Initials _____
Employer            Page 10 of 15            Employee

(Ver H05)

# Schedule "B"
## POLICIES

**Employee** agrees to use **Employee**'s best efforts to do the following:

- Identify and schedule work related to **Employee**'s businesses.

- Make a weekly report to **Employer** regarding the status of any significant projects on which **Employee** is working.

- Make a full disclosure of any existing business. All future business will be run through **Employer**'s screening processes.

- Complete and turn in weekly timesheets.

- Deliver all PIN numbers and pass codes relating to the business financial account, along with full disclosure of any activities on any business account to **Employer**.

- Deliver personal biographical materials to **Employer** to be published in advertising, marketing or promotional materials and on company websites of **Employer** and its affiliates. By delivering such biographical materials to **Employer**, **Employee** hereby expressly grants **Employer** and its affiliates the nonexclusive right to use **Employee**'s name, biographical materials and likeness in connection with advertising, marketing or promotional materials, and websites of **Employer** and its affiliates.

- **Employee** agrees that any communication received or sent by **Employee** at his employment location, whether voice, email, or regular mail shall be subject to review and inspection by **Employer** at any time.

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 11 of 15

Initials _____
Employee

(Ver 1105)

Employee shall be compensated in accordance with Schedule "C-1a" or "C-1b" in accordance with **Employee's** then current Primary Classification. Such compensation shall consist of "Base Compensation" and "Incentive Compensation" as identified in Schedule "C-1a" or "C-1b" attached hereto and incorporated by reference herein.

Incentive Compensation shall consist of the grant to **Employee** on an annual basis of preferred shares of **Mirabilis Ventures, Inc.**, a Nevada corporation ("Mirabilis"), each preferred share (a "Preferred Share") having a face value of One Thousand Dollars ($1,000), and bearing a coupon rate of six percent (6%) (the "Coupon"). Preferred Shares shall be granted to **Employee** on the basis of the formula (position and longevity) set forth in Schedule "C-2," attached hereto and incorporated by reference herein, whenever there are **Employer** net revenues sufficient to enable grants to all employees eligible for such grants (the "Formula"). The Preferred Shares shall not be granted to **Employee** until **Employee** completes their second full year of employment, after which **Employee** shall receive **Employee's** Preferred Shares in accordance with Schedule "C-2." Thereafter, **Employee** shall continue to receive their Preferred Shares, in accordance with Schedule "C-2", on the yearly anniversary of the date of execution of this Agreement. The Coupon shall be paid annually to **Employee**. Incentive Compensation may also consist of yearly discretionary monetary bonuses and yearly discretionary stock bonuses. Both bonuses shall be determined by the Board of Directors of **Employer** and shall be based upon certain performance goals of **Employer** as set by the Board of Directors.

Based on the Formula, whenever three thousand (3,000) Preferred Shares have been granted to **Employee**, **Employee** shall be eligible to be a Preferred Member, and as a Preferred Member, shall have the right to vote, with other Preferred Member, on the admission of new Preferred Members. **Employee** becomes a Preferred Member whenever one-half (1/2) of all current Preferred Members' vote to grant preferred membership status to **Employee**.

Based on the Formula, whenever five thousand (5,000) Preferred Shares have been granted to **Employee**, **Employee** shall be eligible to have "Tenure," and as such a "Tenured Member," shall have the right to vote, with other Tenured Members, on the admission of new Tenured Members. An **Employee** has Tenure and becomes a Tenured Member whenever two-thirds (2/3) of all current Tenured Members vote to grant Tenure to **Employee**, and the permission of a majority in ownership of the common stock of Mirabilis vote to allow **Employee** to be granted Tenure also. Tenured Members shall have such other rights and privileges as Mirabilis shall determine from time to time. The maximum number of Preferred Shares that **Employee** may earn shall be five thousand (5,000).

Tenured Members shall select the boards of directors of Mirabilis' various affiliated companies that **Employee** shall serve on, and **Employee** shall thereby be entitled to receive the additional compensation listed in the Formula for such services.

All voting rights granted under this Agreement shall be subject to Mirabilis' Shareholders Agreement.

Initials _____  
Employer

Common Paymaster Corp Employment Agreement – Paul Glover  
Page 12 of 15

Initials _____  
Employee

(Ver H05)

# EMPLOYEE COMPENSATION RANKS, TITLES & COMPENSATION

*Vice President* – Officer performing primarily professional and advisory services for clients.

*Administrative Vice President* – Officer in a regional office who performs primarily management functions instead of client services.

*Senior Vice President* – Officer in charge of client selection and case assignments in a geographic region.

*Senior Regional Officer (SRO)* – Professional in charge of managing regional organization operations by directing and coordinating activities consistent with established goals, objectives, and policies.

*Executive Vice President* – Officer at corporate office performing primarily management functions, such as Business Development, Operations, Corporate Relations, Controller, Treasurer, Corporate/General Counsel, and Secretary.

| Classification | Hourly Rate | Base Compensation | Directors Fee (Incentive Compensation) |
|---|---|---|---|
| 1. General Analyst | 75 | 48,000 | |
| 2. Senior Analyst | 80 | 54,000 | -- |
| 3. Expert Analyst | 90 | 60,000 | 25% |
| 4. General Advisor | 100 | 66,000 | 25% |
| 5. Senior Advisor | 125 | 72,000 | 33.33% |
| 6. Expert Advisor | 150 | 84,000 | 33.33% |
| 7. Expert Advisor II | 150 | 90,000 | 33.33% |
| 8. General Strategist | 200 | 96,000 | 40% |
| 9. General Strategist II | 200 | 108,000 | 40% |
| 10. Senior Strategist | 250 | 120,000 | 40% |
| 11. Senior Strategist II | 250 | 132,000 | 40% |
| 12. Senior Strategist III | 250 | 144,000 | 40% |
| 13. Expert Strategist | 300 | 150,000 | 40% |
| 14. Master Strategist | 400 | 180,000 | 50% |
| 15. Grand Strategist | 300 | 240,000 | 50% |
| 16. Grand Strategist II | 500 | 300,000 | 50% |
| 17. Nexial Strategist | ∞ | ∞ | N/A |

1.   All professional staff are also entitled to receive referral, sourcing and other fees or commissions on work referred to the firm as if professional was an independent representative.

2.   All professionals except General Analyst and Senior Analyst are eligible for selection by Mirabilis' "Tenured Members" as directors for which additional compensation is paid.

3.   All professionals shall receive performance bonus should personal billings exceed 3 times base compensation.

4.   All professionals shall receive retention consideration as set forth in retention program.

5.   All professionals shall be eligible for discretionary bonuses awarded by Employer's BOD or designate.

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 13 of 15

Initials _____
Employee

(Ver H05)

# Schedule "C-1b"
## SALES COMPENSATION RANKS, TITLES & COMPENSATION

**_Sales Regional Manager_** – Officer, with sales supervising and management experience, who shall control and direct Sales Managers, Sales Specialists and Sales Representatives in a geographic region.

**_Sales Manager_** – Officer in a regional office who performs primarily general sales management functions over Sales Specialists and Sales Representatives instead of client services.

**_Sales Specialist_** – Individual who has formal training in selling Mirabilis', and its affiliates', products and services.

**_Sales Representative_** – Individual who is designated to sell a specific product and/or service for the benefit of Mirabilis and its affiliates.

| | Classification | Hourly Rate | Base Compensation |
|---|---|---|---|
| 1. | Sales Representative | 35.00 | 24,000 |
| 2. | Sales Specialist | 50.00 | 36,000 |
| 3. | Sales Manager | 75.00 | 48,000 |
| 4. | Sales Regional Manager | 125.00 | 72,000 |

1. All sales professional staff are also entitled to receive referral, sourcing and other fees or commissions on work referred to the firm as if sales professional was an independent representative.

2. Sales Regional Manager is eligible for selection by Mirabilis' "Tenured Members" as directors for which additional compensation is paid.

3. All sales professionals shall receive retention consideration as set forth in retention program.

4. All sales professionals shall be eligible for discretionary bonuses awarded by **Employer's** Board BOD or designate.

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 14 of 15

Initials _____
Employee

(Ver H05)

# Schedule "C-2"
## PREFERRED STOCK SCHEDULE

| Staff | Annual Shares | Cumulative Shares |
|---|---|---|
| Year 1 | - | - |
| Year 2 | 50 | 50 |
| Year 3 | 50 | 100 |
| Year 4 | 100 | 200 |
| Year 5 | 100 | 300 |
| Year 6 | 100 | 400 |
| Year 7 | 150 | 550 |
| Year 8 | 150 | 700 |
| Year 9 | 150 | 850 |
| Year 10 | 150 | 1,000 |
| Year 11 | 100 | 1,100 |
| Year 12 | 100 | 1,200 |
| Year 13 | 100 | 1,300 |
| Year 14 | 100 | 1,400 |
| Year 15 | 100 | 1,500 |
| Year 16 | 100 | 1,600 |
| Year 17 | 100 | 1,700 |
| Year 18 | 100 | 1,800 |
| Year 19 | 100 | 1,900 |
| Year 20 | 100 | 2,000 |

| Executive | Annual Shares | Cumulative Shares |
|---|---|---|
| Year 1 | - | - |
| Year 2 | 100 | 100 |
| Year 3 | 200 | 300 |
| Year 4 | 300 | 600 |
| Year 5 | 400 | 1,000 |
| Year 6 | 200 | 1,200 |
| Year 7 | 200 | 1,400 |
| Year 8 | 200 | 1,600 |
| Year 9 | 200 | 1,800 |
| Year 10 | 200 | 2,000 |
| Year 11 | 200 | 2,200 |
| Year 12 | 200 | 2,400 |
| Year 13 | 200 | 2,600 |
| Year 14 | 200 | 2,800 |
| Year 15 | 200 | 3,000 |
| Year 16 | 200 | 3,200 |
| Year 17 | 200 | 3,400 |
| Year 18 | 200 | 3,600 |
| Year 19 | 200 | 3,800 |
| Year 20 | 200 | 4,000 |
| Year 21 | 200 | 4,200 |
| Year 22 | 200 | 4,400 |
| Year 23 | 200 | 4,600 |
| Year 24 | 200 | 4,800 |
| Year 25 | 200 | 5,000 |

Initials _____ Employer

Initials _____ Employee

(Ver H05)

# Common Paymaster Corporation

20 North Orange Avenue, Suite 1400
Orlando, Florida 32801
407.318.8000 (telephone) / 407.426.9191 (facsimile)

January 5, 2006

Paul Glover
1312 Winter Springs Boulevard
Winter Springs, Florida 32708

Re:    Exception Letter to Employment Agreement with Common Paymaster Corporation

Dear Mr. Glover:

In connection with your Employment Agreement with Common Paymaster Corporation ("CPC"), January 30, 2006 (the "Employment Agreement"), Section 3, Compensation and Benefits, CPC shall pay you a guaranteed quarterly bonus in the total sum of Ninety Thousand Dollars ($90,000) per quarter. You shall receive the first bonus no later than the last day of your first year of employment, and all bonuses thereafter shall be payable to you annually.

Additionally, according to Section 3(c) of the Employment Agreement, Employee shall be entitled to ten (10) days paid vacation time, plus five (5) paid holiday vacation days annually. Employee shall be entitled to health and dental insurance paid by the Employer, as well as life insurance equal to twice the amount of Employee's annual salary. Employee shall be entitled to a 401K matching deposit equal to two percent (2%) of the Employee's deposit, paid annually.

Section 4(c) of the Employment Agreement shall be amended as follows:

"(c)    Except for termination of **Employee** due to breaches of paragraphs 4(a)(1) and 4(a)(7) above, if **Employer** terminates this Agreement for any reason, including for cause, or as a result of a merger, acquisition, sale or "Change in Control" (as defined below in paragraph 4(e)), in addition to the Compensation up until date of termination, **Employee** shall be entitled to a lump sum severance payment within thirty (30) days of the termination date of employment. This severance payment shall be an amount equal to six (6) months' base."

Section 8(a) of the Employment Agreement shall be amended as follows:

"(a)    **Employee** agrees that while working for the **Employer** and for a period of eighteen months (18) immediately following the termination of employment for any reason whatsoever or no reason at all, **Employee** shall not provide, directly or indirectly, services similar to those **Employee** is providing to **Employer** under this Agreement, to any person or entity that provides services substantially similar to those of **Employer**."

If the above meets with your understanding and agreement, please acknowledge by signing in the space provided below. This letter may be signed in counterpart and signatures may be transmitted by facsimile. The signature of any party thereon shall be considered as an original

signature and the document transmitted shall be considered to have the same binding legal effect as if it were the signed original.

Very truly yours,

Martin C. Flynn, Jr.
President

Agreed and Accepted by:

Paul Glover



EXHIBIT 3

MIRABILIS VENTURES, INC., a Nevada Corporation

NON-ASSESSABLE, NO PAR VALUE

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE FEDERAL SECURITIES LAWS OR THE SECURITIES LAWS OF ANY STATE, AND SUCH SECURITIES MAY ONLY BE SOLD IN COMPLIANCE WITH SUCH LAWS AND ANY OTHER APPLICABLE LAWS. THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO, AND IN CERTAIN CASES PROHIBITED BY, THE TERMS AND CONDITIONS OF A CERTAIN SHAREHOLDERS AGREEMENT BY AND AMONG THE SHAREHOLDERS OF THE CORPORATION AND THE CORPORATION. COPIES OF SUCH SHAREHOLDERS' AGREEMENT MAYBE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION

SHARES 2750

NUMBER 0028

*This Certifies that* _____ Paul Glover _____ is the

registered holder of _____ 2750 green _____ Shares

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

*In Witness Whereof,* the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed

this _____ 2nd _____ day of _____ August _____ A.D. 20 06

Frank Hailstones, President

Richard E. Berman, Secretary